**United States District Court**
**Southern District of Texas**
**Galveston Division**

| | | |
|---|---|---|
| **Jana Reed, Individually and** | § | |
| **as Representative of the Estate of** | § | |
| **Christopher Reed and on behalf of** | § | |
| **A.R.(a minor); Logan Reed, and Chase** | § | |
| **Reed** | § | |
| *Plaintiffs* | § | **Civil Action No. 3:19-CV-00238** |
| | § | |
| **versus** | § | **Rule 9(H)** |
| | § | |
| | § | |
| **Maersk Line, Limited** | § | |
| *In Personam Defendant*; | § | |
| *M.V. Maersk Idaho* | § | |
| *In Rem Defendant.* | § | |

## PLAINTIFFS' POST-TRIAL BRIEF

To the Honorable Judge Jeffrey Vincent Brown,

Plaintiffs now submit their Post-Trial Brief on this 24th day of June, 2021.

Respectfully submitted,

*/s/ Paxton N. Crew*
**Paxton N. Crew**
**ATTORNEY-IN-CHARGE FOR**
**PLAINTIFFS**
**SDTX 859147**
**TBA No. 24058720**
**303 E. Main, Suite 260**
**League City, Texas 77573**
**Paxton@thecrewlawfirm.com**
**Telephone: (713) 955-0909**
**Facsimile:  (409) 908-4050**

**And**

*/s/ John W. Stevenson, Jr.*
**JOHN W. STEVENSON, JR.**
**SDTX: 3992**
**State Bar No. 19196050**
**Stevenson & Murray**
**24 Greenway Plaza, Suite 750**
**Houston, Texas 77046**
**jstevenson@stevensonmurray.com**
**Telephone:  (713) 622-3223**
**Facsimile:  (713) 622-3224**

## CERTIFICATE OF SERVICE

I, Paxton N. Crew, do certify that a copy of Plaintiffs' Post-Trial Brief and attachments was served on Defendants by the Southern District of Texas' Electronic Case Filing System on this 24th day of June, 2021.

*/s/ Paxton N. Crew*
**Paxton N. Crew**

# TABLE OF CONTENTS

I.      **BACKGROUND** ............................................................................................. 3

II.     **FACTUAL SUPPORT** .................................................................................. 5

     a.  The Vessels ............................................................................................ 5

          i.  The *M.V. Maersk Idaho* ............................................................... 5
          ii.  The Reed's 20' SeaFox fishing boat ……………………...……………5

     b.  The events leading up to the incident ................................................... 6

     c.  The Crew of the *M.V. Maersk Idaho* ……………………...………..…11

          i.  Captain Christopher McLoud, Master of the *M.V. Maersk Idaho* ............ 11
          ii.  David Falkinson, Second Officer ................................................. 13

     d.  The Area Where the *Maersk Idaho's* wake ejected Chris Reed from his Boat ..................................................................................................... 14

     e.  The Voyage of the *M.V. Maersk Idaho* ............................................. 14

          i.  The *M.V. Maersk Idaho's* Passage Plan ..................................... 15
          ii.  The *M.V. Maersk Idaho's* Safety Management System ............................. 15

     f.  The Navigation of the *M.V. Maersk Idaho* ...................................... 16

     g.  Maersk demonstrated a complete lack of credibility and candor ................... 17

          i.  Maersk's Counsel misled the Court on availability of witnesses .............. 17
          ii.  Cherry picked medical records ................................................... 17

III.    **LEGAL SUPPORT** .................................................................................. 20

     a.  Authorities ........................................................................................... 20

     b.  Maersk's violation of 33 CFR § 164.11 invokes the Rule of the *Pennsylvania* and establishes a *prima facie* cause of negligence against Maersk ........................................................................................ 22

c.  This incident was Foreseeable and Preventable by Maersk ............................ 25

　　i.   The *Maersk Idaho* is liable *in rem* for the actions of the pilot ................. 26
　　ii.  The Officers of the *Maersk Idaho* violated the Voyage Plan ..................... 28
　　iii. The Officers of the *Maersk Idaho* violated Maersk's Safety
　　　　Management System ...................................................................... 29
　　iv.  Maersk violated the safe speed rule ......................................................... 30
　　v.   Maersk violated the lookout rule ............................................................. 30

d.  The Maersk retained experts have credibility problems and
　　contradict each other ....................................................................................... 31

　　i.   Dr. Yue's testimony is not credible ....................................................... 31
　　ii.  Maersk's small boating expert – Thomas Danti - was
　　　　incredible, but not in a good way ......................................................... 34

e.  The Reeds were not contributorily negligent .................................................. 37

　　i.   Maritime Comparative Fault Scheme applies here ..................................... 37
　　ii.  Dr. Sanders' Testimony – The Reeds were not negligent ......................... 37
　　iii. The Reeds were *in Extremis* ................................................................. 39
　　iv.  No proof a life jacket would have saved Chris Reed ............................... 40

　　　　1.  No affirmative duty for Chris Reed to wear a life jacket .................... 40
　　　　2.  Statistics from U.S. Coast Guard show that 57 people drowned
　　　　　　while wearing life jacket in 2017 ....................................................... 41

　　v.   No proof throwable would have saved Chris Reed ..................................... 42

　　　　1.  Pia's uncontested testimony on mechanism of drowning shows
　　　　　　that Chris Reed could not have self-rescued even if Jana had
　　　　　　made a good throw with the throwable ................................................. 43
　　　　2.  No evidence Jana Reed would have made a proper
　　　　　　throw with the throwable .................................................................. 43

　　vi.  Chris Reed was not impaired by THC; Maersk failed to
　　　　meet its burden of proof .......................................................................... 44

　　　　1.  The presence of THC in Chris Reed's liver does not equate
　　　　　　to impairment ................................................................................... 45
　　　　2.  Dr. Jones' testimony ........................................................................ 46

       3.  Dr. Wimbish's opinion is not reliable or credible ................................. 50

   f.  Maersk is liable to the Reeds ........................................................... 54

**IV.   THE REED FAMILY DESERVES FULL AND FAIR DAMAGES FOR THEIR LOSS .................................................................. 55**

   a.  Texas law applies to damages ...................................................... 56

   b.  Economic damages ..................................................................... 57

   c.  Non-Pecuniary Losses:  Wrongful Death Beneficiaries ........................ 58

      i.     Loss of Companionship and Society ................................. 59

         1.  Jana Reed – Chris Reed's widow ................................. 60
         2.  Reed Children – Alexis, Chase and Logan ................................. 62

      ii.    Pain and suffering and mental anguish  ........................... 67

         1.  Jana Reed – Chris Reed's widow ................................. 68
         2.  Reed children – Alexis, Chase and Logan ................................. 69

   d.  Jana Reed's Bystander Claim ...................................................... 71

   e.  Non-economic damages – the Estate of Chris Reed – pre-death pain and suffering ........................................................ 73

   f.  Prejudgment and post judgment interest .................................... 78

   g.  Conclusion on Damages ............................................................. 79

**V.   Maersk's trial conduct warrants sanctions ....................................... 80**

**United States District Court**
**Southern District of Texas**
**Galveston Division**

| | | |
|---|---|---|
| **Jana Reed, Individually and** | § | |
| **as Representative of the Estate of** | § | |
| **Christopher Reed and on behalf of** | § | |
| **A.R.(a minor); Logan Reed, and Chase** | § | |
| **Reed** | § | |
| *Plaintiffs* | § | **Civil Action No. 3:19-CV-00238** |
| | § | |
| **versus** | § | **Rule 9(H)** |
| | § | |
| | § | |
| **Maersk Line, Limited** | § | |
| *In Personam Defendant*; | § | |
| *M.V. Maersk Idaho* | § | |
| *In Rem Defendant.* | § | |

## PLAINTIFFS' POST-TRIAL BRIEF

This is a maritime wrongful death case seeking damages under Texas law.  This case is simple.  Maersk should have slowed down and minded its wake.  Had Maersk done so, this accident almost certainly would not have occurred.  Instead, Maersk presented a fractured theory of the case—a spider web of internal inconsistencies.  Maersk offered only three witnesses live at trial (none of whom were Maersk employees) with three disparate opinions:  1) Houston Pilot Marcus Maher who testified that the wake of the Maersk Idaho was only 1-2 feet, and no more than 3 in the channel; 2) MIT Professor Dr. Dick Yue, who testified that the mathematical formula he used revealed a wake size of 10 inches in the area where Chris Reed was killed, and 3) recreational boating expert Thomas Danti who testified that the Reed's should have been extremely careful and taken numerous precautions and undergone significant training to be able to navigate through an unknown

1

sized wake. Thus, Maersk wants it both ways.  On the one hand, they say they created little to no wake and therefore they created no hazard.  On the other hand, they also say the area and the wake they created was so hazardous the Reeds should have stayed away at all costs. The *Maersk Idaho* was crewed by professional mariners who had undergone countless hours of training in order to reach their positions, and yet, Maersk faults the Reeds (ordinary recreational boaters) for failing to prevent them from killing Chris Reed.  The conclusion is simple and Maersk knows it: slow down.

Maersk was negligent because the *Maersk Idaho*'s officers violated the Maersk Safety Management System (SMS), their passage plan, Inland Rule 5 (lookout), Inland Rule 6 (safe speed), and 33 CFR § 164.11 by failing to set a safe speed that would minimize damage caused by the *Maersk Idaho*'s wake.  The captain of the *Maersk Idaho* admitted that the ship's wake can create a danger to small craft, so this incident was foreseeable to Maersk.  The vessel proceeded at an excessive speed, created an excessive wake, with full knowledge of the risk it posed to small craft like the one the Reed's were operating.

As a result of Maersk's conduct, League City and Galveston County lost a hero, community leader, and most importantly a loving father and husband.  Chris Reed was well respected and loved in his community. He is sorely missed by his three children, Alexis, Chase, and Logan. Jana had to witness the unspeakable horror of watching her husband of almost 30 years drown before her eyes. No family, recreational boater, or fisherman in Galveston Bay should have to suffer the same fate as Chris Reed and his family. Maersk should slow down.

## I.    BACKGROUND

1.      This case arises out of the June 7, 2019 death of Charles Christopher Reed ("Chris Reed" or "Mr. Reed").  Mr. Reed was ejected from his boat by the wake generated by the *M.V. Maersk Idaho*.  *In Rem* Defendant *M.V. Maersk Idaho* is owned and operated by *In Personam* Defendant Maersk Line, Limited.  Collectively, these defendants are referred to herein as "Maersk" or "Defendants."

2.      Chris Reed was a husband, and father of three children, Logan, Chase and Alexis Reed.  He and Jana Reed had been married almost thirty years.   Chris served in the army as a paratrooper and military police officer, and after being honorably discharged, he moved to Texas to find a job as a police officer.  Jana followed him from their childhood home in Indiana and they were married in 1989.  Chris was hired by the League City, Texas police force in 1990.  Trial Tr. Day 2-169.  Chris was promoted rapidly from patrolman to motorcycle detail, to detective to sergeant and ultimately to assistant police chief.  Trial Tr. Day 2-170.  He also attended the prestigious FBI National Academy for police chiefs.  Trial Tr. Day 2-170.  During his time on the League City police force, he was shot and wounded in the line of duty.  *Id.*   Chris was very community minded, and participated in National Night Out (Plaintiffs' Exh. 28) and donated expired bullet proof vests to police officers in Ghana.  *See* Plaintiffs' Exh. 24.

3.      While serving as assistant police chief, Chris was asked by the Mayor of League City to become the city manager.  Trial Tr. Day 2-177.  Chris accepted and served approximately 5 years, and then took on the job of City Manager for Nassau Bay, Texas. Trial Tr. Day 2-179.  Chris served in that role for two years until he decided he was ready

to slow down and work more in a consulting role.  Chris then was asked to locate a candidate for Police Chief of Kemah.  Kemah decided they liked Chris Reed better than the candidates and so they offered him the job.  After he refused three or four times he finally accepted.  Trial Tr. Day 2-180.

4.      Chris was also devoted to community service.  He served on Communities in Schools in the Clear Lake area, raised funds for Hope Village, and served as a member of the Clear Creek Independent School Board.  Trial Tr. Day 2-181.

5.      Following Chris's death, there was an outpouring of support and letters of condolences from local, state and national figures, including the President, the Attorney General, Governor Abbott and numerous U.S. and State representatives.  Trial Tr. Day 2-207; Plaintiffs' Exhs. 1, 2, 6.

6.      On July 26, 2019, Plaintiffs Jana Reed, individually and on behalf of the estate of Charles Christopher Reed, Logan Reed, Chase Reed and Alexis Reed filed their original complaint alleging that the *M.V. Maersk Idaho* and her crew were negligent under the General Maritime Law and seeking damages under Texas's Wrongful Death and Survival Statutes.  Specifically, the Reeds alleged that Maersk was negligent for failing to travel at a safe speed and creating an excessive wake, in violation of 33 C.F.R. § 164.11.  *See* Plaintiffs' Original Complaint at Court's Doc. No. 1.   Plaintiffs amended twice prior to Defendants filing their answer, first to correct a factual error, and second to add an *In Rem* claim against the *Maersk Idaho* for any faults of the state compulsory pilot, under the venerable rule of the *China*.  74 U.S. (7 Wall) 53 (1868).

## II.    FACTUAL SUPPORT

### a.  The Vessels

#### i.  The *M.V. Maersk Idaho.*

7.      The *M/V Maersk Idaho* is an American Flagged container ship.   She is 958 feet

long and approximately 106 feet on her beam.   On June 7, 2019, she had 33 feet of draft

and displaced approximately 53,000 metric tons of water.  *See* Plaintiffs' Exh. 63,[1] Appx.

2.



#### ii.  The Reed's 20' SeaFox fishing boat.

8.      The Reed's boat was a modest fishing boat. It was only 20' long and weighed only

2500 pounds.  A photograph of the Reed's fishing boat is attached below.

---

[1] Plaintiffs' commonly used exhibits have been reproduced as an Appendix of Exhibits, and are labeled herein as Appx. 1, etc.



*See* Defendant's Exh. 83.

**b. The Events leading up to the incident.**

9.      Jana is a kindergarten teacher at Bauerschlag Elementary School in League City.

June 7, 2019 was Jana's first Friday off of the Summer, and Chris only worked half a day

on Fridays.  Trial Tr. Day 2-191.  Chris attended a Kemah City Council Meeting and

returned home to meet Jana. Trial Tr. Day 2-219.  Jana and Chris loaded the boat with

drinks and snacks and then trailered the boat to the Clear Lake boat ramp where they

launched it.  Jana had only been on the boat with Chris a few times, and testified that she

felt the conditions were very calm, and that she disliked rough and choppy conditions, and

had it been rough, she would not have gone fishing with him that day.  Trial Tr. Day 2-

195.  Jana testified that she had no reason to think they would encounter any large waves

in Galveston Bay.  Trial Tr. Day 2-196.

6

10.     The Reeds proceeded to Moses Lake which is on the West side of Galveston Bay, in the vicinity of San Leon, Texas, just North of Dickinson Bayou.  Trial Tr. Day 2-195. Chris fished from a small seat on the bow of the boat, while Jana read magazines. Trial Tr. Day 2-195; *see also* Plaintiffs' Exh. 108.



11.     The fish were not biting at Moses Lake, so Chris decided he would try and go to the jetties, a location in Galveston Bay he had never been to, and which marks the entrance of the Houston Ship Channel into Galveston Bay.    At approximately 3:28, the Reeds left Moses Lake, and their boat's Raymarine Chart Plotter began tracking their exact positions as they proceeded through Galveston Bay.  Trial Tr. Day 2-20, Plaintiffs' Exh. 115.

12.     The Reeds proceeded on an easterly course into Galveston Bay, and crossed over the Houston Ship Channel two to three miles north of the *Maersk Idaho.* Trial Tr. Day 2-13.  At this point, the Reeds' boat was not specifically identified by the lookout posted on the bow of the *Maersk Idaho*, nor were any other recreational boats that may have been in the vicinity.   It should also be noted, and it is uncontested, that at no time during any part

7

of the Reeds' time in Galveston Bay was the Reed's boat at risk of collision with the *Maersk Idaho*.

14.    At approximately 3:43, Chris turned the boat in a southerly direction, and then back towards the west.  *See* Plaintiffs' Exh. 117a, Appx. 3.   At this time, the Reed's boat would have been on an intercept to cross just ahead of the *Maersk Idaho*.   Trial Tr. Day 2-22. Chris then altered his course to cross the Houston Ship Channel behind the *Maersk Idaho*. Trial Tr. Day 2-25.  Shortly after this course change, Jana testified that she recalled seeing the *Maersk Idaho* and that she vividly recalled its "obnoxious blue color" and that its name appeared to make no phonetic sense.  Trial Tr. Day 2-197.

15.    Very soon after this, Jana testified that she recalled realizing seeing a "wall of water" that was higher than their boat.   Trial Tr. Day 2-197-98.  Jana testified that they went up and over these waves and they were like huge rolling hills.  *Id.*  After this, Jana told Chris that she was scared, and he reassured her that they would be ok.

16.    The Reed's boat then passed behind the *Maersk Idaho* at 3:46 at a distance of approximately half a mile away.  Plaintiffs' Exh. 119a.   Chris then turned the boat on a path that would lead them back towards where they had come from.  Plaintiffs' Exh. 119a.

17.    As the Reed's boat headed back in the general direction towards Kemah, at approximately 3:48-3:49, they encountered the wakes of the *Maersk Idaho* on the west side of the Houston Ship Channel.   *See* Plaintiffs' Exh. 117; Trial Tr. Day 2-28.   During this time, the Reed's vessel was slowing as it approached the wake.  *Id.*  The wakes were magnified as they passed into the shallower spoil banks alongside the Houston Ship Channel, creating steeper, higher waves.  Trial Tr. Day 2-42.

18.     As shown on Plaintiffs' Exhibit 120, the water depth in this area transitioned from 45', to 7' to 5' or less.



*See* Plaintiffs' Exh. 120, APPX. 4.  Captain Jay Rivera, a retired ship pilot and Plaintiffs' liability expert, opined that the wakes were very likely six to eight feet when the Reed's encountered the wakes, and that they would have risen up in front of the Reed's on a steep angle. Trial Tr. Day 3-57.

