IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| JANA REED, INDIVIDUALLY AND AS | § | |
| REPRESENTATIVE OF THE ESTATE OF | § | |
| CHRISTOPHER REED AND ON BEHALF | § | |
| OF A.R. (A MINOR); LOGAN REED, AND | § | |
| CHASE REED | § | |
| *Plaintiffs* | § | C.A. NO. 3:19-cv-00238 |
| | § | |
| V. | § | 9(H) Admiralty |
| | § | |
| MAERSK LINE-LTD, USA AND | § | |
| MAERSK LINE, LIMITED | § | |
| *In Personam Defendants;* | § | |
| M/V MAERSK IDAHO | § | |
| *In Rem defendant.* | § | |

---

## DEFENDANTS POST TRIAL BRIEF

---

Respectfully submitted,

**HOLMAN FENWICK WILLAN USA LLP**

*/s/ Thomas N. Lightsey III*
Thomas N. Lightsey III
Texas Bar No. 12344010
Federal ID No. 84829
tom.lightsey@hfw.com
Texas Bar No. 03138150
Federal ID. No. 11656
5151 San Felipe, Suite 400
Houston, Texas 77056
Telephone: 713-917-0888
Facsimile: 713-953-9470
**ATTORNEY-IN-CHARGE FOR**
**MAERSK LINE, LIMITED,** *in personam*
**Defendant, and as the owner of the M/V**
**MAERSK IDAHO,** *in rem* **Defendant**

**OF COUNSEL:**
**HOLMAN FENWICK WILLAN USA LLP**
James T. Brown
Texas Bar No. 03138150
Federal ID. No. 11656
jim.brown@hfw.com
Christopher R. Hart
Texas Bar No. 09136310
Federal ID No. 12517

chris.hart@hfw.com
Alejandro Mendez-Roman
Texas Bar No. 24102778
Federal ID No. 2295449
alex.mendez@hfw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on this 24th day of June 2021 to all counsel of record via this Court's Electronic Document Filing System:

*/s/ Thomas N. Lightsey III*
Thomas N. Lightsey III

## <u>TABLE OF CONTENTS</u>

**TABLE OF CONTENTS** .......................................................i

**TABLE OF AUTHORITIES** ...............................................iv

**I.**  **Introduction** ..................................................................... 1

**II.**  **Summary of Argument** ................................................ 5

**III.**  **The Navionics data shows Mr. Reedcircled the Maersk Idaho and purposely chased the wake waves** ................................................. 9

  **A.**  **Evidence proving how the incident occurred is undisputed** ............................ 9

    **1.**  **Incident facts show he chased the waves** ........................ 9

    **2.**  **Mr. Reed's boat course changes tell the story** ..................... 11

  **B.**  **Evidence proving the Reeds' lack of recreational boat safety training, inexperience, and inadequate rescue efforts is undisputed** ............................ 24

    **1.**  **Chris Reed's first boat was his baby, but he failed to learn how to safely operate it and protect himself and his passengers** ................................. 24

    **2.**  **Chris Reed negligently operated his boat** ......................... 25

    **3.**  **Chris Reed's failure to use safety equipment and failure to teach his wife how to do so resulted in inadequate rescue efforts that were contributing causes of his death** ............................ 29

    **4.**  **Marijuana was in his body system at the time of death** ........................ 35

**IV.**  **Contributory Negligence of Chris Reed is the proximate cause of this incident** ...................................................................... 36

  **A.**  **The presence of marijuana in Chris Reed's body at the time of his death cannot be ignored** ........................................................... 36

  **B.**  **Recreational Boat Operators Are Responsible for Safe Operation of Their Boat** ..................................................................... 39

    **1.**  **The law applies equally to recreational boat operators** ........................ 39

      2.     **Mr. Reed was not wearing a life jacket** ................................................ 42

      3.     **Mr. Reed violated Federal and State safety regulation** ........................ 44

  C.  **Reckless operation of his boat caused Mr. Reed falling overboard**................ .49

      1.     **A two-meter elevation change was not the cause of him falling overboard** ................................................................................................. 49

      2.     **Mr. Reed failed to heed chart warnings about shoals and ship waves** ................................................................................................... 52

  D.  **Chris Reed's decisions, acts, and omissions were the proximate cause of his death** ........................................................................................................ 54

**V.**    **Chris Reed's choice to chase the Maersk Idaho and enter the port wake field was the superseding cause of the incident** ......................................................... 56

  A.  **The SOFEC Case** ................................................................................................ 56

  B.  **The Case at Bar** ................................................................................................. 58

**VI.**    **The actions of the Vessel master, crew, and pilot were not a proximate cause of this incident** .................................................................................................... 62

  A.  **The Maersk Idaho was proceeding at a safe speed** ............................................ 62

  B.  **The wake of the Maersk Idaho was not unusual and could have been reasonably anticipated by Mr. Reed** ................................................................ 67

  C.  **The failure of the lookout to report the presence of recreational boats was not a cause-in-fact of Mr. Reed's death** ................................................................ 73

  D.  **Passage Plan Argument of Plaintiffs is the Classic Red Herring** .................... 76

      1.     **Congress Has Expressly Reserved the Regulation of Pilotage to the Individual States** .................................................................................... 76

      2.     **Texas Law Requires Any Ship Moving on a Texas Waterway to Be Under the Direction and Control of a State-Licensed Pilot** .................. 77

      3.     **Using a Passage Plan Developed by a Second Mate in Charleston to**

**Direct the Speed or Course of the Ship in the Houston Ship Channel Would be Illegal and Unsafe** ..................................................... 78

**E.   The height of Maerks Idaho's wake wave, and the ship's speed, were not a proximate cause of Chris Reed's Death** ................................................ 80

**VII.   Plaintiffs failed to meet their burden of proof that a wake wave generated by the M/V Maersk Idaho was unusual and was the proximate cause of Chris Reed's death** ................................................................................ 88

**A.   Evidence proves the Maersk Idaho wake waves were not unusual, not unexpected, and not excessive** ...................................................... 88

**B.   Multiple two-meter elevation changes prove that one of them could not have been the proximate cause of the incident** ............................................... 89

**C.   Plaintiffs have not established when or where Mr. Reed fell overboard** .......... 91

**D.   Plaintiffs have not proven a causal link between the wake of the Maersk Idaho and Mr. Reed falling overboard** ...................................................... 96

**E.   Falling overboard was not the cause of death** ....................................... 98

**VIII.   Under the Texas Proportionate Responsibility Act Plaintiffs Can Recover No Damages** ............................................................................. 100

**IX.   Damages** ................................................................................... 101

**Survival Action** ........................................................................ 102

**Wrongful Death Action** ............................................................... 103

**Quantum of Damages** ................................................................. 104

**1.   Survival Action** .................................................................. 104

**2.   Wrongful Death Actions** ....................................................... 104

**X.   Conclusion** ................................................................................ 105

## TABLE OF AUTHORITIES

### CASES

*Alprin v. City of Tacoma*,
    139 Wash.App. 166, 175, 159 P.3d 448, 453 (2007) ........................................... 41

*Anthony v. Int'l Paper Co.*,
    289 F.2d 574, 581 (4th Cir. 1961) .......................................................................... 43

*Avondale Indus., Inc. v. Int'l Marine Carriers, Inc.*,
    15 F.3d 489, 493 (5th Cir. 1994) ........................................................................ 66

*Badall v. Durgapersad*,
    454 S.W.3d 626, 639 (Tex. App—Houston [1st Dist.] 2014, pet. Denied) ........ 103

*Cliffs-Neddrill Turnkey Int'l-Orangestad v. M/T Rich Duke*,
    947 F.2d 83, 86 (3d Cir. 1991) ............................................................................. 45

*City of Gladewater v. Pike*,
    727 S.W.2d 514, 517 (Tex. 1987)  ................................................................. 54, 55

*Cooley v. Bd. Of Wardens of the Port of Philadelphia*,
    53 U.S. 299, 319 (1851) ..................................................................................... 73

*Cunningham v. Haroona*,
    382 S.W.3d 492, 507 (Tex. App.—Fort Worth 2012, pet. denied).................... 102

*Deutsche Shell Tanker-Gesellschaft mbH v. Placid Ref. Co.*,
    767 F.Supp. 762, 785 (E.D. La. 1991), aff'd, 993 F.2d 466 (5th Cir. 1993)  ....... 64

*Dew v. Crown Derrick Erectors, Inc.*,
    208 S.W.3d 448, 450 (Tex. 2006)  ...................................................................... 58

*Enron Corp. Securities, Derivative & ERISA Litigation*,
    762 F. Supp. 2d 942, 973 (S.D. Tex. 2010)  .............................................. 7, 51, 75

*Estate of Casillas v. City of Fresno*,
    1:16-CV-1042 AWI-SAB, 2019 WL 2869079, at *17 (E.D. Cal. July 3, 2019).104

*Exxon Company, U.S.A. v. SOFEC, Inc. et al.*,
    517 U.S. 830, 833-35 (1996)  .............................................. 6, 45, 56, 57, 58, 61, 62

*Exxon Co. v. Sofec, Inc.,*
    54 F.3d 570, 577 (9th Cir. 1995) ........................................................................... 45

*Ford Motor Co. v. Ledesma,*
    242 S.W.3d, 46 (Tex. 2007*)* ................................................................................. 55

*Gemp v. United States*,
    684 F.2d 404, 408 (6th Cir. 1982) ........................................................................ 40

*Gorgas v. United States*,
    1976 WL 455320 at *1 (N.J. Oct. 14, 1976), aff'd sub nom. Gorgas v. Williams,
    568 F.2d 768 (3d Cir. 1978) ................................................................................. 42

*Hambrook v. Smith,*
    2016 WL 4408991, at *36 (D. Haw. Aug 17, 2016) .......................................... 104

*Hess v. U.S.,*
    361 U.S. 314, 315, 318 (1960)  .................................................................. 7, 96, 97

*Jackson v. Marine Exploration Co., Inc.,*
    583 F.2d 1336 n.5 (5th Cir. 1978) ........................................................................ 73

*Kotch v. Bd. Of River Port Pilot Comm'rs for Port of New Orleans,*
    330 U.S. 552, 559 (1947) ...................................................................................... 73

*Lee Lewis Const., Inc. v. Harrison,*
    64 S.W.3d 1, 14 (Tex. App.—Amarillo 1999), aff'd, 70 S.W.3d 778
    (Tex. 2001) .......................................................................................................... 102

*McClure v. Allied Stores of Texas, Inc.,*
    608 S.W.2d 901, 903 (Tex. 1980)  ........................................................................ 54

*Mike Hooks Dredging Co., Inc. v. Marquette Transp. Gulf-Inland, L.L.C.,*
    716 F.3d 886, 8891 (5th Cir. 2013) ...................................................................... 44

*Missouri Pac. R. Co. v. American Statesman,*
    552 S.W.2d 99, 104 (Tex. 1977)  .......................................................................... 54

*Moore v. Lillebo,*
    722 S.W.2d 683, 688 (Tex. 1986) ....................................................................... 103

*Offshore Logistics, Inc. v. Tallentire,*
    477 U.S. 207, 233 (1986) .................................................................................... 101

*Otto Candies, Inc. v. M/V Madeline D*,
    721 F.2d 1034, 1036 (5th Cir. 1983) ................................................................. 44

*Parkway Co. v. Woodruff*,
    901 S.W.2d 434, 444 (Tex. 1995) ...................................................................... 98

*Pearce v. United States*,
    261 F.3d 643, 650 (6th Cir. 2001) ..................................................................... 40

*Penzoil Producing Co. v. Offshore Exp., Inc.*,
    943 F.2d 1465, 1472 (5th Cir. 1991) ................................................................. 45

*Phillips v. Bramlett*,
    258 S.W.3d 158, 173 (Tex. App.—Amarillo 2007), rev'd, 288 S.W.3d 876
    (Tex.2009) .......................................................................................................... 99

*Randall v. Chevron U.S.A., Inc.*,
    13 F.3d 888, 892 (5th Cir. 1994), opinion modified on denial of reh'g,
    22 F.3d 568 (5th Cir. 1994) ............................................................................. 104

*Richardson v. Foremost  Ins. Co.*,
    641 F.2d 314, 316 (5th Cir. 1981), aff'd 457 U.S. 688 (1982) ........................... 40

*Russell v. Ingersoll-Rand Co.*,
    841 S.W.2d 343, 345 (Tex. 1992) .................................................................... 102

*Sheridan Transp. Co. v. United States*,
    834 F.2d 467, 476 (5th Cir. 1987) (*Sheridan I*), *appeal after remand*,
    897 F.2d 795, 799 (5th Cir. 1990) (*Sheridan II*) .............................................. 45

*The Tungus*,
    358 U.S. 588, 592 (1959)  ..................................................................... 6, 7, 96

*The O'Brien Bros.*,
    258 F.614 (2d Cir. 1919) .................................................................................. 40

*The Pennsylvania*,
    86 U.S. (19 Wall.) 125 (1873) .......................................................................... 43

*Thompson v. Console. Gas, Elec. Light & Power Co. of Baltimore*,
    111 F.Supp 719, 731 (D. Md. 1953 ................................................................. 40

*Usinas Siderugicas de Minas Geras, Sa-Usiminias v. Scindia Steam Nav. Co., Ltd.,*
    118 F.3d 328, 334 (5th Cir. 1997)  ................................................................. 66, 75

*Williams v. Steves Industries, Inc.,*
    699 S.W.2d 570, 575 (Tex. 1985)  ....................................................................... 54

*Yamaha Motor Corp., U.S.A. v. Calhoun,*
    516 U.S. 199, 201-202 (1996) ........................................................................... 101

## RULES AND STATUTES

21 U.S.C. 802 ......................................................................................................... 45

21 U.S.C. § 812  ..................................................................................................... 38

33 C.F.R. § 83.06 ................................................................................................... 64

33 C.F.R. § 175.13 ................................................................................................. 43

33 C.F.R.§ 175.19 .................................................................................................. 43

46 CFR § 16.105 ..................................................................................................... 38

46 U.S. Code § 2302(c) .......................................................................................... 48

46 U.S.C. § 12112(a)(2)(a) ..................................................................................... 74

46 U.S.C. § 8501 (a) ............................................................................................... 72

47 CFR § 80.310 ................................................................................................ 34, 47

Act of Aug. 7, 1789, ch. 9, I Stat 53, 54 (1789) .................................................... 76

Chapter 71 of the Texas Civil Practice and Remedies Code ................................ 101

Section 102 of the Comprehensive Drug Abuse and Control Act of 1970 (21 U.S.C. 802 ......................................................................................................................... 49

Tex. Civ. Prac. & Rem. Code, Chapter 33  ............................................................... 7

TEX. CIV. PRAC. & REM. CODE § 31.001 .................................................... 97

Texas Civil Practices and Remedies Code Chapter 71 ......................................... 97

Tex. Pen. Code § 49.01 ............................................................... 38

Tex. Pen. Code Ann. § 49.06 ...................................................... 38, 45

Tex. Parks & Wild. Code Ann. § 31.066(c)(2) ........................... 33, 46

Texas Transp. Code § 61.002 ...................................................... 76

Texas Transp. Code § 61.003(a) ........................................... 73, 74, 76

Texas Transp. Code § 66.031 ...................................................... 76

## OTHER

Fifth Circuit Pattern Jury Instructions (Admiralty, causation) at 4.6 (5th Cir. 2020) .. 7, 51

Gilmore & Black, The Law of Admiralty § 10-25 at 898 (2d ed. 1975) ........................ 43

Inland Navigation Rule 6 ............................................................... 64

Inland Navigation Rule 13(a) and 16 and 34(a) ............................... 28

Inland Navigation Rule 17(a) ...................................................... 28

Monroe & Stewart, *Dictionary of Maritime and Transportation Terms* ......................... 74

T. Schoenbaum, Admiralty and Maritime Law § 5-3, pp. 165-166 (2d ed. 1994) .......... 58

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| JANA REED, INDIVIDUALLY AND AS | § | |
| REPRESENTATIVE OF THE ESTATE OF | § | |
| CHRISTOPHER REED AND ON BEHALF | § | |
| OF A.R. (A MINOR); LOGAN REED, AND | § | |
| CHASE REED | § | |
| *Plaintiffs* | § | C.A. NO. 3:19-cv-00238 |
| | § | |
| V. | § | 9(H) Admiralty |
| | § | |
| MAERSK LINE-LTD, USA AND | § | |
| MAERSK LINE, LIMITED | § | |
| *In Personam Defendants;* | § | |
| M/V MAERSK IDAHO | § | |
| *In Rem defendant.* | § | |

## POST-TRIAL BRIEF OF DEFENDANTS

### I.    Introduction

New to boating, this was the Reeds' first boat and they had operated it on Galveston Bay only 15 times.[1]  As Plaintiffs state in their Third Amended Complaint, it was indeed a "beautiful sunny day" and they decided to take their boat out for a "nice day on the water in the hopes of catching a few fish."[2]  Operating a small boat, however, is serious business and should never be taken lightly.  This loving couple of 29 years was to be visited by tragedy that day.

---

[1]  Admissions of Plaintiffs, TR 6:107-08 (Day 6, pages 107-08)
[2]  Plaintiffs' Third Amended Complaint. [Dkt 32] at ¶¶ 7,8.

1

They started fishing in Moses Lake when Mr. Reed announced they were leaving to go to the Galveston Jetties for more fishing.  To get there, it was <u>not</u> necessary to cross the Houston Ship Channel or navigate through either the starboard and port wake fields of the inbound *Maersk Idaho* – yet Mr. Reed changed course twice to navigate through both wake fields.

After leaving Moses Lake, Mr. Reed first crossed the Houston Ship Channel three miles ahead of the ship and continued east into East Bay.  While east of the Houston Ship Channel, Mr. Reed did not maintain a steady course.  At one point he almost completed a full circle and was briefly on a northwesterly course which would have taken him in front of the *Maersk Idaho*. He then changed course to the southwest, such that he would pass astern of the *Maersk Idaho,* which because of its size can only navigate in the channel.  On a southwesterly heading he successfully traversed the starboard wake field.

However, Ms. Reed testified that when passing through the starboard wake field, the boat encountered at least three waves which startled both herself and Mr. Reed.   Ms. Reed testified that "our boat just went up and then slammed down and then up and then slammed down and up and slammed down.  They were, like, rolling hills. And, they were so transparent. You could not see them."[3] The waves startled both Mr. and Ms. Reed, who exclaimed in unison, "Oh, s\*\*t!" [4]  While passing through the starboard wake field, Ms.

---

[3]  TR 2:198.
[4]  TR 2:198.

2

Reed began holding on tightly to the boat's seat.[5]  Mr. Reed, however, did not change how he was holding on and continued to navigate with one hand on the steering wheel and one on the throttle.[6]

After passing through the starboard wake field the Reed arrived to a position of complete safety, in waters Ms. Reed described as "flat."[7] While behind the ship in the calm, flat water, Ms. Reed warned Mr. Reed, saying "Chris, I'm scared."[8]  He responded, saying "Don't worry, we'll be fine."[9]

When the boat was behind the ship - a position that Ms. Reed, the Reeds' experts, and all witnesses who testified stated was safe, and where the water was "flat and calm" - Mr. Redd could have continued south toward the Galveston Jetties and away from the inbound ship.  Unfortunately, Mr. Reed decided ignore his wife's plea and instead altered course 180 degrees to the northwest, increased his speed, and chased the *Maersk Idaho*. Mr. Reed's new course was taking him in a direction directly opposite of his intended destination and directly into the port wake field of the ship.[10]  Plaintiffs allege that as Mr. Reed proceeded through the port wake field he went over the top of three wakes from behind, lost his balance, and fell out of his boat, with tragic results.