Before becoming a pilot, Captain Rivera sailed as a Master Mariner on American flagged merchant marine vessels, and made hundreds of transits through Galveston Bay. Trial Tr. Day 3-8-9, 60.  Captain Rivera now acts as a consultant in both litigation and commercial feasibility studies for bringing the largest ships possible into port.  Trial Tr. Day 3-11-12.  Captain Rivera also testified that it was common knowledge within the piloting community that large ships cause large waves.  Trial Tr. Day 3-59.  There was also testimony that the angle of the wakes as they passed over this spoil bank were much more hazardous than the wakes the Reeds had previously transitioned over.  Trial Tr. Day 2-42.

At 3:49 p.m., the Reed's Navionics app recorded an elevation change on their boat of 2 meters, or 6.5 feet.  Trial Tr. Day 1-43.  At that time, the Reeds' boat was travelling at less than 20 miles per hour.  Trial Tr. Day 2-36.

19.     Jana Reed testified that when they encountered the wakes on the west side of the Houston Ship Channel, they appeared to not be as big as the previous wakes:

> . . .but they were really choppy and they -- when we hit them, it sounded like we hit concrete. Like, I can still hear the slapping. And it would jar us. And we hit the second one of those that jarred us, and then our boat kind of turned sideways. And then we -- another one hit us, and then the boat like -- I thought it was going to capsize. It tipped sideways; and then that's when he fell off, when it hit.

Trial Tr. Day 2-199.  The testimony at trial was uncontroverted that the incident occurred at approximately 3:49 and that is approximately the time when the Reed's boat encountered the wake of the *Maersk Idaho*.  Trial Tr. Day 1-256-57.

20.     After Chris was ejected from the boat, Jana attempted to regain control of the boat and maneuver it close enough to him to attempt a rescue.  Jana located Chris in the water and put the boat in reverse in an attempt to get close enough to him.  When she felt she was within 8-10 feet, she threw him a polypropylene dock line.  Trial Tr. Day 2-200.  Chris called out, "Jana Hurry! I can't hold on!" and Jana responded, "Just grab the rope!"  Trial Tr. Day 2-200.  Chris was unable to grab the rope, and almost immediately, another wave took Chris, and all Jana could see was one of his shoes floating.  Trial Tr. Day 2-200.  Jana recalled, ". . . he never one time ever lifted his arms above water. He was never even, like, splashing. All I ever could see was from his chin up."  Trial Tr. Day 2-200.  Jana then

called 911, and the Texas City Fire Department rescue arrived first, followed by the U.S. Coast Guard. Trial Tr. Day 2-201.

### c. The Crew of the *M.V. Maersk Idaho*

#### i. Captain Christopher McLoud, Master of the *M.V. Maersk Idaho*

21.    Captain McLoud appeared at trial only by videotaped deposition testimony offered by Plaintiffs.  Defendants merely offered Captain McLoud's deposition excerpts and errata sheets.  Captain McLoud was the officer responsible for the safe navigation of the *Maersk Idaho* on June 7, 2019. Trial Tr. Day 1-70.   Captain McLoud testified that he met with Houston Pilot Marcus Maher and conducted a master/pilot exchange on board the *Maersk Idaho* prior to its entrance into the Houston Ship Channel on June 7, 2019, but according to Maher, they did not discuss the effects of the vessel's speed on its wake size. Trial Tr. Day 5-33. Maersk's Safety Management System (SMS) required Captain McLoud to do so.  *See* Plaintiffs' Exh. 86, Appx. 5.

22.    Further, Captain McLoud acknowledged that even though Captain Maher was aboard to provide navigational advice, he was not relieved of his obligations for the safety of the vessel.  Trial Tr. Day 1-87.  Captain McLoud further testified that he did not consider the Maersk SMS to control what he did on the ship, saying, "Those are not my documents, they are Maersk's documents." ….. "We do what we do on the ship.")  Trial Tr. Day 1-94.

23.    Most troubling is that Captain McLoud did not know or understand the relationship between a ship's speed and the wake it produced:

> **Q.** So, getting back to this, is the speed that is to be set, does it have to consider by law the damage that might be caused by the vessel's wake? Is that one of the factors?

**A.** No, not necessarily. I don't -- speed may -- may not have anything to do with wake. I don't -- I don't know if that could be -- speed is not even in there. It's not -- you are just saying by the -- by the vessel's wake. You're not saying -- you were saying speed. So I don't -- I don't know the relationship between speed and wake.

**Q. Are you telling -- you don't -- you don't know the relationship between speed of the vessel and the wake?**

**A. No, I don't.**

Trial Tr. Day 1-77, (emphasis added).  This fundamental lack of knowledge is incredible because Maersk placed Captain McLoud in charge of the safety of a ship and its cargo that could easily be worth hundreds of millions of dollars.  But for the purposes of this case, it is astonishing.  Captain McLoud was required by law to set the speed of the vessel with consideration of the damage the vessel's wake might cause, but had no idea about the relationship between a ship's speed and the wake it produced.  *See* C.F.R. § 164.11.  In other words, this federal regulation was violated every time Captain McLoud conducted a master pilot exchange.  Maersk's SMS likewise required Captain McLoud to discuss with Captain Maher areas which would require special care and reduced speed along the route.  *See* Plaintiffs' Exh. 86, APPX. 5.  But Captain Maher testified that they had no discussion about any of these areas other than Captain McLoud advised that the vessel handled well at 70 rpms, which correlates to a speed of approximately 15 knots.  Trial Tr. Day 5-32,33; *see also,* Plaintiffs' Exh. 63, APPX. 2.  This speed was in excess of Maersk's own voyage plan for these segments along the route. *See* Plaintiffs' Exh. 83, pg. 2, waypoints 48-49, APPX. 6.

24.    Captain McLoud has never reported this incident to the U.S. Coast Guard, nor has Maersk.  Neither Captain McLoud nor Maersk have ever done an investigation as is

required by their own Safety Management System because as Captain McLoud put it, "no incident occurred."  Trial Tr. Day 1-126.

25.     Captain McLoud also testified that there were rumors started by Houston Pilots aboard his vessel on the outbound June 9, 2019 transit that the wife had killed Chris Reed. Trial Tr. Day 1-130.  The pilot who was aboard the *Maersk Idaho* on the outbound transit was Captain Clint Winegar.   *See* Plaintiffs' Exh. 64.  Captain Winegar was the same Houston pilot who exchanged text messages with Captain Marcus Maher on the day after the incident, asking the same rumor mongering and slanderous question, "[d] o you think the wife killed him?" Trial Tr. Day 5-143-146.

### ii.  David Falkinson, Second Officer

26.     Incredibly, Falkinson, the second officer aboard the *Maersk Idaho* had not even heard about the drowning death of Chris Reed and the allegations concerning the wake of the Idaho until Plaintiffs' counsel advised him in his deposition.  Falkinson Deposition, 11:5-19.  Mr. Falkinson's deposition was taken on July 27, 2020, over a year after Reed's death, and unmistakably proves Maersk conducted no investigation into this tragedy even after the filing of the lawsuit.

27.     As the second officer he was tasked with preparing the passage plan for this voyage. Falkinson Deposition, 22:16-19.  Maersk provided no training to Mr. Falkinson on how to even prepare a passage plan.  *Id.* at 23:3-6.  Falkinson admits that proximity to shallow areas is a factor when preparing a passage plan and that one should consider the damage that could be caused by the vessel's wake when preparing the passage plan. Falkinson

Deposition, pp. 64:12-65:6;103:7-20.  In Falkinson's experience, the best way to minimize a wake would be to slow down.  *Id.* 75:1-9.

28.     The maximum speed in Falkinson's passage plan was 14 knots.  *Id.* at 129:7-131:2. The evidence is undisputed that the Idaho was traveling 15 knots when it generated the wake which caused Reed's ejection from his boat in the areas of buoys 31 and 33.  Here, however, Captain McLoud recommended the speed of 70 rpms to the pilot.  Trial Tr. Day 5-32-33.  Accordingly, the vessel was traveling at a speed which violated its own passage plan and that recommendation was made by Captain McLoud.

### d.  The Area Where the *Maersk Idaho*'s wake ejected Chris Reed from his boat

29.     Plaintiffs played the admission of Defense Expert Captain Marc Fazioli during their opening where he admitted the wake of the *Maersk Idaho* caused this incident. Trial Tr. Day 1-30.  Defendants later withdrew Captain Fazioli as an expert.  It is undisputed that the area shown in Plaintiffs' Exhibit 120 is the area where Chris Reed was ejected.  *See* Plaintiffs' Exh. 120, APPX. 4.  The area the Reed's encountered the *Maersk Idaho*'s port side wake was over a spoil bank between Houston Ship Channel buoys 31 and 33 on the west side of the Houston Ship Channel.

### e.  The Voyage of the *M.V. Maersk Idaho*

### i.  The *M.V. Maersk Idaho's* Passage Plan

30.     Maersk was required by law to prepare what is known as a voyage plan or as Maersk refers to it, a passage plan.  *See* Annex to IMO Resolution A.893(21).  *See* Plaintiffs' Exh. 77, APPX. 1.  Maersk's Passage Plan for this particular transit had a series of waypoints

which included a maximum speed of 14 knots.  *See* Plaintiffs' Exh. 83, APPX. 6.  Captain

McLoud had a standing order for the transit in question that required the bridge team to

mark on the chart areas where the speed should be reduced to enhance safe navigation.  *See*

Plaintiffs' Exh 80.  There were no such marks on the vessel's charts, in fact, Maersk never

produced any of the caution notes at trial (or at any time) that should have been made on

the vessel's Electronic Chart Display Information System (ECDIS).

### ii.  The M.V. *Maersk Idaho's* Safety Management System

31.    Maersk was required by law to create a SMS that governs the operation of the

*Maersk Idaho*.  *See* 46 C.F.R. §§ 3201-3205.  Among other things, an SMS must contain:

> (1) a safety and environmental protection policy;
> (2) instructions and procedures to ensure safe operation of those
> vessels and protection of the environment in compliance with
> international and United States law;
> (3) defined levels of authority and lines of communications between,
> and among, personnel on shore and on the vessel;
> (4) procedures for reporting accidents and nonconformities with this
> chapter;
> (5) procedures for preparing for and responding to emergency
> situations; and
> (6) procedures for internal audits and management reviews of the
> system.

*See* 33 C.F.R. § 3202(a)(1-6).  It is a violation of 46 C.F.R. § 3204(c) to operate the *Maersk*

*Idaho* without a Safety Management Certificate and Document of Compliance.  46 C.F.R.

§ 3205.  Maersk had a SMS for the *Maersk Idaho*, but as discussed above, Captain McLoud

was oblivious to it.  Captain McLoud recommended a speed in excess of the voyage plan,

and apparently never took into consideration the effect of the *Maersk Idaho*'s speed on the

wake it would produce.  Trial Tr. Day 1-77; Day 5-32-33.

15

### f.  The Navigation of the *Maersk Idaho*

32.     The *Maersk Idaho* was crewed by professional mariners who had all received United States Coast Guard licenses and officer training.  It was required to follow a number of laws and rules dictating its safe navigation and management.  The Reeds, on the other hand, were required to also follow the Inland Rules of the Road, but were not under the same legal regime governing the officers of the *Maersk Idaho.*  Among other things, as explained above, the *Maersk Idaho*'s officers violated their SMS, their passage plan, Inland Rules 5 and 6, and 33 CFR § 164.11 by failing to set a safe speed that would minimize damage caused by the *Maersk Idaho*'s wake.

33.     At approximately 3:43 p.m., the *Maersk Idaho* was transiting through beacons 31 and 32 of the Houston Ship Channel and was travelling approximately 15.1 knots speed over ground.  *See* Plaintiffs' Exh. 54.  This speed was in excess of the vessel's passage plan and created the wake that ejected Chris Reed from his boat.  It is stipulated that the Reed's boat experienced a 2 meter elevation change (6.5 feet) at the time of the accident. There is no other explanation for this elevation change on board the Reed's boat other than the wake of the *Maersk Idaho* was excessive.  This is a violation of Inland Rule of the Road 6.  This is supported by the testimony of expert witnesses Captain Jay Rivera who opined that the wake generated by the *Maersk Idaho* at the time the Reed's interacted with it was 6-8 foot.  Trial Tr. Day 3-57.  Captain Steve Cunningham offered testimony on the wake generated by the *Maersk Idaho* at a slower speed of 12.9 knots and he opined that the wake generated by the Maersk Idaho was more likely than not in the 5-8 foot range as it passed

16

over the spoil bank.  Trial Tr. Day 1-208.  There is no reason any recreational boater should expect a 5-8 foot wave on a calm day in Galveston Bay.

### g.  Maersk demonstrated a complete lack of credibility and candor

### i.  Maersk's Counsel misled the Court on availability of witnesses.

34.    During this week-long trial, Maersk did not ask a single one of its employees (captain, 2nd officer, or corporate representative) to come before the Court and testify in person. Instead, Maersk elected to hijack a fact witness, Captain Maher, and who was described as a non-retained expert.  Though this "fact witness" was present in Galveston, available to testify the afternoon of the fourth day of trial, Defendants' counsel misled the Court and said that they had no witnesses available to begin their case-in-chief. Trial Tr. Day 4-58-59.  This was not true.

35.    Captain Maher was at the Tremont Hotel being woodshedded by Maersk's other counsel for over four hours that afternoon. Trial Tr. Day 5-111-113.  Worse, during cross examination, Plaintiffs learned that Capt. Maher made a cell phone video recording of the *Maersk Idaho's* wake that was never produced to Plaintiffs' counsel. Either the witness or Maersk's counsel kept this recording a secret.  Trial Tr. Day 5-123-124. This conduct, along with an appropriate request for relief under the Rules, is further elaborated in a later section of this brief. However, this conduct was simply "par for the course" during this trial for Maersk.

### ii.    Cherry picked medical records

36.    Throughout the trial, Maersk attempted to deceive and mislead the Court with selective portions of Chris Reed's medical records. The most illustrative example is with

17

Defense Exhibit 145, APPX. 7. These were records from Chris Reed's psychiatrist at Hauser Clinic.  Defendants selectively picked four (4) of 32 pages of the Hauser Clinic records in their exhibit to mislead the Court.  Plaintiffs offered the full Hauser Clinic records on the basis of optional completeness.  *See* Trial Tr. Day 6-106; APPX. 8.  For the purposes of clarity, the Appendix contains Defendant's Exh. 145, as Appendix 7.  Plaintiffs' optional completeness offer is Appendix 8.   The Hauser Clinic records are referred to herein by the pagination in the upper right hand corner.[2]  For example pg. 7 of 34, etc.

37.     The Court will recall the defense repeatedly parading the symptom checklist and the box which asked whether Mr. Reed had ever abused or used recreational drugs and he checked "yes" for marijuana.  *See* Defendant's Exh. 145, APPX. 7 at pg. 7 of 34.   Dr. Wimbish and defense counsel tried to suggest this was indicative of chronic use and abuse. Defendant conveniently left out page 11 of 34 of the Hauser records shown below, when the doctor concluded there was <u>no history of any abuse of any recreational drugs</u>.

**Substance Abuse History**
The patient does not have a history of substance abuse of any recreational drugs.
He does not smoke; alcohol intake is described as being quite rare.

REECHA_20161103_lntake Note.pdf                                    Page| 1 of 5

*See* APPX. 8 at pg. 11 of 34, screenshot of exact verbiage from Hauser Clinic record. The defense then skipped to page 19 of 34 to show the history which brought Reed to the Hauser Clinic.  *See*  APPX. 7 at pg. 19 of 34. They conveniently left out the very next page where the psychiatrist concluded Chris was normal in every aspect including appearance,

---

[2] The records start on page 3 of 34, so even though the reference is to 34 pages, there are only 32 pages in the complete record.

behavior, speech, mood, affect, thought process, thought content, insight/judgment, consciousness, orientation, recent memory, remote memory, attention/cone, language, fund of knowledge, gait/station, muscle strength and muscle tone. *See* APPX. 8 at pg. 20 of 34. They repeated the pattern by including page 22 of 34 without including the very next page, which again shows normal findings on every test. *Compare* APPX. 7, pg. 21 of 34 *with* APPX. 8, pg. 22 of 24.

38.     Chris Reed and his family never denied that he had suffered depression and had been taking medication for years. He did what we want our loved ones to do – seek treatment from medical professionals. What he could not have known and what is unforgiveable here is that the same records of treatment are being unfairly used to attempt to tarnish Chris's name and deny his family recovery for his death. Aggressive advocacy is one thing – misleading the Court is something completely different and Maersk knows it.

39.     The pattern continued by Maersk's constant reference to CTE, balance problems and mental difficulties. They picked one line in Chris's records from Houston Neuropsychology Associates about falls in the last year to attempt to show he was unfit to even be on a boat. *See* Defendant's Exh. 147, APPX. 9. To the contrary, these were two neuropsychological assessments about two years apart that showed no cognitive impairment and in fact improvement in test results between 2017 and 2019.[3] *See* Defendant's Exh. 147, APPX. 9 at pg. 35 of 66

---

[3] Defendant did not bates stamp these exhibits so for clarity the pagination is referred to as the Court's Doc. No. 186, pg. 35 of 66.

In sum, Mr. Reed demonstrated normal performance across multiple objective measures of cognitive functioning, as well as some strengths.  His current test data do not suggest cerebral dysfunction impacting cognition.  His subjective cognitive complaints are most likely due to his depression and anxiety.

*See* 2/2/2017 Appx. 9 at pg. 35 of 66.

Compared to his initial evaluation 1.94 years ago on 2/2/17, the present data reveal notable improvements in visual pattern analysis, complex design construction, delayed recall of organized verbal material, and visual memory.  He continues to evidence strengths in abstract verbal reasoning, response inhibition, and cognitive flexibility.  His intellectual functioning, object naming, verbal fluency, semantic fluency, word reading, visuospatial/constructional skills, working memory, processing speed, verbal memory, complex sequencing, and grip strength (bilaterally) all fell within the normal limits.  He was fully oriented to time, place, person, and situation.