---

[5]  TR 2:226.
[6]  TR 2:226-227.
[7]  TR 2:198.
[8]  TR 2:198.
[9]  TR 2:198.
[10]  The Reed's boat is capable of speeds up to three times that of the *Maersk Idaho*.

As testified to by Dr. Yue, the wake Mr. Reed encountered in the port wake field had already been created before Mr. Reed altered course and increased his speed to chase the ship.[11]  When Mr. Reed changed his course and speed, the wave that Mr. Reed would chase had already been created; there was nothing the ship could do to change the wave.[12]

Mr. Reed never told Ms. Reed he was changing their destination or cancelling their plan to go to the Galveston Jetties.  The only plausible explanation is that Mr. Reed was intentionally jumping the wakes of the *Maersk Idaho*.  There is no other reason (nor was any evidence offered of such) for him to circle a moving ship through both its wake fields, and indeed leaving a position of safety in calm water behind the ship, to chase the ship in a direction opposite of his stated destination.  All in direct disregard of fears voiced by his wife and his own startled exclamation of "Oh, s**t!"

Mr. Reed was by all accounts a loving family man.  The testimony and evidence also indicates that he was a risk-taker and novice boater.  He played semi-profession football and fought mixed martial arts. There is no evidence that Mr. Reed did *anything* to learn how to safely operate his boat - he never took a boating course, never read a nautical chart, never wore a life jacket or required his passengers to wear one, never studied the Rules of the Road, never used his safety equipment or taught his wife how to do so, etc. Mr. Reed also had had high levels of THC (marijuana) in his system at the time of the incident.  Tragically, Mr. Reed was a risk-taker who failed to take the necessary and proper

---

[11]  TR 5:181-82; *see also* DEX 128C.
[12]  TR 5:187.

precautions to operate his boat in a safe and prudent manner.  Rather, his decision to unnecessarily navigate through both wake fields of the *Maersk Idaho* led a catastrophic and devastating loss of life.

## II.    Summary of Argument

1.   **The facts surrounding the incident are for the most part undisputed.  The speeds and positions of the two vessels have been agreed to.  Plaintiffs stipulate that Mr. Reed was a novice boater without any training with only 15 trips on Galveston Bay operating a boat the family had recently purchased.[13]  Although his stated destination of the Galveston Jetties was to the south, Mr. Reed circled the *Maersk Idaho*, intentionally navigating through the ship's starboard and port wake fields with no reason to do so. In between the starboard and port wake fields, he brought his vessel to a position of safety in calm water behind the ship.  His wife warned him of the wake waves and he responded. "Don't worry. We'll be fine."  He then altered course 180 degrees away from the Galveston Jetties, increased speed and headed northwest chasing the ship which had already passed his position on the way to Houston.  He entered the port wake field where Plaintiffs allege he drove over the top of a several wakes from behind and was thrown out of the boat.**

2. **The contributory negligence of Mr. Reed was the sole proximate cause of the incident.  Although the boat was in in both Mr. and Ms. Reed's name, the boat was Mr. Reed's "baby."  Ms. Reed testified, "[H]e would come home from work and play in the boat. I mean, he looked like a little boy sometimes that was playing in a boat. He was constantly cleaning it or doing something to it."[14] Logan Reed testified that Mr. Reed would buy books to learn about his new hobbies.[15] "He loved to educate himself. He had to be an expert of everything he was involved in…"[16]  Nonetheless, Mr. Reed never took a boating class, never read his owner's manual, never read a chart or chart warnings, never wore a life jacket or required his passengers to, never deployed the throwable PFD as required by law, never studied the Rules of the Road, never used his safety equipment or taught his wife how**

---

[13] *See* Note 1, supra.
[14] TR 2:190.
[15] TR 4:47.
[16] TR 4:47.

to do so, never trained Ms. Reed how to use the VHF radio, and never engaged in a man overboard drill with Ms. Reed. The can be no doubt he was keenly aware of the waves in Galveston Bay, having successfully navigated no less than (12) 2 meter elevation changes before altering course to chase the port wake field.[17]   Mr. Reed was a man with self-admitted trouble walking, a history of falling several time in the preceding year, self-admitted complaints about his balance and cognition.[18] Nonetheless, he chose not to wear a life jacket. He was also a self-admitted recreational marijuana user[19] who tested positive for THC/marijuana after the incident.[20] Perhaps the forgoing led Mr. Reed to intentionally chase the ship and intentionally put himself and his boat into a situation he had not properly prepared himself for.

3. **Mr. Reed had successfully navigated the starboard wake field and brought his vessel to a position of safety in calm waters. The ship had now passed him on its way to Houston. Despite encountering "rolling hills" of waves in the starboard wake field, Mr. Reed did not put on a life jacket before turning and increasing speed to enter the port wake field. Rather, Mr. Reed altered course 180 degrees opposite of his destination, increased speed, and chased the *Maersk Idaho,* intentionally entering its port wake field from behind. His decision to do so was an utter failure to easily avoid further wakes and constitutes the type of extraordinary negligence defined by the Supreme Court to supersede any alleged negligence of the Defendants. *Exxon Company, U.S.A. v. SOFEC, Inc et al.,* 517 U.S. 830, 833-35 (1996).**

4. **The evidence shows that Mr. Reed's proportion of fault is at least 51%. Under the Texas Proportionate Responsibility Act Plaintiffs can recover no damages. The admiralty jurisdiction of the federal courts allows the adjudication of state wrongful death and survival statutes in cases of maritime tort. Plaintiffs herein have specifically claimed under the Texas Wrongful Death and Survival Acts. As such, the Supreme Court mandates that a federal court adjudicating such claims do so using whatever conditions or limitations the state attaches to such claims. *The Tungus,* 358**

---

[17]  DEX 166, slides 14&15 (based upon electronic data gathered by Plts. expert Capt. Cunningham – also admitted at trial)

[18]  DEX 145, Hauser Clinic Records at p. 3.

[19]  Id. ("Have you ever abused or used drugs recreationally?  A. Yes, marijuana.")

[20]  DEX 133, Autopsy Report at p. 597, 598-600.  This may the answer the question of why Mr. Reed, a former Army Ranger, professional MMA cage fighter, and semi-pro football player, fell overboard while his wife, described by her counsel in Opening Statement as a " diminutive -- is less than 100 pounds" (TR 1:34) elementary school teacher did not.

U.S. 588, 592 (1959) and *Hess v. U.S.,* 361 U.S. 314, 315, 318 (1960).  Neither *The Tungus* nor *Hess* have been overruled and remain the law of the land.  They cannot be ignored.[21]

5.  The *Maersk Idaho* was not negligent.  It was under the control of a state and federally licensed expert ship pilot as required by Texas law.  Pilot Capt. Maher directed the movement of the vessel by setting its speed and courses.  The speed was set in accordance with Inland Navigation Rule 6 (Safe Speed Under the Circumstances); those circumstances including, among other things, traffic management concerns in a busy channel and wake size.  Capt. Maher has trained his entire life to observe wake height, both as to large ships and small boats (he is also a former U.S. Sailing Team champion and Olympic hopeful).  He personally observed the wake several time near the time of the incident and testified he observed it to be 1-2 feet in the area of the incident.  Dr. Dick Yue of MIT testified that given the water depth, the maximum possible height of a wake in that area, regardless of the speed of the ship, would be 2.2 feet. The Maersk Idaho breached no duties owed to the Plaintiffs.

6.  The actions of the Master, crew, and pilot of the *Maersk Idaho* (negligent or not) were not the proximate cause of Mr. Reed's unfortunate death.  Plaintiffs' position seems to be one of *post hoc ergo propter hoc* – since event Y followed event X, Y must have been caused by X.  Since Mr. Reed fell out of his boat after the ship passed creating a wake, the ship must be the cause.  There may be many causes-in-fact of the incident:  the ship was built, Mr. Reed was born, Mr. Reed and the ship were in Galveston Bay on the same day.  To recover, Mr. Reed must prove proximate cause.  The Fifth Circuit defines his burden as requiring that he "must show that the condition in question was a substantial factor in bringing about or actually causing his injury, and that the injury was either a direct result or reasonably probable consequence of the condition."[22]   This Court has described the substantiality requirement to mean the "Defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense … ."[23]  The "condition" complained of is the *Maersk Idaho* making 15.2 kts, with a wake of 1-2 feet,

---

[21]   The application of Texas law is the subject of Defendants' pending Motion For Application of Texas Civil Practice and Remedies Code, Chapter 33 [Dkt. 78] which the Magistrate Judge reserved for the Court to rule on after trial.

[22]   Fifth Circuit Pattern Jury Instructions (Admiralty, causation) at § 4.6 (5th Cir. 2020).

[23]   *Enron Corp. Securities, Derivative & ERISA Litigation*, 762 F. Supp. 2d 942, 973 (S.D. Tex. 2010).

and safely passing the Reed's boat while it was in the ship's starboard wake. What was the "reasonably probable consequence" of that condition? Mr. Reed had driven through the starboard wake field to a position of safety. Was the ship to foresee that he would disregard his wife's warnings and chase the ship to intentionally jump its wakes from behind, not to mention operate a boat with absolutely no training, knowledge of safety equipment, or use of PFDs?  Reasonable men and women would not consider Mr. Reed's death to be the "direct result or reasonably probable consequence" of the ship safely passing the Reeds (and every other small boat, tug and ship in the channel) on its way to Houston.

7. **Plaintiffs failed to meet their burden of proof to show that a wake from the Maersk Idaho was uncommon or out of the ordinary.  They must show it was unusual and could not be reasonably anticipated.  Ms. Reed testified the waves in the starboard wake field were not as high as the waves they encountered in the port wake field.[24] Consequently, wake wave which were outside of Mr. Reed's comfort zone could have, and should have, been anticipated by Mr. Reed. Furthermore, Plaintiffs offered no testimony of what size wake would have been normal and foreseeable under the circumstances.  Indeed, the evidence shows he had already successively navigated through no less than (12) 2 meter elevation changes before the incident; certainly wakes of that magnitude were not uncommon or unforeseen to him that day.  Perhaps more importantly, the stipulated electronic navigation data proves Mr. Reed's boat confronted (8) 2 meter elevation changes <u>before</u> the *Maersk Idaho* and its wake ever came along, and (4) 2 meter or more changes long <u>after</u> the vessel had departed the area.[25]  There were clearly elevation changes of 2 meters and greater in the location of the incident that day wholly unrelated to the *Maersk Idaho*. Plaintiffs have failed to rule out other sources as causing the wake they claim Mr. Reed was chasing down on the day in question.**

8. **The damages sustained by Plaintiffs are far less than the amount claimed by them at trial.  Total economic and non-economic damages should not exceed $3.7 million, as detailed in Section X below.**

---

[24] TR 2:199.
[25] DEX 166, slides 14&15.

### III.   The Navonics data shows Mr. Reed circled the *M/V Maersk Idaho* and purposely chased the wake waves.

The evidence proves Mr. Reed navigated his boat across the Houston Ship Channel and through the starboard and port wake wave fields of the M/V Maersk Idaho on purpose. The evidence confirms Mr. Reed lacked recreational boat safety knowledge and experience, he negligently operated his boat, he failed to wear a life jacket, Plaintiffs' rescue efforts were inadequate, and he had marijuana in his body at the time of death.

#### A.  Evidence proving how the incident occurred is undisputed.

The only plausible conclusion from the following undisputed facts is that Mr. Reed chased the *M/V Maersk Idaho* port wake waves on purpose. The next conclusion is that an uncommon, unforeseeable wave from *M/V Maersk Idaho* cannot be what caused Mr. Reed's death.

##### 1.  The facts show he chased the waves.

Plaintiffs cannot deny the following key facts, which are discussed in more detail below.[26]

- Mr. Reed successfully passed through multiple two-meter elevation changes, eight times before he even entered the *Maersk Idaho* wake, and then five or six more times before he fell overboard.[27]

---

[26] The trial transcript is cited in the format TR [Day]:[page number]. Defendant's trial exhibits are cited as DEX [exhibit number] at [page number], and Plaintiffs' trial exhibits as PEX in the same format.

[27] DEX 166 at 14-15. Defendant's Exhibit 166 is filed at Dkt. No. 186 pages 52-66. It will be cited as DEX 166, Dkt. 186 at [page number]. Thus, DEX 166 at 14-15 is Dkt. 186 at 65.

- His destination was the Galveston Jetties, but he changed course to encounter *Maersk Idaho* wake waves.[28]

- The Reeds encountered waves in the Maersk Idaho starboard wake field that were like walls of water, leading into them at high speeds 18 to 20 mph, causing both of them to say "Oh, shit!"[29]

- Then entered calm, flat water astern of Maersk Idaho.[30]

- Jana Reed said:  "Chris, I'm scared." Mr. Reed responded to his wife: "Don't worry.  We'll be fine."[31]

- Then Mr. Reed changed course again, to follow and chase the Maersk Idaho port wake field waves.[32]  Crossing them sounded like hitting concrete, and it jarred them.[33]

- The Reeds overtook at least three waves in the port wake field.[34]

- It is unclear exactly how and when Mr. Reed fell overboard.  Mrs. Reed said it was at or after crossing the third white-capping wave in the port wake field.[35]  Dr. Sanders said, at various points of her testimony, it was sometime between 3:49:40 and 3:50:02.[36]  Plaintiffs have not ruled out that some other wave may have been involved.[37]

- Jana Reed was able to remain in the boat.  The boat did not capsize.

- Jana Reed maneuvered the boat to within eight feet of him, saw him afloat on the surface, he was conscious and spoke to her, and she threw him a dock line when within about eight feet of him.[38]

---

[28] TR 2:195,TR 2:232 (Jana Reed testimony); DEX 166; DEX 1; DEX 3; DEX 132; TR 2:77 (Dr. Sanders' testimony).
[29] TR 2:197-198; DEX 166, Dkt. 186 at 65.
[30] TR 2:198 (Jana Reed); TR 2:28, 78 (Dr. Sanders).
[31] TR 2:198 (Jana Reed).
[32] DEX 1; DEX 3; DEX 132.
[33] TR 2:199 (Jana Reed).
[34] TR 2:199 (Jana Reed).
[35] TR 2:199 (Jana Reed).
[36] TR 2:36, TR 2:60 and TR 2:61.
[37] TR 2:59-60.
[38] TR 2:200.

- Mr. Reed was not wearing a life vest, no personal flotation device ("PFD"). He submerged and did not resurface.[39]

- Mr. Reed's body was recovered two days later.[40]

- The autopsy found the cause of death was "drowning," and the manner of death was "accident."[41]

- The autopsy also found marijuana was in his body system at the time of death.  And it found no head or other injury that would have prevented him from self-rescuing.[42]

    2.    **Mr. Reed's course and speed changes tell the story.**

Before the Reeds even entered the *Maersk Idaho* wake waves, they successfully passed through two-meter elevation changes eight times.  DEX 166 at 14-15.[43]  During the 10 minutes between 3:31:52 and 3:41:55, Chief Reed passed through eight of these two-meter elevation changes, each time at a speed of about 40 mph.  DEX 166 at 14.[44]  The fifth time was when he crossed the Houston Ship Channel from East to West at buoys 35/36, about three miles ahead of *Maersk Idaho*, at a speed of 40.5 mph.  Capt. Cunningham, Plaintiffs' expert, admitted that these eight two-meter elevation changes were not related to the transit of the Maersk Idaho.[45]

---

[39] TR 2:220 and TR 2:200
[40] TR 2:202.
[41] DEX 133.
[42] DEX 133; TR 3:195 (Dr. Bux).
[43] Dkt. 186 at 65-66,
[44] DEX 166 at 14 is Dkt. 186 at 65.
[45] TR 1:218-222.

11

Mr. Reed's destination was the Galveston Jetties,[46] so his course would have taken him southeast, well to the east of the Ship Channel and clear of any wake waves from *Maersk Idaho*. The screenshot below illustrates this, from DEX 166.[47]



After the Reeds crossed to the east side of the channel, Mr. Reed could have headed south and gotten to the jetties without having to cross the Houston Ship Channel again.[48] Below is a screenshot of DEX 1 showing the location and speed of the vessels at 3:43:07. From this Reed boat position, Mr. Reed could have headed due south to the jetties and not encountered either the starboard or port wake fields of the *Maersk Idaho*.

---

[46] TR 2:195 (Jana Reed).
[47] DEX 166, Dkt. 186 at 66.
[48] TR 2:76 (Dr. Sanders); TR 3:115 (Capt. Rivera).

12



Mr. Reed altered course several times while on the east side of the Houston Ship Channel.  At one point, the Reed boat was on a course that would have crossed ahead of the *Maersk Idaho* while traveling at nearly double the speed of the *Maersk Idaho*.[49]  Below is a screenshot of DEX 1 showing the location and speed of the vessels at 3:44:29.  At this time, neither vessel is a danger to the other.[50]

---

[49]  TR 3:119.
[50]  TR 3:119.



Then instead of crossing safely in front of the *Maersk Idaho* and away from its wake, Mr. Reed again changed course and speed taking the boat to the southwest, a course which took him into the *Maersk Idaho's* starboard wake field. Below is a screenshot of DEX 1 showing the location and speed of the vessels at 3:45:30. As Plaintiffs' expert Dr. Wendy Sanders put it, Mr. Reed was the captain of the boat, it was his decision to choose the course, and he is responsible.[51] Dr. Sanders testified that Mr. Reed made a conscious decision to cross the starboard wake of the *Maersk Idaho*.[52]

---

[51] TR 2:76.
[52] TR 2:77.

14



The animation created by Plaintiffs' expert Capt. Steve Cunningham is DEX 3.  It shows overlaid course tracks of both vessels.[53]  At 3:45:30, Mr. Reed changed course to head directly into the starboard side wake field of the *Maersk Idaho*.[54]  Jana Reed testified they saw a wall of water in front of them.[55]  Jana and Mr. Reed both said at the same time: "Oh shit!"[56]  Describing how they passed through this first set of waves, she testified:  "And our boat just went up and then slammed down and then up and then slammed down and up and slammed down.  They were, like, rolling hills."[57]  They went through nine or ten wakes

---

[53]  TR 1:190.
[54]  DEX 3, at 20:45:30.
[55]  TR 2:197-198.
[56]  TR 2:197-198.
[57]  TR2:198.

on this starboard wake field side, as Dr. Sanders testified.[58]  Below is a screenshot of DEX

3 showing the location and speed of the vessels at 3:45:30.[59]



As admitted by Capt. Cunningham, the elevation changes recorded were of the

elevation changes of the Reed **boat** which did not directly correlate to the size of the **waves**

being encountered by the boat.[60]

While heading into the *Maersk Idaho's* the starboard side wake, the Reeds

experienced two-meter elevation changes twice, and once even a three-meter elevation

---

[58]  TR 2:77.
[59]  Capt. Cunningham said his wave field in this animation is for illustration purposes only; it is not meant to show the actual wave field of the *Maersk Idaho* on June 7, 2019.
[60]  TR 1:248.

change.[61]   Dr. Sanders estimates that they went through 9 to 10 waves on the starboard side.[62]

After passing through the starboard wake waves, the Reeds entered flat, calm water in the Ship Channel astern of the *Maersk Idaho*.   Jana Reed and three expert witnesses all testified the Reeds were safely in an area of calm, flat water.[63]   At this time Mrs. Reed said, "Chris, I'm scared."   Mr. Reed responded:   "Don't worry.   We'll be fine."[64]

As can be seen in the screenshots below from DEX 1, Mr. Reed then increased his speed from 14.5 mph to 23.2 mph,[65] and he altered course again, this time to the northwest, 180 degrees in the opposite direction from the jetties.[66]   This new course, along with the increased speed, took the Reeds into the port wave field of the *Maersk Idaho*.[67]   See below screenshots of DEX 1 showing the location and speed of the vessels at 3:46:21, and again at 3:47:08, after the change in course and speed.