*See* 1/10/2019 Appx. 9 at pg. 45 of 66.

There was one entry about motor dexterity which was nonspecific in nature. There was NOTHING in the records to show Chris was unfit physically or mentally to operate a boat. Any suggestion to the contrary is again misleading and deceptive.  And Maersk offered no medical testimony of any kind to demonstrate any deficits, mental or otherwise, which compromised Reed's ability to operate a boat or live a normal life to his full life expectancy.

## III.   LEGAL SUPPORT

### a. Authorities

40.     An injury from the swell of a vessel establishes *prima facie* liability of the vessel creating the swell. *West India Fruit and S.S. Co. v. Raymond*, 190 F.2d 673, 674 (5th Cir.1951); *Alamia v. Chevron Transp. Corp.*, 660 F.Supp. 1123, 1127 (S.D. Miss 1987). The vessel generating the swell or wake must "exonerate herself from blame by showing that it was not in her power to prevent the injury by adopting any practical precautions." *Id. See also, Ladd v. United States*, 97 F.Supp. 80, 83 (E.D.Va.1951).  Here, Maersk could have prevented this entire accident by simply slowing down.  Courts in the Fifth Circuit

20

have long embraced this approach.  It is well established that excessive speed in a crowded waterway saddles liability for damage caused thereby on the offending vessel.  *See, e.g. Indian Towing Co. v. The Lyons Creek*, 187 F.Supp. 774, 777 (E.D. La 1960) (citing numerous cases holding this) *aff'd* 293 F.2d 107 (5th Cir. 1961) ("[a] vessel which sees, or should see, other vessels, whether moored or navigating, in a position where damage to such vessel from her swell is foreseeable, must reduce her speed or direct her course away from them.").

41.     When a statute or regulation "creates a minimum standard of care ... then an unexcused violation, an act done with less than minimum care," is negligence *per se*. *Dougherty v. Santa Fe Marine, Inc.,* 698 F.2d 232, 234–35 (5th Cir.1983) (quoting *Lowe v. Gen. Motors Corp.,* 624 F.2d 1373, 1381 (5th Cir.1980)). "The failure to follow any Coast Guard regulation which is the cause of an injury establishes negligence per se." *Id.* at 235 (citing *Kernan v. Am. Dredging Co.,* 355 U.S. 426, 78 S.Ct. 394, 401, 2 L.Ed.2d 382 (1958); *Reyes v. Vantage S.S. Co.,* 609 F.2d 140, 143 (5th Cir.1980)). Similarly, 33 C.F.R. § 164.11 has been relied upon as a basis for invoking the *Pennsylvania* rule.  *Osprey Ship Management, Inc. v. Foster,* 2008 WL 4371376 (S.D. Miss 2006) (not reported); *aff'd* 387 F.Appx 425 (5th Cir. 2010).  In *Foster*, the master of a ship violated numerous company policies, and similar to the case at bar, failed to override the pilot's actions in navigating the vessel.

> Captain Potter failed to (1) prepare a proper transit plan; (2) post a proper lookout;  . . . (6) properly monitor the acts of the pilot; and (7) prepare or inform himself sufficiently to have the level of situational awareness or preparation necessary to properly manage the pilot. As Master of the vessel, Captain Potter's negligence is imputed to Plaintiffs. For these reasons, the

21

Court concludes that there is a direct causal link between Plaintiffs' violations of 33 C.F.R. § 164.11 and the damage to the M/V AMERICAN CORMORANT, and that the violations of this regulation were causes of the allision.

*Id.* at *23.

42.     Although this case does not involve an allision, the similarities between the *Foster* case and the case at bar are striking and illustrate why Maersk bears full responsibility for the death of Chris Reed.

> **b. Maersk's violation of 33 CFR § 164.11 invokes the Rule of the *Pennsylvania* and establishes a *prima facie* cause of negligence against Maersk.**

43.     Maersk and the crew of the *Maersk Idaho* violated a litany of maritime laws, regulations and its own policies in this case.  The primary regulation that Maersk violated is 33 C.F.R. § 164.11 which requires the owner or master to ensure the person directing the movement of the vessel to set the speed of the vessel with consideration of the damage that might be caused by the wake.  33 C.F.R. § 164.11.   This regulation works hand in hand with Inland Rule of the Road 6 (Safe Speed).  Because the *Maersk Idaho* violated 33 CFR § 164.11—a rule specifically designed to prevent this type of accident—Plaintiffs invoke the Rule of the *Pennsylvania*.  86 U.S. (19 Wall.) 125, 136, 22 L. Ed. 148 (1873).

44.     Under the *Pennsylvania* rule, the Defendant must prove that the violation of the rule intended to prevent this accident could not have been the cause of the accident.  Maersk cannot meet this burden.  33 C.F.R. § 164.11 is contemplated by Maersk's own passage planning requirements and the SMS.  Neither Maersk, nor its representative aboard the *Maersk Idaho*, Captain McLoud, can delegate this responsibility to the pilot.  Captain

McLoud admitted that he did not even understand the effect the vessel's speed has on its wake. Trial Tr. Day 1-77.  Captain Maher also testified that when he boarded, Captain McLoud simply told him what speed other pilots liked 70 RPM.  Trial Tr. Day 5-32.  There was no discussion regarding wake wash damage as required by Maersk's SMS and 33 C.F.R. § 164.11.  Trial Tr. Day 5-33.  Had Chris Reed not been ejected from his boat by the wake of the *Maersk Idaho*, none of this would have been an issue.  But Maersk and Captain McLoud were simply operating on a theory of it's better to be lucky than good. This is an operations mantra that unfortunately kills people.

45.     Captain McLoud did not even know who he worked for and disregarded Maersk's own policies.   Trial Tr. Day 1-93.  Captain McLoud's testimony was shocking given how Maersk tries to portray the way Chris Reed failed to follow rules and was an unsafe boat operator.  Only one colloquy is needed to illustrate this:

> **Q.** Why would somebody have put this on the Maersk document to make sure you mark crossing and high-density traffic areas?
> **A.** Yeah. I don't -- I don't know why they would put this on here.
> **Q.** You don't know why?
> **A.** I don't know why, yeah.
> **Q.** Do you have any -- any reason you can offer why – why Maersk puts down there that you should mark the crossing and high-density traffic area?
> **A.** They put together a lot of documents on their own. We do -- we do what we do on the ship. I'm not going to speak for what –…

Trial Tr. Day 1-94.  Captain McLoud then made the outrageous admission that "There is no maximum speeds for pilot transits, you know. They're -- I mean, you're -- you're maneuvering speeds."  Trial Tr. Day 1-95.  In other words, the devil may care what 33 C.F.R. § 164.11 says, what the Maersk SMS says, and what ordinary good seamanship principles say.  Maersk and Captain McLoud violated 33 C.F.R. § 164.11 by failing to

23

ensure that the vessel's speed was set with consideration that may be caused by its wake, and Captain McLoud admitted that he took no effort at all to even comply.  This is akin to gross negligence at worst, gross incompetence at best.

46.     In sum, Maersk's violation of 33 C.F.R. § 164.11 is the embodiment of everything that Maersk did wrong in this case, and the other violations are simply separate dominos in the chain of error.  Had the lookout reported recreational boats, the vessel could (should) have slowed down.  Had Captain McLoud understood the effect a vessel's speed has on its wake, he could have ensured that Captain Maher slowed down to avoid generating a dangerous wake.  Had the passage plan actually considered the effect of the ship's wake in shallow waters surrounding the Houston Ship Channel and the officers and crew followed it this tragedy could have been averted.  Had Captain McLoud followed the Maersk SMS instructions on discussions of safe speed with Captain Maher, who knows what may have occurred.  But Maersk failed at many things, not just one thing.  At bottom, the real cause of this incident is that the vessel simply wasn't navigated with consideration of the effect of her speed on the damage that might be caused by her wake.

### c.     This incident was foreseeable and preventable by Maersk

47.     All of the above statutory and rule violations are also breaches of Maersk's duty to use reasonable care under the circumstances. *See Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000) ("When analyzing maritime tort cases, we rely on general principles of negligence law."). These breaches are even more striking considering that Maersk knew its actions were a serious danger to small recreational watercraft—making Chris Reed's death both foreseeable and preventable.

48.     First, common sense tells anyone who has been through Galveston Bay that recreational boaters and fisherman are present.   The *Maersk Idaho* comes through Galveston Bay every month or so and Captain McCloud has been the master aboard for numerous of those transits. *See* Trial Tr. Day 1-89.  Second, Captain McCloud admitted that his vessel's wake can be dangerous to small craft like the Reed's boat. Trial. Tr. Day 1-82. That is why it is important to set the vessel at a safe speed in coastal or congested waters. *Id.* at 74-75. Third, the *Maersk Idaho's* chart specifically identifies a boat ramp and caution area near the Texas City Dike. *See id.* at 120-21. This puts the *Maersk Idaho* on notice that small recreational vessels (like the Reed's) are likely present in this area.

49.     On June 7, 2019, the *Maersk Idaho* barreled down the Houston Ship Channel at 15 knots, with full knowledge of the risk its big wake posed to small recreational vessels like the Reed's. It proceeded in indifference to this risk and created the huge wake that threw Chris Reed out of his boat and to his death.

### i.  The *Maersk Idaho* is liable *in rem* for the actions of the pilot.

50.     Under the general maritime law, the *Maersk Idaho*'s officers and Maersk's failures to set the vessel's speed with consideration of the wake it would produce were the cause-in-fact and proximate cause of the death of Chris Reed and the injuries sustained by Jana Reed.

51.     The presence of a pilot on board does not relieve the watch officers of their duties and obligations with respect to safe navigation of the vessel, and a vessel is liable *in rem* for the negligence of its pilot. *The China*, 74 U.S. (7 Wall) 53 (1868); *Charente S.S. Co. v. United States*, 12 F.2d 412, 413 (5th Cir. 1926); *Kingfisher Shipping Co. v. M/V Klarendon*,

651 F. Supp. 204, 207 (S.D. Tex. 1986). Accordingly, Plaintiffs may recover its damages under maritime law from the *Maersk Idaho*, *in rem*, for the negligence of Pilot Maher. Further, when a compulsory pilot commits an error which the master of the vessel has a duty to countermand, and the master fails to do so, the shipowner may be held liable, *in personam*, for failure to intervene. *See Kingfisher Shipping Co.*, 651 F. Supp. at 208. Accordingly, Maersk is liable, *in personam*.

52.     Likewise, Captain McLoud lacked the knowledge to even be able to understand the need to step in and supercede Captain Maher given his testimony he had no idea what the relationship between a ship's speed and her wake's size is.   Trial Tr. Day 1-77.   To underscore this, Captain McLoud recommended the speed.   Trial Tr. Day 5-32-33.

53.     With respect to Captain McLoud's responsibilities while Captain Maher was conning the vessel, the Fifth Circuit has explained that "[t] he master is entitled to assume that the pilot is an expert on local conditions and practices, until it becomes manifest that the pilot is steering the vessel into danger." *Avondale v. International Marine Carriers, Inc.,* 15 F.3d 489, 492-93 (5th Cir.1994).   The fact that there was a pilot on board did not relieve Captain McLoud from his affirmative duty to exercise due care to assure the safety of his vessel. A vessel's master retains authority to countermand those orders of a pilot which would place the vessel in a position of apparent and avoidable danger. *See Delta Transload, Inc. v. The Navios Commander,* 818 F.2d 445, 451 n. 17 (5th Cir.1987). "If the master's responsibility to intervene in cases of great necessity means anything, it must require that he have an adequate level of information to determine when 'great necessity' arises," and the master must "pay attention so that he [knows] that he [needs] to

26

intervene." *Avondale Industries, Inc.,* 15 F.3d at 493.  As the United States Supreme Court

has stated:

> [t]here are many cases in which ..., notwithstanding the pilot has charge, it is
> the duty of the master to prevent accident, and not to abandon the vessel
> entirely to the pilot; but that there are certain duties he has to discharge
> (notwithstanding there is a pilot on board) for the benefit of the owners....
> [I]n well-conducted ships the master does not regard the presence of a duly-
> licensed pilot in compulsory pilot waters as freeing him from every
> obligation to attend to the safety of the vessel; but that, [while the master sees
> that his officers and crew duly attend to the pilot's orders, he himself is bound
> to keep a vigilant eye on the navigation of the [vessel] and, when exceptional
> circumstances exist, not only to urge upon the pilot to use every precaution,
> but to insist upon such being taken.]

*The Oregon,* 158 U.S. 186, 195 (1895).  Here, Captain McLoud had a duty under law,

under Maersk's SMS, and under the passage plan to prevent this accident.  Finally, Captain

McLoud lacked the knowledge required by a master mariner to ensure his ship was safely

navigated by Captain Maher.  Because of that lack of knowledge, he failed in his duty, and

Maersk is responsible.  Captain Maher testified McLoud recommended the speed, not the

other way around.  Trial Tr. Day 5-32-33.  Regardless, Maersk is liable either way.

### ii.   The Officers of the *Maersk Idaho* violated the Voyage Plan

54.     Captain McLoud was required by law and company policy to create a passage plan

for this transit.  *See* Plaintiffs' Exhs. 67, 81.  Maersk's passage plan for the June 7, 2019

transit required it to consider a number of caution areas.   Captain McLoud testified that he

did not know what the caution areas where in the vicinity of the Texas City Dike, just to

the South of the incident area, and that he would rely on the pilot.  Trial Tr. Day 1-157.

55.     Captain McLoud testified repeatedly that he would have to look at the ECDIS, but

not one witness or expert in this entire case has ever explained what was on the actual

27

ECDIS warning.  More incredibly, Captain McLoud testified that the maximum speeds in the Voyage Plan Waypoint list meant nothing.  *See* Trial Tr. Day 1-157; Plaintiffs' Exh. 83, Appx. 6.  He went on to say, "We can -- we can deviate from the plan. I can deviate from the plan whenever I want. So that's why the speeds don't really matter all that much." Trial Tr. Day 1-158.

56.     At the time preceding the incident, the *Maersk Idaho* had made speeds of up to 15 knots, well in excess of the passage plan's maximum speed of 14 knots.  Captain Maher testified that he could have safely navigated the *Maersk Idaho* at speeds less than 15 knots. Trial Tr. Day 5-84.   Plaintiffs offered exhibits showing the *Maersk Idaho* transiting the area in question at speeds of 8.9 knots (Plaintiffs' Exh. 89) and 11.2 knots (Plaintiffs' Exh. 92).  The passage plan set a **<u>maximum</u>** speed through the area in question, but that does not mean that the *Maersk Idaho* could safely transit through this area at the maximum speed of 14 knots, indeed, it would have been prudent for the officers of the *Maersk Idaho,* Captain McLoud and Captain Maher to have considered the effect of the vessel's wake on unaware recreational boaters and slow down to a speed less than 14 knots.  The fact that they were transiting most of the Houston Ship Channel at speeds in excess of the passage plan shows utter disregard for the dangers presented by the *Maersk Idaho*'s wake.

### iii.   The Officers of the *Maersk Idaho* violated Maersk's Safety Management System

57.     Maersk's SMS contained a policy for navigating with a pilot on board.  *See* Plaintiffs' Exh. 86, Appx. 5.  Maersk's policy states that to supplement the passage plan,

the following should be discussed with the pilot, "possible wake wash damages (Transit speed restrictions/limitations):

To supplement the passage plan, discuss the following with the pilot:

- Examine the route which is to be followed. It is important that information is obtained from the Pilot, regarding any legs of the route that require special care and reduced speed due to:
  o Discuss the Berthing Plan (Read Section 11 below)
  o Possible wake wash damages (Transit speed restrictions/limitations)

*See* Plaintiffs' Exh. 86, APPX. 5.  Captain Maher testified that they did not discuss wake wash damages during the master pilot exchange, and there was no discussion between them regarding the caution areas on the passage plan.  Trial Tr. Day 5-33.  This is a clear violation of the SMS, and this failure is yet more evidence of Maersk's negligence in this case.

### iv.  Maersk violated the safe speed rule

58.    In *Alamia*, the District Court held that because the wake generated was excessive, it was a violation of the reasonable care standard the general maritime law, and triggered violations of the Inland Rules 5 (lookout) and 6 (safe speed).  *Alamia*, 660 F.Supp. 1123, 1988 A.M.C. 1856, 57-58 (S.D. Miss. 1987).  There is little difference here, and it is Maersk's responsibility in any event to prove that these violations could not have been the cause of the accident.

59.    To illustrate how Maersk violated the safe speed rule, the Court only need consider the formula used by Maersk's naval architect at trial.  Dr. Yue admitted that there is a direct correlation between speed and the size of a vessel's wake and provided a formula that he

used to testify on what the wake size would be. Trial Tr. Day 5-189.  Using Dr. Yue's own methodology, a reduction in speed from15 knots to 12 knots would reduce the wake size by 36%. A reduction in speed from 15 knots to 10 knots would reduce the wake size by 56%.   In other words, a 6 foot wake would become a 2.64 foot wake at 10 knots and 3.9 feet at 12 knots. Or put simply: slowing down would have prevented this incident.

### v.  Maersk violated the lookout rule

60.    It is undisputed that no one aboard the *Maersk Idaho* ever identified the Reed's vessel, or any other recreational boaters who may have been at risk from the wake generated by the *Maersk Idaho*.   Captain Maher told the interesting story that they overheard a boat racing under their starboard bridge wing, that no one had identified until it was in close enough proximity that he could see the occupants of the boat.  Trial Tr. Day 5-136.  Captain Maher testified that he was continuously walking back and forth on the bridge, monitoring his wake, yet he never once noticed the speed boat, the Reeds, nor did anyone else.  Trial Tr. Day. 5-100.  As stated in the *Alamia* case, this is sufficient to create a violation of the lookout rule:

> Neither bar pilot Jacob Foster or any witnesses produced by the Defendants testified that they knew what happened on October 11, 1984, and no one could recall even seeing the F/V Sunset Ltd. or any other shrimp trawler in the area on that day.  The Court finds that the vessel was negligently operated at an excessive rate of speed under the circumstances then existing, and that the officers and crew of the Chevron Frankfurt were negligent in failing to maintain a proper lookout for other fishing vessels in the area. The Court further finds that this negligence was the proximate cause of the damages sustained by the Plaintiff.