---

[61]   DEX 166 at 9, 14.
[62]   TR 2:77.
[63]   TR 2:28; TR 3:122; TR 6:75.
[64]   TR 2:198, 224.
[65]   DEX 166 at 14, Dkt. 186 at 65.
[66]   TR 2:77-78.
[67]   TR 2:77-78; TR 6:75.





If Mr. Reed had kept heading due west from the Houston Ship Channel, or turned his boat to the south toward his intended destination at the jetties, he would not have been affected by the *Maersk Idaho* port wake field.  Around this time is when the wave was generated that the Reeds ended up encountering at the incident site.  As Dr. Dick Yue explained, that wave was generated by *Maersk Idaho* 183 seconds (3 minutes and 3

18

seconds) before the wave travelled to the incident location.[68]  Therefore, this particular port

side wake had been created by 3:46:49[69] – before Mr. Reed altered course towards it.  If

Dr. Sanders time of incident is correct at 3:49:40, then the wave that arrived at the incident

location at that time would have been generated by 3:46:37, again before Mr. Reed altered

course to northwest to follow and chase the port side wake waves.  By increasing his speed

and altering course to the northwest, Mr. Reed purposely steered his boat into the already-

created port wake field of the *Maersk Idaho*.[70]

The Reed boat experienced another two-meter elevation change at 3:47:24, near the

edge of the Ship Channel, while overtaking the port side wake waves[71]



[68] TR 5:177-178.
[69] TR 5:178.  This time is 183 seconds before 3:49:52.  Dr. Sanders testified that the incident occurred plus or minus 10 seconds from 3:49:52, although she also said it occurred about 3:49:40, or at least that Mr. Reed was already out of the boat by 3:49:43.  TR 2:60-61.
[70] TR 2:78, TR 2:80 and TR 6:75.
[71] DEX 166, Dkt. 186 at 61, 65.

Although Mrs. Reed testified it sounded like hitting "concrete . . . and it would jar us"[72] as they crossed waves in the port wake field, Mr. Reed continued traveling on his northwest course at speeds of 17.9 mph to 23.2 mph, basically following the *Maersk Idaho's* path and overtaking the wake field waves that had already been created.[73]

For a little more than the next two minutes, Mr. Reed continued on his course overtaking the port side waves, leading up to the incident time at around 3:49:40 to 3:50:02.[74]  His course led him into a shallow part of Galveston Bay called the spoils area, which is adjacent to the Houston Ship Channel.[75]  This area is clearly marked on the paper and electronic nautical charts of the bay.  Using the electronic chart that Mr. Reed had available to him on June 7, 2019, the Navionics application on his cellular phone, he would have seen that he was driving his boat into the spoils area.[76]  In this part of Galveston Bay, the official NOAA navigation charts show the water depths ranging from four to seven feet.[77]

Below is a screenshot from DEX 132 at 3:47:24, showing the track line of the Reed boat (in light blue) overlaid on a NOAA chart showing the recorded water depths, in feet, in this area of Galveston Bay.

---

[72] TR 2:199.
[73] TR 6:75; DEX 166, Dkt. 186 at 60, 65.
[74] DEX 166, Dkt. 186 at 61-62.
[75] TR 6:46-47 and TR 6:75.
[76] TR 6:46-47.
[77] As shown in a screenshot from DEX 132; *see also* DEX 9.

:



Mr. Reed then continued to transit in the spoils area on a northwesterly course until approximately 3:49:45 where the heading of the Reed boat turns to the west.   Plaintiffs' experts Dr. Wendy Sanders and Capt. Cunningham both indicate that Mr. Reed fell out of his boat sometime between about 3:49:40 to 3:49:50.  Mrs. Reed does not recall the exact time.  While Plaintiffs' experts can speculate as to a time, there is no way of telling the exact time Mr. Reed fell overboard, or for that matter what caused him to fall overboard. During the time between 3:49:34 and 3:49:52, the Reed boat experienced two-meter elevation changes twice.[78]  These changes are similar to the previous twelve times they had two-or-more-meter elevation changes, eight of which were unrelated to any waves from

---

[78]  DEX 166, Dkt. 186 at 65.

21

the *Maersk Idaho*.  Plaintiffs failed to establish exactly which wave allegedly caused Mr. Reed to go overboard, much less what caused that particular wave.

The Reed boat GPS unit continued to record data even after Mr. Reed fell overboard. After Mrs. Reed called 911 and the United States Coast Guard boarded her boat, a USCG boatswain drove the Reed boat back to the Texas City Dike dike.  While the USCG boatswain was driving the Reed boat, the boat experienced four elevation changes of over two meters, including three-meter elevation changes twice.[79]   The Reed boat navigated through these elevation changes without any issues.  Jana Reed made no comment about how the USCG boatswain was driving the boat or any large waves during this time.  These elevation changes were completely unrelated to the movement of the *Maersk Idaho*, which had long since departed the area.

Here is the last page of DEX 166, which shows a graphic summary of the Reed boat's two-meters or more elevation changes, before and after the incident.

---

[79]  DEX 166, Dkt. 186 at 65.



The GPS unit on the Reed boat recorded two meters or more elevation changes 18 times, most unrelated to the time the boat was in the *Maersk Idaho* starboard or port wake fields.  As admitted by Captain Cunningham, the elevation changes only relate to the movement of the Reed boat's GPS unit itself and not to the size of the waves under the boat.[80]  An example of this was Defendant's demonstrative video showing a small boat "getting air" while going over average size waves.  Capt. Cunningham also testified there are rounding factors and margins of error to consider and evaluate with the GPS elevation data, which makes it imprecise.[81]  For these reasons,  the elevation changes as recorded by the Reed boat's GPS unit are not a reliable method to show the size of the waves created by the *Maersk Idaho*.  On the other hand, the elevation changes show that Mr. Reed should

---

[80]  TR 1:248.
[81]  TR 1:237, TR 1:200 and TR 1:202.

have expected there to be waves in Galveston Bay capable of changing the elevation of the boat.  Indeed, the evidence proves he was on notice to expect waves and elevation changes when boating on Galveston Bay (not to mention his wife's specific warning about the waves).  Certainly he was on notice that it would have been prudent to put on his life jacket since he experienced so many elevation changes of two or more meters before the incident, and he hit a "wall of water" at 18 mph to 23 mph that caused him and his wife to exclaim "Oh shit!"

The evidence of the course tracks of the two vessels proves that Chief Reed consciously chose to change course to navigate into the *Maersk Idaho* starboard side wake field.  Once he entered the safe area of flat and clam water behind the *Maersk Idaho*, he ignored his wife's warning and intentionally changed course again, this time to chase the port wake field waves that had already been created.

### B. Evidence proving the Reeds' lack of recreational boat safety training, inexperience, and inadequate rescue efforts is undisputed.

#### 1. Mr. Reed's first boat was his baby, but he failed to learn how to safely operate it and protect himself and his passengers.

About a year prior to the incident, Mr. Reed bought a fishing boat as a hobby that he could share with his wife.[82]  As Jana Reed testified, even though they both owned the boat, it was Mr. Reed's baby.[83]  The only testimony regarding the children going out on the

---

[82]  TR 2, pp. 214-215.
[83]  TR  2, p. 189.

boat with their parents was that Chase went out on the boat just once.[84]  Prior to the incident,

Mr. Reed had been on the boat in Clear Lake and Galveston Bay approximately 15 times.[85]

Of these times, it is unknown how many times they may have been in the area of Galveston

Bay known as the Houston Ship Channel.[86]

Mr. Reed had not taken a class for instructions and training to learn about boating

safety prior to June 7, 2019.[87]  There is no evidence that Mr. Reed ever reviewed the boat's

owner's manual prior to June 7, 2019.[88]  Both the NMMA and the United States Coast

Guard recommend that new boaters take a boating safety instruction course.[89]  These kinds

of boating safety and training courses are available locally.  They provide classroom and

hands-on training, and some are even offered free of charge.[90]  According to the Coast

Guard, 80 percent of the deaths that occurred on vessels occurred where the operator had

not received a nationally-approved boating safety education certificate.[91]

### 2. Mr. Reed negligently operated his boat.

Mr. Reed failed to heed navigation warnings on the nautical chart for the area of the

shoals and spoils area where he chose to overtake *Maersk Idaho's* port wake waves.

---

[84]  TR  3, p. 252; Deposition Transcript of Chase Reed. p. 34.
[85]  TR  6:107.
[86]  TR 6:107-108.
[87]  TR 6:107-108.
[88]  TR 2:88 and TR 2:217.
[89]  TR 2:95 and TR 2:107-108; TR 6, p. 26.
[90]  TR 6:14 and TR 6:26.
[91]  TR 2:156.

NOAA Chart 11326, DEX 9, is the official government chart for small boaters on Galveston Bay.[92]   It has multiple warnings to small vessels indicating that large ships transiting the Houston Ship Channel can cause swells engulfing the shoals alongside the channel.  It says:  "Small craft should use extreme caution when operating in these areas."[93] Some of the warnings to small boaters contained in NOAA chart 11326 are as follows:



NOTE B

Large vessels traversing the Houston Ship Channel can cause swells engulfing the shoals alongside the channel. Small craft should use extreme caution when operating in these areas.

CAUTION
WARNINGS CONCERNING LARGE VESSELS

The "Rules of the Road" state that recreational boats shall not impede the passage of a vessel that can navigate only within a narrow channel or fairway.  Large vessels may appear to move slowly due to their large size but actually transit at speeds in excess of 12 knots, requiring a great distance in which to maneuver or stop.  A large vessel's superstructure may block the wind with the result that sailboats and sailboards may unexpectedly find themselves unable to maneuver.  Bow and stern waves can be hazardous to small vessels.  Large vessels may not be able to see small craft close to their bows.

---

[92]  TR 2, p. 101; TR 6, pp. 41-42.
[93]  DEX 7 and DEX 9; *see also* TR 6, p. 44.

CAUTION

Small craft should stay clear of large commercial and government vessels even if small craft have the right-of-way.

All craft should avoid areas where the skin divers flag, a red square with a diagonal white stripe, is displayed.

The Reeds did not have NOAA Chart 11326 onboard the boat.  There is no indication they ever consulted the chart or even knew about this warning.[94]  The Navionics navigation application on Mr. Reed's phone has a plotting functions that allows one to plot the course to one's destination.  If one tries to plot a course that would take them over the spoils area adjacent to buoys 33/34, the application will route them around rather than over the spoils area.[95]  A recreational boater should, as Note B on the navigational chart NOAA 11326 indicates, should use extreme caution when transiting near or above the spoils area. Mr. Reed ignored these caution area warnings.  Instead of exercising extreme caution, he attempted to overtake a wake field of a large container vessel while navigating his 20-foot boat over the shallow spoils area.

Mr. Reed failed to follow the Inland Navigation Rules for overtaking another vessel. As he was circling the *Maersk Idaho* and after he passed out of the safe, calm water astern of the ship, he turned his boat to the northwest and was on a course more than 22 ½ degrees

---

[94]  TR 2:101 and TR 2::132
[95]  DEX 22; TR 2:48-51.

abaft the beam of the *Maersk Idaho*.  As testified by Capt. Jay Rivera, Capt. Marcus Maher, and Capt. Thomas Danti, this makes the situation between the Reed boat and the *Maersk Idaho* an overtaking situation under the Inland Navigation Rules.[96]  Under the overtaking rules, the Reed boat was the overtaking or give-way vessel and the *Maersk Idaho* was the overtaken or stand-on vessel.  The overtaking vessel has the obligation to stay "well clear" and communicate his intentions to overtake.[97]  The vessel seeking to overtake the other must first ask permission by whistle signal or radio (both of which the Reed boat had).  Then, only if the vessel to be overtaken agrees, the overtaking vessel can then proceed with the maneuver.[98]  The overtaken vessel has the obligation to maintain her course and speed.[99]

There is no evidence that Mr. Reed complied with his obligation to contact the *Maersk Idaho* regarding his intention to overtake.  Mr. Reed failed to use his VHF radio or his horn to communicate his intention to overtake and pass the *Maersk Idaho* on its port side.

His failure to exercise extreme caution, his failure to comply with his obligation to contact the *Maersk Idaho* before attempting to overtake her, and his failure to stay well clear of her while overtaking, all constitute negligent operation of his boat.

---

[96]  TR 3:123; TR 5:97; TR 6:51-54; DEX 28 (Rule 13(b)).
[97]  Inland Navigational Rule 13(a) and 16 and 34(a).
[98]  TR 6, pp. 54-55.
[99]  Inland Navigational Rule 17(a).

### 3.    Mr. Reed's failure to use safety equipment and failure to teach his wife how to do so resulted in inadequate rescue efforts that were contributing causes of his death.

**<u>Failure to wear a life jacket</u>**

Mr. Reed was not wearing a life vest, a PFD, when he fell overboard, as Mrs. Reed acknowledged.[100]  She said he never wore a life jacket, and that he never trained her regarding use of lifesaving equipment on the boat.[101]  Although not used, there were several different types of PFDs on the boat, including two of the comfortable Type V "fanny pack" types.[102]  According to Coast Guard statistics, 86% of drowning victims were not wearing a life vest/PFD.[103]

While not a legal requirement that an adult wear a PFD, it is reasonable and prudent for a recreational boater do so while navigating a small boat in Galveston Bay, especially while traveling in excess of 40 mph.  The United States Coast Guard recommends that all boaters regardless of age wear a life vest/PFD while on the water.  The Coast Guard's Boater's Guide to the Federal Requirement for Recreational Boats publication specifically recommends:  "Life jackets should be worn at all times when the vessel is underway.  A life jacket can save your life, but only if you wear it." (p.9) "The Coast Guard recommends that you always wear a life jacket while underway on a boat and require passengers to do the same." (p. 11) "Be safe. Wear your life jacket. … 9 out of 10 drowning fatalities occur

---

[100]  TR2:220.
[101]  TR2:218-219.
[102]  TR 2:218 and TR 2:220.
[103]  TR 6:18.

in inland waters, most within a few feet of safety.  Worse still, many of these victims owned life jackets and may have survived had they been worn." (p.17)  "As a boat operator, you should make sure that everyone on board is wearing a U.S. Coast Guard-approved life jacket at all times while on the water." (p. 55).  The Reed boat did have the required number of Type II PFDs on board.  They are specially designed to turn unconscious wearers face up in the water.

The Plaintiffs' own expert, Dr. Frank Pia, agreed that "one of the easiest ways for fishermen in a recreational boat . . . to prevent drowning is to wear a PFD."[104]  Dr. Pia also agreed that "a U.S. Coast Guard-approved PFD should be worn by adults during boat trips," but Chief Reed was not wearing one.[105]  He acknowledged the Type II PFDs on the Reeds' boat were the USCG-approved type, and he at least acknowledged it is "partially correct" that the purpose of flotation in this PFD is keep the head above water and the face above the surface.[106]  Dr. Pia acknowledged that when Chief Reed was conscious when he was first on the surface of the water, he was face-up, he spoke words to his wife calling for help, and at that time he was considered a "swimmer in distress."[107]

Another Plaintiffs' expert, Dr. Sanders, agreed that wearing a life jacket when going on Galveston Bay at 40 mph is good practice, that wearing one can save your life but only

---

[104]  TR 3:230.
[105]  TR 3:230.
[106]  TR 3:235-236.
[107]  TR 3:246-247.

if you're wearing it, and with the recommendation that "if you won't wear a life jacket for your own sake, wear it for the sake of people you care about."[108]

The recommendation to wear a PFD is especially important if the boater has medical conditions such as balance, vertigo, memory problems, or cognitive difficulties.  As evident by Mr. Reed's medical history, his self-reported medical issues made him more susceptible to falling overboard.

It was not prudent, it was unreasonable, and it was negligent for Mr. Reed to fail to wear a PFD while boating on June 7, 2019.  The only plausible conclusion from these facts is that it is more likely than not that if Mr. Reed had been wearing his Type II PFD he would have remained afloat, been rescued, and he would not have drowned.  His failure to wear the PFD is certainly a contributing cause, a proximate cause, of his drowning.

**Failure to deploy throwable PFD for ready use.**

After Mr. Reed fell overboard, Ms. Reed testified she backed the boat towards Mr. Reed.  She came within eight feet of Mr. Reed and threw him a dock line that was tied to the boat.[109]  The GPS data from the Reed boat, however, shows that the closest the Reed boat ever came back to the point where Plaintiffs' experts assert Mr. Reed fell overboard was over 167 feet away and increasing.[110]  Jana Reed's testimony—that she got within eight feet of Mr. Reed—casts doubt on the testimony of Plaintiffs' experts' that Mr. Reed fell

---

[108]  TR 2:133-134.
[109]  TR 2:55, 2:58 and 2:128.
[110]  TR 2:63.

overboard sometime between 3:49:40 to 3:49:50. According to the stipulated GPS data, the Reed boat never came back within eight feet of the positions it was in during that time. There is no testimony that the Reed boat would have been affected by the wake wave of the *Maersk Idaho* during the time when Mrs. Reed navigated the boat in the figure eight pattern where it came back within eight feet of its previous course track.

The dock line was an inadequate rescue attempt, a result of Mr. Reed's failure to teach his wife about using the throwable PFD that was stowed in a closed compartment on the Reeds' boat. Under both Texas and federal law, a Type IV throwable PFD must be "immediately available". Jana Reed testified that all the life jackets and the Type IV throwable were stored in the right front compartment with the hatch closed when Mr. Reed fell overboard.[111] As testified by Capt. Thomas Danti, Defendants' small boat expert, it was a violation of the law to keep the Type IV throwable in a closed compartment and not "immediately available".[112] Unfortunately, because the boat was drifting away from Mr. Reed, the line was very quickly outside Mr. Reed's grasp.[113] Mr. Reed never conducted man overboard drills or trained Mrs. Reed what to do if someone fell overboard.