*Alamia*, 660 F.Supp. at 1128.  It is uncontroverted that Maersk did not identify the Reed's boat, nor any other recreational boaters whom may have been unaware of the massive wake that was being generated by the *Maersk Idaho*.

### d.  The Maersk Retained Experts Have Credibility Problems and Contradict Each Other.

61.     Maersk presented two retained experts at trial, one who stated the wake was so small that it was not a hazard, the other who said this area was so hazardous (due to large wakes) that the area should essentially be avoided at all costs and went on to criticize the manner that Jana Reed tried to rescue Chris.

### i.  Dr. Dick Yue's Testimony is not credible.

62.     Dr. Yue is a professor in Massachusetts. He was asked to calculate the size of the wake created by the Maersk Idaho.  Trial Tr. Day 5-196-201.  Dr. Yue had not been to the Houston Ship Channel since the early 1980's.  Trial Tr. Day 5-199.  He didn't review any depositions other than his own, didn't review any expert reports, created no physical models and made no field observations. Trial Tr. Day 5-198, 199.  He never saw the Reed boat, never saw pictures of the Reed boat, and was never given any information about damage to the Reed boat. Trial Tr. Day 5-200. He spent a total of 4 hours on this case through completion of his report.

63.     Yue knows that many factors can affect wave height including speed of the boat, water depth, bathymetry, wind, tidal currents, trim of the vessel, underwater hull shape and geometry of the ship, squat and draft of the vessel and the depth to draft ratio.  Trial Tr. Day 5-202-204.  Yue did not consider winds, tidal currents, trim or squat in his calculations.

31

Trial Tr. Day 5-204-205.  He said he considered draft of the vessel but doesn't know whether the draft shown on his report or the ship's pilot card is accurate. Trial Tr. Day 5-206-207. He also said he considered displacement of the vessel but doesn't know whether the displacement in his report or the ship's pilot card is correct.  Trial Tr. Day 5-208.  He doesn't know the depth of the water where the *Maersk Idaho* was located at the time it generated the wave in question. Trial Tr. Day 5-209.  He used a uniform depth of 7 feet where the Reed vessel was located even though he knows the bathymetry in the spoil areas change all the time and he knows the water is shallower and deeper than 7 feet in the area. Trial Tr. Day 5-210.  *See* also Plaintiffs' Exh. 120, Appx. 4.  He made no effort to measure the depth where Reed jettisoned. He stated in his report "that the waves in the area where Reed was jettisoned could not be obtained by numerical simulation due to requirement of huge computation costs."  Trial Tr. Day 5-210-211. Such a task could be done in principle, but one would have to reconstruct the bathymetry, squat, loading of the ship, currents and the tides.  Trial Tr. Day 5-212.  Instead of doing that he used a panel method to calculate a wave height of .8 feet (10 inches) at the incident location. Trial Tr. Day 5-213.

64.     Yue did acknowledge the wave height from the *Maersk Idaho* in the Houston Ship Channel could have been 5.4 feet or higher and that as the waves come off the ship channel and into the shoals the waves become steeper and more dangerous depending on the height. Trial Tr. Day 5-214-215. Yet, Yue claims that the maximum wave height under any circumstances in the incident area was 2.2 feet.  Trial Tr. Day 5-213.

65.     Interestingly, Yue concludes that the same formula for calculating maximum wave height in the area is the same for outbound travel of the ship.  Trial Tr. Day 5-216.  When

shown the drone video of waves generated by the Maersk Idaho traveling outbound at 12.9 knots, Yue was unable to say whether the waves generated were less than 2.2 feet. *See* Plaintiffs' Exh. 94, drone video. Anyone can tell from watching the video the waves were higher than 2.2 feet. We don't need Dr. Yue to tell us that.

66.     Taken as a whole, Dr. Yue's wake height estimates are contrary to the evidence and to common sense.

- The Physical Evidence
  - Ejection of Chris Reed, a 200+ lb. former MMA fighter.
  - Physical injuries to Jana Reed as she was wedged into place when wake struck the boat. Trial Tr. Day 2-202-203.
  - Damage to rub rail, gel coat cracking and fracture of trolling motor bracket.
- Eyewitness testimony of Jana Reed. Trial Tr. Day 2-199-200.
- Wake height documented in drone video while Idaho traveling at less than 13 knots outbound in same area. Plaintiffs' Exh. 94.
- Elevation change of 2 meters in 1 second.
- Waves in this area Trial Tr. Day 5-215.

67.     Finally, and perhaps most importantly, Yue admits that scientists test their hypothesis in the real world. Trial Tr. Day 5-230. When asked why Maersk in its 21 transits to Houston since Reed was killed, couldn't have filmed the 10" wake he says existed in the area where Reed was jettisoned he said – "You are asking the wrong person who is sitting in Cambridge, Massachusetts." Trial Tr. Day 5-231.

> ### ii.     **Maersk's Small Boating Expert-Thomas Danti was incredible, but not in a good way.**

68.     Maersk's small boat expert, Thomas Danti, had no idea what caused the wake which caused the event. Trial Tr. Day 6-79, 80. He has no idea of the size of the wake. He says the size of the wake doesn't matter. Trial Tr. Day 6-82. Danti acknowledged the difference

between the waves on the starboard side and the port side of the Idaho.  On the starboard side, the waves would be to the front or the bow of the Reed's boat.  Trial Tr. Day 6-82.  On the port side, one is coming to the back side of the wake which appears calmer than when you approach it from the front.  Trial Tr. Day 6-82.  As one approaches the back of the wake, one can't tell the height differential that you're going to fall when you come over the wake.  Danti's position is that Reed should have stopped once he approached the back of the wave and not driven over it, whether it was 10", 2', 6' or 10' tall.  Trial Tr. Day 6-84.  Thus, it is Danti's opinion that no boater can ever go over the top of a wake as you approach it from the back.  That is preposterous.

69.    What Danti's testimony does illustrate, however, is that it would have been difficult for the Reeds, or any other boater, to recognize not only the height of the *Maersk Idaho's* wake as it passed over the spoil bank, but also the dangerousness of the wake itself.  The Reeds would have had no need to recognize the hazard if Maersk hadn't created the dangerous wake in the first place.

70.    Moreover, Danti says the Reeds should have never even entered the shoal area.  Trial Tr. Day 6-87, 88.  He says one should anticipate that big ships will create big wakes in the shoal areas. Trial Tr. Day 6-88.  If that is true, why did Marcus Maher say in his 3,000 transits of the Channel he has never generated a wake bigger than 1-2 ft. in the shoals?  Why does the MIT professor, Dr. Yue, say the wave was only 10" high in the shoal area?  Is Maersk saying a 10" wake in the shoal area must be avoided at all costs by every recreational boater?  The inconsistency of theories and testimony is striking.

34

71.    Danti also criticized Mr. and Mrs. Reed for their use of safety equipment.  Even though he acknowledged they had all required safety equipment aboard their vessel, he said Mr. Reed should have been wearing a PFD. Trial Tr. Day 6-92.  He acknowledged there is no legal requirement for adults to use them in Galveston Bay and conceded that his own students are NOT required to wear them unless they are offshore, going over a rough bar or can't swim. Trial Tr. Day 6-92.

72.    He is not a medical doctor and does now know the extent of Reed's injuries when he was ejected from the boat and sustained a head injury. Trial Tr. Day 6-94, 95.  He doesn't know one way or the other whether the PFD's the Reeds had would have safely kept Reed's head above water and prevented him from drowning. Trial Tr. Day 6-95.

73.    Danti's opinions grow even more bizarre as he speculated that the Reeds should have listened to the VHF radio to hear whether big ships were coming to the Port of Houston and if so to avoid the shoal areas entirely. Trial Tr. Day 6-98.  Then, he says had Mrs. Reed hit the Man Overboard button or called with the VHF radio someone may have heard her.  He acknowledges that he can't say whether someone would have heard it or whether it would have made a difference.  Trial Tr. Day 6-99-100.  He also says the Reeds were <u>overtaking</u> the *Idaho* and should have called the ship on the radio.  Danti said that the Reeds should have been monitoring their VHF radio and contacted the *Maersk Idaho* on channel 16 because he says all vessels are required to monitor that channel, but Captain Maher testified that channel 16 was not being monitored.  Trial Tr. Day 5-35.  Their other expert, Fazioli, disagrees on the applicability of the VHF radio entirely. *See* Fazioli rebuttal

offer, 146:16-149:8; 149:22-25.  Even if a call was made, the wake was already created.

Trial Tri Day 6-101.

74.     Finally, and perhaps, most bizarre is Danti's opinion that Chris Reed's medical

condition meant that he shouldn't have been on a boat to begin with.  As shown above,

Danti and counsel cherry picked the records.  Had they objectively looked at the records,

they would have seen that Chris underwent neuropsychological testing which proved he

had no cognitive impairment.  *See,* Defendant's Exh. 147, APPX. 9 at pg. 35 of 66 and 45

of 66.

75.     Most telling about the lack of medical evidence to suggest impairment or disability

of Mr. Reed is Maersk's failure to call its expert doctor, Dr. Lee Ann Grossberg.  Had any

of the opinions offered by Danti been anchored in science or medicine, Maersk's own

medical doctor would have been called to support it.  Again, Maersk's failure to call its

own experts speaks volumes about the lack of merit in their defense.

> **e.     The Reeds were not contributorily negligent.  Maersk bears the burden
> of proof on its affirmative defenses under comparative or contributory
> fault.  They failed to meet that burden on each theory they have
> alleged.**

> **i.  Maritime Comparative Fault Scheme applies here.**

76.     Maersk has argued that Texas' contributory negligence statute applies here because

Plaintiffs alleged claims arising under Texas's wrongful death and survival statutes.  These

arguments are more attempts by Maersk to cozen the Court with theories Maersk's counsel

knows are invalid.     This is a maritime tort.  This case involves a recreational boat (a

traditional maritime activity) upon the navigable waters of the United States, interacting

with the wake of commercial vessel.  Both the Reed and Maersk vessels are bound by the Inland Rules of the Road in how they operated their vessels.  *See* Inland Rule of the Road 1; 33 C.F.R. 83.01.  Maersk's argument that Texas law applies was flatly rejected by the U.S. Supreme Court over 60 years ago. *See Pope & Talbot v. Hawn*, 346 U.S. 406, 409-10 (1953) (rejecting application of Pennsylvania comparative fault law that bars contributorily negligent plaintiff from recovering).   This discrete issue has already been fully briefed by the parties. *See* Court's Doc. Nos. 78 (Maersk motion for application); 87 (Plaintiffs' response); and 88 (Maersk Reply).

### ii.  Dr. Sanders' Testimony − The Reeds were not negligent

77.     Dr. Wendy Sanders was called to testify about the handling of the Reed boat before, during and after the wake which jettisoned Chris Reed into the water.  She holds three mechanical engineering degrees, has extensively studied fluid dynamics in the maritime field and has personally operated small watercraft for many years.  Trial Tr. Day 2-6-10.

78.     Dr. Sanders analyzed Reed's travel through the starboard side of the *Maersk Idaho* wake and noticed deceleration of speed as well as prudent approach to the angle of the wake. Trial Tr. Day 2-25-28. Reed was correctly approaching the wake at between 30˚ - 60˚. Trial Tr. Day 2-27.  As he entered calmer water behind the *Maersk Idaho* he increased his speed until he began to approach the port side wakes where he decelerated through the waves.  Trial Tr. Day 2-28.  Dr. Sanders explained that a planning speed of between 15 – 17 mph gave the Reed boat the best maneuverability through the wake area.  Trial Tr. Day 2-32.  During the last minute and thirty seconds, there was a significant downward trend in the speed of the Reed boat consistent with active deceleration.  Trial Tr. Day 2-33.

37

79.     Sanders further explained the differences between the starboard wake and the port wake.  On the port side of the Idaho are the spoil areas where the dredge dump their dirt. Trial Tr. Day 2-39.  The depth in the spoil area is not uniform. Trial Tr. Day 2-40.  When you transition from deep water in the channel to shallow water in the spoils you end up with much steeper, higher waves which an ordinary, typical recreational boater would not expect. Trial Tr. Day 2-42 - 43.  Dr. Sanders has taken and designed boating safety courses and these issues were not addressed. Trial Tr. Day 2-43.

80.     Lastly, the VHF radio is a nonstarter since there was no proof someone would have been listening and could have gotten there in time to rescue Mr. Reed.  Trial Tr. Day 2-51-52.

### iii.   The Reeds were *In Extremis.*

81.     Maritime law embraces the *in extremis* doctrine.  *See, Union Oil Co. of Cal. v. Tug Mary Malloy*, 414 F.2d 669, 674 (5th Cir. 1969).  The Fifth Circuit has explained the *in extremis* doctrine as follows, "Where the master of a vessel, placed in a situation of peril not of his making, has, acting within the bounds of reason, done that which at the time and under the stress and strain of the moment seemed to be the best thing to do, he will not be charged with fault by second guessing after the event."  *Green v. Crow*, 243 F.2d 401, 403 (5th Cir. 1957).  Another Fifth Circuit case penned by the famous admiralty jurist Judge John R. Brown, states that:

> . . . [I]in collision situations–unlike common law incidents where two strangers are involved–in which each vessel has duties toward the other that are formally well defined and known, the one who is put to a sudden choice of action to avoid hazard created by the patent fault of the other has considerable latitude. The choices of stopping engines or going ahead, going

to port rather than starboard, are to be judged not by an armchaired admiral, who has hours, days, weeks, months or years to reflect, but in the light of choices suddenly forced on by the neglect of the one now seeking total absolution. For, errors in judgment committed by a vessel put in sudden peril through no fault of her own are to be leniently judged. . . . The piercing searchlight of hindsight . . . may point to other maneuvers that might have been taken. . . . Conduct must be judged with reference to the circumstances at the time and not by a cool estimate of possible danger which might be formed after the event.

*Afran Trans Co. v. S/S Transcolorado*, 458 F.2d 164, 166 (5th Cir. 1972) (Brown, J.) (internal citations and quotations omitted.)  Here, this applies not only to Chris Reed, who certainly did not create the excessive wake he encountered, but also to Jana Reed who was forced to try and rescue him after the *Maersk Idaho*'s wake jettisoned him from their boat.

82.     Should Chris Reed have reasonably anticipated that the wake of the *Maersk Idaho* would rise up in front of him as he crossed over the spoil bank?   Maersk made mixed arguments about this, on one hand Marcus Maher testified he had never seen dangerous wakes in this area, but on the other, Thomas Danti testified that no one should transit this spoil bank because of the risk of huge wakes.  What should an ordinary recreational boater have expected when one of the largest ship companies in the world tells different stories? What would an ordinarily prudent person do in similar circumstances to Jana Reed?  Jana Reed, a kindergarten teacher and novice boater was somehow able to navigate the boat to within 8 feet of her husband, who she had just witnessed being knocked out of their boat. Was it imprudent to throw a dock line when she is trying to quickly save her husband who she just witnessed get knocked out of their boat?  Was it imprudent for her to call 911 or use a VHF radio?  Under the circumstances, Jana did the best she could to prevent Maersk from killing her husband.

### iv.   No proof a life jacket would have saved Chris Reed.

#### 1.   No affirmative duty for Chris Reed to wear a life jacket.

83.     Maersk invites the Court to create a general rule that recreational boaters have an affirmative duty to wear a life jacket to prevent injuries caused by vessels who fail to maintain their wake.  This argument is akin to assumption of the risk which is barred in Admiralty law.  *Movible Offshore Co. v. Ousley*, 346 F.2d 870, 873 (5th Cir. 1965) ("The question, therefore, is whether the doctrine of assumption of the risk has a place in that body of law when a seaman is not involved. We think it has not.").   This goes far beyond even the most stringent liability regimes in admiralty.  For instance, even under the Jones Act, there is no duty on vessel owners to require crewmembers to wear life jackets, or to teach crewmembers how to swim. *Zapata Haynie Corp. v. Arthur*, 980 F.2d 287, 292 (5th Cir. 1992) (Jolly, J).   Assigning fault to Chris Reed in this case would in effect create a general duty that all recreational boaters in Galveston Bay should wear a lifejacket at all times.  This would be a greater duty than even the legislature of Texas or Federal law imposes.  The Court should reject this invitation.

84.     Chris was simply doing what all other fisherman in Galveston Bay do: enjoying a nice afternoon of fishing on their boat.  Virtually no recreational fishermen in Galveston Bay wear life jackets.  Chris Reed was acting as an ordinary and prudent person under the same or similar circumstances. *See Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000) ("When analyzing maritime tort cases, we rely on general principles of

negligence law.")   Maersk has failed to meet its burden to prove that Chris was unreasonable by not wearing a life jacket under these circumstances.