The Reeds violated state and federal safety statutes by not having a Type IV throwable PFD immediately available or accessible. Federal law states that "no person may use a recreational boat unless" a throwable PFD is "**immediately available**."[114] Texas

---

[111] TR 2:220.
[112] TR 6:21.
[113] TR 2:58 and TR 2:62-63.
[114] *See* 33 CFR §175.19 (emphasis added).

law is nearly identical, requiring that "a person may not operate a recreational vessel of 16 feet or more in in length unless the vessel is equipped with… at least one **immediately accessible** Type IV throwable flotation device."[115]  In violation of the statutes, the Reeds had their throwable PFD stored in a closed compartment at the bow of the boat.  Having the throwable PFD in a closed forward compartment is not immediately available.[116]  The United States Coast Guard's publication, A Boater's Guide to the Federal Requirements for Recreational Boats, states, "Throwable devices must be immediately available for use. They should be on main deck within arm's reach, hanging on a lifeline, or other easily reached location."[117]

Because Ms. Reed did not have a throwable PFD available, she threw Mr. Reed the closest thing she could find, a dock that was tied to the boat.  Therefore, as the boat continued to move it carried the line away from Mr. Reed.  Instead, the first thing near Jana Reed should have been the Type IV throwable in case a person fell overboard.[118]  It would have drifted alongside Mr. Reed, unlike the eight-foot line that moved away with the boat. As the boat owner/operator, Mr. Reed failed to make sure his passengers were aware of the safety features of the boat, and to insure they were properly deployed and available to be used.[119]  According to state and federal law, Mr. Reed should not have left the dock without

---

[115] *See* Tex. Parks & Wild. Code Ann. § 31.066(c)(2) (emphasis added).
[116] TR 6: 21.
[117] DEX 55, p. 10.
[118] TR 6:103.
[119] TR 6:37 and TR 6:103.

first making sure the Type IV throwable was immediately available in case they needed to use it.[120]   Mr. Reed's failure to properly prepare the boat and his passengers for this trip was a contributing cause of his death.

### **Mr. Reed violated the law related to use of their VHF Radio.**

Mr. Reed never trained or showed Mrs. Reed how to use the VHF radio with which the boat was equipped.[121]   Jana Reed testified that the VHF radio was not ever used.[122] Since the Reed boat was equipped with the VHF radio, they were required by law to have it turned on and to maintain a radio watch.[123]   Jana Reed did not use the radio after Mr. Reed fell overboard, and that radio could have facilitated a rescue by other boats in the area.[124]

Federal law required the Reeds to have the VHF radio set to "an appropriate DSC distress calling channel."[125]   Digital Selective Calling ("DSC") is a function which allows a VHF user, with the push of a button, to send an automated distress call not only to the Coast Guard, but also to other vessels in the area.[126]   The VHF and the DSC distress function were designed for the very situation which faced Ms. Reed on June 7, 2019. However, because Mr. Reed did not train Ms. Reed on how to use the radio[127] she did not

---

[120]   TR 6, p. 103.
[121]   TR 2, p. 232.
[122]   TR 2, p. 137 and 232.
[123]   TR 2, p. 135; TR 6, 28-29; 47 CFR § 80.310.
[124]   TR 6, p. 106.
[125]   47 CFR § 80.310.
[126]   TR 6, pp. 29-30.
[127]   TR 2, p. 232.

use the DSC or make a manual mayday call to alert the Coast Guard and other vessels in the area which could have come sooner to her assistance.  Jana Reed testified that there was at least one other small boat in the area that was trailing the *Maersk Idaho*.[128]  Once a distress call is made there is a legal obligation placed upon all vessels to render assistance, as described by Capt. Danti.[129]  It is more likely than not that if the DSC function had been used or Mrs. Reed had made a call on the VHF radio another small boater would have rendered aid.[130]  Mr. Reed's violation of the law by not standing a radio watch and his failure to train his passenger—in this case his wife—as to the proper use of the VHF radio was a contributing cause of his death.

### 4.     Marijuana was in his system at the time of death.

It is undisputed that marijuana was in Mr. Reed's body system at the time of his death.  Of course, this means marijuana was in his body at the time he changed course to drive through the Maersk Idaho starboard wake field, when he changed course again to leave the safe flat water astern of the ship, when he overtook the port wake field waves, and when he fell out of the boat while his wife remained aboard.

The autopsy toxicology report found tetrahydrocannabinol, Delta 9 THC, in his liver.[131]  Plaintiffs' forensic pathology expert, Dr. Bux, confirmed that THC is the active substance of marijuana.  He said it is true that "the active psychoactive ingredient of

---

[128]  TR 2:197; TR 6:33.
[129]  TR 6:33.
[130]  TR 6:106.
[131]  DEX 133 at 4-5.

Marijuana was in Chief Reed's body at the time of his death."[132]   The toxicology report found an even larger amount of metabolized THC, Delta 9 Carboxy THC, in his liver.[133] Dr. Bux agreed it is true that the metabolized THC found in his liver "certainly came from active marijuana that used to be in his body before it became metabolized."[134]

Dr. Bux agreed that the psychoactive ingredient, THC, is the one that causes the effect of the drug in a person.  He acknowledged the effects of marijuana on a person "can" include: time and space and distance perception become confused, it can slow a person's reflexes, and one reason people use marijuana is to experience its euphoric effects.  He agreed it is possible marijuana can affect a person's judgment and decision-making.[135]

Dr. Grossberg, Dr. Wimbish, and Dr. Jones all agreed that THC was in Mr. Reed's liver at the time of his death.  Even Mr. Reed admitted in a medical history record that in the past he had used or abused marijuana.[136]

IV.     **The contributory negligence of Mr. Reed is the proximate of this incident.**

A.     **The presence of marijuana in Mr. Reed's body at the time of his death cannot be ignored.**

Although Plaintiffs contend it is not known when Mr. Reed last used marijuana or whether he was impaired by it, they cannot deny that the active ingredient of marijuana was in his body at the time of his death and when he fell out of his boat.  Dr. Wimbish

---

[132]   TR 3:204, 208.
[133]   DEX 133 at 5.
[134]   TR 3:206.
[135]   TR 3:204-205.
[136]   DEX 145 at 3 (Hauser clinic records).

testified that Mr. Reed was under the influence of marijuana when he fell overboard.[137]  He had high levels of THC in his system at the time of his death.[138]  Even Mr. Reed admitted in a medical history record that he had used or abused marijuana in the past.[139]

Plaintiffs' toxicology expert, Dr. Jones, was equivocal about the actual effect of marijuana on Mr. Reed, but he admitted some general truths about THC.  He acknowledged THC is the primary psychoactive substance in marijuana, meaning it has "the properties to change an individual's behavior and responsiveness" and "THC alters a person's mental and physical faculties."[140]  Some detrimental effects of THC include dizziness and increased heart rate.  Marijuana has also been found to impair critical driving-related skills, including impaired judgment, memory, concentration, reaction time, cognitive and motor skills.[141]  Marijuana has been known to increase the risk of an accident occurring.   THC increases someone's likelihood to take unnecessary risks.[142]

Dr. Wimbish testified the concentration of THC and its metabolite found in Mr. Reed indicates he had recently used or that he was a chronic user of marijuana.[143]  Dr.Wimbish concluded that based on the level of THC found in Mr. Reed's system, it is

---

[137]  Deposition of Dr. Wimbish, p. 56:10-12: ("He was intoxicated at the time. Altered the normal use of his mental and/or physical faculties to adjust to the events that took place.").
[138]  It is undisputed that Mr. Reeds post mortem liver analysis revealed 13 nanograms/grams of THC and 290 nanograms/grams of TCH-COOH (a THC metabolite). DEX 133; *see also* Deposition of Dr. Wimbish p. 33:18-22; TR 3:170 (Dr. Jones); TR 3:206, 208 (Dr. Bux).
[139]  DEX 145 at 3 (Hauser Clinic records).
[140]  TR 3:160; See also Deposition of Dr. Wimbish, p. 42, 44, 61, 107 and 110.
[141]  TR 3:162-164.
[142]  TR3:164.
[143]  Deposition of Dr. Wimbish, p. 22 and 23.

more likely than not that he had used marijuana on the day of the accident.[144]   Dr. Wimbish's testimony supports the conclusion that at the time of the incident, Mr. Reed was impaired/intoxicated to some extent, meaning he did not have the normal use of his mental and/or physical faculties.[145]

Therefore, Mr. Reed violated Texas and Federal law by operating his boat under the influence of THC.[146]   Under Texas law it is a crime to operate a watercraft while intoxicated. Tex. Pen. Code Ann. § 49.06.  "Intoxicated" means "not having the normal use of mental or physical faculties by reason of the introduction of . . . a controlled substance." Tex. Pen. Code § 49.01.  Under Federal law it is a crime to operate a vessel while under the influence of a dangerous drug.  46 U.S. Code § 2302(c).  A "dangerous drug" is a narcotic drug, a controlled substance, or a controlled-substance analog, as defined in section 102 of the Comprehensive Drug Abuse and Control Act of 1970 (21 U.S.C. 802). See 46 CFR § 16.105.  Marijuana is a schedule I controlled substance.  See 21 U.S.C. § 812.  Therefore, it is a violation of this federal statute to operate a boat while under the influence of marijuana.

---

[144]   Deposition of Dr. Wimbish, p. 67:12-15.

[145]   Deposition of Dr. Wimbish, at p. 6:12-24, 44, 56, and 62; see also Dr. Jones testimony, TR3:160.

[146]   Under Texas law it is a crime to operate a watercraft while intoxicated. Tex. Pen. Code Ann. § 49.06. "Intoxicated" means "not having the normal use of mental or physical faculties by reason of the introduction of… a controlled substance…" Tex. Pen. Code § 49.01.  Under Federal law it is a crime to operate a vessel while under the influence of a dangerous drug.  46 U.S. Code § 2302(c).  A "dangerous drug" is a narcotic drug, a controlled substance, or a controlled-substance analog, as defined in section 102 of the Comprehensive Drug Abuse and Control Act of 1970 (21 U.S.C. 802).  *See* 46 CFR § 16.105. Marijuana is a schedule I controlled substance.  *See* 21 U.S.C. § 812.

Dr. Wimbish's testimony supports the conclusion that Mr. Reed was under the influence of marijuana at the time of the incident because he did not have normal use of his mental or physical faculties.

Despite Plaintiffs' arguments about the effect of marijuana on Mr. Reed, their own expert, Dr. Sanders, agreed she absolutely "would not get on a vessel where the operator had been drinking or using any types of narcotics or marijuana."[147]

This evidence supports a finding that Mr. Reed's use of marijuana was a contributing factor in the cause of this incident. Being under the influence of marijuana would explain his poor judgment and risk-taking behavior in purposely heading into the Maersk Idaho waves, ignoring his wife's warning that she was scared, his response to "Don't worry, we'll be fine," continuing on his course to overtake waves that sounded like hitting concrete, and even his lack of balance that caused him to fall overboard when his wife remained in the boat. The presence of marijuana in his body was a proximate cause of this incident.

**B. Recreational Boat Operators Are Responsible for Safe Operation of Their Boat.**

**1. The law applies equally to recreational boat operators.**

Small boat operators are legally obligated to act prudently and follow the applicable law. The fact that one is operating a recreational boat, as opposed to a commercial vessel, does not absolve the recreational operator from his/her legal obligations. As the Second Circuit put it in a wrongful death case:

---

[147] TR 2:117.

He acted as if the very smallness of his boat, or some privilege inherent in pleasure craft, entitled him to cast all the burdens of avoiding collision on the other vessel. **There is no legal distinction in respect of the rules of navigation between vessels operated for pleasure and for profit, between large boats and small ones, or those with a numerous crew and those operated by one man.[148]**

Mr. Reed, as a recreational boater, was duty bound to follow the rules of the road, to know of and heed the warnings on charts, to comply with safety regulations, etc. The Fifth Circuit has held, "boats, regardless of their size, purpose, and activity, are governed by the same 'Rules of the Road' as the largest seagoing vessel…"[149] It is undisputed that the Inland Rules of the Road apply to all vessels.  Rule 1 states, "These Rules apply to *all vessels* upon the inland waters of the United…" (emphasis added.)  Even Plaintiffs' own expert, Captain Rivera, testified that the Rules of the Road apply equally to all vessels.[150]

It is also undisputed that Mr. Reed was responsible for knowing the warnings on the applicable charts. "The [recreational boat] navigator is chargeable with the information contained on such charts and a prudent navigator will, of course, consult such charts before a contemplated voyage by vessel."[151] Or, as another court held, "We are bound by the

---

[148] *The O'Brien Bros.*, 258 F. 614, 616 (2d Cir. 1919) (emphasis added).
[149] *Richardson v. Foremost Ins. Co.,* 641 F.2d 314, 316 (5th Cir. 1981), aff'd, 457 U.S. 668 (1982); *see also Pearce v. United States,* 261 F.3d 643, 650 (6th Cir. 2001); *see also Gemp v. United States*, 684 F.2d 404, 408 (6th Cir. 1982) (pleasure craft operators, are charged as a matter of law with knowledge of information shown on charts).
[150] TR 3:76.
[151] *Thompson v. Consol. Gas, Elec. Light & Power Co. of Baltimore*, 111 F. Supp. 719, 731 (D. Md. 1953).

admiralty rule that any boater, even a recreational one, is charged with knowledge of all warnings and hazards contained in NOAA charts.[152]

Both Captain Rivera and Dr. Sanders testified that Mr. Reed was responsible for knowing the warnings on the applicable charts. Captain Rivera testified that "that recreational boaters are obligated to know the warnings on the charts as applicable…"[153] Dr. Sanders testified that "a safe boater would read warnings on available charts."[154]

The National Oceanic and Atmospheric Administration Chart number 11326 contains the following warning:[155]

> Large Vessels traversing the Houston Ship Channel can cause swells engulfing the shoals alongside the channel. Small craft should use extreme caution when operating in these areas.

It is undisputed that Mr. Reed "was using his Navionics app which contains chart information."[156] The chart's warning regarding using extreme caution was available to Mr. Reed if he had chosen to use it.[157]  However, as shown by the screenshot of Mr. Reed's phone taken by the Coast Guard, Mr. Reed was not using the warnings function of his Navionics app.[158] Alternatively, even if Mr. Reed had been using the warnings function of his Navioncis app, it is clear that he ignored the warning. (And the warning of his wife, i.e.

---

[152] *Alprin v. City of Tacoma*, 139 Wash. App. 166, 175, 159 P.3d 448, 453 (2007)
[153] TR 3:126.
[154] TR 2:101
[155] DEX 7.
[156] TR 2:132
[157] TR 2:132
[158] DEX 92.

"Chris, I'm scared.)  Also, as Captain Rivera testified, the routing function of the Navionics app will not allow a user to chart a course over the shoals.[159] When a boat operator who chooses to navigate through an area which contains ample warnings of potential dangers is solely responsible for that choice, and for any subsequent injuries.[160]

Dr. Sanders testified that Mr. Reed, as captain of his boat, was responsible for his own safety as well as the safety of his passengers.[161] Dr. Sanders further testified that Mr. Reed, as captain of his boat, was responsible for teaching his passengers and crew how to use the safety equipment on his boat.[162]   The evidence is unfortunately replete with evidence that Mr. Reed did not train himself or Ms. Reed on the operation of the boat or the use of the safety equipment.

## 2.    Mr. Reed was not wearing a life jacket.

Mr. Reed was not wearing a life jack or other type of PFD when he fell overboard.[163] According to Coast Guard statistics, 86% of drowning victims were not wearing a life jacket or PFD.[164]   Although there is no legal requirement for an adult to wear a PFD, it is reasonable and prudent for a recreational boater do so while navigating a small boat in Galveston Bay especially while traveling in excess of 40 mph.  As reflected by the elevation

---

[159]  Although not technically synonymous, the parties have used shoals and spoils interchangeable.  *See, e.g.,* TR 3:120; *see also* TR 1:238-239.

[160]  *Gorgas v. United States*, 1976 WL 455320, at *1 (N.J. Oct. 14, 1976), aff'd sub nom. Gorgas v. Williams, 568 F.2d 768 (3d Cir. 1978)

[161]  TR 2:103; *see also* TR 102.

[162]  TR 2:137.

[163]  TR 2:218-220.

[164]  TR 6:18.

changes in the Reed boat's GPS unit boats tend to have changes in elevations while traveling in Galveston Bay, even if not caused by the wakes of large commercial vessels.

The United States Coast Guard recommends that all boaters regardless of age wear a life jacket or PFDs while on the water.[165]   The Coast Guard's *Boater's Guide to the Federal Requirement for Recreational Boats* specifically recommends:   "Life jackets should be worn at all times when the vessel is under way.  A life jacket can save your life, but only if you wear it."[166] "The Coast Guard recommends that you always wear a life jacket while underway on a boat and require passengers to do the same."[167] "Be safe. Wear your life jacket. … 9 out of 10 drowning fatalities occur in inland waters, most within a few feet of safety.  Worse still, many of these victims owned life jackets and may have survived had they been worn."[168] "As a boat operator, you should make sure that everyone on board is wearing a U.S. Coast Guard-approved life jacket at all times while on the water."[169]   The Reed boat did have the required number of Type II PFDs on board, including PFDs which are designed to turn unconscious wearers face up in the water.[170]

This recommendation is especially important if the boater has medical conditions such as balance, vertigo, memory problems, or cognitive difficulties.[171]  As evident by Mr.

---

[165] *See* DEX 55, pp. 4, 6, 7, 10, and 29.
[166] *Id.* at p. 9.
[167] *Id.* at p. 11.
[168] *Id.* at p. 17.
[169] *Id.* at p. 55. .
[170] DEX 55, p. 13.
[171] TR 6:65-66.

Reed's self-reported medical history, his medical issues made him more susceptible to falling overboard.[172]  While it is a personal choice, it was prudent and reasonable to expect Mr. Reed to wear a life jacket of some type while boating on June 7, 2019.  It is more likely than not that had Mr. Reed been wearing a PFD he would have been rescued and not have drown.[173]  Failing to wear a PFD was, unfortunately, a contributing cause of his death.

### 3.      Mr. Reed violated Federal and State safety regulation.

i)      The Pennsylvania Rule

The Pennsylvania Rule is a maritime law burden shifting rebuttable presumption created by the United States Supreme Court in 1873. Pursuant to the Pennsylvania Rule, when a party breaches a statutory duty which is relevant to the injury in question, a rebuttable presumption arises that the breach of the statutory duty establishes causation. *Otto Candies, Inc. v. M/V Madeline D*, 721 F.2d 1034, 1036 (5th Cir. 1983) ("The rule shifts the burden of proof as to causation to the statutory offender…"); *see also Mike Hooks Dredging Co., Inc. v. Marquette Transp. Gulf-Inland, L.L.C.,* 716 F.3d 886, 8891 (5th Cir. 2013) ("shifting the burden of proving causation").

To rebut this presumption, the breaching party must show "not merely that her fault might not have been one of the causes, or that it probably was not, but **that it could not have been**." *Otto Candies, Inc.,* 721 F.2d at 1036 (5th Cir. 1983); *citing The Pennsylvania,* 86 U.S. (19 Wall.) 125 (1873) (emphasis added); *see also* Gilmore & Black, The Law of

---

[172]  DEX 45 and 147.
[173]  TR 6:106.