### 2. Statistics from U.S. Coast Guard show that 57 people drowned while wearing a life jacket in 2019.

85.     Maersk makes much of the statistical argument that 79% of drowning victims were not wearing a life jacket.  Maersk concludes that because Chris Reed was not wearing a life jacket, more likely than not he would be alive had he been wearing one.  Maersk's experts are quite fond of the *post hoc, ergo propter hoc* fallacy, that is, "after the fact, therefore because of the fact."  Here, Maersk equivocates on a statistic—with no scientific methodology applied—to conclude that Chris Reed's death was caused because he failed to wear a life jacket.  Maersk offers no scientifically sound methodology to bridge this gap.  It merely relies on a small data set that provides a large statistical number to cloak their unsupported theory with some authority.    Unfortunately, the underlying data set from which this 79% figure is likely insignificant statistically.  Indeed, in 2019, according to the very source that Maersk relies on, 439 people drowned, and of that 439, 57 were wearing lifejackets.

| LIFE JACKET WEAR BY TOP FIVE KNOWN CAUSES OF DEATH | | | | | |
|---|---|---|---|---|---|
| Known Cause of Death Rank | Cause of Death | Number of Deaths | Life Jacket | | |
| | | | Worn | Not Worn | Unknown if worn |
| 1 | Drowning | 439 | 57 | 362 | 20 |

*See* Defendant's Exh. 58, Recreational Boating Statistics.  This statistic alone is insufficient to prove, more likely than not, that Chris Reed would have lived had he been wearing a life jacket.  Had Maersk called a medical doctor to testify on this issue, perhaps it could have bridged the analytical gap.    Maersk designated a forensic pathologist who was clearly

qualified to render such a conclusion, but for whatever reason, she was withdrawn. Instead, Maersk relied on Thomas Danti to pull statistics out of a Coast Guard publication and render a baseless opinion which he was certainly not qualified to render. The learned Court certainly did not need Mr. Danti to assist it in dividing 439 by 57. Most fourth graders can do that.

### v.  No proof throwable would have saved Chris Reed.

86.    Maersk argued at length that the Reed's violated the Coast Guard requirement that a throwable device be "immediately available."   First, there is no evidence of where the throwable was actually located at the time of the accident.  Second, this argument relies on a number of assumptions: 1) that Jana Reed would have made a good throw with the throwable; 2) that Chris could have self-rescued had a good throw been made and 3) that the few steps between Jana Reed and where the throwable was located was not "immediate." Ultimately, Maersk cannot succeed on this argument because it cannot prove that more likely than not a throwable would have saved Chris Reed.  There is no credible evidence to support this theory.

> ### 1.  Pia's uncontroverted testimony on mechanism of drowning shows that Chris Reed could not have self-rescued even if Jana had made a good throw with the throwable.

87.    With regard to Maersk's theory that Jana Reed was negligent for not throwing a throwable to Chris, Maersk never rebutted the testimony of Dr. Franceso Pia, a drowning expert and life saving expert.  Dr. Pia testified on the mechanics of drowning.  Dr. Pia testified that from his experience in actually observing and documenting drowning victims

when someone is drowning, the victim will involuntarily place their arms out to the side and attempt to press down on the water in an attempt to pull themselves out of the water. Trial Tr. Day 3-226.  Dr. Pia further testified that this process in an adult usually lasts 60 seconds before a person will succumb and go beneath the water's surface.  *Id.*  This testimony corroborates Jana Reed's testimony and explains why Chris exclaimed, "Jana Hurry! I can't hold on!"  Maersk offered no plausible theory that if the throwable had been thrown, that Chris could have held on to it and self-rescued.

### 2. No evidence Jana Reed would have made a proper throw with the throwable.

88.    Maersk offered no credible evidence that had the throwable been within hand's reach, that Jana Reed would have made a good throw to Chris where he could have self-rescued.  This theory requires rank speculation.  This theory also is yet another attempt by Maersk to try and paint Chris and Jana Reed as "rule breakers" in an attempt to offset the egregious violations made by the crew of the *Maersk Idaho*.

89.    Dr. Sanders also addressed the issues about Ms. Reed's throwing of a rope to her husband as opposed to a throwable.   The throwable is one and done.  If you miss, you don't get a chance to throw again. Trial Tr. Day 2-49.  The rope can be thrown and used to pull him to the boat. Trial Tr. Day 2, 50.  It can be used again.  Trial Tr. Day 2-50.

### vi.   Chris Reed was not impaired by THC; Maersk failed to meet its burden of proof.

90.    Chris Reed's body was submerged in the hot June water of Galveston Bay for about two days before his corpse was recovered and an autopsy was performed. *See* Trial Tr. Day 3-187.  Due to the deteriorated condition of Chris's body, the toxicology labs were run on

a sample of his liver tissue as opposed to a blood test.  The lab reported that Chris's liver tissue tested positive for amphetamines (which was consistent with prescribed medication) and Delta 9 THC and Delta 9 THC carboxy. *See* Defendant's Exh. 133.

91.     Maersk alleges that Mr. Reed was "intoxicated" on the effects of THC in support of its affirmative defense of contributory negligence.  "The defendant has the burden of proving that the plaintiff was contributorily negligent and that such negligence was the proximate cause in producing his injury." *Miles v. Melrose*, 882 F.2d 976, 984 (5th Cir. 1989).  While it is true that the autopsy results reported the presence of THC in Chris Reed's liver, this fact does not equate to impairment or "intoxication" at the time of the incident.

### 1.     The presence of THC in Chris Reed's liver does not equate to impairment.

92.     Because the toxicology results in this case are taken from Chris Reed's liver tissue, as opposed to blood, the toxicology evidence itself is weak.  In a jury trial, the toxicology results probably should not have even been admitted given their prejudicial nature, lack of credible science to support an inference of impairment, and lack of corroborating evidence of impaired conduct.  However, given that this is a bench trial, the Court is in a much better position to put aside prejudices and decide issues based on credibility, science, and the complete evidence presented. *See Foradori v. Harris*, 523 F.3d 477 f.n.28 (5th Cir. 2008) ("The district court also noted the possible prejudicial effect of the marijuana evidence, suspecting that Captain D's attorneys impermissibly intended to use the evidence primarily to cast doubts on [the plaintiff's] character.").

93.     Evidence of alcohol or drug consumption itself is so prejudicial that courts require correlating evidence of impairment for the evidence to be admissible under Rule 403.[4] *See Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 583, 586-87 (5th Cir. 2003) (driver admitted to taking "five or six 'hits' of marijuana" the evening of car wreck and responding officer to the crash testified that driver "was 'swaying back and forth' and that he was 'possibly intoxicated.'"); *Celaya v. Hankook Tire Am. Corp.*, No. CV-11-00429, 2016 WL 10611188 *2-*3 (D. Ariz. March 29, 2016) ("Given this attenuated relevance, in addition to the lack of any admissible evidence that Mr. Celaya was actually impaired, the evidence of THC has only minimal value."); *Donald v. Triple S Well Serv., Inc.*, 708 So.2d 1318, 1323-24 (Miss. 1998) ("Evidence of drinking is so prejudicial that more than mere drinking must be shown; actual intoxication with impairment of physical or mental capacities is required."); *Gustavson v. Gaynor*, 503 A.2d 340, 342-43 (N.J. App. Div. 1985)( collecting cases; noting that "evidence of prior drinking is admissible as being relevant to the issue of the driver's fitness only when there is some supplementary evidence from which the trier of fact may reasonably conclude that the drinking affected the safe operation of the vehicle.").

94.     Maersk has not proven impairment and it cannot. Chris Reed's body was recovered after spending two days in Galveston Bay. *See* Trial Tr. Day 3-187.  Due to the deteriorated

---

[4] *See also Duzon v. Stallworth*, 866 So.2d 837, 857 (La. App.—1st Cir. 2002) (holding trial court did not abuse discretion excluding BAC evidence because there was no "admissible evidence that…the driver of the bicycle was **impaired** by alcohol." (emphasis added); *State v. Garrett*, 525 So.2d 1235, 1240 (La. App.—1st Cir. 1988) ("[t]he mere fact that a person has consumed alcohol prior to a vehicular accident does not prove that the person was 'under the influence' or that the alcohol consumption *caused* the accident.") (emphasis in original).

nature of his remains, toxicology labs had to be taken from his liver instead of his femoral blood stream. *Id.* at 188. Toxicology results from a liver (especially one that spent two days submerged in sea water) are not the best samples to interpret toxicology findings. *Id.*

### 2.   Dr. Jones testimony.

95.     Plaintiffs retained expert toxicologist; Dr. Jones testified about the difficulties with toxicology results taken from liver tissue like in this case. *See* Trial Tr. Day 3-148.  He said that it is impossible to do a "backtrack calculation" of the THC liver content and correlate that to an equivalent blood content reading.  *Id.*   Dr. Jones discussed the three leading articles related to this issue and concluded that liver content levels are 5-6 times or up to 20 times more than blood content results, all of which vary by individual. *Id.* at 150. Thus, Chris Reed's liver tissue sample results cannot be correlated with THC content found in blood samples. *Id.* at 151.

96.     However, even if these tissue sample results could be correlated to blood, there is not one single THC concentration level that defines impairment.   Unlike alcohol, researchers and toxicologists have been unable to come up with scientifically reliable "cutoff" concentration that defines impairment. *See id.* at 153-55.  The leading authority in these research studies is Dr. Marilyn Huestis, who has been studying the issue since 1993. *Id.* at 153.  In 2015, after multiple studies, she concluded that "unfortunately, there is no one THC blood concentration that will achieve this goal [of establishing a per se limit], not now, nor after much more additional research." *Id.* at 155.

97.     Further, it should be noted that Dr. Huestis's studies are performed on **live** subjects in controlled environments.[5]   However, even Dr. Huestis's studies related to impairment are not reliable in postmortem cases when the blood sample is collected from a corpse rather than a living human being.[6] She said as much in an article published in 2011: "It is **currently unknown** whether these models would be valid for impairment determination when using **postmortem** THC and THCCOOH concentrations for several reasons."[7] (emphasis added).

98.     One federal court has excluded an expert's opinion as unreliable for this very reason. In *Celaya v. Hankook Tire*, the defendants attempted to introduce evidence of a positive TCH and TCHOOH test taken from the decedent's postmortem blood and urine samples. 2016 WL 10611188 at *2 (D. Ariz. March 29, 2016). Defendants claimed that the positive THC finding went to the decedent's contributory negligence because he allegedly failed to secure himself or his daughter with a seatbelt before his fatal crash. *Id.* at *3. After reviewing the scientific literature on the subject, including that of Dr. Huestis above, the court excluded the expert's opinion on impairment:

> Defendants have offered no authority to counter the conclusions of Dr. Huestis and her colleagues that the Huestis models are not reliably applied to postmortem cases. […] Without some evidence that the models have been tested and proven to be reliable in postmortem cases, the Court must conclude that Dr. Fersew's [defendants' toxicologist] impairment opinion is based on an unreliable methodology and is therefore inadmissible."

---

[5] *See, e.g.*, Marilyn A. Huestis, *Estimating the Time of Last Cannabis Use from Plasma Δ⁹Tetrahydrocannabinol & 11-nor-9-Carboxy- Δ⁹-Tetrahydrocannabinol Concentrations,* CLINICAL CHEMISTRY 51:12 (2005).

[6] Marilyn A Huestis, et al, *Postmortem Redistribution of Δ⁹⁻ Tetrahydrocannabinol (THC), 11-hydroxy-THC (11-OH-THC), and 11-nor-9-carboxy-THC (THCCOOH)*, FORENSIC SCIENCE INT'L, vol. 212, 247-251 (2011)

[7] *Id.* at pg. 251.

*Id.* at *3.

99.     The Court should reach the same conclusion here. The published peer-reviewed science regarding impairment from post-mortem samples is inconclusive and unreliable. Further, the *Celaya* case dealt with **blood samples** taken shortly after death.  Here, the toxicology results were taken from a **liver tissue sample,** from a corpse that spent approximately two days submerged in seawater beforehand.

100.    In short, based on the toxicology results, literature, and evidence in this case, neither Dr. Jones nor Dr. Bux can determine impairment in this case—only that THC was present in Chris Reed's liver. *See id.* at 155; 191. To prove impairment, there must be some corroborating evidence like the Fifth Circuit described in *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581 (5th Cir. 2003). In *Bocanegra,*, the driver admitted to taking five or six hits of marijuana and the investigation officer witnessed him swaying and said he was probably impaired. *Id.* at 583, 586-87. Further, the issue in that case was the **admissibility** of the toxicology evidence. The party with the burden of proof would still have to **prove impairment <u>and</u> proximate cause** once the case was remanded for a new trial. Again, Maersk has the burden of proof on these issues and cannot meet its burden on either element here.

101.    Here, there is simply no corroborating evidence that Chris Reed was impaired the day of the incident.  Indeed, Chris Reed attended a city council meeting that morning with Carlene Neeley.  She testified that Chris was active, engaged and was not in any way impaired.  *See* deposition of Carlene Neeley at 27:9 -28:4; 34:10 – 35:19. Further, Jana Reed testified that her husband did not appear impaired while driving the boat or his vehicle

the day of his death. *See* Trial Tr. Day 2-187-88. When Chris got home from work that day, he took off his work clothes, put on his boat clothes and he and Jana were off to launch the boat. *Id.* at 192. The whole transition from coming home to leaving to launch the boat took only 15 minutes. *Id.* Chris had no problems launching the boat that afternoon, which undoubtedly is a difficult (if not impossible) task for someone to successfully perform while impaired on marijuana. *See id.* at 193.

102.    The Court should conclude that Defendants failed to meet their burden of proof on this issue because there is no corroborating evidence of impairment. *See Am. Dredging Co. v. Lambert*, 153 F.3d 1292 (11th Cir. 1998) (district court correctly held that plaintiff was not contributorily negligent when eyewitnesses said he was not acting impaired and toxicology results were tainted because his corpse "was in sea water for between 56 and 59 hours"); *see also Easterwood. v. Carnival Corp.*, No. 19-cv-22932, 2021 WL 1152398 at *13 (S.D. Fla. March 26, 2021) (holding defendant failed to meet burden of proof of impairment to establish comparative fault on plaintiff).

### 3.    Dr. Wimbish's opinion is not reliable or credible.

103.    Defendants' toxicologist, Gary H. Wimbish, Ph.D.'s opinion on impairment fails the *Daubert* test and is not credible. First, Dr. Wimbish's opinion is grounded in speculation. Second, the testimony is not based on sufficient facts or data.  Third, the opinion is not the product of reliable principles and methods.  Finally, because there are no scientifically reliable principles upon which to base such an opinion, Dr. Wimbish has not and cannot apply a reliable methodology to the facts of this case. To wit, he admitted that:

- The only tissue sample he relied upon was a liver sample taken after being submerged in Galveston Bay over two days in June 2019: *See Wimbish* Deposition at 6:12 –7:9.

- There is no scientific peer reviewed literature which quantifies a *per se* THC amount **in liver samples** that would establish impairment: *Id.* at 30:8-14; pg. 34:15 –35:9; 90:6-16.

- Dr. Wimbish admits that there are no studies correlating concentrations of THC in blood samples to concentrations of THC in liver samples. *Id.* at 66:5-10.

- The only article Dr. Wimbish relies upon for liver samples being indicative of recent ingestion specifically says that this issue is "unknown" and Dr. Wimbish admitted it.  *Id.* at 92:18 –95:9.

- Dr. Wimbish went on to state that the only article he relied upon for his opinion on recency or chronicity of use does not even say that in the article. *Id.* at 97:25 –98:7.

- Dr. Wimbish has no objective evidence of the amount of THC Chris Reed may have ingested, i.e. he has no evidence of a dose:  *Id.* at 32:16 –33:13.

- Dr. Wimbish has no idea how long before his death Chris Reed may have even ingested or how he ingested THC. *Id.* at 25:2 – 9.

- Dr. Wimbish cited no peer reviewed scientific literature for the effects of post-mortem redistribution of THC from other fatty tissues to the liver.  *Id.* 83: 15-21.

- Dr. Wimbish did not account for eyewitness observations of Chris Reed's actions on the day of his death, including lack of any objective impairment during the Kemah City Council meeting on the day of his death. *Id.* at 37:1 – pg. 39:15.

104.   Dr. Wimbish cites a single article to support his opinion that Chris Reed was impaired the day of the accident based on the toxicology results from his liver tissue. *Id*. at 90-93.  The problem is that the article he cites does not support his opinion—in fact the article concludes the exact opposite.  In sum, the authors say that based on all scientific

data available, it is still unknown "whether or not tissues will provide any interpretative help with time of [THC] ingestion or psychomotor impairment." *See* Wimbish Deposition, 91.

105.    When confronted with this inconvenient truth about his source material, Dr. Wimbish gave a classic inadmissible, speculative, answer about how he knows what the authors of this article were thinking:

Q:    […] This article that you have relied upon in forming your opinion says that these tissue samples, it's not clear whether they provide an interpretative help for determining psychomotor impairment. That's what the article says, true?

A:    Yes, sir. And I can tell you where it's going with this statement and why it's there. It says that--

Q:    Okay.

A:    --we should use brain tissue as a better example, and its leaning for further research that needs to be developed.  They're giving caveats is what they're doing.  And I know this – these arti—these – authors very well.[8]

* * *

Q:    You're not emailing them [authors] and asking them what they meant by this, are you?

[…][9]

A:    No. I know these individuals very well.  I'm interpreting this based on my abilities to read this material and interpret what is being said. [10]

* * *

Q:    […] what I'm getting at is how well you know these individuals doesn't have any basis on what this article says, what the clear text says.  We're looking at –

A:    True.

Q:    --scientifically reviewed—

A:    Sure it does.

Q:    --peer reviewed literature.  Not what you – not what your friends – how good a friends you are with these people, true?

---

[8] Deposition of Dr. Wimbish at pg. 93:9-21.
[9] Counsel's objections omitted throughout the excerpts in this brief.
[10] *Id.* at 94:5-10.

A:    Well, its extremely well written, and I know how these individuals think and what they're saying based upon this publication.

Q:    Okay.

A:    I'm familiar with the process.[11]

106.   This is classic speculation.  An expert cannot interpret words to mean different things because he "knows how these individuals think."  The literature says there is no scientifically reliable way to determine if liver tissue results provide help in determining psychomotor impairment.  The Court should take that conclusion at its face value instead of speculating about what uncalled witnesses may have been thinking when they wrote those words.

107.   After further questioning, Dr. Wimbish admitted that the article does not say liver tissue samples can be used to determine impairment:

Q:    […] It does not say in this article that THC levels in liver samples or metabolite samples in –samples in liver samples can be used to determine recency or chronic use?  It does not say that in this article, does it, Dr. Wimbish?
[…]

A:    This is correct.[12]

Yet, that is precisely the purported conclusion that Dr. Wimbish reached in this case—that the positive finding in Chris Reed's liver tissue is attributed to recent or chronic use.   By his own admission, Dr. Wimbish's opinions are not reliable nor supported by peer reviewed literature.  His opinion is not credible on this basis alone.