Admiralty § 10–25 at 898 (2d ed. 1975). The presumption is rebutted only when the statutory violator shows by clear and convincing showing that the violation could not have been a proximate cause of the incident. *See, e.g., Exxon Co. v. Sofec, Inc.,* 54 F.3d 570, 577 (9th Cir. 1995), *aff'd sub nom. Exxon Co., U.S.A. v. Sofec, Inc.,* 517 U.S. 830, (1996) ("This presumption can be rebutted by a 'clear and convincing showing of no proximate cause.'"); *see also Cliffs-Neddrill Turnkey Int'l-Oranjestad v. M/T Rich Duke,* 947 F.2d 83, 86 (3d Cir. 1991); *see also Anthony v. Int'l Paper Co.,* 289 F.2d 574, 581 (4th Cir. 1961).

The Pennsylvania rule applies to any "statutory violator" who is a "party to a maritime accident." *Pennzoil Producing Co. v. Offshore Exp., Inc.*, 943 F.2d 1465, 1472 (5th Cir. 1991), *citing Sheridan Transp. Co. v. United States,* 834 F.2d 467, 476 (5th Cir.1987) (*Sheridan I* ), *appeal after remand,* 897 F.2d 795, 799 (5th Cir.1990) (*Sheridan II* ).

ii)    Mr. Reed did not have a throwable PFD Immediately Available

Mr. and Ms. Reed violated both Texas and Federal safety statutes by not having a throwable Personal Floatation Device ("PFD") immediately available/accessible.[174] Federal law states that "no person may use a recreational boat unless" a throwable PFD is "immediately available."16 *See* 33 CFR §175.19. Texas law is nearly identical in that states that "a person may not operate a recreational vessel of 16 feet or more in in length unless

---

[174]  A throwable PFD "means a PFD that is intended to be thrown to a person in the water. A PFD marked as Type IV or Type V with Type IV performance is considered a throwable PFD." See 33 CFR § 175.13.

the vessel is equipped with… at least one immediately accessible Type IV throwable flotation device."17 *See* Tex. Parks & Wild. Code Ann. § 31.066(c)(2).

Although neither the Texas statute nor the Federal statute defines "immediately available" or "immediately accessible," this Court does not have to interpret this requirement in a vacuum. The definition of "immediately available" is provided by multiple other relevant sources which are set forth in detail in Defendants' Motion for Application of the Pennsylvania Rule, and which are fully incorporated herein.[175]

Nonetheless, it is not disputed that the throwable was not immediately available on the day of the incident.  Ms. Reed testified that all of the life preserves, including the Type IV throwable PFD, at the time of the accident were stowed in a forward compartment with the hatch closed.[176] Dr. Sanders testified, "I didn't say it was inaccessible. I said it wasn't immediately available."[177] Consequently, Ms. Reed threw to Mr. Reed the closest thing available – an eight foot line tied to the moving boat.

Because there was no throwable PFD immediately available/accessible, the burden is on Plaintiffs to show by clear and convincing evidence that this could not have been a cause of Mr. Reed's death.  Plaintiffs have failed to meet that burden as required by clear and convincing evidence.

> iii)    Mr. Reed violated the VHF safety statute

---

[175] *See* Dkt. No. 91. Defendants hereby fully incorporate herein Defendants' Motion for Application of the Pennsylvania Rule.

[176] TR 2:220.

[177] TR 2:104.

While not required by law, the Reeds' boat was equipped with a VHF radio. As such, they were required to have it on and to "maintain a watch."[178] However, Ms. Reed testified that neither she nor Mr. Reed ever used the VHF radio, and she did not know how to use it.[179]

Federal law also required the Mr. Reed to have the VHF radio set to "an appropriate DSC distress calling channel."[180] Digital Selective Calling ("DSC") is a function which allows a VHF user, with the push of a button, to send an automated distress call not only to the Coast Guard, but also to other vessels in the area.[181] The VHF and the DSC distress function were designed for the very situation which faced Ms. Reed on June 7, 2019. However, because Mr. Reed did not train Ms. Reed on how to use the radio[182] she did not use the DSC or make a manual mayday call to alert the Coast Guard and other vessels in the area which could have come immediately to her assistance. Ms. Reed testified that there was at least one other small boat in that was trailing the *Maersk Idaho*.[183]

Once a distress call is made there is a legal obligation placed upon all vessels to render assistance as described by Capt. Danti.[184] It is more likely than not that if the DSC function had been used or Mrs. Reed had made a call on the VHF radio another small boater

---

[178]  47 CFR § 80.310; TR 2, p. 135; TR 6:28.
[179]  TR 2:232; TR 6:29.
[180]  47 CFR § 80.310.
[181]  TR 6:29-30.
[182]  TR 2:232.
[183]  TR 2:197; TR 6:33.
[184]  TR 6:33.

would have rendered aid.[185]  Mr. Reed's violation of the law by not standing a radio watch and his failure to train his passenger—in this case his wife—as to the proper use of the VHF radio was a contributing cause of his death. The burden is on Plaintiffs to show by clear and convincing evidence that this could not have been a cause of Mr. Reed's death. Plaintiffs have failed to meet that burden as required by clear and convincing evidence.

iv) Mr. Reed was under the influence of THC at the time of the incident

In violation of both Texas and Federal law, Mr. Reed was under the influence of the psychoactive ingredient of marijuana at the time of the accident.[186]  Under Texas law it is a crime to operate a watercraft while intoxicated.[187] Tex. Pen. Code Ann. § 49.06. "Intoxicated" means "not having the normal use of mental or physical faculties by reason of the introduction of… a controlled substance…" Tex. Pen. Code § 49.01

Under Federal law it is a crime to operate a vessel while under the influence of a dangerous drug.[188] 46 U.S. Code § 2302(c). A "dangerous drug" is a narcotic drug, a controlled substance, or a controlled-substance analog, as defined in section 102 of the Comprehensive Drug Abuse and Control Act of 1970 (21 U.S.C. 802*). See* 46 CFR § 16.105. Marijuana is a schedule I controlled substance. *See* 21 U.S.C.A. § 812.

---

[185]  TR 6:106.

[186]  Deposition of Dr. Wimbish, at p. 6:12-24, 44, 56, and 62; TR 3, p. 160.

[187]  Tex. Pen. Code Ann. § 49.01(4) "Watercraft" means a vessel, one or more water skis, an aquaplane, or another device used for transporting or carrying a person on water, other than a device propelled only by the current of water.

[188] 33 C.F.R. § 95.010: Vessel includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water.

48

Because Mr. Reed was intoxicated and under the influence of marijuana at the time of the accident, the burden is on Plaintiffs to show by clear and convincing evidence that his marijuana intoxication/impairment could not have been a cause of the accident. Plaintiffs have failed to meet that burden as required by clear and convincing evidence.

**C.    Reckless operation of his boat caused Mr. Reed to fall overboard.**

    **1.    A two-meter elevation change was not the cause of him falling overboard.**

Plaintiffs' apparently contend that a wake wave from the *Maersk Idaho* caused Mr. Reed to fall out of his boat—although it did not cause his wife to fall out—and that in turn caused him to drown.  They argue the *Maersk Idaho* was going too fast, so it's a large wake, and its wake rocked the boat causing him to fall overboard.  In essence, they argue that since he fell overboard, and since his boat experienced an elevation change as he passed through the *Maersk Idaho's* wake, the fact that he fell overboard must have been caused by the ship's wake wave.

But Plaintiffs' argument overlooks the overwhelming and undisputed evidence that his boat went through multiple two-meter elevation changes on the day of his incident, and they point to nothing that makes the two-meter elevation changes near the time of his incident any different from the other two-meter changes.  Defendant's Exhibit 166 summarizes the two-meter or more elevation changes.  Mr. Reed did that eight times—at speeds of about 40 mph—before he even entered the *Maersk Idaho's* wake.  After he intentionally changed course to head into the starboard wake field, he went through three

elevation changes of two meters or more, one of them a three-meter change.[189]  Mrs. Reed testified these starboard wake waves were higher than the waves in the port wake field.[190] Dr. Sanders testified they went through about nine or ten waves on the starboard side.[191] None of those boat elevation changes caused him to fall overboard.

After he intentionally changed course again to chase the port wake field waves, he went through two-meter elevation changes three times.  Plaintiffs' expert Dr. Sanders could not say exactly when he fell out.  She estimated the time being between 3:49:42 and 3:50:02.[192]  During that time, DEX 166 shows the boat did not have a two-meter elevation change.  It did have a two-meter change at 3:49:34 and again at 3:49:39, and Dr. Sanders said at another time she thinks he fell out about 3:49:40.[193]

For the two-meter elevation change at 3:49:34, Dr. Sanders testified he experienced "the exact same elevation change in the starboard wake field," which he successfully navigated.[194]  Since he successfully passed through the exact same two-meter change on the starboard side, one cannot conclude that the exact same elevation change on the port side caused him to fall overboard.

---

[189]  DEX 166, Dkt 186 at 65.
[190]  TR 2:199.
[191]  TR 2:77.
[192]  TR 2:61.
[193]  TR 2:60.
[194]  TR 2:124.

Ultimately, Dr. Sanders gave herself some "leeway" of a "few seconds" on when he actually fell out, saying "it doesn't matter."[195]  That's because she then proceeded to testify "where I have 3:49:40 [as the time he fell out] is consistent with whether he lost control as a result of this large wave and was ejected overboard on the way down or if he came out on the way up.  I don't know which.  So that's why I'm giving a range of time."[196]  This testimony does not prove that a two-meter elevation change from a wave is what caused him to fall overboard.  It supports the conclusion that Mr. Reed lost control of his boat, and him losing control is what caused him to fall out.  Since the elevation changes themselves were the same as what he had successfully navigated many times in the previous minutes, once cannot conclude that the mere fact he experienced **another** two-meter change somehow caused him to fall out this time.  He knew what he was getting into when he was intentionally crossing through the wake fields, since he crossed many waves already, so he cannot blame any particular wave for "ejecting" him from his boat.  If he lost control of his boat, that is not the fault of a wave or the *Maersk Idaho*, that would be caused by his operation of his boat and his decisions to make course changes to purposefully pass through and chase the wake fields.

Mrs. Reed's testimony does not prove a two-meter elevation change caused him to fall out, either.  She said when they "hit the second one of those waves that jarred us," among the waves in the port wake field that sounded like hitting concrete as they overtook

---

[195] TR 2:120.
[196] TR 2:120.

them, "then our boat kind of turned sideways."[197]  While the boat was sideways, they hit

another wave and then the boat "tipped sideways; and then that's when he fell off, when it

hit."[198]  This supports a conclusion that Mr. Reed having his boat sideways to the wave,

when he was purposely trying to overtake the wave from behind, is what caused his boat

to tip.  That doesn't explain why he fell out but she did not, and it certainly does not prove

that an unexpected two-meter elevation change "ejected" him from the boat.  Again, this

supports the conclusion that Mr. Reed lost control of his boat while purposely trying to

overtake waves from behind.

The boat experienced four more elevation changes of two-meters or more—two of

them were three-meter changes—after the incident while the USCG bosun was driving the

boat.[199]  None of those elevation changes caused anyone to be "ejected" from the boat.

Therefore, one cannot conclude that a two-meter change, or an unexpected excessive

elevation change from a *Maersk Idaho* wake wave, is what caused Mr. Reed to fall out of

his boat.

> **2.     Mr. Reed failed to heed chart warnings about shoals and ship waves.**

As detailed above in Section III.B.2, Mr. Reed failed to heed the express warning

in Note B on the NOAA navigation chart 11326, the chart intended for small boaters, that

says "Large vessels traversing the Houston Ship Channel can cause swells engulfing the

---

[197] TR 2:199.
[198] TR 2:199.
[199] DEX 166, Dkt. 186 at 65.

shoals alongside the channel. **Small craft should use extreme caution** when operating in these areas."[200]   Mr. Reed was operating his boat in precisely this area, alongside the Ship Channel and entering the shallow spoils area, knowing that he was purposely chasing and overtaking wake waves from a large ship, but he exercised no caution at all.

He ignored the Chart 11326's other cautions, too, that say "Large vessels may . . . transit at speeds in excess of 12 knots, [and] bow and stern waves can be hazardous to small vessels."   And another caution says "Small craft should stay clear of large commercial and government vessels even if small craft have the right-of-way."[201]

As explained above in Section III.B.2, he also apparently failed to use or heed his own Navionics navigation application on his phone, which would have warned him about passing over the spoils area and tried to re-route him around it.

Ignoring cautions, purposely heading into the ship's starboard wake waves, ignoring his wife's warning that she was scared, deciding not to stay in the flat calm water, and then purposely chasing and overtaking the port wake waves, was reckless conduct on the part of Mr. Reed.   Mr. Reed did all these things while he had marijuana in his body, he know he had balance problems and difficulty concentrating, and he failed to put on his life jacket. Mr. Reed's conduct constitutes extraordinary negligence.

---

[200]   DEX 9 (emphasis added).
[201]   DEX 9.

**D.    Mr. Reed's decisions, acts, and omissions were the proximate cause of his death.**

Under the Fifth Circuit Pattern Jury Charge for an admiralty case, proximate cause means:

> The condition [or conduct, rather than an alleged unseaworthy condition] in question was a substantial factor in bringing about or actually causing his/her injury, and that the injury was either a direct result or a reasonably probable consequence of the condition [or conduct].

Fifth Circuit Pattern Jury Instructions (Admiralty, causation) at § 4.6 (5th Cir. 2020). A court in this District has described the substantiality requirement to mean the "conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense." *Enron Corp. Securities, Derivative & ERISA Litigation*, 762 F. Supp. 2d 942, 973 (S.D. Tex. 2010).

The Texas state law definition of proximate cause is similar.  Proximate cause is composed of two elements, cause-in-fact and foreseeability.  *City of Gladewater v. Pike*, 727 S.W.2d 514, 517 (Tex.1987), citing *Williams v. Steves Industries, Inc*., 699 S.W.2d 570, 575 (Tex.1985); *McClure v. Allied Stores of Texas, Inc.,* 608 S.W.2d 901, 903 (Tex.1980); and *Missouri Pac. R. Co. v. American Statesman*, 552 S.W.2d 99, 104 (Tex.1977).  "Cause in fact means that the omission or act involved was a substantial factor in bringing about the injury and without which no harm would have occurred." *Gladewater,* 727 S.W.2d at 517, citing McClure, 608 S.W.2d at 903; *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex.2007).

Here, Mr. Reed's conduct meets either definition of being the proximate cause of his injury. His decision to leave the flat calm water behind the *Maersk Idaho* to chase and overtake its port wake waves was certainly a substantial factor in bringing about this incident. It is a cause in fact because if he had not chosen to take that course, the death would not have occurred. If he had maintained control of his boat, his death would not have occurred.

Because of the manner Mr. Reed was handling his boat, his injury was foreseeable, a reasonable probable consequence of his decisions and actions, he already knew the why he was navigating through the waves was sufficient to cause him and his wife to exclaim "Oh, shit!" Despite that and despite his wife's warning that she was scared, he chose to intentionally change course again to overtake the port side wake waves. Unfortunately, but foreseeably, his wife's fear proved to be well-founded. On top of all this, he failed to wear his PFD, which likely would have prevented him from drowning after he fell out of his boat. Considering Mr. Reed's additional acts and omissions discussed above, this all confirms that Mr. Reed's decisions and conduct certainly were a substantial factor in bringing about or causing his death, and his injury was a foreseeable or probable consequence of his reckless behavior.

**V.**     **Mr. Reed's choice to chase the *Maersk Idaho* and enter the port wake field was the superseding cause of the incident.**

**A.**     **The *SOFEC* Case**

In *Exxon Company, U.S.A. v. SOFEC, Inc et al.,* 517 U.S. 830 (1996), the Supreme Court reaffirmed that the doctrine of superseding cause is applicable in maritime cases. *SOFEC* involved the total loss of the Exxon tanker *Houston* which broke away from an offshore mooring facility owned by Hawaiian Independent Refinery Inc. (HIRI) when the facility's mooring system failed casting the ship adrift.  It later grounded and became a total constructive loss.  The mooring system that failed was manufactured by SOFEC.  During a storm the chain holding the ship to the mooring broke and the ship began drifting away. This caused the oil hoses to part, a portion of which remained attached to the ship.  So long as the hose was attached to and trailing from the ship, the ship was unable to use its engines to maneuver for fear of fouling the hose in the propeller.  For the next 2 hours and 41 minutes, the vessel drifted as the Captain did his best to prevent fouling of the propeller. A small assist vessel arrived and got control of the hose removing the threat of fouling the propeller.  "Between 1803 and 1830, Captain Coyne maneuvered the *Houston* out to sea and away from shallow water" and "successfully avoided the peril resulting from the breakout."  *SOFEC* at 834.  As the Court described it, "the ship had reached a safe position" and was "heading out to sea and in no further danger of stranding."  *Id*.

At this point, the Court found, the ship was now safe and "Captain Coyne had ample time, as well as opportunity and available manpower, to take precautions which would have

eliminated the risk of grounding, and that his failure to do so amounted to extraordinary negligence, superseding any negligence of the defendants with regard to the breakout or provision of safe berth after the breakout." *Id.* at 835.   What Captain Coyne did was fail to have anyone plot the position of his ship and without knowing his position, "he was unable to make effective use of a navigational chart to check for hazards." *Id.* at 833-34. The Court noted that "his failure to plot fixes after 1830 was entirely independent of the fact of breakout; he voluntarily decided not to plot fixes in a situation where he was able to plot fixes." *Id.* at 834.   Without having fixed his position or checked the chart, the Captain "initiated a final turn towards shore."   During the turn, he finally had the ship's position plotted and the chart indicated he was turning his vessel into a reef.   His "ensuing efforts to avoid the reef came too late, and moments later the ship ran aground, resulting in its constructive total loss." *Id.*

Having thus stated the facts, the Court set forth the law:

The doctrine of superseding cause is ... applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable. It is properly applied in admiralty cases. ... [T]he superseding cause doctrine can be reconciled with comparative negligence. Superseding cause operates to cut off the liability of an admittedly negligent defendant, and there is properly no apportionment of comparative fault where there is an absence of proximate causation.

*SOFEC* at 837-38 (citing 1 T. *Schoenbaum, Admiralty and Maritime Law* § 5–3, pp. 165–166 (2d ed.1994))[202].  Having stated the facts and the law, the Court framed the question it was bound to answer:

> The legal question that we took this case to address is whether a plaintiff in admiralty that is the superseding and thus the sole proximate cause of its own injury can recover part of its damages from tortfeasors or contracting partners whose blameworthy actions or breaches were causes in fact of the plaintiff's injury. **As we have held above, the answer is that it may not**.

*SOFEC* at 840 (emphasis added).