108.   Finally, Dr. Wimbish's "evidence of impaired conduct" is his opinion that Chris Reed drove his boat too close to the *Maersk Idaho*. *See* Wimbish Deposition at 40:21-25.

---

[11] *Id.* at 94:9.
[12] *Id.* at 97:25 – 98:7.

Dr. Wimbish, a toxicologist, is the only expert in this case who holds this opinion, despite many experienced mariners offering their expertise to the Court. Chris Reed was three tenths of a mile away from the container ship when the incident occurred. Trial Tr. Day 1-195. Dr. Wimbish essentially ignores the testimony of Jana that her husband did not appear impaired and had not even reviewed the deposition of Carlene Neely before his deposition. *See* Wimbish Depo at p. 10-11, 37. Instead he cherry picked a criticism about the proximity of Chris Reed's boat to the *Maersk Idaho* and has failed to cite a single peer-reviewed article that actually supports his opinion of impairment.

109.    Unlike Dr. Wimbish, Dr. David Jones has outlined the numerous studies and peer reviewed scientific articles that prove that even THC blood or plasma concentrations do not establish a relationship between blood (and plasma) and performance impairing effects. Trial Tr. Day 3-149-155. Given the lack of any direct relationship between concentration in a liver tissue specimen vs. blood there is no way to state that Reed was impaired by THC at the time of the incident. Trial Tr. Day 3-154-55. These conclusions are echoed by Dr. Bux, a forensic pathologist. *Id.* at 191-92. Even the forensic pathologist hired by the defense, Dr. Grossberg, could not draw impairment conclusions from the THC levels of Reed. She said that only generalized statements such as "may have" or "could have impaired someone" could be made in this case. For her to give anything other than a "may have or could have" opinion, she testified that the values would need to be extremely high – many times more than what's present in this case. *See* Dr. Grossberg deposition at pgs. 42, 43.

110.     The Court should conclude that Chris Reed was not impaired at the time of his death and that Defendants have failed to carry their burden of proof on this theory of contributory negligence. It is telling that Maersk did not bring its toxicologist, Dr. Wimbish, or its medical doctor, Dr. Grossberg, to testify at trial concerning this issue.  Their absence from trial demonstrates that Maersk only brought forth this evidence in an attempt to prejudice the Reed family.

### f.   Maersk is liable to the Reeds

111.     Maersk is liable to the Reeds under the General Maritime Law for failing to exercise reasonable care under the circumstances.  Maersk and the *Maersk Idaho, in rem*, owed the Reeds, and others on the waters of Galveston Bay a duty to minimize the *Maersk Idaho*'s wake, and to set the vessel's speed with care such that its wake would not cause damage. As shown above, Maersk and the *Maersk Idaho* breached that duty and that breach caused Chris Reed to be ejected from his boat.  Maersk and the *Maersk Idaho, in rem*, are liable for the damage caused by that breach.

### IV.     The Reed family deserves full and fair damages for their loss.

112.     Chris was a loving husband and father to three children. He was a lifetime public servant, serving in the United States Army as a ranger and paratrooper before becoming a law enforcement officer. *See* Trial Tr. Day 2-169-72; 178.  He served the communities of Galveston County as a patrolman in League City, assistant city manager in League City, City Manager in Nassau Bay and the Chief of Police in Kemah. *Id.* June 7, 2019 was not Chris's time to die; his life was tragically cut short by the wake of the Maersk Idaho.

113.     After Chris was ejected from his boat, his wife Jana frantically attempted to rescue him.  When she was unable to do so, she experienced the horror of seeing her own spouse scream his last words before succumbing to his injuries and drowning.  No spouse should have to endure the terror of watching their partner die in such a dreadful way.

114. In addition to Jana, Chris leaves behind his three children: Alexis (19), Chase (20), and Logan (27).  A father's relationship with his children is different in every family, but Chris was a close, active, and loving father to all of his children. Alexis, Chase, and Logan's premature loss of their father is devastating and will be felt by them for years to come as they start families of their own without the love, support, and guidance of their dad.



### a.                  Texas law applies to damages.

115. Plaintiffs have pleaded for damages under Texas law, specifically, under the Wrongful Death and Survival statutes. *See* Plaintiffs' Third Amended Complaint [Dkt. 32] at pgs. 6-12. Texas law governs the award of damages in this wrongful death case. *See Yamaha Motor Corp v. Calhoun*, 516 U.S. 199, 216 (1996) ("[T]he damages available for the jet ski death of Natalie Calhoun are properly governed by state law."); *see also* Dkt. 87. Accordingly, Plaintiffs' brief will focus on Texas law, cases, and jury awards regarding the damages sought herein.

### b. Economic damages.

116.    Plaintiffs pleaded for all pecuniary losses suffered as a result of Chris Reed's death. These losses include: (1) loss of earning capacity in the past and future; (2) loss of income in the past and future; and (3) loss of household services in the past and future.  Plaintiffs and Defendants each retained economists to opine on each element of the aforementioned economic damages.  Their opinions concerning the Reeds' economic losses are strikingly close.

117.    Plaintiffs' expert, Dr. Thomas Mayor, is a well-qualified and experienced economist. *See* Trial Tr. Day 4-11-14; Plaintiffs' Exh. 134. Dr. Mayor calculated the Reeds' economic damages in accordance with the Fifth Circuit's opinion and guidelines in *Culver v. Slater Boat Co.*, 772 F.2d 114 (5th Cir. 1983) (also referred to as "*Culver II*"). *Id.* at 14-15. At trial, Dr. Mayor detailed his entire analysis and calculations for the Court. Or, as math teachers like to say, he "showed his work." *See* Trial Tr. Day 4-15-32.  Dr. Mayor also created a table to summarize his calculations. *See* Plaintiffs' Exh. 133A. In summation, Dr. Mayor calculated the Reeds' economic losses as follows:

1.  Loss of earning capacity in the past and future:        **$1,175,695**[13]

2.  Loss of pension income in the past and future:        **$1,900,947**[14]

3.  Loss of Household services in the past and future:  **$456,288**[15]

                **Total economic loss:**        **$3,532,930**[16]

---

[13] *See* Trial Tr. Day 4-26;

[14] *See* Trial Tr. Day 4-31.

[15] *See* Trial Tr. Day 4-30

[16] *See* Trial Tr. Day 4-32

Stated differently, the total pecuniary losses in the **past are $310,001** and in the **future** total **$3,222,929.**

118.    Defendants hired Ygnacio D. Garza, a certified public accountant, to calculate the Reeds' pecuniary losses. *See* Court's Doc. No. 68-6.   The Defendants' economist came up with roughly the same economic loss for the Reeds, but it was actually about $50,000 greater. *See* Trial Tr. Day 4-32.   In Dr. Mayor's 40-plus year career, he has not seen two economists calculate losses this close on a percentage wise basis. *Id.* Defendants did not call their economist to trial.   Thus, Plaintiffs pray that the Court award economic damages consistent with Dr. Mayor's calculations above.

119.    Additionally, Chris Reed's estate is entitled to recover burial costs. *Russel v. Ingersoll-Rand Co.*, 841 S.W.2d 343, 345 (Tex. 1992). Chris Reed's funeral cost $12,996.20. *See* Trial Tr. Day 2-209; Plaintiffs' Exh. 36.  Plaintiffs pray for this total award of funeral expenses.

### c.  Non-Pecuniary Losses: Wrongful Death Beneficiaries

120.    Non-pecuniary losses are difficult to quantify and are inherently subjective.  Juries, as voices of the community in which they live, struggle with quantifying these types of awards.  Ultimately, whatever verdict they reach, is the collective decision of 12 differing members of the community in which the case is tried.

121.    In this case, the Court sits as finder of fact.  But that does not make the Court's assessment of noneconomic damages any less difficult than a jury's.  For this reason, Plaintiffs have submitted jury awards from other cases so the Court has an idea of how communities in Texas value losses such as the Reed family experienced.  Also, for the

Court's convenience, attached as Damages APPX. 1,[17] is a modified jury verdict form that serves as a worksheet for the Court, demonstrating the elements of damages allowed under Texas law.

122.    Damages for non-economic losses, such as loss of companionship and society and mental anguish, are allowable under the Wrongful Death Statute. TEX. CIV. PRAC. & REM. CODE Ann. § 71.001–71.011 (West 2008) (Texas Wrongful Death Act); *see Guzman v. Guajardo*, 761 S.W.2d 506, 510 (Tex. App.—Corpus Christi 1988, writ denied). While both loss of companionship and society damages and mental anguish damages "compensate for non-economic losses, the two elements of damages are separate and do not overlap." *Thomas v. Uzoka*, 290 S.W.3d 437, 455 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); *see Moore v. Lillebo*, 722 S.W.2d 683, 688 (Tex. 1986).

### i.    Loss of Companionship and Society

123.    Loss of companionship and society are the "positive benefits flowing from the love, comfort, companionship, and society that the beneficiary would have experienced had the decedent lived." *Thomas*, 290 S.W.3d at 455; *see Moore*, 722 S.W.2d at 687–88. Loss of companionship focuses on the removal of the positive benefits the beneficiary enjoyed prior to the wrongful death. *Thomas*, 290 S.W.3d at 456.

124.    Loss of companionship damages need not be proportional to the damages for pecuniary loss. *See Mo. Pac. R.R. Co. v. Lane*, 720 S.W.2d 830, 833 (Tex. App.—Texarkana 1986, no writ). The trier of fact may consider the following factors in awarding

---

[17] Plaintiffs have prepared an appendix of these damage exhibits, they are referred to herein as "Damages Appx. 1," etc.

damages for loss of companionship and society: "(1) the relationship between the husband and wife, or a parent and child; (2) the living arrangements of the parties; (3) any absence of the deceased from the beneficiary for extended periods; (4) the harmony of family relations; and (5) common interests and activities." *Moore*, 722 S.W.2d at 688; *see Thomas*, 290 S.W.3d at 456; *see Guzman*, 761 S.W.2d at 510.

### 1.    Jana Reed—Chris Reed's widow

125.    Plaintiffs request the Court to award **$3 million** for Jana's loss of society claim. Almost every spouse's relationship to their partner is close, loving, and unique.  Jana and Chris's was especially so.  They had known each other since the 6th grade, eventually marrying on July 30, 1990.  They had been married almost 30 years until Chris's early death. Chris was Jana's biggest supporter, financially and emotionally.  He encouraged her to get her college degree so she could be self-sufficient. Trial Tr. Day 2-173.

126.    The Reed family was featured in the Family Circle magazine. *See* Trial Tr. Day 2-177; Plaintiffs' Exh. 23.  After their first born, Logan, the Reed's had difficulty conceiving so they made the choice as husband and wife to adopt two additional children, Chase and Alexis. Trial Tr. Day 2-177. As Jana aptly put it, after her husband died "nothing will ever be the same." *Id.* at 204. Jana and Chris lost the opportunity to be grandparents together, to Charley Belle and probably many more in the future. *Id.*

127.    As stated above, Plaintiffs request $3 million for Jana's loss of society claim— $775,000 in the past and $2.25 million in the future. Under Texas law, these amounts are within the ranges awarded by Texas juries to widows and widowers:

- $3.5 million combined past and future awarded to spouse of construction worker who **drowned** after his equipment fell over the edge of a barge. *See Suarez v. Austin Commercial, LP*, No. 2014-11694 (151st Dist. Ct., Harris County, Tex. Apr. 12, 2016), *rev'd on other grounds* (barred by workers' comp.), 556 S.W.3d 363 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (Jury Verdict Attached as Damages APPX. 2 and Verdict Search Summary Attached as Damages APPX. 2a).

- $2 million ($3,019,265 adjusted for inflation)[18] awarded to spouse of driver who was killed after a pipe fell off a tractor-trailer and collided with his car. *See C & H Nationwide, Inc. v. Thompson*, 810 S.W.2d 259, 262, 265 (Tex. App.—Houston [1st Dist.] 1991), *rev'd on other grounds*, 903 S.W.2d 315 (Tex. 1994) (damages for lost inheritance and prejudgment interest may be awarded on future damages).

- $2.25 million ($2,693,075 adjusted for inflation) combined past and future awarded to spouse of worker who was struck by pieces of a failed coupling device on the job. *See Bice v. Teco-Westinghouse Motor Co.*, No. 2008-56581 (55th Dist. Ct., Harris County, Tex. Apr. 29, 2011) (Jury Verdict Attached as Damages APPX. 3 and Verdict Search Summary Attached as Damages APPX. 3a).

- $1.75 million combined past and future awarded to spouse of worker who died in an explosion on the job. *See Delgado v. Oiltanking Holding Americas, Inc.*, No. 2012-32487 (127th Dist. Ct., Harris County, Tex. Nov. 11, 2013), *rev'd on other grounds*, 502 S.W.3d 202 (Tex. App.—Houston [14th Dist.] 2016), *reh'g overruled* (Oct. 18, 2016) (Jury Verdict Attached as Damages APPX. 4 and Verdict Search Summary Attached as Damages APPX. 4a).

- $1 million ($1,155,001 adjusted for inflation) combined past and future to spouse of decedent who died following a collision with a drunk driver. *See Stow v. Webb*, 2012-49872 (157th Dist. Ct., Harris County, Tex. Nov. 13, 2014) (Jury Verdict Attached as Damages APPX. 5 and Verdict Search Summary Attached as Damages APPX. 5a).

---

[18] For all verdicts or judgments more than five years old, Plaintiffs have included the award amounts adjusted for inflation utilizing the United States Bureau of Labor Statistics inflation calculator. The calculator is accessible via the web at www.bls.gov/data/inflation_calculator.htm

## 2. Reed Children—Alexis, Chase & Logan

128.     Plaintiffs ask the Court to award **$1.75 million** to each of the Reed children as compensatory damages in the past and future for loss of society.  Each of the Reed children testified about their relationship with their dad and what his loss means to them.

129.     Alexis is Jana and Chris's youngest child at 19 years old who still lives in the family home. Trial Tr. Day 3-249.  Alexis was adopted after Chris and Jana decided to adopt local kids who needed parents.  She testified that her dad was her "real life superman, the first man I ever loved, and he helped to raise me and teach me to be strong, to always work for what I get, to keep going, keep pushing forward, to not give up." *Id*.  Simply, Alexis described her dad as "safe for me." *Id.* at 251. Now that her dad is gone, she testified that Chris didn't get to hand her her high school diploma, he won't be able to walk her down the aisle on her wedding day or meet any of her children. *Id.* Instead her family will have "to live through these happy moments while still being sad because he can no longer be with us." *Id.*  This loss especially affected Alexis because she had also lost her biological father.  Trial Tr. Day 4-50.



*See* Plaintiffs' Exh. 32.

130.   Chase is Jana and Chris's only son.  He is currently serving in the Navy as an aviation mechanic stationed in Japan. Trial Tr. Day 2-185. As a veteran, Chris was instrumental in Chase's decision to join the armed forces. *Id.* After his service in the Navy, Chase wants to join the Army to honor his dad. *Id.* at 186. Chris got Chase interested in wrestling and was his coach from age 8 until 14. *See* Deposition of Chase Reed at pg.15. Chase testified that he and his dad had a "tough love" relationship—he wanted Chase to be his own man. *See* Deposition of Chase Reed at pg. 14.  Chase described his dad as tough, resilient, intelligent and "king of his own world." *See* Deposition of Chase Reed at pg.15. Chris and Chase also enjoyed time hunting together. Trial Tr. Day 2-185.  Like his other

siblings, Chase will miss all the future moments with his dad, his career in the armed forces,

starting a family, and, God willing, spending time with Chase's children.



Jana Reed, 3:19-cv-238

131.   Logan is Chris and Jana's oldest daughter. She named her 9-month-old daughter

Charley, after her dad. Trial Tr. Day 4-43.   Chris and Logan undoubtedly had a special

relationship from the start. When she was born, Jana said that it really changed Chris for

the better. Trial Tr. Day 2-175.   They did everything together. Chris maneuvered his work

schedule so he and Logan could spend two days a week together, what they called "Daddy

days." *Id.* They would go to playgrounds together with tunnels to crawl through. Chris

bought them both knee pads so their knees would not hurt as they crawled through them.

*See id.* They enjoyed going to the beach together and playing guitar hero. Trial Tr. Day 4-44-45.

132.   Chris coached all of Logan's athletic teams until middle school.  He was present at every competition. *Id.* at 45. Her dad helped her run for vice president of her high school, helped her become a second-generation member of the Clear Lake Chamber of Commerce, and paid for her college tuition. *Id.* at 46-47.  Logan graduated *magna cum laude* from Texas Tech. *Id.*  Logan and Chris loved to travel together. When she studied abroad they spent a week in Ireland together and had a trip planned to Panama before her dad's untimely death. *Id.*  at 48.

133.   Of course, Chris will not be able to take any more trips with Logan. He will not get to meet baby Charley, watch her grow up, or watch his daughter Logan grow into becoming a mother. Logan has not had her dad for these moments and will not in the future.



*See* Plaintiffs' Exh. 33.

As stated above, Plaintiffs request $1.75 million for each of the Reed children's loss of society claim—$750,000 in the past and $1 million in the future. Under Texas law, these amounts are within the ranges awarded by Texas juries:

- $17.5 million combined past and future to two surviving minor children of construction worker who died after falling four stories on the job. *Garcia v. Manhattan Vaughn, JVP*, No. 2013-76550 (80th Dist. Ct., Harris County, Tex. Feb. 10, 2016), *settled on appeal*, No. 01-16-00443-CV (Tex. App.—Houston [1st Dist.] June 1, 2016) (Jury Verdict Attached as Damages APPX.6 and Verdict Search Summary Attached as Damages APPX. 6a).

- $7 million ($10,462,881 adjusted for inflation) combined past and future loss of companionship and society and pain and suffering and mental anguish awarded to two surviving children—one adult and one minor—of pedestrian who was electrocuted when she stepped on an electrical box on sidewalk. *See Sanchez v. Mica Corp.*, 107 S.W.3d 13, 33 (Tex. App.—San Antonio 2002), *vacated in part*, (Mar. 27, 2003).