## B.     The Case at bar

The Plaintiffs herein allege the "blameworthy actions" of Defendants to be excess speed and wake (which as the Court is well-aware, Defendants strongly deny).  Assuming, *arguendo,* Plaintiffs' allegations to be true, the extraordinary negligence of Mr. Reed is the superseding cause of Plaintiffs' damages cutting off any liability of Maersk.  Mrs. Reed was clear:  Mr. Reed navigated his boat from a position of safety in "flat" water,[203] forward into the port side wake wave – the ship's wakes did not come upon him from behind and impact them.[204]

---

[202]   Texas law also recognizes the doctrine of superseding cause.  *See, e.g*., *Dew v. Crown Derrick Erectors, Inc*., 208 S.W.3d 448, 450 (Tex.2006)("Superseding cause may intervene between the original wrong and the final injury such that the injury is attributed to the new cause rather than the first and more remote cause").
[203]   Jana Reed, TR 2:198
[204]   *Id*., TR 2:232



In the case at bar, the undisputed facts establish:

1. Mr. Reed had already successfully navigated the starboard wake field of the ship into a position of total safety in "flat, calm water" behind the ship as stated by Mrs. Reed[205], as well as his expert, Dr. Sanders ("He is in between the two wakes.  So he is back to, basically, calm water, flat water.")[206].

2. He was aware of the wakes coming from the ship having gone through at least three (3) 2 meter elevation changes on the starboard side of the *Maersk Idaho* before coming to the calm water.[207]   Mrs. Reed testified that while going through the

---

[205] Jana Reed, TR 2:198
[206] Dr. Wendy Sanders, TR 2:28
[207] Defs. Ex. 166, slides 14&15 (elevation changes based upon electronic data gathered by Plaintiffs' expert Capt. Cunningham.

starboard wake "our boat just went up and then slammed down" at least three time."[208]

2. At that point Mrs. Reed specifically warned Mr. Reed about the wakes once they were in the safe, calm water:  "Chris, I'm scared."  He responded "Don't worry, we'll be fine."[209]

3. At this point, the ship was gone, having passed the Reed's location on its way to Houston. The Reed boat was in a position of complete safety.

4. Mr. Reed ignored Mrs. Reed's warning, altered his course 180 degrees toward the northwest and chased down the ship to intentionally put his boat in the port wake field of the *Maersk Idaho*.

5. Like Capt. Coyne, Mr. Reed did not consult the navigational chart which contained numerous warnings to small boats regarding the shoal area he was about to enter, large ships, and wakes.[210]

6. Mr. Reed could have remained safely astern of the ship, or continued to the south, away from the ship, toward his stated destination of the Galveston Jetties.

7. Instead, Mr. Reed negligently chased the ship to negligently put himself in the port wake field to jump wakes from behind with tragic results.

---

[208] Jana Reed, TR 2:198.
[209] *Id*., TR 2:198.
[210]  DEX 9 – NOAA Chart 11326.

As had Capt. Coyne, Mr. Reed "had reached a safe position" and was "in no further danger." *SOFEC* at 834.  The ship was gone; its wakes having passed the Reed's location as the ship continued to Houston.   His decision to chase the ship was "entirely independent" of the ship's wakes, which had already passed him by.  He "voluntarily decided not to" heed Mrs. Reed's warnings choosing instead to chase down the ship, most likely to jump the port wakes.  *Id.*   As did Captain Coyne, he also failed to heed the warnings on the navigational chart, which were many, including:[211]





---

**CAUTION**
**WARNINGS CONCERNING LARGE VESSELS**
The "Rules of the Road" state that recreational boats shall not impede the passage of a vessel that can navigate only within a narrow channel or fairway. Large vessels may appear to move slowly due to their large size but actually transit at speeds in excess of 12 knots, requiring a great distance in which to maneuver or stop. A large vessel's superstructure may block the wind with the result that sailboats and sailboards may unexpectedly find themselves unable to maneuver. Bow and stern waves can be hazardous to small vessels. Large vessels may not be able to see small craft close to their bows.

Mr. Reed's extraordinary negligence was the superseding causes of the incident and, as a matter of law, cuts off any liability for the alleged negligence of Maersk. *See SOFEC* at 837-38 ("Superseding cause operates to cut off the liability of an admittedly negligent defendant, and there is properly no apportionment of comparative fault where there is an absence of proximate causation.").

**VI.     The actions of the master, crew, and pilot of the *Maersk Idaho* were not a proximate cause of this incident.**

    **A.     The *Maersk Idaho* was proceeding at a safe speed.**

Captain McLoud is a professional mariner and was the captain of the *Maersk Idaho* on June 7, 2019. He is a 1990 graduate of the Massachusetts Maritime Academy.[212] He has been the permanent master of *Maersk Idaho* since 2017.[213] The *Maersk Idaho* has been

---

[212] TR 1:137.
[213] TR 1:144.

regularly calling on Houston since approximately 2015, and calls on Houston every 35 days.[214]

Captain Maher was the Houston Pilot who had the conn of the *Maersk Idaho* at the time of the incident.   He is an accomplished sailor who, as a young man, won multiple North American championships, was on the U.S. Sailing Team and competed for a spot on the United States Olympic team.[215]  Captain Maher spends most of both his profession and leisure time being on Galveston Bay.[216]   His small boat experience gives him the experience to judge the size of wakes.[217]

Captain Maher graduated from Texas A&M Maritime College in 1997.[218]  His first job after graduation was working on tugs in Houston and Galveston.[219]  He then worked for a dredging company, including dredging in the Galveston Bay area.[220]  He worked his way up to Captain on one of the largest dredging ships in the United States.[221]

Captain Maher joined the Houston Pilots in 2005.[222]  At the time of trial, Captain Maher had made over 3,300 transits of the Houston Ship Channel as a pilot.[223] Captain Maher has piloted ships past the area where Mr. Reed fell overboard approximately 3,100

---

[214] TR 1:150.
[215] TR 5:8-9.
[216] TR 5:8.
[217] TR 5:13-14.
[218] TR 5:14.
[219] TR 5:10.
[220] TR 5:10-11.
[221] TR 5:10-12.
[222] TR 5:15.
[223] TR 5:26.

times.  He has never noticed any unusual or dangerous wakes in spoils area on the west side of the Houston Ship Channel near markers 33 and 34, where Mr. Reed fell overboard.[224]

The master of a ship is the ultimate authority on the ship.[225]  However, when a pilot is on board, the pilot has the conn and directs the movement of the ship.[226]  The pilot, Captain Maher, set the speed of the *Maersk Idaho* for the inbound transit of June 7, 2019.[227] The captain of the *Maersk Idaho* was on the bridge with the pilot and heard the pilot's orders setting the speed of the ship.[228]  The captain of the *Maersk Idaho* testified he hires a pilot expecting that the pilot will provide him correct information regarding potential dangers.[229]  However, the master had the right and the duty take the conn back from the pilot if the captain feels the pilot is negligently doing his job.[230]  Captain Maher has never had a captain take the conn from him.[231]

Rule 6 of the Inland Navigation Rules ("the Rules of the Road) is the "safe speed" rule.[232]  This rule requires that "every vessel shall at all times proceed at a safe speed… appropriate to the prevailing circumstances and conditions."[233]  In determining what is a

---

[224]  TR 5:26-27.
[225]  TR 1:70.
[226]  TR 5:28-29; *See, e.g., Deutsche Shell Tanker-Gesellschaft mbH v. Placid Ref. Co.,* 767 F. Supp. 762, 785 (E.D. La. 1991), aff'd, 993 F.2d 466 (5th Cir. 1993).
[227]  TR 1:116.
[228]  TR 1:116.
[229]  TR 1:104.
[230]  TR 5:29.
[231]  TR 5:29.
[232]  Rule 6 is codified in 33 C.F.R. § 83.06.
[233]  DEX 28:23.

safe speed "appropriate to the prevailing circumstances and conditions," Rule 6 lists several factors which must be considered, including traffic density.[234]  In this instance, the pilot testified that he considered all of the factors listed in Rule 6 when setting the speed of the *Maersk Idaho* on June 7, 2019.[235]

Although the *Maersk Idaho* could have physically transited the Houston Ship Channel at slower speed, the pilot determined it was prudent to do so at the speeds he chose based on the surrounding vessel traffic.[236]  The traffic which the pilot considered in setting the ship's speed included traffic crossing the Houston Ship Channel coming from Bolivar Roads, traffic coming out of Texas City, inbound tows, outbound ships and tows, etc.[237]  The pilots testified the ship was travelling at a speed which was safe for both commercial and recreational vessels.[238]

The pilot set the ship's speed in such a way to safely manage the other vessel traffic.[239]  For example, the *Maersk Idaho* adjusted its speed to ensure another vessel could complete a turn and steady up on its new course before meeting the *Maersk Idaho.*[240]  Also, Houston Pilots "do everything we can to make sure" they do not to have a situation where three vessels are abreast of each other.[241]  Having three vessels abreast increases the chance

---

[234]  DEX 28:23.
[235]  TR 5:107-109.
[236]  TR 5:84-85.
[237]  TR 5:60-64.
[238]  TR 5:109.
[239]  T R 5:60-64.
[240]  TR 5:64.
[241]  TR 5:80.

of a collision.[242]   In this instance, the pilot set the ship's speed to avoid having a three abreast situation and to prevent "vessels stacked on top of each other."[243]   Both the master of the vessel and the pilot testified there was no hurry to get the ship to the dock.[244]

Other factors considered in setting the speed of the *Maersk Idaho* was that for safety reasons,  Houston Pilots try to keep one and a half to two miles between vessels which are ahead of or behind them and going in the same direction.[245]   Additionally, ships in the Houston Ship Channel do not pass other ships because doing so is "considered the most dangerous thing we do."[246]   Therefore, a ship's speed must be set to avoid overtaking another ship, or to avoid being overtaken by another ship.

As the Fifth Circuit has held, the "responsibilities of a pilot are broad and encompass, 'the command and navigation of the ship.'" *Usinas Siderugicas de Minas Geras, Sa-Usiminias v. Scindia Steam Nav. Co., Ltd.*, 118 F.3d 328, 334 (5th Cir. 1997). However, "the master is not wholly absolved from his duties while the pilot is on board and may advise him and even displace him in case he is intoxicated or manifestly incompetent."[247] *Avondale Indus., Inc. v. Int'l Marine Carriers, Inc.,* 15 F.3d 489, 493 (5th Cir. 1994). "The master is entitled to assume that the pilot is an expert on local conditions

---

[242]  TR 5:80.
[243]  TR 5:1323.
[244]  TR 1:117; TR 5:48-49.
[245]  TR 5:64.
[246]  TR 5:63.
[247]  The American Pilots Association has recognized this standard in a Resolution which states, "A pilot takes control of the conn and the master steps aside except when it's manifestly obvious that the pilot is incompetent, incapacitated, or the ship is in immediate danger." [DEX 39]

and practices, until it becomes manifest that the pilot is steering the vessel into danger." *Id.* at 494. Nonetheless, "the master has a responsibility to monitor the pilot's decision making. If the master's responsibility to intervene in cases of great necessity means anything, it must require that he have an adequate level of information to determine when "great necessity" arises." *Id.* Here, the captain of the *Maersk Idaho* did not take the conn from the pilot because "[w]e were at a safe speed…"[248]

Plaintiffs have failed to meet their burden of proof to show, by a preponderance of the evidence, that Captain Maher was manifestly incompetent in setting his speed at approximately fifteen knots in the area of the Houston Ship Channel near where Mr. Reed fell off of his boat.  Additionally, Plaintiffs have not met their burden of proof to show, by a preponderance of the evidence, that Captain McLoud failed to monitor the pilot's decision or that captain McLoud failed to have an adequate level of information to determine whether a great necessity had arisen which required him to intervene in the manner in which Captain Maher was piloting the ship.  The undisputed evidence is that the captain was on the bridge with the pilot, and heard the pilot's orders setting the speed of the ship. Furthermore, Plaintiffs have not offered any evidence of what a safe speed would have been for the *Maersk Idaho.*

**B.    The wake of the *Maersk Idaho* was not unusual and could have been reasonably anticipated by Mr. Reed.**

---

[248] TR 1:172.

Captain Maher's training since being a cadet at the maritime college has been to monitor the size of his wake, recognizing that speed is a factor affecting the size of the ship's wake.[249]   Potential wake wash damage is something Captain Maher takes into account "from the time I board until the time I get off the vessel" and, therefore, he did not need to discuss potential wake wash damage with Captain McLoud.[250]   As a general rule, Captain Maher keeps his wakes to less than three feet.[251]   This is in part because on the Houston Ship Channel there are many inland tow boats pushing barges, which have about three feet of freeboard.[252]   Keeping his wake to less than three feet prevents the ship's wake from damaging the tows or injuring their crews.[253]   If a tow believes a ship's wake is excessive, the tow will let the ship know.[254]   [TR 5:42] On June 7, 2021, no tows complained that the wake of the *Maersk Idaho* was excessive.[255]

The master of the *Maersk Idaho* and the pilot both monitored the size of the ship's wake as the ship passed the spoils area.[256]   Captain McLoud testified he is "constantly watching the wake. The pilot is doing the same thing."[257]   On the day of the incident, Captain Maher testified the ship's wake outside the channel in the spoils area was one to

---

[249]  TR 5:25.
[250]  TR 5:33.
[251]  TR 5:41-42.
[252]  TR 5:41-42.
[253]  TR 5:41-42.
[254]  TR 5:42.
[255]  TR 5:42.
[256]  TR 1:124
[257]  TR 1:170.

two feet[258]. He did not see any waves breaking in the spoils area west of markers 33 and 34.[259]

The pilot checked the size of the wake of the *Maersk Idaho* multiple times in the minutes before Mr. Reed fell off his boat.[260]  For instance, as the *Maersk Idaho* approached the turn at channel markers 25 and 26 at approximately 3:38 pm, a sailboat was outbound under power on the west side of the channel (i.e. on the port side of the *Maersk Idaho*).[261] It appeared that the sailboat was going to turn and cross in front of the *Maersk Idaho.*[262] The pilot and the ship's lookout discussed the sailboat and the *Maersk Idaho* blew its danger signal.[263]   The sailboat altered its course to its starboard.[264]   The sailboat then passed the *Maersk Idaho* without incident as the pilot watched the sailboat pass through the ship's starboard wake.[265]  Based on the pilot's Personal Pilot Unit computer ("PPU"), at this time the *Maersk Idaho* was making approximately 15.6 knots.[266]  (*See* screen capture below.)

---

[258]  TR 5:151.
[259]  TR 5:4.
[260]  TR 5:110.
[261]  TR 5:91.
[262]  TR 5:91.
[263]  TR 5:92.
[264]  TR 5:92.
[265]  TR 5:92.
[266]  DEX 13.



After completing the turn at markers 25 and 26, as the ship approached markers 26 and 27, the *Maersk Idaho* steadied up on a course of 336 degrees.[267]  To confirm this course, the pilot lined up a set of physical structures called "ranges," which were behind the ship – one near the Galveston Yacht Basin and the other off of Pelican Island.[268]  To line up the ranges, the pilot went to the bridge wing and looked behind the ship.[269]  While doing so he

---

[267]  TR 5:74.
[268]  TR 5:74-75.
[269]  TR 5:75.

also observed the wake of the *Maersk Idaho*, which was approximately one to two feet outside of the channel.[270]   Based on the pilot's PPU, at this time the *Maersk Idaho* was making over 14.5 knots.[271]   (*See* screen capture below.)



A few minutes later, as the ship approached markers 29 and 30 at approximately 3:42 pm, the captain and the pilot heard the engine of a recreational powerboat racing of the ship's starboard side.[272]   The captain and the pilot walked to the starboard side of the

---

[270]  TR 5:77.
[271]  DEX 13.
[272]  TR5:77-78.

bridge and observed a powerboat jumping the ship's starboard wake.[273]   The powerboat

then "continued on without incident."[274]   Based on the pilot's PPU, the *Maersk Idaho* was

making approximately 15 knots at this time.[275]   (*See* screen capture below.)



The pilot testified it is his practice to closely monitor a ship's wake when he

overtakes a tug and barge.[276]   At approximately 3:48 pm, one minute before Plaintiffs

estimates Mr. Reed fell overboard, the *Maersk Idaho* was making approximately 14 knots

and was abeam of markers 33 and 34 near the area where Plaintiffs believe Mr. Reed fell

---

[273]  TR 5:78.
[274]  TR 5:78.
[275]  DEX 13.
[276]  TR 5:110.

overboard.  At this point in the transit, the *Maersk Idaho* was overtaking a tow called the *Nan Cenac*.  The pilot testified that he followed his usual procedure of monitoring the ship's wake when the *Maersk Idaho* passed the *Nan Cenac*.[277]  (*See* screen capture below.)



Since this incident on June 7, 2021, Captain Maher has piloted approximately four hundred ships past markers 33 and 34.[278]  He has made it a point to observe the size of the wakes when passing this area.[279]  The wakes he has observed in the area where the incident occurred have been one to two feet.[280]

> **C.** **The failure of the lookout to report the presence of recreational boats was not a cause-in-fact of Mr. Reed's death.**

---

[277]  TR 5:110.
[278]  TR 5:50.
[279]  TR 5:50.
[280]  TR 5:50.

The *Maersk Idaho* posted the bosun as the dedicated lookout on the bow of the ship.[281]  The sole duty of a dedicated lookout is to act as the lookout.[282]   The duty of a lookout is to report relevant information which might be a danger to the vessel.[283]   The pilots expected to see recreational boats on Galveston Bay, especially on a sunny day in June.[284]  The master of the *Maersk Idaho* recalls seeing recreational boats on the day of the incident, but the ship did not need to slow down because they were at a safe speed.[285]

Captain Maher was satisfied with the way the lookout did his job and does not fault the lookout for not reporting the Reeds' boat.[286]  If the lookout, or anyone else, had reported the presence of the Reeds' boat, Captain Maher would not have changed anything he did while piloting the *Maersk Idaho*.[287]   That is because the *Maersk Idaho* was operating at a safe speed and had an appropriate size wake for the pleasure boats on the bay that day.[288]  Although Captain Maher does not recall whether he saw the Reeds' boat, that is "because I don't feel as if it would stick out. If it was a danger to me or I was a danger to it, it would certainly stick out."[289]

---

[281]  TR 1:115-116.
[282]  TR 1:116.
[283]  TR 5:99; TR 1:116-117; The Maersk Safety Management System states, "Relevant observations to be done and to report everything seen to the navigating officer" DEX 69:27.
[284]  TR 5:52.
[285]  TR 1:173-174.
[286]  TR 5:99-100.
[287]  TR 5:100.
[288]  TR 5:100.
[289]  TR 5:91.

The evidence shows that the lookout had properly performed his function earlier in the transit in the situation involving the sailboat.  The failure of the lookout to report the presence of the Reeds' boat, or the presence of other recreational boats, was not a proximate cause of this incident.  Proximate cause is composed of two elements, cause-in-fact and foreseeability.

*In re Enron Corp. Sec., Derivative & Erisa Litig.*, 762 F. Supp. 2d 942, 973 (S.D. Tex. 2010). "Cause in fact means that the omission or act involved was a substantial factor in bringing about the injury and without which no harm would have occurred." *Id*. "The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called 'philosophic sense,' which includes every one of the great number of events without which any happening would not have occurred." *Id.*

The failure of the lookout to report the presence of recreational boat in the area was not a cause-in-fact of this incident.  The Fifth Circuit has held that the failure of a lookout to provide a pilot with information which the pilot already has does not rise to the level of a legal causation. *Usinas Siderugicas de Minas Geras, Sa-Usiminias v. Scindia Steam Nav. Co., Ltd*., 118 F.3d 328, 335 (5th Cir. 1997) (Party failed to show "the district court erred in finding that the lack of a dedicated lookout and radar monitor were not concurrent causes of the accident" because  "the pilot was aware of the position of the barges and that he

thought the turn was going to be successful" and "[r]adar and visual observation would have given him no more useful information than he already had.") Even if someone had reported the presence of recreational boats in the area, the pilot would not have changed anything about the way he piloted the *Maersk Idaho*, including the ship's speed.  Therefore, what the lookout did nor did not report was not a cause-in-fact of this incident.