- $6,761,000 ($10,917,980 adjusted for inflation) awarded to three surviving children ages 17, 12, and 7 of man and woman whose car was struck by a train. *See Atchison, Topeka and Santa Fe Ry. Co. v. Cruz*, 9 S.W.3d 173, 177, 185 (Tex. App.—El Paso 1999), *review granted, judgment vacated, and remanded by agreement*, (Dec. 21, 2000).

- $6 million ($7,500,174 adjusted for inflation) for future loss of companionship and society awarded to three surviving minor children of inmate who was beaten to death while officers and wardens stood by and watched. *See Wackenhut Corrections Corp. v. de la Rosa*, 305 S.W.3d 594, 600, 608 (Tex. App.—Corpus Christi 2009, no pet.), *abrogated by Zorilla v. Aypco Constr. II, LLC.*, 469 S.W.3d 143, 155 (Tex. 2015) (holding that statutory caps on exemplary damages are not waived if not pleaded as an affirmative defense). This award was affirmed by the Thirteenth Court of Appeals. *Id.* at 639.

- $3.25 million ($3,871,783 adjusted for inflation) combined past and future to minor child of worker who was struck by pieces of a failed coupling device on the job. *See Bice v. Teco-Westinghouse Motor Co.*, No. 2008-56581 (55th Dist. Ct., Harris County, Tex. May 10, 2011) (Jury Verdict Attached as Damages APPX. 3 and Verdict Search Summary Attached as Damages APPX. 3a).

- $2.35 million ($2,714,253 adjusted for inflation) combined past and future awarded to three surviving minor children of worker who died in an explosion on the job. *See Delgado v. Oiltanking Holding Americas, Inc.*, No. 2012-32487 (127th Dist. Ct., Harris County, Tex. Nov. 22, 2013), *rev'd on other grounds*, 502 S.W.3d 202 (Tex. App.—Houston [14th Dist.] 2016), *reh'g overruled* (Oct. 18, 2016) (Jury Verdict Attached as Damages APPX. 4 and Verdict Search Summary Attached as Damages APPX.4a).

- $1 million combined past and future to each of three surviving adult children of construction worker who drowned after his equipment fell over the edge of a barge. *See Suarez v. Austin Commercial, LP*, No. 2014-11694 (151st Dist. Ct., Harris County, Tex. Aug. 1, 2016), *rev'd on appeal on different grounds* (barred by workers' comp.), 556 S.W.3d 363 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (Jury Verdict Attached as Damages APPX. 2 and Verdict Search Summary Attached as Damages APPX. 2a).

### i. Pain and Suffering and Mental Anguish

134. Mental anguish is "the emotional pain, torment, and suffering that the wrongful-death beneficiary experienced as a result of the death of her family member." *Thomas*, 290 S.W.3d at 455; *see Moore*, 722 S.W.2d at 688. Mental anguish emphasizes the negative impact the wrongful death has on the beneficiary. *Thomas*, 290 S.W.3d at 455–56.

135. The trier of fact may consider the following factors in awarding damages for mental anguish: "(1) the relationship between the husband and wife, or a parent and child; (2) the living arrangements of the parties; (3) any absence of the deceased from the beneficiary for extended periods; (4) the harmony of family relations; and (5) common interests and activities." *Moore*, 722 S.W.2d at 688; *see Thomas*, 290 S.W.3d at 456; *see Guzman*, 761 S.W.2d at 510. "Proof of a familial relationship is 'some' evidence that the surviving family members suffered mental anguish as a result of the death." *JBS Carriers, Inc. v.*

*Washington*, 513 S.W.3d 703, 718 (Tex. App.—San Antonio 2017, pet. filed) (quoting *Moore*, 722 S.W.2d at 686).

### 1.   Jana Reed—Chris Reed's widow

136.   Plaintiffs ask the Court to award Jana Reed **$1.5 million** in past and future compensatory damages for the emotional pain, torment, and suffering experienced by Jana because of the death of her husband, Chris Reed. This is separate and distinct from a bystander claim, which is addressed below.  Jana lost her best friend, spouse, and biggest supporter two years ago in Galveston Bay.

137.   Since Chris's death, Jana has been in therapy and continues with therapy to this day to deal with the emotional pain and torment of her loss. *See* Trial Tr. Day 2-204. Logan testified that immediately following her dad's death, Jana was hysterical and confused. *See* Trial Tr. Day 4-49. Since then, and even today, Jana is different. Logan testified that her mom used to be carefree, fun, and they would spend lots of time together. *Id.*  But after Chris's death Jana has become distant and can't sit still because she does not want her mind to wander. *Id.*

138.   As stated above, Plaintiffs' request $1.5 million for Jana's mental anguish claim—$1 million in the past and $500,000 in the future. Under Texas law, these amounts are within the ranges awarded by Texas juries:

- $3.5 million combined past and future awarded to spouse of construction worker who drowned after his equipment fell over the edge of a barge. *See Suarez v. Austin Commercial, LP*, No. 2014-11694 (151st Dist. Ct., Harris County, Tex. Aug. 1, 2016), *rev'd on appeal on different grounds* (barred by workers' comp.), 556 S.W.3d 363 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (Jury Verdict Attached as Damages Appx. 2 and Verdict Search Summary Attached as Damages Appx. 2a).

68

- $2 million ($3,952,936 adjusted for inflation) awarded to spouse of driver who was killed after a pipe fell off a tractor-trailer and collided with his car. *See C & H Nationwide, Inc. v. Thompson*, 810 S.W.2d 259, 262, 265 (Tex. App.—Houston [1st Dist.] 1991), *rev'd on other grounds*, 903 S.W.2d 315, 316 (Tex. 1994) (award of damages for lost inheritance and prejudgment interest may be awarded on future damages).

- $2 million ($2,382,636 adjusted for inflation) combined past and future awarded to spouse of worker who was struck by pieces of a failed coupling device on the job. *See Bice v. Teco-Westinghouse Motor Co.*, No. 2008-56581 (55th Dist. Ct., Harris County, Tex. May 10, 2011) (Jury Verdict Attached as Damages APPX.3 and Verdict Search Summary Attached as Damages APPX. 3a).

- $1 million ($1,146,427 adjusted for inflation) combined past and future awarded to spouse of worker who died in an explosion on the job. *See Delgado v. Oiltanking Holding Americas, Inc.*, No. 2012-32487 (127th Dist. Ct., Harris County, Tex. Nov. 22, 2013), *rev'd on other grounds*, 502 S.W.3d 202 (Tex. App.—Houston [14th Dist.] 2016), *reh'g overruled* (Oct. 18, 2016) (Jury Verdict Attached as Damages APPX.4 and Verdict Search Summary Attached as Damages APPX. 4a).

- $1 million combined past and future awarded to spouse of decedent who died following a collision with a drunk driver. *See Stow v. Webb*, 2012-49872 (157th Dist. Ct., Harris County, Tex. Dec. 17, 2014) (Jury Verdict Attached as Damages APPX. 5 and Verdict Search Summary Attached as Damages APPX. 5a).

### 2.      Reed Children—Alexis, Chase & Logan

139.   Plaintiffs ask the Court to award each of the Reed children **$900,000** each in past and future compensatory damages for the emotional pain, torment, and suffering experienced by them due the death of their dad, Chris Reed.

140.   Following Chris's death, his grieving family "clashed a lot." Logan testified that she was angry; Alexis was withdrawn; Jana was hysterical and confused; and her brother Chase was simply trying to keep them all together. Trial Tr. Day 4-49. Since then, Logan said that her sister Alexis has withdrawn even more from the family. Chase has put even more

69

pressure on himself to be the man of the family even though she "knows all he wants to do is just call my dad and get advice or cry." *Id.* at 50. In fact, Logan said that Chase recently called her dad's old phone just to hear his voice and tell him that he loved him. *Id.*

141.   Logan herself described that she felt like her mind went off the tracks—there is a huge hole that she will never be able to fill, she has lost her motivation, self-esteem, and purpose. Her dad was her best friend and mentor. She is confused and lost. *Id.* at 51. She testified that it sometimes keeps her up at night knowing the way he died, drowning, and his body at sea for days. *Id.* at 53.

142.   As stated above, Plaintiffs' request $900,000 for each of the Reed children's mental anguish claim—$500,000 in the past and $400,000 in the future. These amounts are within the ranges awarded by Texas juries to surviving children and affirmed by other Texas courts:

- $7.5 million combined past and future to two surviving minor children of construction worker who died after falling four stories on the job. *Garcia v. Manhattan Vaughn, JVP*, No. 2013-76550 (80th Dist. Ct., Harris County, Tex. Feb. 10, 2016), *settled on appeal*, No. 01-16-00443-CV (Tex. App.—Houston [1st Dist.] June 1, 2016) (Jury Verdict Attached as Damages APPX. 6 and Verdict Search Summary Attached as Damages APPX. 6a).

- $7,386,000 ($11,798,072 adjusted for inflation) awarded to three surviving children ages 17, 12, and 7 of man and woman whose car was struck by a train. *See Atchison, Topeka and Santa Fe Ry. Co. v. Cruz*, 9 S.W.3d 173, 177, 185 (Tex. App.—El Paso 1999), *review granted, judgment vacated, and remanded by agreement*, (Dec. 21, 2000).

- $7 million ($10,462,881 adjusted for inflation) combined past and future loss of companionship and society and pain and suffering and mental anguish awarded to two surviving children—one adult and one minor—of pedestrian who was electrocuted when she stepped on an electrical pull box on sidewalk. *See Sanchez v. Mica Corp.*, 107 S.W.3d 13, 33 (Tex. App.—San Antonio 2002), *vacated in part*, (Mar. 27, 2003).

- $6 million ($7,500,174 adjusted for inflation) damages for future pain and suffering and mental anguish awarded to three surviving minor children of inmate who was beaten to death while officers and wardens stood by and watched. *See Wackenhut Corrections Corp. v. de la Rosa*, 305 S.W.3d 594, 600, 608 (Tex. App.—Corpus Christi 2009, no pet.), *abrogated by Zorilla v. Aypco Constr. II, LLC.*, 469 S.W.3d 143, 155 (Tex. 2015) (holding that statutory caps on exemplary damages are not waived if not pleaded as an affirmative defense).

- $2 million ($2,310,002 adjusted for inflation) combined past and future awarded to three surviving minor children of worker who died in an explosion on the job. *See Delgado v. Oiltanking Holding Americas, Inc.*, No. 2012-32487 (127th Dist. Ct., Harris County, Tex. Nov. 22, 2013), *rev'd on other grounds*, 502 S.W.3d 202 (Tex. App.—Houston [14th Dist.] 2016), *reh'g overruled* (Oct. 18, 2016) (Jury Verdict Attached as Damages APPX. 4 and Verdict Search Summary Attached as Damages APPX. 4a).

- $1.5 million combined past and future awarded to three surviving adult children of construction worker who drowned after his equipment fell over the edge of a barge. *See Suarez v. Austin Commercial, LP*, No. 2014-11694 (151st Dist. Ct., Harris County, Tex. Aug. 1, 2016), *rev'd on appeal on different grounds* (barred by workers' comp.), 556 S.W.3d 363 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (Jury Verdict Attached as Damages APPX. 2 and Verdict Search Summary Attached as Damages APPX.2a).

- $1 million ($1,953,519 adjusted for inflation) awarded to two surviving adult children of driver who was killed after a pipe fell off a tractor-trailer and collided with his car. *See C & H Nationwide, Inc. v. Thompson*, 810 S.W.2d 259, 262, 265 (Tex. App.—Houston [1st Dist.] 1991), *rev'd on other grounds*, 903 S.W.2d 315, 316 (Tex. 1994) (evidence was insufficient to support award of damages for lost inheritance and prejudgment interest may be awarded on future damages).

### d.    Jana Reed's Bystander Claim

143.   Texas law permits recovery of damages for mental anguish when someone witnesses or perceives an incident that causes the death of their close relative. *See United Servs. Auto Ass'n v. Keith*, 970 S.W.2d 540, 541-42 (Tex. 1998).  Jana's bystander recovery is a separate and distinct claim; it is not derivative of the wrongful death claim. *See Estate*

*of Barrera v. Rosamond Vill. Ltd. P'ship*, 983 S.W.2d 795, 799 (Tex. App.—Houston [14th Dist.] 1998, no pet.)  There are three factors that are required to recover for a bystander claim:

    (1) Whether the plaintiff was located near the scene of the accident;

    (2) Whether the shock resulted from a direct emotional impact on the plaintiff from a contemporaneous perception of the accident, as distinguished from learning of the accident from another source after its occurrence; and

    (3) Whether the plaintiff and the victim were closely related.

    *See Keith*, 970 S.W.2d at 541-42*; Jones v. City of Houston*, 294 S.W.3d 917, 920 (Tex. App.—Houston [1st Dist.] 2009, pet. denied.). It is undisputed that Jana meets all three elements here: she witnessed her husband drown.

144.   Plaintiffs asks the Court to award **$2 million** for Jana's mental anguish associated with the observation of the death of her husband. Jana had to witness the unspeakable horror of watching her husband of almost 30 years drown before her eyes. At trial, she testified about the frightening experience of watching Chris be ejected from their boat after encountering the wake of the *Maersk Idaho*. *See* Trial Tr. Day 2-199-200.  After Chris went overboard, Jana "was frantically yelling his name and looking for him because [she] could not see him anymore." *Id.*

145.   After reversing the boat, Chris appeared to Jana on the opposite side he fell off.  Jana grabbed a rope and threw it to Chris in an attempt to rescue him. At this time, Chris and Jana exchanged their final moments as husband and wife before his death:

        "Chris, grab the rope!"
        "Jana, hurry! I can't hold on!"
        "Just grab the rope!"

> But he never one time ever lifted his arms above the water.  He was
> never even, like splashing. All I could ever see was from his chin up.
> And right after he said, "Jana, hurry! I can't hold on!" another wave
> went over his head, and that was the last time I saw him, other than
> his shoe floating.

Trial Tr. Day 2-200.

146.   Jana did not get to say a proper goodbye to her lifetime partner. Afterwards, Jana

called 911 and could not help but scream Chris's name over and over. *Id.* at 201.

Undoubtedly, a portion of Jana's time in therapy is geared toward an attempt to erase this

awful memory.  Yet, it will inevitably haunt her for the remainder of her life.

147.   As stated above, Plaintiffs' request $2 million for Jana's bystander mental anguish

claim—$1 million in the past and $1 million in the future. This amount is within the range

Texas juries award for bystander claims:

- $3.25 million ($4,729,101 adjusted for inflation) combined wrongful death
  bystander damages awarded to mother whose child died in car wreck; $300,000
  in bystander damages to each grandparent who came to scene afterwards. *See
  Lowery v. Union Pac. R.R. Co.*, No. C-2002-0018, Johnson County District
  Court (Oct. 9, 2003) (Verdict Search Summary attached as Damages APPX. 7).

- $2.1 million ($3,036,033 adjusted for inflation) combined past and future
  bystander damages awarded to each of two minor children that were passengers
  in car wreck were their dad died. *See Berno v. Price Const., Inc.*, No, 2001-CVE-
  00095D3 (Webb County Dist. Court, Feb. 20, 2004) *settled before appeal*
  (verdict attached as Damages APPX. 8; Verdict Search summary attached as
  Damages APPX. 8a).

### e. Non-economic damages – the Estate of Chris Reed – pre-death pain and suffering.

148.   Under Texas law, pain and suffering damages are recoverable only if the person was

conscious during the accident. *See S. Pac. Transp. Co. v. Luna*, 730 S.W.2d 36, 38 (Tex.

App.—Corpus Christi 1987, no writ). Additionally, "[c]onsciousness of approaching death

73

is a proper element to be considered in evaluating mental suffering." *Jenkins v. Hennigan*, 298 S.W.2d 905, 911 (Tex. Civ. App.—Beaumont 1957, writ ref'd n.r.e.). "Fear of imminent death or serious injury, even for a matter of seconds, provides *some* evidence of mental anguish that is more than mere worry, anxiety, vexation or anger." *Ontiveroas v. Lozano*, No. 14-15-00294, 2006 WL 1140374, at *3 (Tex. App.—Houston [14th Dist.] Apr. 27, 2006, no pet.).

149.    The existence of conscious pain and suffering "may be established by circumstantial evidence, and further that such suffering may be inferred or presumed as a consequence of severe injuries . . . ." *Green v. Hale*, 590 S.W.2d 231, 237 (Tex. Civ. App.—Tyler 1979, no writ). There are no objective measurements for determining the adequacy of the amount awarded as compensation after conscious pain and suffering is established. *HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d 861, 871 (Tex. App.—Fort Worth 2005, no pet.); *Dawson v. Briggs*, 107 S.W.3d 739, 751 (Tex. App.—Fort Worth 2003, no pet.). "Regardless of how brief in duration, a tremendous amount of fear can be inferred from the surrounding circumstances" and the finder of fact must "translate that moment of mental anguish into an appropriate monetary award." *Green*, 590 S.W.2d at 238.

150.    Plaintiffs ask the Court to award **$3 million** for Chris Reed's pre-death pain, suffering and mental anguish.  Plaintiffs have presented sufficient evidence to support a substantial award for Chris Reed's pre-death pain, suffering, and mental anguish. Drowning is truly one of the more painful, terrifying and psychologically terrible ways to die.  In addition to Jana's testimony, the Court heard from two experts concerning the

physiological and psychological aspects of drowning and what Chris Reed experienced before his demise: Dr. Bux, a forensic pathologist, and Dr. Pia, a drowning expert.

151.    Dr. Bux is an eminently qualified and experienced pathologist. *See* Trial Tr. Day 3-182-84.  Dr. Bux testified about the physiological effects Chris Reed went through as he drowned: first, he was treading water, trying to keep his head up. *Id.* at 194. Once his head went under water, Dr. Bux said that Chris would have been shocked at what is happening to him, he would have panicked, and tried to hold his breath. He estimated that Chris could have done this for 30-60 seconds. After that, Chris would have gone through some involuntary breathing, where he did anything he could to prevent himself from breathing in saltwater. *Id.* at 195.