### D.    The Passage Plan Argument of Plaintiffs is the Classic Red Herring

Plaintiffs argue that the *Maersk Idaho's* speed in the channel should have been governed by the Passage Plan drafted by the ship crew in Charleston before ever coming to Houston.  In particular, a 14 knot maximum speed noted in the Plan should have been followed by the state pilot, Capt. Marcus Maher and the failure to do so was negligent.

#### 1.    Congress Has Expressly Reserved the Regulation of Pilotage to the Individual States.

While pilotage is an activity that falls within the Commerce Clause, Congress expressly reserved it to the separate states in the Lighthouse Act of 1789:

> That all pilots, in the bays, inlets, rivers, harbors, and ports of the United States shall continue to be regulated in conformity with the existing laws of the States, respectively, wherein such pilots may be, or with such laws as the States may be respectively hereinafter enact for that purpose, until further legislative provision shall be made by Congress.[290]

Congress' intent not to limit state authority over pilotage continues.  *See, e.g.,* 46 U.S.C.  § 8501(a)("Pilots in the bays, rivers, harbors, and ports of the United States shall

---

[290]  Act of Aug.7,1789, ch. 9, I Stat 53, 54 (1789).

be regulated only in conformity with the laws of the States.").  The Supreme Court has

reviewed Congress' reasoning behind the Act and unequivocally endorsed state regulation

of pilotage:

> The act of 1789 contains a clear and authoritative declaration by the first Congress…that until Congress should find it necessary to exert its power, it [regulation of pilotage] should be left to the legislation of the States; that it is local and not national; that it is likely to be best provided for, not by one system, or plan of regulation, but by as many as the legislative discretion of the several States should deem applicable to the local peculiarities of the ports within their limits.

*Cooley v. Bd. of Wardens of the Port of Philadelphia*, 53 U.S. 299, 319 (1851).  *See also*

*Kotch v. Bd. of River Port Pilot Comm'rs for Port of New Orleans*, 330 U.S. 552, 559

(1947).  Welcoming the authority granted them by Congress, all the coastal states,

including Texas, have chosen to regulate pilotage.[291]

### 2.   Texas Law Requires Any Ship Moving on a Texas Waterway to Be Under the   Direction and Control of a State-Licensed Pilot

The Texas Compulsory Pilotage Act requires ships the size of the *Maersk Idaho* to

"obtain a pilot to provide pilot services when the vessel is underway or otherwise moving

on a river, bay, harbor, or port in this state…."  Tex. Transp. Code § 61.003(a).  An

---

[291] *Jackson v. Marine Exploration Co., Inc.*, 583 F.2d 1336 n.5 (5th Cir. 1978) (Alabama, California, Connecticut, Delaware, Florida, Georgia, Indiana, Louisiana, Maine, Maryland, Massachusetts, Mississippi, North Carolina, New Hampshire, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, Virginia, and Washington).

exception is a U.S. flag vessel that is "licensed for and engaged in coastwise trade." *Id*. § 61.003(a)(1).[292]

While the *Maersk Idaho* is a U.S. flag federally-registered vessel, she is not, and cannot be, licensed for or engaged in coastwise trade.[293]  Title 46 of the U.S. Code governs the registration and documentation of U.S. flag vessels.  46 U.S.C. § 12112(a)(2)(a) requires a ship to be "built in the United States" to qualify for a coastwise endorsement and engage in that trade.  It is undisputed that the *Maersk Idaho* was built in Hyundai Heavy Industries shipyard, Ulsan, Korea and launched in 2000.  *See* Official U.S. Coast Guard Certificate of Inspection for *Maersk Idaho*, Def. Ex. 73, and Ship's Particulars, Def. Ex. 70.  As such, the *Maersk Idaho* was required to, and did, hire a local state pilot to provide pilot services by way of directing the movement of the vessel as it was underway in Texas waters.

### 3. Using a Passage Plan Developed by a Second Mate in Charleston to Direct the Speed or Course of the Ship in the Houston Ship Channel Would be Illegal and Unsafe

The Passage Plan of the *Maersk Idaho* was drafted by the ship's second mate when the vessel was in Charleston, South Carolina – before it ever left for Houston.[294]   While

---

[292]  The other few exceptions that exist public (government owned) vessels, vessels less than 20 gross tons, motorboats registered in Texas, or vessels in distress, none of which apply to the *Maersk Idaho*.  Tex. Transp. Code § 61.003(a)(1-5).
[293]  "Coastwise trade" is the practice of picking up a cargo or passenger for hire in one U.S. port and discharging it in another.  *See*  Monroe & Stewart, *Dictionary of Maritime and Transportation Terms* at p. 91 (Cornell Maritime Press 2005)
[294]  Depo Offer of David Falkinson, Dkt. 171 at p. 92.

the ship's crew at all times followed the speed and course commands of Capt. Maher, Plaintiffs fault the ship for exceeding the "maximum speed" set forth in the Passage Plan during the transit.  Capt. McLoud testified that the Plan is just a rough guide used for estimating times of arrival, etc.  The speeds in the Passage Plan are simply a "guide, a basic plan. … That's not exactly what we're going to do.  That can fluctuate."[295]  They can deviate from it at any time.[296]  Once in pilotage waters, such as the Houston Ship Channel, the ship's crew does not use the ship's Passage Plan for speed or direction, rather the Captain hires a local pilot who is the expert for those waters to set the speed and guide the ship. Capt. McLoud agreed with Plaintiffs' counsel that "the compulsory state pilot directs the navigation of the ship" subject to the Captain's overall command.[297]  While in the Houston Ship Channel on the day of the incident, the pilot was "the person in charge … of setting the speed."[298]  In this case, it was Houston Pilot Capt. Marcus Maher, who directed the course and speeds of the ship the entire time it was transiting the ship channel, including all times material to this lawsuit.[299]  Capt. McLoud also testified he relies on the Houston Pilot to inform him of any dangers along the route.[300]  Capt. Maher testified he is in charge of directing the movement of the vessel on the Houston Ship Channel.[301]     Texas law

---

[295]  Capt. McLoud, TR 1:91.
[296]  Id. at 1:142.
[297]  Id. at 1:87
[298]  Depo. Offer of Second Mate David Falkinson, Dkt. 171 at p.101.
[299]  Capt. McLoud, TR at 1:116
[300]  Id. at 1:104.
[301]  Capt. Marcus Maher, TR 5:29.

required the *Maersk Idaho* to hire a Houston Pilot to provide "pilot services" when transiting the channel. Tex. Transp. Code § 61.003(a). "Pilot services" is defined by the Houston Pilots Licensing and Regulatory Act as:

> [T]he "acts of a pilot in conducting a vessel through the navigable water in this state and the ports in which the pilot is licensed or certified as a pilot, and **including the adoption and implementation of ship movement strategies**, such as navigation safety guidelines, for use by pilots in the navigable water in this state.

Tex. Transp. Code § 66-002(6)(emphasis added). Importantly, Texas law also mandates that "a person may not provide pilot services unless the person has a license or certificate issued under this chapter for the Harris County ports in which the pilot services are to be provided." Tex. Transp. Code § 66-031. The Second Mate of the *Maersk Idaho* had no such license. Ship movement strategies include the speed and course used by a ship to go from one point to another. Once under the control of the state pilot, allowing the movement of the ship to be directed in any way by a Passage Plan drafted by someone who is not licensed to provided pilot services in Texas (and who does not have the experience and training to do so) would not only be illegal, it would be patently unsafe. None of the crew of the *Maersk Idaho* were licensed by the Governor of Texas as a Branch Pilot for the Houston Ship Channel. The "failure to follow the Passage Plan" issue raised by Plaintiffs is simply a red herring.

**E.      The height of *Maersk Idaho*'s wake wave, and the ship's speed, were not a proximate cause of Mr. Reed's death.**

80

The credible evidence proves the *Maersk Idaho* wake waves were not uncommon, unusual, or unforeseeable, the wave height was not excessive, and the ship's speed and its wake were not a proximate cause of Mr. Reed's death.  Plaintiffs argue the *Maersk Idaho* was going too fast which made its wake too big, but the credible evidence proves that simply is not true.

Dr. Dick Yue, Ph.D., is a professor of mechanical and ocean engineering at Massachusetts Institute of Technology (MIT) with a focus on wave hydrodynamics, offered as a naval architect expert.  Applying theories of ship-wave generation and wave propagation, mathematically and scientifically the *Maersk Idaho's* wake height in the area of the incident (located over the spoils area) could not have been more than 2.2 feet.  This is based on Dr. Yue's analysis of the maximum height possible of a wake wave created by the *Maersk Idaho* and then propagating away from the *Maersk Idaho* and into the spoils area where Mr. Reed encountered them as he chased the port wake field waves.  Dr. Yue explained the science of wave breaking criteria, known as McCowan's criteria, means that a wave must break when the water depth becomes shallow according to a mathematical formula.  Based on that formula and another formula to calculate dissipation of the wave as it travels further away from the vessel, the maximum possible height of *Maersk Idaho's* wake wave at the incident location is 2.2 feet.[302]

---

[302]  TR 5:156-158,

Dr. Yue also calculated what the numerically predicted wake wave height would be based on the *Maersk Idaho's* hull shape, vessel speed, and other parameters.  Based on numerical simulation of *Maersk Idaho* wave generation, using wave propagation theory and calculations, the estimated wake height in the area of the incident would be about 10 inches, or 0.8 feet.[303]  Dr. Yue acknowledged this simulation and theoretical prediction could be underestimated, and dependent on some unknown data points, so that is why he used McCowan's criteria and wave propagation theory to calculate the maximum possible height of a wave in the shoal area based on wave-breaking criterion and the charted depth near the shoal.   Based on this theory, the maximum wave height would be 2.2 feet.  This maximum wave height was based on the distance away from the channel and the depth of the water.  Dr. Yue used the water depths from the NOAA navigation chart 11324 to determine that seven feet was a controlling depth that would cause the waves to break, thus not exceeding the calculated maximum height, and he used GPS location of the Reed boat to calculate the distance the wave would have traveled.[304]

Dr. Yue testified that the wake wave would have been created 183 seconds prior to arriving at the incident location where Plaintiffs assert Mr. Reed fell overboard.  This time is 3 minutes and 3 seconds.  With the wake wave being created 183 seconds prior to arriving at the spoils area, the wake wave would have had to pass over the area marked on the

---

[303]  TR 5:159-161.
[304]  TR 5:166-173.

navigational chart NOAA 11324 showing five and seven feet of water depth.[305]   As explained by Dr. Yue, when a wave entered the shoaling or spoils area, if the wave height was higher than 5.4 feet it would immediately start to break once it reached the seven foot depth.  It would then continue to break and dissipate as it keeps going into shallower water. Once it initially breaks a wave cannot grow any bigger.[306]

As Dr. Yue explained, once the wake wave of the *Maersk Idaho* was created there was nothing the *Maersk Idaho* could do to change the size of the wave.[307]  If Plaintiffs are correct and Mr. Reed feel overboard at around 3:49:52, the wake wave that arrived at that location would have been created 183 seconds prior, or at 3:46:49.  According to the data and the aminations created by the parties, at that time when the wave was generated the Reed boat was still in the starboard wake field of the *Maersk Idaho* or more likely in the flat calm water astern of the *Maersk Idaho*.  This is consistent with testimony of Plaintiffs' expert, Dr. Sanders, who said it took "about three minutes" for the Reed boat to travel from the centreline of the Houston Ship Channel to the place where the incident occurred.[308]

From the Reed boat's position in calm flat water in centreline of the Ship Channel there was no indication to the *Maersk Idaho* that Mr. Reed would later intentionally change his course more northerly and head into the spoils area in order to chase the wake wave that the *Maersk Idaho* had already created.  Below are screenshots of the different

---

[305]  TR 5:174-179.
[306]  TR 5:180.
[307]  TR 5:182-184.
[308]  TR 2:28-29.

animations showing the location of the vessel at 3:46:49, the approximate time the wave at issue was created.

From DEX 1:



From DEX 3:



From DEX 132:



Dr. Yue also testified that there is a correlation between a decrease in speed of the *Maersk Idaho* and the size of the wave that it creates.  He explained, however, that a decrease in speed of say 3 knots, from 15 knots down to 12 knots, would only make a difference of several inches in wave height at the incident location.[309]    Dr. Yue further testified that regardless of changes in draft, squat and other factors, the calculation as to the maximum possible wave height based on McCowan's criteria will remain the same:  2.2 feet.[310]

---

[309]  TR 5:185-187.
[310]  TR 5:188.

No other witness offered any testimony to refute either Dr. Yue's mathematical calculations or his opinions regarding the maximum size of the wake wave created by the *Maersk Idaho*.  The evidence indicates that two-foot waves are common in this area.

This was confirmed by the drone video made by Plaintiffs' counsel Mr. Crew.[311] The drone video captures the wake field from the *Maersk Idaho* on March 18, 2020 in the area of buoys 33/34.  As Capt. Cunningham indicated, the spoils area are located between the small boat in the video and the *Maersk Idaho*.[312]  There is no noticeable difference in the size of the waves and they look very smooth and seismic while going over the spoils area below.[313]  Below is a screenshot from the drone video showing the wake field of the *Maersk Idaho* on March 18, 2020.  As to the size of the wake observed by Capt. Maher on June 7, 2019, he testified consistently with Defendants' naval architect, Dr. Dick Yue, that the wake of the *Maersk Idaho* on June 7, 2019 was three feet near the edge of the Channel and dissipated while traveling away from the channel to a height of one to two feet outside the Ship Channel.[314]

---

[311]   DEX 85.
[312]   TR 1, pp. 238-239.
[313]   TR 6, pp. 71-72.
[314]   TR 5, pp. 77 and 141.



Captain Maher testified that he and Capt. McCloud observed a recreational power boat that was overtaking them on their starboard side not long before reaching buoys 31/32.[315]  Earlier in the transit, near the Texas City Dike, he and the bow lookout also discussed a sailboat which appeared ready to cut in front of the *Maersk Idaho* prior to meeting the *Maersk Idaho.*[316] When the sailboat did not respond to a VHF radio call, Captain Maher sounded the danger signal. They subsequently met the sailboat without incident.[317]  This evidence proves the Maersk Idaho wake was not dangerous to these two recreational boats.

Similarly, the wake waves were not excessive, not uncommon, and could not have been the proximate cause of Mr. Red's death.

---

[315] TR 5, pp. 77-78.
[316] TR 5, pp. 91-92.
[317] TR 5, pp. 91-92.

**VII.    Plaintiffs failed to meet their burden of proof that a wake generated by the M/V *Maersk Idaho* was unusual and was the proximate cause of Mr. Reed's death.**

**A.    Evidence proves the *Maersk Idah*o wake waves were not unusual, not unexpected, and not excessive.**

Plaintiffs failed to meet their burden of proving that the port wake field waves from *Maersk Idaho*, where they allege a wave (or something) knocked Mr. Reed out of his boat, were uncommon and unexpected to Mr. Reed.  The overwhelming evidence proves just the opposite.  The waves cannot be considered unusual or uncommon because Mr. Reed had just driven his boat through the starboard wake field and navigated through them without falling overboard.  Mrs. Reed testified the starboard side waves were higher than those in the port wake field.  So Mr. Reed already knew he was in the ship's wake field, what the waves were like, and therefore encountering the port side waves was not unusual to him.

It is certain the port waves were not unexpected to him; he altered course to bring his boat into the waves on purpose.  As Dr. Sanders said, he passed through about nine to ten waves in the starboard wake field.  There he had two-meter elevation changes twice, and a three-meter elevation change once.  Dr. Sanders testified that the elevation change in the port wake field at 3:49:34 was the exact same elevation change as he experienced in the starboard wake field.[318]  His wife even warned him that experience in the starboard wake field scared here.  With that recent experience, no reasonable person could conclude that the port side wake waves were unexpected or unforeseeable to him.

---

[318]  TR 2:124.

On the starboard side, Mrs. Reed said the first wave there was like a wall of water, taller than her.  As Capt. Danti testified, the Dean of Chapman School who instructs people how to operate their small boats, novice boaters tend to overestimate wave heights.  The more experienced eye of Capt. Maher confirmed the waves in the shoal area away from the ship channel, where Reed went on purpose, were about one to two feet high.  This is consistent with Dr. Dick Yue's scientific opinion that the waves could not possibly have exceeded 2.2 feet.  Waves of one to two feet are not excessive in Galveston Bay.  In fact, the navigation chart for small boaters even warns that waves from commercial vessels in the Ship Channel can engulf the shoal areas near the Ship Channel.  This confirms that one to two foot waves there are not excessive and not uncommon.

The comments of Plaintiffs' witness, Capt. Rivera, that waves were six to eight feet is not credible.  He was not there, did not see the waves like Capt. Maher did, and he has never piloted a ship in the Houston Ship Channel whereas Capt. Maher has done so about 3,000 times.  Even if Capt. Rivera's estimate were correct, that just proves the Reeds had already encountered waves of the same or higher height in the starboard wake field.  That proves the port side waves were absolutely not unforeseeable.  And they cannot have been uncommon compared to the starboard side waves the Reeds just passed through.

**B.** **Multiple two-meter elevation changes prove that one of them could not have been the proximate cause of the incident.**

Evidence proves the Reed boat experienced 18 elevation changes of two-meters or more on the day of the incident.[319]  Plaintiffs really have not even tried to prove which one of them allegedly caused Mr. Reed to fall out of his boat.  It makes no sense that one out of 18 of them could be the proximate cause.  Eight of these two-meter elevation changes occurred during the ten minutes between 3:31:52 and 3:41:55, before the Reed boat even encountered *Maersk Idaho* wake waves.  Four of them occurred after the incident when the USCG bosun was driving the boat.  Thus, 12 of these two-meters or more elevation changes had no relationship with—and cannot have been proximately caused by—*Maersk Idaho* wake waves.

Even considering the six two-meters or more elevation changes while the boat was in the *Maersk Idaho* starboard and port wake fields, nothing in the evidence proves that they were somehow so different that they became the cause-in-fact and foreseeable consequence of encountering another two-meter elevation change.  Since he experienced 17 of these changes without falling overboard, it cannot be a reasonable conclusion that the other one (and Plaintiffs have not identified exactly which other one) was somehow so different that it became the foreseeable cause-in-fact of him falling out of the boat and drowning.

---

[319]  DEX 166, Dkt. 186 at 65.

Plaintiffs have not even ruled out that the wave (again, which one?) may have been generated from sources other than *Maersk Idaho*.  Dr. Sanders could only estimate an approximate area and time when Mr. Reed fell overboard.[320]

With this evidence, it is apparent the Plaintiffs' have not met their burden that a wave generated by the Maersk Idaho was the proximate cause of Mr. Reed falling overboard and then drowning.