152.    Chris would have held on as long as he could, but eventually his body would force him to take a breath under water. *Id.* When he did that, he would obviously inhale seawater, which would have been very painful and alarming to him. This would cause him to start coughing underwater. Eventually, he would start swallowing the seawater, which is an irritant. This would cause him to vomit.  At that point, Chris would be aspirating seawater and his own vomit. After a minute and half, Chris would lose consciousness. Eventually he would stop breathing and his heart would stop. *Id.* at 196. Besides this physical pain, Chris also suffered tremendous mental anguish; panic, terror, and a visceral sense of his impending doom. *Id.*

153.    Dr. Pia also spoke about the psychological effects of drowning. As the Court will recall, Dr. Pia is an expert in drowning and training people to recognize the instinctive drowning response. *See* Trial Tr. Day 3-217-220. Dr. Pia sat on the American Red Cross

75

National Advisory Committee for lifeguard training for years. *See* Plaintiffs' Exh. 130. He is a published author in the field of drowning and rescue. In the Handbook on Drowning: Prevention, Rescue and Treatment, Dr. Pia authored sections titled "The Reasons people Drown" and "Management of Physical and Psychological Responses during Administration of CPR to Drowned Persons." *See* Plaintiffs' Exh. 130, at pg. 3.

154.    Dr. Pia testified about the five stages of drowning: (1) surprise; (2) gasping for air; (3) instinctive drowning response—body movements a person goes through to prevent drowning; (4) submersion; and (5) unconsciousness and death. *See* Trial Tr. Day 3-222. Dr. Pia specifically focused on the instinctive drowning response during Chris's drowning. *Id.* at 225-228.  Chris was surprised, fearful, and grasping for air. During the instinctive drowning response, Chris would have extended his arms out to his sides, like pressing down on a table or desk.  This instinctive drowning response robbed Chris of his perception that he could competently swim. *Id.* at 227-28.

155.    As stated above, Plaintiffs request an award of $3 million for Chris Reed's pre-death pain and suffering as he drowned.  This award is within the range of other jury awards in death cases.

- $10 million to decedent's estate for pre-death physical pain and mental anguish suffered in a fire at his job site. *Cuevas v. Certified Safety Specialists, Inc.*, No. 2012-21574 (129th Dist. Ct., Harris County, Tex. Aug. 6, 2015) (settled on appeal) (Jury Verdict Attached as Damages APPX. 9).

- $6 million ($7,133,481 adjusted for inflation) to decedent's estate for physical pain and mental anguish sustained after being severely burned in a fire at her living facility and later dying from her injuries. *Wagner v. Four J's Cmty. Living Center, Inc.*, No. 2009-40925 (269th Dist. Ct., Harris County, Tex. Oct. 21, 2011) *aff'd by* No. 01-19-346, 2021 WL 2006311 (Tex. App.—Houston [1st Dist.] May 20, 2021) (estate settled before appeal; $5.5

million award for pain and mental anguish to surviving victim affirmed-as well as additional $2.5 million in disfigurement) (Jury Verdict Attached as Damages APPX.10).

- $5 million ($6,151,538 adjusted for inflation) to decedent's estate for pre-death pain and mental anguish suffered in a flash fire at his job site. *Lerma v. Hilcorp Energy Co.*, No. 2009-08235 (55th Dist. Ct., Harris County, Tex. Nov. 9, 2010) (no appeal, settled after judgment) (Jury Verdict Attached as Damages APPX.11).

- $5 million to decedent's estate for pre-death pain and mental anguish suffered after falling four stories at the construction site where he worked. *Garcia v. Manhattan Vaughn, JVP*, No. 2013-76550 (80th Dist. Ct., Harris County, Tex. Feb. 10, 2016) (settled on appeal) (Jury Verdict Attached as Damages APPX. 6).

- $5 million to decedent's estate for pre-death conscious pain and mental anguish in **drowning case**. *Suarez v. Austin Commercial, L.P.*, No. 2014-11694 (151st Dist. Ct., Harris County, Tex. Apr. 12, 2016), *reversed on other grounds; damages not discussed*, No. 01-16-00682-CV (Tex. App.—Houston [1st Dist.] May 26, 2017) (Jury Verdict Attached as Damages APPX. 2 and Verdict Search Summary Attached as Damages APPX. 2a).

- $3 million ($4,263,912 adjusted for inflation) award affirmed for pre-death pain and mental anguish suffered after the decedent's supplemental oxygen ordered never arrived. *CIGNA Healthcare of Tex., Inc. v. Pybas*, 127 S.W.3d 400, 406, 416 (Tex. App.—Dallas 2004, no pet.).

- $1 million ($1,976,468 adjusted for inflation) award affirmed for pre-death pain and mental anguish suffered after a pipe fell off a tractor-trailer and collided with decedent's car. *C & H Nationwide, Inc. v. Thompson*, 810 S.W.2d 259, 262, 265 (Tex. App.—Houston [1st Dist.] 1991), *rev'd on other grounds*, 903 S.W.2d 315, 316 (Tex. 1994) (award of damages for lost inheritance and prejudgment interest may be awarded on future damages).

- $1 million ($1,463,811 adjusted for inflation) award affirmed for pre-death pain and mental anguish suffered after going into anaphylactic shock from a honeybee sting and dying before the ambulance reached the location. *Wilhelm v. Flores*, 133 S.W.3d 726, 737 (Tex. App.—Corpus Christi 2003), *rev'd on other grounds*, 195 S.W.3d 96, 98 (Tex. 2006) (beekeeper did not owe worker—the employee of a commercial buyer—a duty to warn of the dangers associated with bee stings).

- $1 million ($1,377,661 adjusted for inflation) award affirmed for pre-death pain and mental anguish suffered after wheelchair rolled down a wheelchair ramp and ejected decedent from her wheelchair onto the concrete and then down the stairs. *SunBridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 236, 252 (Tex. App.—Texarkana 2005, no pet.).

- $1 million ($1,250,029 adjusted for inflation) award affirmed for pre-death pain and mental anguish suffered before vehicle was struck by an oncoming train. *Union Pac. R.R. Co. v. Legg*, No. 03-07-00512-CV, 2009 WL 2476636, at *1 (Tex. App.—Austin Aug. 12, 2009, no pet.). In *Legg*, Dustin Legg was struck by a Union Pacific train, ejected from his vehicle, and pronounced dead shortly thereafter. *Id.* The court of appeals noted that "[t]here was a substantial amount of evidence at trial indicating that Dustin was not conscious after the accident." *Id.* at *2. The only evidence indicating that Dustin was conscious following the accident was from a witness who testified that after witnessing the accident and arriving at the scene, she saw Dustin "shaking" and "moaning." *Id.* The court of appeals stated that it "**need not consider whether Dustin was conscious after the accident . . . because there is legally sufficient evidence that he experienced mental anguish *prior* to the accident.**" *Id.* (emphasis added). The court found "there was a period of time in which Dustin was aware of the oncoming train and the dangerousness of the situation." *Id.* The court noted that "[c]onsciousness of approaching death may be established by circumstantial evidence" and thus held that the evidence was legally sufficient to support the jury's finding that "Dustin consciously experienced mental anguish" in the moments before the train struck his vehicle. *Id.* at *3.

### f.  Prejudgment and Post-judgment interest

156.   Plaintiffs request an award of prejudgment and post-judgment interest. *See* Plaintiffs' Third Amended Complaint at ¶ 51, Court's Doc. No. 32.  Because damages in this case are governed by Texas law, prejudgment interest should be awarded pursuant to Texas law. *See Meaux Surface Protection, Inc. v. Fogleman*, 607 F.3d 161, 172-173 (5th Cir. 2010); *Wood v. Armco, Inc.*, 814 F.2d 211, 213 n.2 (5th Cir. 1987) (same). Plaintiffs have a statutory right to an award of prejudgment interest in this wrongful death case. *See* TEX. FIN. CODE. § 304.102.  Prejudgment interest accrues as simple interest at a rate of five

percent[19] per year on the amount of the judgment, beginning 180 days after the lawsuit was filed and ending on the day preceding the date the judgment is entered. *See* Tex. Fin. Code. §§ 304.003(c); 304.103; 304.104.   Here, the Plaintiffs filed suit on July 22, 2019. *See* Plaintiffs' Original Complaint, Court Doc. No. 1. Thus, prejudgment interest begins to accrue on January 16, 2020.

157.    Federal law governs post-judgment interest. Post-judgment interest is awarded as matter of course on all federal civil judgments. *See* 28 U.S.C. § 1961(a); *Fogleman*, 607 F.3d at 173.  Plaintiffs also request an award of allowable court costs.

### g.    Conclusion on Damages

158.    Plaintiffs have presented the Court with their formulation of what the damages suffered by the Reed family amount to.  As Texas trial judges instruct juries, (and consistent with Texas law) these damage amounts are contemplated without regard to the contributory negligence or fault of Chris or Jana Reed. Inevitably, Maersk will argue that these damage awards are too high.  Plaintiffs invite Maersk, in its Reply brief, to submit to the Court the jury form attached as Damages Appx. 1 here, filled out with the amounts it believes adequately represent the losses sustained by the Reed family without regard to any alleged contributory negligence of the Reeds. To date, Maersk has refused to do so.

---

[19] Post-judgment interest accrues at the prime rate as published by the Board of Governors of the Federal Reserve or 5% per year, whichever is greater. *See* Tex. Fin. Code. 304.003(c). The daily prime rate is accessible via the web at https://www.federalreserve.gov/releases/h15/.  Plaintiffs anticipate the prime rate to remain below 5% for the foreseeable future.

## V.  Maersk's trial conduct warrants sanctions.

159.    The Plaintiffs rested their case-in-chief on the morning of Thursday, May 20 (day 4). *See* Trial Tr. Day 4-58. This was known well in advance by Maersk. *Id.* at 59; Trial Tr. Day 5-125. At that time, the Defense was to put on their case-in-chief, but day four of this bench trial concluded at 11:02 a.m. *See* Trial Tr. Day 4-61.  That's because defense counsel told the Court "we don't have any witnesses for this afternoon.  We could start tomorrow morning." *Id.* at 58-59.  Of course, we now know that was not true. Captain Marcus Maher, the pilot for the Maersk Idaho, was in Galveston and available to testify before the Court at the precise moment counsel uttered those words. Instead, Capt. Maher was at the Tremont Hotel, being woodshedded by another of Defendants' counsel for over four hours. *See* Trial Tr. Day 5-111-113. This deceit before the Court was calculated so that Maersk could gain an advantage and woodshed a "fact witness" and "non-retained expert." This is deception, plain and simple. *See In re DePuy Orthopaedics, Inc.*, 888 F.3d 753, 791 (5th Cir. 2018) ("Lawyers *cannot* engage with a favorable expert, pay him for 'his time,' then invite him to testify as a purportedly 'non-retained' neutral party.  That is deception, plain and simple.") (emphasis in original).

160.    Captain Maher was designated as a non-retained expert by Maersk on the topics of the safe navigation of the *Maersk Idaho* in the Houston Ship Channel. *See* Trial Tr. Day 5-5-6.  Maersk did not provide a list of facts Captain Maher relied on, nor a summary of his opinions as required by Rule 26(a)(2)(C)(ii) of the Federal Rules of Civil Procedure. During trial, counsel for Plaintiffs objected to Maersk's failure to properly designate Captain Maher under Rule 26(a)(2)(C)(ii) and asked that his testimony be limited.  This

objection was overruled.   During cross-examination, it was revealed that Captain Maher is also a client of counsel for the *Maersk Idaho*, and that he had met with counsel for Maersk for over four hours on the preceding day of his testimony in order to prepare. *Id.* at 113-114.   Among other things, this was problematic because Captain Maher was a fact witness in this case and Counsel for Maersk indicated on the day before that no witnesses were available when Plaintiffs rested their case in chief in the morning.   Plaintiffs queried Captain Maher on what he was doing with Maersk's counsel at the Tremont House, but Counsel for Maersk objected to this line of questioning on the basis of attorney client privilege.   This objection was overruled.   Captain Maher testified that he had been reviewing depositions, accident recreations and trial testimony with counsel for Maersk and had not actually received any legal advice. *Id.*

161.   Perhaps the most troubling part about Captain Maher's testimony is when it was revealed that he had actually taken a video of the wake of the *Maersk Idaho*, and provided it to his counsel, but the video was never produced to Plaintiffs' counsel:

> **Q,** Captain Maher, have you been on the MAERSK IDAHO since June 7th, 2019?
> **A.** Yes, sir, I have.
> **Q.** And what happened on that day?
> **A.** I proceeded inbound to Houston. I don't remember if it was Bayport or Barbour's Cut terminal. I had an inbound trip.
> **Q.** Did you have an opportunity to go out on the bridge wing and watch wakes?
> **A.** Sure.
> **Q.** And so you certainly could have taken your cell phone or something else like that and taken a video of the wakes that you produced in this exact area that we're talking about here today, couldn't you?
> **A.** You could have.
> **Q.** But you didn't?
> **A. You know, it's not here, no.**

81

**Q.** But you would rather us just take your word for it than what you could have done to prove to this Court what you are saying now about how this lady's husband died?

**MR. LIGHTSEY: Objection. Argumentative.**

**MR. CREW: I'll move on.**

**THE COURT: I think it's a valid cross.  Overruled.**

**A.** What was your question, again, sir?

BY MR. CREW:

**Q.** My question is: You would rather this Court take your words for how big that wake was than when you were on the actual ship in an inbound situation, simply go out on the bridge wing and take a video of the wake that was produced by the MAERSK IDAHO and, instead, you would rather him take your word for it that the wakes were one to two feet when this lady's husband has been killed in this case?

**A. I mean, that's what was produced. I'm sorry.**

**Q.** So you didn't do it?

**A.** Didn't do what?

**Q.** You could have, but you didn't take a video?

**A. I did take a video.**

**Q.** You did make a video?

**A. I did.**

**Q.** So you are telling me you went out on the bridge wing of the MAERSK IDAHO and made a video showing the size of the wakes in this case?

**A. I did.**

**Q.** And did you give it to your attorneys?

**A. We did.**

**Q.** Okay. And is there a reason why we don't have that video and it's never once been produced to us?

**A. I do not know the reason for that.**

Trial Tr. Day 5-122-24.  One thing is clear from this colloquy, Captain Maher and Maerks's counsel discussed the presence of this video before trial and certainly before he testified in this case, but it was not produced to Plaintiffs' counsel until after Plaintiffs had rested their case and after it was revealed that Defendants had concealed it.

162.    Maersk's lead counsel, attempted to ameliorate this problem, by claiming they had no record of receiving the video in his email. *Id.* at 127. Mr. Lightsey then made the shocking and brazen suggestion that even though this video had never been provided to

Plaintiffs' counsel,  he was thinking ". . . that, perhaps, we just produce it to the Court right now and whatever the Court wants to do. . ."*Id.*  This would have compounded prejudice upon prejudice.

163.    Rule 37 says that a failure to disclose evidence results in automatic exclusion of that evidence at trial. Further, the Court may order other relief as a sanction, as it sees just, including, among other sanctions:

> (1) Directing that designated facts be taken as established for purposes of the action, as the prevailing party claims,
>
> (2) Prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence.
>
> *See* Fed. R. Civ. P. 37(c)(1)(C).

164.    The Court also has inherent power to sanction to protect the integrity of the judicial process. *See Shepherd v. Am. Broadcasting Cos., Inc.*, 62 F.3d 1469, 1474-75 (D.C. Cir. 1995) ("When rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap.") (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991)).  These sanctions may also include the "drawing [of] adverse evidentiary inferences or precluding the admission of evidence." *Id.*

165.    Maersk's lack of candor with the Court and the failure to disclose evidence go hand-in-hand with one witness and one issue: Captain Maher's testimony concerning the wake height of the *Maersk Idaho.* Counsel's misrepresentation to the Court afforded Maersk the opportunity to woodshed Capt. Maher for over four hours—an alleged fact witness, "non-

retained" expert, and current client of Maersk's lawyers.  With all of Capt. Maher's bias, it might as well have been Maersk's counsel who took the witness stand in Capt. Maher's place.

166.    Accordingly, Plaintiffs ask for the following: (1) that plaintiffs' assertion of the Maersk Idaho's wave height be taken as true—that is the wake was 5-8 feet at the time the Reed's boat encountered it; (2) that the Court disregard the testimony of Capt. Maher regarding the wake height of the Maersk Idaho; and (3) that the Court adversely infer that the video recording of the *Maersk Idaho*'s wake is harmful to Maersk's case. *See Smith v Kmart Corp.*, 177 F.3d 19, 28-29 (1st Cir. 1999) (jury instructed that witness's testimony would have been harmful to defendant and established plaintiffs theory as fact when witness did not show up for his deposition); *see also Moore v. Citgo Refining and Chem. Co.*, 735 F.3d 309, 318-319 (5th Cir. 2013) (refusing to allow witnesses testify who failed to comply with discovery order).

## Prayer

Plaintiffs request the Court to enter Judgment in their favor for the reasons expressed herein.

Respectfully submitted,

THE CREW LAW FIRM, P.C.

*/s/ Paxton N. Crew*
Paxton N. Crew
ATTORNEY-IN-CHARGE FOR
PLAINTIFFS
SDTX 859147
TBA No. 24058720
303 E. Main, Suite 260
League City, Texas 77573
Paxton@thecrewlawfirm.com
Telephone 713-955-0909
Facsimile 409-908-4050

AND

*/s/ John W. Stevenson, Jr.*
JOHN W. STEVENSON, JR.
SDTX:  3992
State Bar No. 19196050
Stevenson & Murray
24 Greenway Plaza, Suite 750
 Houston, Texas 77046
jstevenson@stevensonmurray.com
(713) 622-3223 Office
(713) 622-3224 Facsimile

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon all known counsel of record in accordance with the Federal Rules of Civil Procedure on June 24, 2021.

/s/ John W. Stevenson, Jr.
JOHN W. STEVENSON, JR.