### C.  Plaintiffs' have not established when or where Mr. Reed fell overboard.

Plaintiffs have failed to establish by a preponderance of the evidence when or where Mr. Reed fell overboard, or a causal connection to the wake of the *Maersk Idaho.*  Captain Cunningham, Plaintiffs' expert, testified he could not determine exactly when Mr. Reed fell overboard.[321]  Nonetheless, Captain Cunningham testified Mr. Reed fell overboard "within a few seconds of" 20:49:30.[322]  At trial, Dr. Sanders testified that Mr. Reed fell overboard "somewhere in this area before the boat starts drifting offward or westward," which was at approximately 20:49:40.[323]  However, Dr. Sanders confirmed at trial that in

---

[320]  TR 2:61, 62-63.
[321]  TR 1:230.
[322]  TR 1:225.
[323]  TR 2:38. *See also* TR 1:252.  Dr. Sanders is Plaintiffs' retained recreational boating expert. *See* Plaintiffs' Designation of Expert Witnesses. Dkt. No 54. Dr. Sanders has a PhD in fluid mechanics. TR 2:6. She has been a boater all of her life and she and her husband spend a few hours a month on their personal boat. TR 2:86. She does not hold a Coast Guard license, has never served in the merchant marine, the navy nor the Coast Guard. TR 2:85. She is not a certified small boat handling instructor and has never taught small boat handling or small boat safety equipment classes. TR 2:85-86.  Only a small percentage of her work involves being on a boat. TR 2:86. She was unfamiliar with the Select Digital Calling function of VHF radio which, with a push of a button, will automatically send a distress call. TR 2:136. She was also unfamiliar with pan-pan, an internationally recognized standard urgency distress call. TR 2:136

her deposition she testified that Mr. Reed could have fallen overboard as late as 20:50:02.[324]

Therefore, Plaintiffs' two experts testified that Mr. Reed fell overboard sometime between 20:49:30 and 20:50:02, a thirty-two second period.[325]

Depending on how the distance is measured, the Reeds' boat travel between approximately 325 feet to 375 feet during that thirty two seconds.  The two screen captures below show the location of the Reeds' boat at that the locations where Plaintiffs' experts estimate Mr. Reed may have fallen overboard, and the distance between the various estimated locations.[326]

---

[324]  TR 2:60.

[325]  As a reminder, the Navionics data recorded the time in Zulu or Greenwich Mean Time. To get the local time in Galveston Bay, five hours must be subtracted, so the reported 20:49:30 time is actually 15:49:30 local time, or 3:49:30 pm.

[326]  The three of the four yellow pins reflect when/where Captain Cunningham testified Mr. Reed may have fallen overboard, Dr. Sanders' trial testimony regarding when/where Mr. Reed may have fallen overboard, and Dr. Sanders' deposition testimony regarding where she estimated Mr. Reed may have fallen overboard.  The fourth yellow pin, with red writing, pin is the location where the Reed boat encountered a two-meter elevation change at 20:49:35.



Additionally, the general area where Plaintiffs assert Mr. Reed fell overboard cannot be correct because that area is far too far away from where Ms. Reed attempted to rescue Mr. Reed.  After Mr. Reed fell overboard, Ms. Reed backed the boat towards Mr. Reed, getting close enough to speak with Mr. Reed.[327] Ms. Reed threw him an eight foot line which was tied to the boat.[328]  The line landed close enough to Mr. Reed for him to grab it.[329] The only place where the Navionics track shows the boat getting back to within eight feet of its previous track are the two places where the track crosses itself in what has been referred to as the figure eight. (See the lower left portion of the below screen capture.)

Dr. Sanders testified Ms. Reed threw Mr. Reed the line from the northeast corner of the figure eight.[330] As measured at trial, it is one hundred sixty seven feet from where Dr. Sanders believes Mr. Reed fell overboard to where Dr. Sanders believes Ms. Reed threw the eight foot line to Mr. Reed.[331]

---

[327] TR 2:200.
[328] TR 2:231.  6
[329] TR 2:231.
[330] TR 2:54.
[331] TR 62-63.



Plaintiffs would have this Court believe Mr. Reed drifted one hundred and sixty seven feet to the *south* when all of the external forces acting on his body were moving to the *northwest,* including the wake of the *Maersk Idaho*, the prevailing winds and the current.[332]   Plaintiffs' expert, Captain Rivera, confirmed that the current was moving at 0.7 knots to the northwest.   Captain Rivera explained "speed over ground" is the speed the ship

---

[332] *See* TR 2:70 for the direction of wake waves.  *See* TR 2:64 for the direction of the wind.  *See* TR 2:58 for the direction of the current.

is doing irrelevant of the current.[333]   Speed through the water is "the speed that the vessel is doing in the water," taking into account whether a current is may be pushing with or against the direction of the movement of the ship.[334] Pursuant to the ship's ECDIS, which the parties stipulated was accurate, in the area where the incident occurred, the ship's speed over ground was 15.4 knots and the speed through the water was 16.1.[335]   At this time the ship was making a course of 336 degrees.[336]   This clearly indicates that the vessel was being pushed forward at 0.7 knots by the current.

### D. Plaintiffs have not proven a causal link between the wake of the Maersk Idaho and Mr. Reed falling overboard.

Plaintiffs have to prove, by a preponderance of the evidence, a causal link between the wake of the *Maersk Idaho* and Mr. Reed falling overboard.  Dr. Sanders agreed that 20:49:40, her earliest estimated time of Mr. Reed falling overboard, was some six seconds after Mr. Reed encountered the most recent two meter elevation change.[337] Dr. Sanders latest estimated time at which Mr. Reed may have fallen overboard, i.e. 20:50:02, is twenty seven seconds after Mr. Reed encountered the most recent two meter elevation change.

However, knowing that Ms. Reed navigated to within 8 feet of Mr. Reed after he fell out, and knowing the time and place that occurred, radically alters the time when Mr. Reed could have fallen overboard.  Clearly, Mr. Reed fell overboard near the figure eight.

---

[333]  TR 3:23.
[334]  TR 3:23.
[335]  TR 3:127-128. See also DEC 12.
[336]  *See* DEX 12.
[337]  TR 2:120.

The figure eight is more than a minute, and more than one hundred feet, from the two meter elevation change at 20:49:35. Plaintiffs have offered no competent evidence to establish, by a preponderance of the evidence, a causal link between the 20:49:35 two meter elevation change and Mr. Reed falling overboard in the area of the figure eight. And, to make matters even less certain, Captain Cunningham testified that Mr. Reed could have fallen overboard at 20:49:30 - *before* the Reeds encountered the last two meter elevation change at 20:49:35.

Plaintiffs have also failed to establish, by a preponderance of the evidence, that it was the wake of the *Maersk Idaho* which caused Mr. Reed to fall overboard. The only explanation Dr. Sanders could provide to explain why Mr. Reed fell overboard was a vague explanation that Mr. Reed encountered "unpredictably harsh operating conditions."[338] She could not say whether a wave caused Mr. Reed to be "ejected" or whether he lost control of his boat and fell overboard.[339]

Critically, Plaintiffs have failed to establish that it was a wake wave from the *Maersk Idaho* which caused Mr. Reed to fall overboard. Dr. Sanders was asked whether "the only wake waves that were created that would have been affecting Mr. Reed at this time would have been perhaps from the MAERSK IDAHO, correct?" Dr. Sanders answered, "No, I don't think that is true… there is no way to know where other waves might have been… Other waves will be on a body of water for various reasons." Consequently, Plaintiffs have

---

[338] TR 2:117. It is worth noting that as Mr. Reed had already navigated through the starboard wake field, which Ms. Reed testified were larger waves, and which clearly startled Mr. Reed, it cannot be said that the waves in the port wake field would have been unpredictable.
[339] TR 2:117.

also failed to establish that if Mr. Reed did encounter waves which caused him to fall overboard, that such waves were generated by the *Maersk Idaho.*

### E.   Falling overboard was not the cause of death.

Plaintiffs' arguments miss the point that "the incident" is not just Mr. Reed falling overboard.  Plaintiffs filed a wrongful death case.  The injury for which they seek damages is the death of Mr. Reed.  The cause of death was drowning.  Neither falling overboard nor a wave actually caused drowning.

Mr. Reed's failure to wear a life vest, failure to teach his wife about the throwable PFD, failure to practice and teach his wife what to do in a man overboard situation, and failure to use the boat automatic cut-off switch, all must be taken into account to determine what caused him to drown.

Trying to side-step Mr. Reed's decisions and conduct, Plaintiffs failed to meet their burden of proving that negligence of Maersk was the proximate cause of Mr. Reed's death. In attempting to do so, they argue about the speed of *Maersk Idaho* and the size of its wake waves.   The evidence proves, however, that a slower speed would not have made a significant difference in the wave height, and the height of waves in the port wake field was even less than the waves in the starboard side that did not cause him to fall overboard, and they ignore the many other elevation changes he experienced without falling out of the boat.  Once he was out of the boat and afloat on the water surface, there were many things Mr. Reed could have and should have done to prevent drowning.

The chain of events that resulted in Mr. Reed's death is filled with factors completely under the control of Mr. Reed, all of which were substantial factors leading up to the cause of death.  His failure to wear a life jacket, a PFD, is the most substantial factor that brought about or actually caused his death by drowning.  Plaintiffs' own witnesses acknowledged he should have been wearing a PFD, and even that one of the easiest ways for a recreational boater to prevent drowning is to wear a PFD.

In short, the immediate cause of death by drowning was Mr. Reed's failure to wear a life jacket and the inadequate rescue efforts that resulted from his failure to learn and teach his wife how to use the safety equipment on his boat.

## VIII.   Under the Texas Proportionate Responsibility Act Plaintiffs Can Recover No Damages

The evidence shows that Mr. Reed's proportion of fault is at least 51%.  Under the Texas Proportionate Responsibility Act, Plaintiffs can recover no damages.  The admiralty jurisdiction of the federal courts allows the adjudication of state wrongful death and survival statutes in cases of maritime tort.  This case involves the death of a non-seaman in state waters on Galveston Bay.[340]   There is no dispute that Plaintiff was a recreational boater - not a seaman, maritime, or offshore worker.[341]   In their Third Amended Original Complaint, as well as in the three complaints that preceded it, Plaintiffs seek damages exclusively under the Texas Wrongful and Survival Acts: "Maersk's . . . breaches of these duties caused the death of Mr. Reed, and the damages which flow from those breaches are shown below [Texas Wrongful Death and Survival Acts cited]."[342]

As a matter of state sovereignty, it is well-settled that a federal admiralty court adjudicating a death claim under a state wrongful death or survival act: "must enforce that right as an integrated whole with whatever conditions and limitations the creating State enacted."  *The Tungus*, 358 U.S. 588, 592 (1959); *Hess v. U.S.*, 361 U.S. 314, 315, 318 (wrongful death claim brought under Oregon Wrongful Death Act, "liability must be determined in accordance with the laws of that place.").  In an action for wrongful death in

---

[340]  Plaintiff's Third Amended Original Complaint at ¶ 5 [Dkt. 32].
[341]  *Id*. at ¶¶ 6, 16 ("Mr. and his wife of twenty-nine years, Jana, decided to take an early afternoon fishing trip on Galveston Bay.  . . . He was not a seaman or a maritime worker.").
[342]  *Id.* at ¶ 29.

state territorial waters the conduct said to give rise to liability is to be measured not under the admiralty standards, but under the substantive standards of state law. *Hess v. U.S.* at 319 ("Admiralty courts when invoked to protect rights rooted in state law, endeavour to determine the issues in accordance with the substantive law of the State.").[343] *The Tungus* and *Hess* remain the law of the land. They have never been overruled and cannot be ignored. As this Court is enforcing "[t]he policy of the State Legislature in enacting a wrongful death statute . . . it is incumbent upon a court enforcing that policy to enforce it all; it may not pick and choose." *Hess v. U.S.*, 361 U.S. 314, 320 (1960)(emphasis added). Mr. Reed's negligence in this case exceeded 50%. As such, Plaintiffs are barred from recovery by operation of the 51% contributory negligence bar of the Texas Proportionate Responsibility Act, TEX. CIV. PRAC. & REM. CODE § 31.001.[344]

## IX.   Damages

This is a suit arising out of the death of a non-seaman in Texas state waters. Therefore, recoverable damages are based on the Texas Wrongful Death and Survival Acts.[345] The United States Supreme Court, in *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 201-202 (1996), held that state law remedies are available in maritime

---

[343]  Defenses such as contributory negligence are substantive. *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 233    (1986)

[344]  This application of the Texas Proportionate Responsibility Act is set for in Defendants' Motion for Application of Texas Civil Practice and Remedies Code, Chapter 33 [Dkt. 78] and adopted as if set forth fully herein. It has been fully briefed by the parties and was timely presented to the Magistrate Judge who reserved it for the Court to rule on after trial.

[345] *See* Chapter 71 of the Texas Civil Practices and Remedies Code.

wrongful death cases "in which no federal statute specifies the appropriate relief and the decedent was not a seaman, longshore worker, or person otherwise engaged in a maritime trade."

### *Survival Action*

A decedent's action survives his death and may be prosecuted in his behalf. *Russell v. Ingersoll-Rand Co.,* 841 S.W.2d 343, 345 (Tex. 1992). A survival action is wholly derivative of the decedent's rights. *Id.* The damages recoverable are those which the decedent sustained while alive, and not any damages claimed independently by the survival action plaintiffs (except that funeral expenses may also be recovered if they were not awarded in a wrongful death action). *Id.* Defenses that could have been raised against a claim by the decedent may also be raised against the same claim asserted by the decedent's. *Id.*

The damages recoverable in a survival action are conscious pain and suffering, mental anguish, and funeral expenses. *Cunningham v. Haroona,* 382 S.W.3d 492, 507 (Tex. App.—Fort Worth 2012, pet. denied). Only pain and mental anguish that the deceased consciously experienced is compensable. *Id.*

Whether the complainant suffered a severe physical injury is one factor to consider for pain and anguish presumably accompanying such an injury. *Lee Lewis Const., Inc. v. Harrison*, 64 S.W.3d 1, 14 (Tex. App.—Amarillo 1999), aff'd, 70 S.W.3d 778 (Tex. 2001). The severity and duration of the pain and distress is also to be considered. *Id.* at 14-15*,*

*citing Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex.1995) (noting that the court must distinguish between shades and degrees in evaluating claims of mental anguish).

### **_Wrongful Death Action_**

Pecuniary losses are generally defined to the jury as "the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that [the parent], in reasonable probability, would have received from [the decedent] had he lived." *Badall v. Durgapersad*, 454 S.W.3d 626, 639 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). Pecuniary damages include lost earning capacity. *Phillips v. Bramlett*, 258 S.W.3d 158, 173 (Tex. App.—Amarillo 2007), rev'd, 288 S.W.3d 876 (Tex. 2009).

Loss of companionship and society are also recoverable under Texas law in wrongful death action. *Moore v. Lillebo*, 722 S.W.2d 683, 688 (Tex. 1986). "Companionship and society shall be defined as the positive benefits flowing from the love, comfort, companionship, and society the named plaintiff would, in reasonable probability, experience if the decedent lived." *Id.* Mental anguish is concerned "not with the benefits [the beneficiaries] have lost, but with the issue of compensating them for their harrowing experience resulting from the death of a loved one." *Id.* at 688. Mental anguish and loss of society and companionship are separate elements of recovery. *Id.* Damages should not overlap, and no double recovery should be allowed. *Id.*

***Quantum of Damages***

One factor considered by the Court for this element of damages was Ms. Reed's testimony that Mr. Reed was above water for, "Maybe a minute or less" from the time she first saw Mr. Reed fell overboard. *See Randall v. Chevron U.S.A., Inc.,* 13 F.3d 888, 892 (5th Cir. 1994), opinion modified on denial of reh'g, 22 F.3d 568 (5th Cir. 1994) (worker clung to leg of offshore platform for 25 minutes before drowning. Award of $1,000,000 for pain and suffering reduced to $500,000.); *See* also Hambrook v. Smith, 2016 WL 4408991, at *36 (D. Haw. Aug. 17, 2016 (the one-to-two-and-a-half-minutes that elapsed while decedent was conscious supported an award of $50,000); *); see also Estate of Casillas v. City of Fresno*, 1:16-CV-1042 AWI-SAB, 2019 WL 2869079, at *17 (E.D. Cal. July 3, 2019) (award of 250,000 for pain-and-suffering for gunshot victim who struggled for 10 minutes before dying.)

Based on the foregoing law, and the facts of this case, Defendants respectfully submit that the amount of damages awarded, if any, should not exceed the amounts suggested below, subject to reduction as appropriate for Mr. Reed's contributory negligence.

### 1.    Survival Action

| Mr. Reed's Conscious Pain and Suffering | $200,000 |
|---|---|
| Funeral Expenses | 12,996.20[346] |

### 2.    Wrongful Death Actions

---

[346] *See* PEX 36.

A.    Lost Economic Benefits

| Past and Future Lost Wages and Fringe Benefit | $1,175,695.00 |
|---|---|
| Past and Future Loss of Retirement Benefits | $0.0 |
| Past and Future Loss of Household Services | $456,288.00 |

B.    Pecuniary Loss (including the loss of the care, maintenance, support, services, advice and counsel).

| Jana Reed | $300,000 |
|---|---|
| Logan Reed | $100,000 |
| Alexis Reed | $100,000 |
| Chase Reed | $100,000 |

C.    Loss of Companionship and Society

| Jana Reed | $300,000 |
|---|---|
| Logan Reed | $100,000 |
| Alexis Reed | $100,000 |
| Chase Reed | $100,000 |

D.    Mental Anguish

| Jana Reed | $500,000 |
|---|---|
| Logan Reed | $50,000 |
| Alexis Reed | $50,000 |
| Chase Reed | $50,000 |

## X.    Conclusion

The Reeds were novice boaters having purchased their first boat and used it only 15 times in Galveston Bay.  Mr. Reed always operated the boat and never taught Jana Reed how to navigate or use the boat's safety equipment.  They never wore life jackets of any type.  Mr. Reed was headed from Moses Bay to the Galveston Jetties for more fishing.  He

had **no** reason to cross the Houston Ship Channel or navigate in the wake fields of the inbound *Maersk Idaho*.  Yet he headed East, crossed the ship channel ahead of the ship, then altered course back to the West toward the ship circling it in a clockwise fashion.  By all accounts he brought his boat to the safe, calm waters behind the ship.  He was then warned by his wife the waves had frightened her.  Responding "Don't worry, we'll be fine," he altered course to the North in the exact opposite direction of Galveston, chased the ship which had already passed, and intentionally entered its port wake field with tragic result.  Mr. Reed was by all accounts a loving family man.  He was also a risk taker who never took the proper actions to prepare for the risks he intended to undertake.  He was a self-admitted recreational marijuana user and high levels of THC were found in his system after the incident.  Unfortunately, his own actions and inactions precipitated his tragic death.  Apart from a claim supported solely by the cry of *post hoc ergo propter hoc* (Mr. Reed was injured while jumping a wake from the *Maersk Idaho* thus Maersk is liable), Plaintiffs have not met their burden to prove the alleged wake was uncommon and could not be anticipated by Mr. Reed.  Sadly, Mr. Reed is the agent of his own misfortune and Plaintiffs should not be permitted to recover from Maersk.