IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| JANA REED, INDIVIDUALLY AND AS | § | |
| REPRESENTATIVE OF THE ESTATE OF | § | |
| CHRISTOPHER REED AND ON BEHALF | § | |
| OF A.R. (A MINOR); LOGAN REED, AND | § | |
| CHASE REED | § | |
| *Plaintiffs* | § | C.A. NO. 3:19-cv-00238 |
| | § | |
| V. | § | 9(H) Admiralty |
| | § | |
| MAERSK LINE-LTD, USA AND | § | |
| MAERSK LINE, LIMITED | § | |
| *In Personam Defendants;* | § | |
| M/V MAERSK IDAHO | § | |
| *In Rem defendant.* | § | |

---

**DEFENDANTS' REPLY TO PLAINTIFFS' POST TRIAL BRIEF**

---

Respectfully submitted,

**HOLMAN FENWICK WILLAN USA LLP**

*/s/ Thomas N. Lightsey III*
Thomas N. Lightsey III
Texas Bar No. 12344010
Federal ID No. 84829
tom.lightsey@hfw.com
5151 San Felipe, Suite 400
Houston, Texas 77056
Telephone: 713-917-0888
Facsimile: 713-953-9470
**ATTORNEY-IN-CHARGE FOR**
**MAERSK LINE, LIMITED,** *in personam*
**Defendant, and as the owner of the M/V**
**MAERSK IDAHO,** *in rem* **Defendant**

**OF COUNSEL:**
**HOLMAN FENWICK WILLAN USA LLP**
James T. Brown
Texas Bar No. 03138150
Federal ID. No. 11656
jim.brown@hfw.com
Christopher R. Hart
Texas Bar No. 09136310
Federal ID No. 12517
chris.hart@hfw.com
Alejandro Mendez-Roman
Texas Bar No. 24102778
Federal ID No. 2295449
alex.mendez@hfw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on this 1st day of July 2021 to all counsel of record via this Court's Electronic Document Filing System:

*/s/ Thomas N. Lightsey III*
Thomas N. Lightsey III

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ......................................................... iii

I.      Plaintiffs' liability case is not as simple as Plaintiffs' posit................................. 1

    A.  The facts and the question left unanswered ......................................... 1

    B.  The duty of a ship with regard to its wake and Plaintiffs' failure to meet their burden of proof that the *Maersk Idaho* breached any such duty............. 2

II.     Regardless of what radio channel Pilot Maher was monitoring, Chris Reed violated Inland Navigation Rules 13, 17, and 34 by overtaking the *Maersk Idaho.* ...................................................................... 11

    A.  The Inland Navigation Rules prohibited Chris Reed from attempting to overtake the *Maersk Idaho* at that point. ...................................... 15

    B.  The duty of the *Maersk Idaho* ...................................................... 17

III.    The *Maersk* Idaho complied with 33 C.F.R. 164.11. ......................... 19

IV.     Dr. Dick Yue was not incredible--he just provided the wave height testimony Plaintiffs' counsel had indicated would be provided by Plaintiffs' Naval Architect Dr. Savander. ...................................................... 23

V.      Chris Reed cannot invoke the error *in extremis* doctrine by placing himself in peril.................................................................... 26

VI.     Mr. Reed's failure to wear a life jacket is indeed the most substantial factor in the cause of his death.................................................... 32

    A.  Dr. Sanders' refusal to admit she would recommend boaters wear life jackets is incomprehensible. .......................................... 32

    B.  U.S. Coast Guard recreational boater statistics cited by Plaintiffs prove it is more likely than not had Mr. Reed worn a PFD he would be alive today. ................................................................. 34

    C.  Overwhelming evidence proves Mr. Reed should have worn a life jacket, and that his failure to do so was contributory negligence. .............. 35

**VII.**    **Additional sanctions are not warranted.** ...............................................36

    **A.**   **The legal standard for granting an adverse inference** ...................................37

    **B.**   **An adverse inference is not appropriate in this matter** .................................38

    **C.**   **The legal standard for use of the Court's inherent authority to sanction** ...... 40

    **D.**   **Use of the Court's inherent power to sanction is not appropriate in this situation.** .......................................................................................................41

    **E.**   **Defendants have been barred from using the video – additional sanctions are not warranted.** ..................................................................................... 46

**VIII.**   **Medical records tempest** ..................................................................... 46

    **A.**   **Plaintiffs' hyperbolic cries that Maersk attempted to "deceive and mislead the court" are unwarranted:  the records are the records.** .............................. 46

**IX.**    **No negative inference from not calling of experts** ........................................... 50

**X.**     **Plaintiffs' Brief makes many assertions that are unsupported or contrary to the record.** .......................................................................................... 52

**XI.**    **Damages** .................................................................................................. 57

    **A.**   **Economic damages should be reduced.** ........................................................... 57

    **B.**   **Non-economic damages are far less than the amount Plaintiffs request.** ....... 59

## <u>TABLE OF AUTHORITIES</u>

<u>C</u><u>ASES</u>

*Alamia v. Chevron Transp. Corp.,*
   600 F.Supp. 1123 (S.D. Miss. 1998) ..................................................................... 3

*Ashton v. Knight Transp., Inc.*
   772 F.Supp.2d 772, 801 (N.D. Tex.2011)............................................................. 38

*Austin Bridge & Road, LP v. Suarez,*
   556 S.W.3d 363 (Tex. App. —Houston [1st Dist.] 2018, pet. Denied) .............. 60

*Belden v. Chase,*
   150 U.S. 674, 698 (1893) ..................................................................................... 18

*Bildon Farms, Inc. v. Ward County Water Improvement Dist. No. 2,*
   415 S.W.2d 890, 897 (Tex. 1967) ........................................................................ 59

*Caskey v. Man Roland, Inc.,*
   83 F.3d 418 (5th Cir.1996) .................................................................................. 46

*Chambers v. NASCO, Inc.,*
   501 U.S. 32, 44 (1991) ......................................................................................... 40

*City of Chicago v. M/V Morgan,*
   375 F.3d 563, 577 (7th Cir. 2004)........................................................................ 29

*Condrey v. SunTrust Bank of Ga.,,*
   431 F.3d 191, 203 (5th Cir.2005).................................................................... 37, 38

*Crompton Greaves, Ltd. v. Shippers Stevedoring Co.,*
   776 F.Supp.2d 375, 403 (S.D. Tex.2011) ........................................................... 37

*Edington v. Madison Coal & Supply Co.,*
   No. CIV.A. 08-69-JGW, 2010 WL 3938370, at *1 (E.D. Ky.
   Oct. 5, 2010). ................................................................................ 4, 5, 6, 7, 8, 10

*Foremost  Ins. v. Richardson,*
   457 U.S. 668, 675 (1987) ..................................................................................... 12

*Green v. Crow,*
   243 F.2d 401, 403 (5th Cir. 1957)........................................................................ 27

*Gregg v. Weeks Marine, Inc.,*
   2000 WL 798493 (E.D. La.)...................................................................... 4

*Hunt v. Marquette Transp. Co. Gulf-Inland, LLC,*
   CIV.A. 09-6055, 2011 WL 3924926, at *1 (E.D. La. Aug. 5, 2011), report
   and recommendation adopted, CIV. A. 09-6055, 2011 WL 3957254(E.D. La.
   Sept. 6, 2011)...................................................................................... 37

*In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.,*
   888 F.3d 753 (5th Cir.2018) ........................................................... 41, 42

*In re Moore,*
   739 F.3d 724, 730 (5th Cir.2014) ........................................................ 41

*Jones v. City of Houston,*
   294 S.W.3d 917 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)................ 60

*Kim Crest, S.A. v. M.V. Sverdlovsk,*
   753 F. Supp. 642, 647 (S.D. Tex. 1990).................................................... 17

*King v. Ill. Cent. R.R.,*
   337 F.3d 550, 556 (5th Cir. 2003) ........................................................ 37

*Kostic v. Texas A & M Univ. at Commerce,*
   3:10-CV-2265-M, 2013 WL 3356263, at *4 (N.D. Tex. July 3, 2013) .............. 37

*LaFrentz v. Lockheed Martin Corp.,*
   4:18-CV-4229, 2021 WL 1215847, at *5 (S.D. Tex. Mar. 21, 2021).................. 37

*Maxwell v. Hapag-Lloyd Akt. Hamburg,*
   862 F. 2d  767, 769 (9th Cir. 1988) ........................................................ 4

*Moran v. M/V GEORGIE MAY,*
   164 F. Supp. 881, 885 (S.D. Fla. 1958)................................................... 4

*M/V Morgan,*
   375 F.3d at 577 ................................................................................. 32

*Nat'l Steel Corp. v. Buckeye S. S. Co. . (Kinsman Marine Transit Co.),*
   492 F.2d 364 (6th Cir. 1974)................................................................ 29

*Nat'l Steel Corp. v. Kinsman Marine Transit Co.,*
   369 F. Supp. 498, 512–13 (E.D. Mich. 1972), aff'd sub nom ........................... 29

*O'Donnell Transportation Company v. M/V MARYLAND TRADER,*
    228 F. Supp 903, 909 (S.D.N.Y. 1963) ....................................................... 4

*P.R. Ports Auth. v. M/V Manhattan Prince,*
    897 F.2d 1, 6 (1st Cir. 1990) ................................................................. 29

*Premier Dealer Servs., Inc. v. Duhon,*
    CIV.A. 12-1498, 2013 WL 6150602, at *6 (E.D. La. Nov. 22, 2013) ............... 38

*Profit Shipping, Ltd v. M/V IMPERIAL SPIRIT,*
    No. 3:13-CV-0202, 2015 WL 10371483, at *6 (S.D. Tex. Nov. 30, 2015)
    (J. Hanks, Jr.)........................................................................................... 29

*Rimkus Consulting Grp., Inc. v. Cammarata,*
    688 F.Supp.2d 598, 619 (S.D. ex.2010)  ...................................... 37, 38

*Roadway Exp., Inc. v. Piper*
    447 U.S. 752, 764 (1980).  ................................................................. 40

*Scalici v. Moran Towing & Transp. Co.,*
    No. 82 CIV. 2147, 1986 WL 13442 (E.D.N.Y. July 10, 1986)................... 8, 9, 10

*Shepherd v. Am. Broad. Companies, Inc.*
    62 F.3d 1469, 1475 (D.C. Cir.1995)...................................................... 41

*State Bank & Trust Company of Golden Meadow v. Del-Co Marine, Inc., 1981,*
    1981 A.M.C. 1301, 1304 (E.D. La. 1980)............................................... 4

*United States of America for the Use of Marshall E. Wallace d/b/a Wallace Const. Co. v.*
*Flintco Inc.,*
    143 F.3d 955, 965 (5th Cir. 1998) ...................................................... 59

*United States v. Heard,*
    709 F.3d 413, 421 (5th Cir. 2013)........................................................ 50

*United States v. Wise,*
    221 F.3d 140, 156 (5th Cir.2000) ........................................................ 37

*U.S. v. Chapman,*
    435 F.2d 1245, 1247 (5th Cir. 1970)................................................... 50

*Vick v. Texas Employment Comm'n*
    514 F.2d 734, 737 (5th Cir.1975).  ..................................................... 37

*Whitt v. Stephens County,*
    529 F.3d 278, 284 (5th Cir.2008)   .................................................................. 38


## RULES AND STATUTES

33 C.F.R. 26(a) ................................................................................................. 11

33 C.F.R. 26.03 (f) ........................................................................................... 11

33 C.F.R. 26.04(d) ........................................................................................... 11

33 C.F.R. 164.11 ........................................................................................ 19, 22

33 U.S.C. § 2001 et seq .................................................................................... 12

33 U.S.C. § 2001-2038 ..................................................................................... 11

Federal Rule of Civil Procedure 26(a)(1)(A)(ii) .............................................. 58

Federal Rule of Civil Procedure 26(a)(1)(A)(iii) ............................................. 58

Fed. R. Civ. P. 37 ............................................................................................. 46

Fed. R. Civ. P. 37(c)(1) .................................................................................... 46


## OTHER

Inland Navigation Rule 3 .................................................................................. 11

Inland Navigation Rule 6 .................................................................................... 7

Inland Navigation Rule 13 ........................................................... 7, 11, 14, 18, 51

Inland Navigation Rule 13(a) ................................................................. 11, 14, 30

Inland Navigation Rule 13(b) ...................................................................... 14, 30

Inland Navigation Rule 13(c) ........................................................................... 14

Inland Navigation Rule 13(d) ........................................................................... 14

Inland Navigation Rule 16 .................................................................... 15, 30

Inland Navigation Rule 17 ........................................................................ 11

Inland Navigation Rule 17 (Action by Stand-on Vessel) ................................. 15

Inland Navigation Rule 17(a) ............................................................... 11, 14

Inland Navigation Rule 17(a)(i) ............................................................... 17

Inland Navigation Rule 34 ................................................................... 11,18

Inland Navigation Rule 34 (Sound and Light Signals) .................................... 16

Inland Navigation Rule 34(a) ................................................................... 30

Inland Navigation Rule 34(c)(i) ............................................................... 16

Inland Navigation Rule 34(c)(ii) .............................................................. 16

Inland Navigation Rule 34(h) ................................................................... 16

1 Geo. J. Legal Ethics 389, 391–92 (1987) ................................................ 45

Craig H Allen, *Farwell's Rules of the Nautical Road* (8th ed., p. 420.) ..................... 16, 17

Simon Gault, *Marsden on Collisions at Sea* (12 ed. 1998, § 6-115) ............................... 15

Joseph D. Piorkowski, Jr., Professional Conduct and the Preparation of Witnesses for Trial: Defining the Acceptable Limitations of "Coaching", ................................................. 45

F. Bailey & H. Rothblatt, Successful Techniques for Criminal Trials, 403 (2d ed. 1985) ........................................................................................ 45

Major Douglas E. Acklin, USAF, Witness Preparation: Beyond the Woodshed, 27 A.F.L. Rev. 21, 21 (1987) ................................................................... 45

*The Dexter*, 23 Wall. 69 ........................................................................ 18

*The Rhode Island*, 20 F. Cas. 646, 651 (S.D.N.Y. 1847). ................................. 18

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| JANA REED, INDIVIDUALLY AND AS | § | |
| REPRESENTATIVE OF THE ESTATE OF | § | |
| CHRISTOPHER REED AND ON BEHALF | § | |
| OF A.R. (A MINOR); LOGAN REED, AND | § | |
| CHASE REED | § | |
| _Plaintiffs_ | § | C.A. NO. 3:19-cv-00238 |
| | § | |
| V. | § | 9(H) Admiralty |
| | § | |
| MAERSK LINE-LTD, USA AND | § | |
| MAERSK LINE, LIMITED | § | |
| _In Personam Defendants;_ | § | |
| M/V MAERSK IDAHO | § | |
| _In Rem defendant._ | § | |

## DEFENDANTS' REPLY TO PLAINTIFFS' POST TRIAL BRIEF

**I.    Plaintiffs' liability case is not as simple as Plaintiffs posit.**

### A.    The facts and the question left unanswered

On page one of their Post-Trial Brief Plaintiffs state:  "The case is simple.  Maersk should have slowed down and minded its wake.  Had Maersk done so, this accident almost certainly would not have occurred."  Factually, this statement ignores the stipulation and the undisputed facts that show the 2-meter elevation changes were not uncommon or unanticipated by Mr. Reed.  Also ignored is the fact that he intentionally jumped both wake fields of the _Maersk Idaho_ for no reason other than to jump wakes.  Indeed, Plaintiffs' counsel and every witness they called, expert or otherwise, left unanswered the most important question in the case – why Chris Reed successfully brought his boat to a position of safety in calm water about a half mile behind the ship, then altered course 180 degrees

to chase the ship so he could overtake it and enter the port wake field, ignoring his wife's warning as he did so.  Plaintiffs themselves raise the question on page 8:  "The Reed boat then passed behind the *Maersk Idaho* at 3:46 at a distance of approximately half a mile away.  **Chris then turned the boat on a path that would lead them back toward where they had come from."[1]** Left unanswered by Plaintiffs is why?  Why did he chase the ship in the exact opposite direction of the Galveston Jetties?  He never told his wife he was changing their destination or cancelling their day on the bay and heading home (as any spouse would if doing so).  The reason for his chasing the port wake field is left glaringly unanswered by Plaintiffs.  The answer, however, is equally as obvious.

## B.   The duty of a ship with regard to its wake and Plaintiffs' failure to meet their burden of proof that the *Maersk Idaho* breached any such duty

Legally, the case is also not as simple as Plaintiffs claim.  What duty did Maersk breach?  Did the wake they alleged to have caused the incident even come from the *Maersk Idaho*?  They cannot avoid presenting their claim as one sounding in *ergo hoc propter hoc* – Chris Reed chose to jump a wake and was killed;  the wake came from the *Maersk Idaho*;  therefore the *Maersk Idaho* is liable.   "If the *Maersk Idaho* was not on the bay that day, the incident would not have occurred" seems to be the foundation of their argument.  While that may be true, the law rejects cause-in-fact as a basis of liability; plaintiffs must prove that the actions of the *Maersk Idaho* were the legal or proximate cause of the incident.   In

---

[1] Dkt. 212 at p. 8.

2

light of Plaintiffs' oversimplification, the law of wake damage and the duties owed by ships thereunder bears detailed review.

The majority of cases asserted by Plaintiffs to support their liability theory on wake damage are premised upon either a moving ship passing a moored or stationary object that is subsequently damaged by the wake, or a ship coming up upon another vessel ahead of it and damaging it with its wake during the passing.  Here, the *Maersk Idaho* had already safely passed the Reed boat which then altered course to chase the *Maersk Idaho* from behind.  An example of Plaintiffs' attempt to beat a square peg into a round hole on this issue is the sole case they cite in their Third Amended Complaint, *Alamia v. Chevron Transp. Corp.*, 660 F. Supp. 1123 (S.D. Miss. 1988)  and quoted directly by lead counsel for Plaintiffs in his opening statement to the Court.  *Alamia*, however (and most of cases cited by Plaintiffs), contained facts vastly different from those now before the Court.  In *Alamia*, the large ship came upon a small shrimp vessel that was ahead of it in the channel.  When it "passed the area of Plaintiff's [shrimper's] vessel" its wake then damaged some equipment on the shrimp boat.  *Alamia* at 1125-26.  In the case at bar, the *Maersk Idaho* **had already passed and cleared** the Reed boat without incident.  Ignoring the warning of his wife, Mr. Reed then altered course 180 degrees and chased the ship as it proceeded away from them on its way to Houston.  Mr. Reed then intentionally put his boat into the port wake field of the *Maersk Idaho*.   As the Court is aware, there is no presumption of negligence merely because an incident happens.

Whether a vessel is responsible for damages caused by her swells depends on the facts and circumstances of each particular case. *State Bank & Trust Company of Golden Meadow v. Del-Co Marine, Inc.*, 1981 A.M.C. 1301, 1304 (E.D. La. 1980); *Gregg v. Weeks Marine, Inc*., 2000 WL 798493 (E.D. La.); *Moran v. M/V GEORGIE MAY*, 164 F. Supp. 881, 885 (S.D. Fla. 1958). Generally, a moving vessel owes a duty of reasonable care to appreciate the reasonable effect of its wake and to take reasonable precautions to avoid creating unusual swells that may injure others. *Gregg*, 2000 WL 798493 at p. 4; *Maxwell v. Hapag-Lloyd Akt. Hamburg*, 862 F. 2d 767, 769 (9th Cir. 1988).  Only "unusual" swells or suction which cannot be reasonably anticipated furnish the basis for a claim. *Id*.; *O'Donnell Transportation Company v. M/V MARYLAND TRADER*, 228 F. Supp. 903, 909 (S.D.N.Y. 1963).

The case at bar is far more like the case of *Edington v. Madison Coal & Supply Co*., No. CIV.A. 08-69-JGW, 2010 WL 3938370, at *1 (E.D. Ky. Oct. 5, 2010).  *Edington v. Madison Coal & Supply Co*., involved a small 17' recreational vessel that successfully passed a commercial tow going in the opposite direction.  The recreational vessel then changed course to chase the tow and intentionally put itself into the tow's port wake.  The facts are strikingly similar to those are bar and bear detailed review.  The commercial tug was pushing a 14-barge tow downriver on the Ohio River and the small boat was headed upriver.  FOF 10, 21.  The Plaintiff/decedent Danny Edington was driving and was a novice boater who had purchased the boat a week prior and used it once on the river.  He had no training as to the operation of the boat or the Rules of the Road.  FOF 7, 9, 33.  Neither he

4

nor any of the other adults in the boat were wearing life jackets.  FOF 12.  The two vessels headed toward each other and successfully passed.  FOF 25. After passing, Mr. Edington intentionally altered his course back toward the stern of the tug and entered the port wakes. FOF 30, 32, 33.  Due to improper loading of all passengers in the bow, Edington's boat then took on water and capsized. FOF 11, COL 65. Unfortunately, Mr. Edington drown. FOF 39.

Plaintiffs' claims were dismissed after the court found that "the actions of the Decedent were the sole cause of the tragic accident … and plaintiffs' resulting damages". 2010 WL 3938370, at *9.  In *Edington*, just like the case at bar, Plaintiffs' expert claimed that a reduction in speed of the Defendant vessel would reduce the size of the wake wave but "conducted no experiments or simulations to determine the precise size of the wake generated from the bow." *Id*. at *3.   Plaintiffs herein also wholly failed to provide the Court with such information.   While Plaintiffs' counsel purported to the Court and Defendants that such an opinion would be forthcoming from his designated wave expert Dr. Savander, it never materialized.   Plaintiffs repeatedly stated how important a naval architect opinion is and how helpful it would be to the Court.   On June 8, 2020, Plaintiffs judicially admitted that the naval architect's work "would be very beneficial to the court in understanding the precise way the wake of the *Maersk Idaho* caused this incident."[2]  Later, Plaintiffs judicially admitted again that the evidence from a naval architect "would be very

---

[2] Plaintiffs' Request for Pre-Motion (Status) Conference. Dkt. 40 at p. 2.

helpful to the Court in deciding this case."[3]  Further, during Captain Rivera's deposition, Plaintiffs' lead counsel stated on the record that Plaintiffs' naval architect "is doing a complete naval architecture analysis and accident re-creation **that you guys are going to get in December**.  Then we'll have the full wave study and the interaction of the Reeds' boat with the wave. So we'll be able to see it… **And then we'll also be able to check whether or not this elevation data is really accurate or not.**"[4]  Dr. Savander was de-designated by Plaintiffs on the day his report was due.  The reason is obvious.  His opinion on wave height would not have helped Plaintiffs' case.

The *Edington* court found that the "the Edington boat did not encounter any waves or bow wake of unusual size as it passed the *M/V Tennessee*."  FOF 29.  The description of the wakes bears direct quotation:

> Drawing closer to the tow boat on the port side near the 3–4 foot waves created immediately behind the tow by its wheel wash, the Edington boat drew close enough to encounter a wave large enough to come over the low-lying bow of the *Hurricane*. The wheel wash wave encountered by the *Hurricane* at some distance off the stern was no more than 2 feet at the point of contact due to the dissipation of its size over distance. However, the speed and angle with which the Edington boat encountered the wave, combined with the *Hurricane's* bow-down position, caused the wave to drench the seated occupants in the bow of the boat with water and spray, and also flooded the Edington boat.
>
> The motivation for the Decedent's decision to turn toward the wheel wash will never be known. Although the defendant suggested that **the motive may have been to "jump" the larger waves behind the tow for sport,** the occupants of the Edington vessel testified that they had never witnessed the Decedent take a similar action. Regardless of the motive, all credible

---

[3] Plaintiffs' Unopposed Motion to Extend Time to File Naval Architect Report. Dkt. 45 at p. 2.
[4] Ex. 10 – Deposition of Captain Rivera at p. 140:8-17 (emphasis added).

evidence points to the fact that the Decedent, a novice boater, **did in fact turn his vessel toward the wheel wash coming from the stern of the tow**.

*Edington*, FOF 32, 33, 2010 WL 3938370 at *4 (emphasis added).  In the case at bar, all credible evidence (indeed as stipulated to by the parties) likewise presents the Court with a novice boater who intentionally ran his vessel into the wake of a commercial ship that had already safely passed him.

The *Edington* court also found "[t]he decedent was also negligent for not wearing a PFD."  COL 66.  As for the Rules of the Road, the court found under Rule 13 the tow was the stand-on vessel and the small boat the give-way vessel. As such the Edington boat was required to "take early and substantial action to keep well clear of the *M/V Tennessee*." FOF 42.  In the case at bar, as an overtaking vessel, the Reed boat was required to "keep well clear" of the *Maersk Idaho*.  Chasing the ship and intentionally entering its wake field is not "taking early and substantial action" to "keep well clear."

Ultimately, the *Edington* court held that Plaintiffs failed to meet their burden of proving that the wake was "unusual" and that the speed of the allegedly offending vessel was unreasonable under the prevailing conditions.  *Id*. at *7.  The court held that the speed was a safe speed in accordance with Inland Navigation Rule 6 and that:

> Likewise, the amount and size of the wheel wash created by the *M/V Tennessee* was reasonable and did not constitute an "unusual swell." Its size should have been anticipated by Decedent under the prevailing conditions, and **would not have impacted the Edington boat but for Decedent's own negligence**.

7

*Id.* (emphasis added).  Here, the wake Plaintiffs allege to have harmed Mr. Reed "would not have impacted" his boat but for his negligent decision to chase the ship and intentionally drive into the port wake field.  Certainly, a two-meter elevation change should have been anticipated by Mr. Reed in that he had already intentionally navigated through at least (12) two- meter elevation changes, in addition to being warned by his wife.  The court summed up its decision:

> By contrast, the Decedent clearly violated Rules 9 and 16 by failing to stay well clear of the *M/V Tennessee*. Such violations were the direct, proximate, and sole cause of the accident. The Edington boat unexpectedly changed course toward the port stern of the *M/V Tennessee* in an unforeseeable and dangerous manner. The course change of the Edington boat, coupled with the bow down attitude of that vessel, directly caused the chain of events that led to the damages sustained by the plaintiffs, including the untimely death of Danny W. Edington, Jr.

> The cause of the accident was the Edington boat's failure to stay well clear of the *M/V Tennessee*, and the Decedent's decision to steer into the wheel wash toward the port stern of the *Tennessee* immediately after passing the tow boat. Sadly, the Decedent's own actions and reactions caused the Edington boat to capsize. The Decedent was also negligent in not wearing a PFD.

*Edington*, COL 65, 66.  Equally as sad in the instant case, Mr. Reed's own decision to chase the ship and steer into its port wake field caused his death.

In *Scalici v. Moran Towing & Transp. Co*., No. 82 CIV. 2147, 1986 WL 13442 (E.D.N.Y. July 10, 1986), a recreational boater sued a tug and barge for wake damage.  The court found the wake was about 4 feet and "[t]here was uncontradicted testimony that a four foot wave is not uncommon in the waterways in which plaintiff was accustomed to take his boat."  FOF 13.  In dismissing plaintiffs' case, the *Scalici* court found:

8

> Plaintiff failed to prove that either the *Margaret Moran* or the *Morania 22* was operated in a negligent manner or that either of their wakes had any serious effect on the *Carol Sue* or its passengers other than producing an annoying disturbance. The wakes produced by the tugs were not unusually large for this area, nor did either tug come unreasonably close to the *Carol Sue* in their passages down the waterway. **Any untoward consequences of the *Carol Sue's* encounter with the *Moran's* wake were due mainly to plaintiff's taking the *Carol Sue* into the channel adjacent to the AK Bridge abutment just as the wake approached.** The tug operators could not reasonably be expected to have foreseen that the *Carol Sue* would suddenly enter the channel at that point.

*Scalici*, 1986 WL 13442, at *7 (emphasis added). In the case at bar, Plaintiffs have failed to offer any evidence on what size wake would be usual for the area of the incident, much less meet their burden to prove that the wakes of the *Maersk Idaho* were "unusual." Indeed, in Opening Statement, Plaintiffs' counsel informed the Court that Maersk didn't want to "be accountable for a phenomena that happens every day in Galveston Bay" namely "vessel-made waves many of which are large enough for people to surf on." Mr. Crew then offered to show the Court a short video of "this phenomena of tanker surfing" pointing out "there are dozens, if not hundreds, of these videos out there." If that is so, the wakes of the *Maersk Idaho* that were chased by Mr. Reed were anything but unusual. Indeed, the only competent testimony of the actual wake height is from eyewitness pilot Captain Maher (1-2 feet) and from expert Dr. Yue of MIT (maximum of 2.2 feet and more likely 10 inches).

Plaintiffs have cited cases to this Court where the facts are distinguishable from the case at bar. There is a line of cases which hold that if a moving vessel's wake causes damage to a moored or stationary vessel there is a rebuttable presumption of negligence on

the moving vessel.  As shown through the stipulated data regarding the movement of the Reed boat and the *Maersk Idaho,* this is not one of those cases.  This is not a case where there is a presumption of fault on the *Maersk Idaho*.

Similarly to the plaintiffs in *Edington* and *Scalici*, during the bench trial, Plaintiffs failed to meet their burden of proof to show the speed of the *Maersk Idaho* was excessive and created an unusually large wake wave.  While their expert was critical of the speed of the *Maersk Idaho*, no witness for Plaintiffs testified as to what speed the *Maersk Idaho* should have been traveling in order to make a reasonable and usual size wave.  In fact, the record is bare as to what Plaintiffs claim is a usual size wave that should be expected in the spoils area west of buoys 33/34.  This leaves the Court to speculate as to what would be a safe speed and what would be an unusual wake wave.  On the other hand, Captain Maher testified that he has transited this area thousands of times prior to this incident and hundreds of times since and the usual size waves he sees in this area are one to two feet.  Captain Maher testified that on June 7, 2019, he monitored his wake in the area of the incident and he observed it to be one to two feet.  Furthermore, Dr. Dick Yue testified that the maximum height that a wave can achieve in the spoils area west of buoys 33/34 would be 2.2 feet based on mathematical and scientific theories.  This testimony was uncontradicted.

**II.      Regardless of what radio channel Pilot Maher was monitoring, Chris Reed violated Inland Navigation Rules 13, 17, and 34 by overtaking the *Maersk Idaho*.**

Plaintiffs' Post-Trial Brief seems to chastise Captain Maher for testifying he was monitoring Channel 13, but not 16, on the VHF radio.[5]  Captain Maher testified he was monitoring Ch. 13 "communications between vessels," Channel 12 "Vessel Traffic Service Channel," and Channel 74 "port operations channel."[6]  In other words, he was complying with the Bridge-to-Bridge Telephone Act requirement for channels 13 and 12.[7]  As will be demonstrated, when considering the effect of Rules 13, 17, and 34, it is irrelevant as to which, if any, of the channels Captain Maher or the *Maersk Idaho* were monitoring.

The Inland Navigation Rules, 33 U.S.C. § 2001-2038, were enacted by Congress in 1980.  The rules apply to all vessels upon the inland waters of the United States, large and small, commercial and noncommercial.  Rule 1 (Application) states: "These Rules apply to all vessels upon inland waters of the United States…."[8]  The Supreme Court itself instructs the "Federal Rules of the Road" apply to all vessels without regard to their

---

[5] Dkt. 212 at p. 35.
[6] TR 5:34-35.
[7] 33 C.F.R. § 26.04(d)("On the navigable waters of the United States, Channel 13 is the designated frequency required to be monitored in accordance with § 26(a)."  33 C.F.R. § 26.03(f), Table 26(f)(vessel using Vessel Traffic Service must monitor Ch. 12 when in "the navigable waters south of a line extending due west from the southernmost end of Exxon Dock #1").  Captain Maher was monitoring these channels.
[8] The rules specifically define "Vessel" as "every description of watercraft, including non-displacement craft and seaplanes, used or capable of being used as a means of transportation on the water." Rule 3 (General Definitions).

commercial or noncommercial nature." *Foremost Ins. v. Richardson*, 457 U.S. 668, 675 (1987) (citing Inland Navigation Rules, 33 U.S.C. § 2001 et seq.).[9]

Rule 13 (Overtaking) governed the situation existing between the two vessels from the time Chris Reed left the safe position behind the *Maersk Idaho*, altered course to the Northwest and chased the ship putting his vessel in the port wake field of the *Maersk Idaho*. Below is a screen shot from the animation of Defendants' based upon the stipulated positions of the vessels and admitted without objection.  The inset boxes have been added by counsel for the purposes of this brief.  Specifically, this is a screen shot at the time Chris Reed started to chase the *Maersk Idaho* and leave the safety of the channel behind it, where his expert Dr. Sanders admitted the water was "calm and flat."   The inset box, upper right, shows the view of the *Maersk Idaho* as seen from the Reed boat at the same time.   The relative length of the vectors is based upon their actual speeds and shows how much faster the Reed boat was (at this point, 29.4 mph):

---

[9] On the day in question, the Inland Navigation Rules applied equally to the Reed's boat as it did to *Maersk Idaho*.  Both vessels were governed by the obligations and duties in the rules.  This was also the testimony of Expert Captain Danti, as well as Plaintiffs' experts Dr. Wendy Sanders and Captain J. Rivera.



The animation of Plaintiffs' expert Captain Cunningham shows likewise.  His also contains the track taken by the Reed boat before and after the overtaking maneuver was commenced:



Rule 13(b) states: "The vessel shall be deemed to be overtaking when coming up with another vessel from the direction more than 22.5° abaft her beam" – the precise situation above.  Such was the case when Chris Reed altered course to the Northwest and began to enter the port wake field of the *Maersk Idaho*.  Mr. Reed was the <u>overtaking</u> vessel and the *Maersk Idaho* was the <u>overtaken</u> vessel.  Rule 13(c) states, "When the vessel is in doubt as to whether she is overtaking another, she shall assume that this is the case and act accordingly."  Chris Reed's duty under Rule 13 is clearly delineated in 13(a): "[A]ny vessel overtaking any other shall keep out of the way of the vessel being overtaken."  At trial Plaintiffs' experts Rivera and Sanders agreed that it was an overtaking situation initially, but claimed that subsequent alterations of speed and/or course by the Reed's vessel changed this into some other situation.  Rule 13(d) addresses this and states: "Any subsequent alteration of the bearing between the two vessels shall not make the overtaking vessel a crossing vessel within the meaning of these rules or **relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear**."

As seen on the tracks of the ships from the electronic navigation data and animations admitted by both sides[10], while the relative bearing between the vessels may have changed somewhat, from the time Chris Reed altered course to the Northwest, he was constantly overtaking the *Maersk Idaho*, and indeed would be deemed to be doing so at Rule 13(d).  As noted by one well-known commentator: "once an overtaking vessel, always an

---

[10] Defendants' Animation, DEX 1; Plaintiffs' Animation, DEX 3.

overtaking vessel." *See* Simon Gault, *Marsden on Collisions at Sea* (12 ed. 1998, § 6-115). As the vessel required to "keep out of the way of the vessel being overtaken," the Reed's boat would have been the Give-Way vessel under Rule 16 of the Inland Rules which states: "Every vessel which is directed to keep out of the way of the other vessel shall, so far as possible, **take early and substantial action <u>to keep well clear</u>**."

Rule 17 (Action by Stand-on Vessel) governed the duties owed by the *Maersk Idaho*: "Where one of two vessels is to keep out of the way, the other shall keep her course and speed." Tragically Chris Reed did not "take early and substantial action to keep well clear" of the *Maersk Idaho*. Instead, he took his vessel from a position of safety one-half mile behind the *Maersk Idaho*, and intentionally altered course almost 180° to chase the *Maersk Idaho* from behind to enter its port wake field. Wendy Sanders, Plaintiff's small boat expert, testified that when Chris Reed was astern of the *Maersk Idaho* in the main ship channel, he was in an area where the water was flat and calm.

> **A.     The Inland Navigation Rules prohibited Chris Reed from attempting to overtake the *Maersk Idaho* at that point.**

Under the Inland Navigation Rules, one vessel is not permitted to overtake another unless it requests permission *and that permission is granted*. It is noted by one leading commentator:

> Under the Inland Rules, one power-driven vessel desiring to overtake another power-driven vessel **must first initiate an exchange of signals or reach an agreement by radio telephone**, regardless of whether or not the vessel needs to maneuver to accommodate the event. The requirement to exchange signals applies in all waters subject to the Inland Rules, not just in narrow channels or fairways.

Craig H Allen, *Farwell's Rules of the Nautical Road* (8th ed., p. 420.).  This duty is governed by Rule 34 (Sound and Light Signals).  Rule 34(c)(i) instructs: "A power-driven vessel intending to overtake another power-driven vessel **shall** indicate her intention by the following signals on her whistle: one short blast to mean "I intend to overtake you on your starboard side"; two short blasts to mean "I intend to overtake you on your port side."

Thus, if Chris Reed intended to overtake the *Maersk Idaho* down its port side, he was required to sound a proposal signal of two short blasts.  It is undisputed that the Reed's vessel had the required whistle/horn for making the sound signal, indeed two of them.  (*See* testimony of Wendy Sanders).  The rules do permit one to use the VHF radio in lieu of the whistle signals.  *See* Rule 34(h) "A vessel that reaches an agreement with another vessel in a head on, crossing, or overtaking situation, as for example, by using the radio telephone … is not obliged to sound the whistle signals prescribed by this rule, but may do so."  Chris Reed also had a VHF radio on board his vessel that could have been used to comply in lieu of the whistle signal.

Under the Rules, Chris Reed was **not** permitted to proceed with his intended overtaking without an agreement for his doing so from the *Maersk Idaho*.  Rule 34(c)(ii) states: "the power-driven vessel about to be overtaken shall, if in agreement, sound a similar sound signal.  If in doubt she shall sound the danger signal prescribed in paragraph (d)."  It is undisputed that Chris Reed never made the required signal requesting permission to overtake, much less did the *Maersk Idaho* ever acquiesce in his maneuver.  Regardless

16

of whether Mr. Reed failed to seek overtaking permission by whistle signal or radio, since he received no such permission he was prohibited from overtaking the *Maersk Idaho*.

Commentators also agree that without an agreement to overtake, the proposing vessel should **not** start to maneuver.  *See Allen*, supra at p. 316 "Nor should the vessel desiring to overtake the one ahead start her maneuver until an agreement has been reached." In *Kim Crest, S.A. v. M.V. Sverdlovsk*, 753 F. Supp. 642, 647 (S.D. Tex. 1990), Judge Hughes found the overtaking vessel "negligent for attempting a last minute one-whistle overtaking without an agreement from the vessel ahead of him."  He found the vessel being overtaken to be blameless:  "As the vessel being overtaken, the *Cisco* was obliged to maintain its course and speed."  (As did the *Maersk Idaho* in the case at bar).  Had Chris Reed followed the rules, he would not have been permitted to proceed with the overtaking absent an agreement and consequently would not have put his vessel into the port wake field – whether the *Maersk Idaho* even had a radio or not.

### B.    The duty of the *Maersk Idaho*

The *Maersk Idaho* was the stand-on vessel and its obligation once Chris Reed started overtaking it is set forth in Rule 17(a)(i): "where one of two vessels is to keep out of the way [in this case the Reed's vessel], the other [*Maersk Idaho*] shall keep her course and speed."  That is what the *Maersk Idaho* did.  While it may have slowed due to current, the ship's engine speed was never reduced.  Chris Reed's actions in entering the wake field at a high speed to the extent he could not keep control of his vessel certainly violated his duty "to take early and substantial action <u>to keep well clear</u>" of the *Maersk Idaho*.  Indeed, he

17

intentionally chased the *Maersk Idaho* and purposefully navigated into the port wake field. Due to his lack of boating skills and knowledge of the waterway, tragedy struck.  The burden of staying well clear is left to the overtaking vessel.  In an old admiralty case involving a collision during an overtaking maneuver, the court faulted the overtaking vessel commenting:   "The approaching [overtaking] vessel, when she has command of her movements, takes upon herself the peril of determining whether a safe passage remains for her beside the one preceding her, and must bear the consequences of misjudgment in that respect. The law extends no immunity to the one possessing the greater speed …. [T]he claimants having a full knowledge … of the position and course of the *Naugatuck* [overtaken vessel] before making the attempt to pass her, are chargeable with the consequences of their movement …." *The Rhode Island*, 20 F. Cas. 646, 651 (S.D.N.Y. 1847).

Not only did the Rules of the Road apply equally to the Reeds and the *Maersk Idaho*, they are not discretionary.  Congress has spoken.   The Rules it enacted:

> [A]re not mere prudential regulations, but binding enactments, obligatory from the time that the necessity for precaution begins, and continuing so long as the means and opportunity to avoid the danger remain. *The Dexter*, 23 Wall. 69. Obviously, they must be rigorously enforced, in order to attain the object for which they were framed, which could not be secured if the masters of vessels were permitted to indulge their discretion in respect of obeying or departing from them.

*Belden v. Chase*, 150 U.S. 674, 698 (1893).  The violation of Rules 13 and 34 by Chris Reed brought his vessel from a position of safety astern of the *Maersk Idaho*, into the port wake field where he fell overboard.

18

### III.    The Maersk Idaho complied with 33 C.F.R. 164.11

33 C.F.R 164.11 requires the master of a vessel to ensure that the person directing the movement of the vessel sets the ship's speed "with consideration for . . . the damage that might be caused by the vessel's wake."  The *Maersk Idaho* was in compliance with this regulation because it did set its speed taking into account the size of its wake.[11]

Captain Maher testified that he has been trained to monitor his wake since he was a cadet.[12]  Captain Rivera, Plaintiffs' expert, confirmed that monitoring one's wake is part of the training for professional mariners.[13] The pilot, Captain Maher, testified that potential wake wash damage is something he takes into account "from the time I board until the time I get off the vessel" and, therefore, he did not need to discuss potential wake wash damage with Captain McLoud.[14]

The pilot, Captain Maher, set the speed of the *Maersk Idaho* for the inbound transit on June 7, 2019.[15] The captain of the *Maersk Idaho* was on the bridge with the pilot and heard the pilot's orders setting the speed of the ship.[16]

---

[11] Although Captain McLoud initially testified he was not familiar with 33 C.F.R. 164.11, he later testified that he knew the substance of the law, but had never seen it before in a Westlaw format. *See* Dkt. No. 199.
[12] TR 5:25.
[13] TR 3:113.
[14] TR 5:33.
[15] TR 1:116.
[16] TR 1:116.

19

The master of the *Maersk Idaho* recalls seeing recreational boats on the day of the incident. [17] However, Captain McLoud testified the ship did not need to slow down when he saw these boats because they "didn't need to. We were safe speed."[18]

Captain Maher also knew there were recreational boats on the bay that day (e.g. the sailboat) and expects to see recreational boats on the bay on sunny summer days.[19] Captain Maher testified, "I had the appropriate size wake for all the pleasure boats out there that day."[20] Therefore, even if someone had told Captain Maher about the Reed's boat, he would not have changed anything he did.[21]

Captain McLoud testified, "I walk back and forth, and I am constantly watching the wake."[22] Captain McLoud testified that both he and the pilot were both monitoring the wake as they passed through the spoils area.[23] Captain Maher also testified he "continuously" monitors his wake through the area where the incident occurred.[24] This is consistent with Captain Rivera's testimony that when he was sailing he would also walk to the bridge wings to look astern at his wake. [25]

Captain Rivera testified that competent pilots check their wakes.[26] Captain Rivera confirmed that Captain Maher has "vastly more experience" on the Houston Ship Channel

---

[17] TR 1:173.
[18] TR 1:173.
[19] TR 5:53 and TR 5:91.
[20] TR 5:100.
[21] TR 5:100.
[22] TR 1:170.
[23] TR 1:172.
[24] TR 5:129.
[25] TR 3:80.
[26] TR 3:79.

than he does.[27]  Captain Rivera also testified that Captain Maher has "an enormous amount of experience of what type of wakes are thrown adjacent to the spoils in this area of the Houston Ship Channel."[28]  Captain Rivera also testified he would defer to a Houston Ship Pilot "about what types of wakes are created in the spoils area adjacent to, say markers 33 and 34."[29] Captain Rivera testified that he would expect someone with Captain Maher's background to "be particularly sensitive to the issue of possible wake wash damage."[30] Captain Rivera does not have any recollection based on his personal experience of what types of wakes are created in the area of the Houston Ship Channel where the incident occurred.[31]

Captain Rivera does not dispute that Captains McLoud and Maher were monitoring their wake, he just didn't know "for how long that process happened."[32] However, the undisputed evidence is that Captain Maher observed his wake at least four times in the minutes before the incident.  The first time was as the ship approached markers 25 and 26 when the sailboat passed the *Maersk Idaho* without incident as the pilot watched the sailboat pass through the ship's starboard wake at approximately 3:38 pm.[33]   The second time was when the pilot steadied up on the ranges around 3:40 pm. [34] The third time was

---

[27] TR 3:101.
[28] TR 3:102.
[29] TR 3:103.
[30] TR 3:82.
[31] TR 3:103.
[32] TR 3:80-81.
[33] TR 5:92.
[34] TR 5:75.

at approximately 3:42 pm when both Captain McLoud and Captain Maher went to the edge of the bridge and saw the power boat jumping its wake.[35] The fourth time was as *Maersk Idaho* was overtaking the *Nan Cenac*, a tug and barge unit, and Captain Maher specifically checked his wake to make sure it would not be a problem for the tug and barge.[36] This last time was at approximately 3:48 pm, about one minute before Plaintiffs say Mr. Reed fell overboard.

Captain Maher has transited past this spoils area 3,000 times as a pilot. In the spoils area he has never seen any unusual or breaking wakes in that area.[37]  On the day of the incident, Captain Maher testified the ship's wake outside the channel in the spoils area were one to two feet.[38]  He did not see any waves breaking in the spoils area west of markers 33 and 34.[39]  Since the day of the incident, Captain Maher has taken about four hundred ships past this area and has made it a point to go out and see what size wake was there, and they were one to two feet.[40]

Captain McLoud may not have been able to cite chapter and verse of the wake regulations from the C.F.R., but it is clear that both he and Captain Maher set the vessel's speed such that the *Maersk Idaho's* wake was not dangerous to a prudent and competent boater.  The *Maersk Idaho* did not violate 33 C.F.R. 164.11.

---

[35] TR 5:78.
[36] TR 5:110.
[37] TR 5:26-27.
[38] TR 5:151.
[39] TR 5:4.
[40] TR 5:50.

**IV.    Dr. Dick Yue was not incredible—he just provided the wave height testimony Plaintiffs' counsel had indicated would be provided by Plaintiffs' Naval Architect Dr. Savander**

Plaintiffs' Brief at ¶ 59 ignores the scientific evidence and tries to offer Plaintiffs' lawyer's opinion in place of naval architecture scientific evidence.  Plaintiffs' counsel tries to do re-calculations based on Dr. Yue's formula for how "the wave height scales approximately as the speed squared."[41]   The calculations in Plaintiffs' Brief at page 30 ignore the scientific fact that the wave height at the incident location could not possibly exceed 2.2 feet due to the controlling water depth that would cause the wave to break.  As Dr. Yue testified, the maximum possible height at the incident location was limited by water depth independent of vessel speed and could not exceed 2.2 feet, regardless of the vessel speed.[42]

Plaintiffs' attempt to re-calculate misstates and misapplies Dr. Yue's testimony and formula because it starts with the unfounded premise that the wave was originally 6 feet before reduction in speed, and it ignores the depth in the shoals and spoils area.  As Dr. Yue testified, based on hydrodynamics science and McCowan's criteria, the wave cannot exceed 5.4 feet because it will break when it encounters the seven-foot depth.  As it propagates from there and passes 5-foot depth, it can only get smaller and when it arrives at the incident location it cannot be greater than 2.2 feet.[43]

---

[41] TR 5:189.
[42] TR 5:191, 223-225, 230.
[43] TR 5:159-161, 181-184.

Instead of producing their much promised expert report and analysis, Plaintiffs de-designated their naval architect expert witness, Dr. Savander. Their recalculated-lawyer-assertions in ¶ 59 are not admissible expert opinions. Dr. Yue, who is the only naval architect and hydrodynamics expert in this case, testified that a reduction in vessel speed to 12 knots would have reduced the numerically predicted wave height by only "about three and a half inches or so."[44] If speed were reduced from 15 to 14 knots, the difference in predicted wake height would have been about one inch.[45] This proves that not reducing the speed of *Maersk Idaho* had no substantial impact on the wake height at the incident location.

Having chosen not to offer Dr. Savander's naval architect expert opinions, Plaintiffs' counsel's opinion in Brief ¶ 59 does not controvert the scientific evidence presented by Dr. Yue. In short and based on uncontroverted science from Dr. Yue, slowing down would not have prevented this incident. Reducing speed would not have made a significant difference.

Plaintiffs' attack on Dr. Dick Yue's credibility, at Plaintiffs' Brief pages 30-33, is completely unfounded. Dr. Yue has no bias in this case. He is a former associate dean of engineering at MIT and current Philip J. Solondz Chair Professor of Engineering and Professor of Mechanical and Ocean Engineering at MIT, and he teaches and publishes about wave hydrodynamics.[46] Their arguments in ¶¶ 62-67 demonstrate they don't like his

---

[44] TR 5:190.
[45] TR 5:189.
[46] TR 5:154-159.

opinions, but certainly don't undermine the truth and the science that Dr. Yue explained in his testimony.

Plaintiffs' cross examination of Dr. Yue, and Plaintiffs' Brief, make no real attempt to question the science behind Dr. Yue's 2.2 feet maximum possible wave height based on the charted water depth and McCowan's criteria for wave breaking as water depth becomes too shallow to support a wave's height.[47]   Instead, Plaintiffs' Brief ¶ 65 makes the misleading assertion that the drone video of waves from *Maersk Idaho* when it was outbound on a different day (March 18, 2020) at a different location in a different direction somehow shows the waves were higher than 2.2 feet.   This assertion ignores Dr. Yue's explanation that the maximum possible wave height formula depends on the water depth in the specific location.[48]   Plaintiffs offered no evidence of the water depth over which the drone video waves had passed.   Without knowing the depth, they cannot apply the formula correctly.   The Chart 11324 at DEX 8 shows the water depths adjacent to the Ship Channel near and north of Buoys 33/34, where the drone video waves presumably had passed, are deeper than the seven-foot depth that Dr. Yue explained limited the height of the wave that would have travelled to the incident location on June 7, 2019.

Plaintiffs never proved exactly where was the location of the drone video, but it is clear the *Maersk Idaho* was outbound, not inbound, and so the waves did not pass over the same area and depths that they did on June 7, 2019.   The drone video itself shows waves

---

[47] TR 5:159-173.
[48] TR 5:216.

that are not excessive and not dangerous, as proven by the successful passage through these waves by Mr. Crew in the small boat from which the drone was launched. *See* DEX 85. If counsel's assertion is taken as true that the waves seen in the drone video are larger than 2.2 feet, the fact that counsel was able to safely navigate those larger waves proves that it is not the size of the waves that was the problem on June 7, 2019, it was how Mr. Reed choose to navigate those waves.

What is not credible is Plaintiffs' proffered opinion from Captain Rivera that the wave height he estimated was six to eight feet. Dr. Yue's credible, scientific opinion proves that cannot be true. The wave could not have exceeded 2.2 feet. For the same reason, Captain Cunningham's opinion that the drone video waves—filmed on a different day in a different location—were five to eight feet high cannot be true for the wake waves at the incident location on June 7, 2019. Captain Maher's eyewitness testimony that the waves outside the Ship Channel were one to two feet is consistent with and corroborates Dr. Yue's scientific opinion.

## V. Chris Reed cannot invoke the error *in extremis* doctrine by placing himself in peril

On page 38-39 of their Post-Trial Brief, Plaintiffs claim that Chris Reed's negligence should not be held against him and he not be blamed for his own death based on the doctrine of *in extremis*. Plaintiffs state that Chris Reed did not create the wake he intentionally chased down to only later find out he did not know how to navigate and that Jana Reed should not be blamed for not knowing what to do in case of an emergency. They now

26

claim that their negligence should be excused on a theory of *in extremis*.  In support of their position, Plaintiffs cite to *Green v. Crow*, 243 F.2d 401, 403 (5th Cir. 1957)(emphasis added) which holds "Where the master of a vessel, ***placed in a situation of peril not of his making***, has, acting within the bounds of reason, done that which at the time and under the stress and strain of the moment seemed to be the best thing to do, he will not be charged with fault by second guessing after the event."  However, in this instance, unlike in *Green,* the situation Chris Reed found himself in was **entirely** of his own making.

Witness after witness testified that Chris Reed intentionally steered his boat towards and through the starboard wake field of the *Maersk Idaho*.  As Plaintiffs' expert, Dr. Sanders, put it, Chris Reed was the captain of the boat, it was his decision to choose the course, and he is responsible.[49]  Dr. Sanders testified that Chris Reed made a conscious decision to cross the starboard wake field of the *Maersk Idaho*.[50]  Afterward, he passed through the transparent rolling walls of water, he arrived in calm flat water behind the *Maersk Idaho*.[51]  At which point his wife warned him that she was scared.[52]

While in the calm flat water behind the ship, Mr. Reed could have put on a life jacket, deployed the throwable PFD, or turned southeast and gone to the jetties.  He did none of these things. Rather, he completely ignored his wife's warnings, ignored the starboard wake field which surprised and startled  him, and instead changed course to the

---

[49] TR 2:76.
[50] TR 2:77.
[51] TR 2:28; TR 3:122; TR 6:75.
[52] TR 2:198 and 224.

northwest, almost tripled his speed to chase down the port side field of the *Maersk Idaho* while transiting into the spoils area.[53]

The evidence shows the port side wake waves were created prior to Chris Reed consciously deciding to chase down the waves.  In paragraph 33 of their Brief, Plaintiffs suggests "the wake that ejected Chris Reed from his boat" was created at "approximately 3:43 p.m."  According to Dr. Dick Yue, the *Maersk Idaho's* port side wake had been created by 3:46:49.[54] Regardless of exactly when it was created, Mr. Reed altered course towards a wake that had already been created.  Ms. Reed admitted that they navigated into the port wakes - the wakes did not come upon them.

The facts of this case, including the Navionics data, prove that it was Chris Reed who made the decision to put himself into the port side wake field of the *Maersk Idaho* and nothing that *Maersk Idaho* did caused him to do so.  The main peril faced by Chris Reed on June 7, 2019, was not knowing, due to his lack of experience and training, where in the bay he should use extreme caution to properly navigate the manageable wakes created by the *Maersk Idaho*.  Plaintiffs are now trying to shift responsibility for Chris Reed's unfortunate decisions onto Maersk and the *Maersk Idaho*.  The evidence is clear, the wake waves of the *Maersk Idaho* existed before Chris Reed intentionally decided to take the starboard waves head-on and then overtake the port side waves.  Plaintiffs cannot hide

---

[53] TR 2:78 and 80; TR 6:75.
[54] TR 5:181.

28

behind the *in extremis* doctrine because Chris Reed purposefully chose to create the peril of overtaking waves without the proper knowledge and experience.

The *in extremis* doctrine simply is not implicated on the facts of the case. "The party relying on the *in extremis* doctrine must be completely free from fault prior to the emergency occurrence." *City of Chicago v. M/V Morgan*, 375 F.3d 563, 577 (7th Cir. 2004) (citing *P.R. Ports Auth. v. M/V Manhattan Prince*, 897 F.2d 1, 6 (1st Cir. 1990)); *see also See Profit Shipping, Ltd v. M/V IMPERIAL SPIRIT*, No. 3:13-CV-0202, 2015 WL 10371483, at *6 (S.D. Tex. Nov. 30, 2015) (J. Hanks, Jr.); *see also Nat'l Steel Corp. v. Kinsman Marine Transit Co.*, 369 F. Supp. 498, 512–13 (E.D. Mich. 1972), aff'd sub nom. *Nat'l Steel Corp. v. Buckeye S. S. Co. (Kinsman Marine Transit Co.),* 492 F.2d 364 (6th Cir. 1974) ("But where, as here, the perilous situation is due directly to the fault of the vessel claiming the *in extremis* doctrine, she cannot find shelter in it.").

As Plaintiffs admit, Chris Reed was a novice boater with absolutely no boater safety training or education prior to June 7, 2019.[55]   As the owner and operator of the boat he failed to properly provide his passenger—Jana Reed—any training on effectively and safely dealing with emergency situations.   Mr. Reed failed to deploy the Type IV throwable PFD as mandated by law, which deprived her of a tool which may have saved his life.

---

[55] TR 2:88 and 217; TR 6:107-108.

Further, as stated in Section II, *supra*, Mr. Reed violated the overtaking Rule and placed himself in the position of peril.[56]  The overtaking vessel—in this case the Reeds' boat—has the obligation to stay "well clear" and communicate his intentions to overtake.[57] Only if the vessel to be overtaken agrees, the overtaking vessel can then proceed with the maneuver.[58]  Mr. Chris Reed did not comply with either obligation.

Further, Plaintiffs assert in ¶ 82 of their brief that Chris Reed should not have anticipated a wake in front of him as he was crossing the spoils.  However, the Reeds experienced numerus 2 plus meter elevation changes before and after leaving the position of safety one-half mile behind the *Maersk Idaho*.  He had just navigated through the transparent walls of water on the starboard side they he and Mr. Reed did not see. "They were, like, rolling hills. And they were so transparent. You could not see them.")[59]  Mr. Reed was certainly on notice that these types of elevation changes are common in the bay, including in a ship's wake field.

From the time that the Reeds left Clear Lake until they first encountered the starboard wake field of the *Maersk Idaho*, the Reed boat had already experienced at least eight (8) two (2) meter changes in elevation at high rates of speed.[60]  Captain Cunningham admitted that these eight (8) two (2) meter elevation changes were not related to the transit

---

[56] TR 3:123; TR 5:97; TR 6:51-54; DEX 28 (Rule 13(b).
[57] Inland Navigational Rule 13(a) and 16 and 34(a).
[58] TR 6:54-55.
[59] TR 2:198.
[60] DEX 166, slides 1-8 and 14-15.

of the *Maersk Idaho*.[61]  While transiting through the starboard side wake field of the *Maersk Idaho*, the Reeds experienced two (2) two (2) meter elevation changes and one (1) three (3) meter elevation change.[62]  Jana Reed testified that while going over through the starboard wake field the boat slammed up and down, up and down, up and down at least three times.[63]  Dr. Sanders estimates that they went through 9 to 10 waves in the starboard wake field.[64]

While the elevation changes as recorded by the Reed boat's GPS unit are not a reliable method to show the **size of the waves** created by the *Maersk Idaho,* the elevation changes show that Mr. Reed should have expected there to be waves in Galveston Bay capable of changing the elevation of the boat and clearly should have been on notice to expect waves when transiting through Galveston Bay (not to mention his wife's specific warning about the waves).[65]  These two (2) plus meter elevation changes weigh in favor of taking proper precautions, which include wearing a life vest or PFD while transiting Galveston Bay.

Prior to Chris Reed falling overboard on June 7, 2019, he choose not to take boater safety training, failed to have a Type IV throwable PFD immediately available/accessible, and had not properly trained Jana Reed on the safety procedures and equipment onboard. He changed course often at high rates of speed, first chasing the starboard side and then

---

[61] TR 1:218-222.
[62] DEX 166, slides 9 and 14.
[63] TR 2:221-222.
[64] TR 2:77.
[65] TR 1:235.

the port side wake waves of the *Maersk Idaho*, failing to wear a life vest, and having active

THC in his system.[66]   He also failed to maintain a VHF radio watch.   Therefore, because

the Reeds are not "completely free from fault prior to the emergency occurrence" they

cannot rely on the *in extremis* doctrine.   *See, e.g., M/V Morgan*, 375 F.3d at 577.

## VI.   Mr. Reed's failure to wear a life jacket is indeed the most substantial factor in the cause of his death.

Plaintiffs' Brief at pages 40-42 argues Mr. Reed should not have to wear a life jacket

and he was not negligent for failing to wear one.   But the evidence proves his failure was

negligent, and wearing a PFD would have saved his life.

### A.   Dr. Sanders's refusal to admit she would recommend boaters wear life jackets is incomprehensible.

As Plaintiffs' small boat safety expert, Dr. Wendy Sanders refused to recommend

that someone on a small boat wear a life jacket.   Her refusal demonstrates her testimony is

that of a paid advocate.   For herself personally, she admitted "if I was alone going 40 miles

an hour in a boat that **I might** wear a life jacket."[67]   But as a purported boat safety expert

giving advice to others who asked her for a recommendation whether they should wear a

life jacket, she said "I would leave it up to their discretion and tell them it's not required by

---

[66] It is undisputed that Chris Reeds post mortem liver analysis revealed 13 nanograms/grams of THC and 290 nanograms/grams of TCH-COOH (a THC metabolite). DEX 133; *see also* Deposition of Dr. Wimbish p. 33:18-22; TR 3:170, 206, and 208.
[67]   TR 2:81 (emphasis added).

law."[68]  When asked whether it would be prudent to wear a life jacket, she said it "depends on the circumstances" and she would leave the decision up to the judgment of an adult.[69]

Her refusal to recommend a good safety practice proves she is not credible as a purported small boat safety expert.  In the circumstances of this case - i.e. Mr. Reed driving his boat at 40 mph through multiple two-meter elevation changes, driving into the starboard wake field into walls of water that caused him to exclaim "Oh, sh*t!", hearing his wife's warning that she was scared, and finally driving out of calm water into and overtaking the port wake field that sounded like hitting concrete, all while knowing he was a novice boater with medical conditions including balance issues and falling three or four times in the past year and thinking he may have dementia and CTE while having active THC in his system - it certainly was not prudent for him to not wear a life jacket.

Later, Dr. Sanders acknowledged it "could be" a good boating practice to wear a life jacket when going 40 mph across Galveston Bay, and that wearing a life jacket "can" save your life but only if you're wearing it "in certain circumstances."[70]  Her evasive, equivocal testimony on this point just proves she is a paid advocate who knows that prudent safety practices would be inconsistent with Plaintiffs' incredible theory that wearing a life jacket—a personal **flotation** device—would not have prevented Mr. Reed from submerging and drowning.  Her failure to unequivocally recommend that adults should wear a PFD is directly contrary to U.S. Coast Guard safety recommendations.  Dr. Sanders'

---

[68]  TR 2:82.
[69]  TR 2:82.
[70]  TR 2:133-134.

33

life jacket opinions are not credible.  Query what Dr. Sanders would really tell Mr. Reed if given the chance today?

**B.     U.S. Coast Guard recreational boater statistics cited by Plaintiffs prove it is more likely than not had Chris Reed worn a PFD he would be alive today.**

The statistics numbers cited in Plaintiffs' Brief at ¶ 85 confirm that 82% (362/439) of persons who drowned in 2019 were not wearing a life jacket.[71]  Only 13% (57/439), a small minority of drowning victims, were wearing a life jacket.  Thus, far more than 50% were not wearing a life jacket, which demonstrates it is more likely than not a person who is not wearing a life jacket would die from drowning.  These statistics support only one conclusion:  It is more likely than not Chris Reed would not have died from drowning if he had been wearing his PFD life jacket.

The full report of U.S. Coast Guard 2019 Recreational Boating Statistics is in evidence at DEX 58.  It says, where cause of death was known, 86% of boating accident victims who drowned were not wearing a life jacket.[72]  Its executive summary also says: "Where instruction was known, 70% of deaths occurred on boats where the operator **did not** receive boating safety instruction . . . Operator inattention, improper lookout, **operator inexperience**, excessive speed, and alcohol use rank as the top five contributing factors in accidents."[73]

---

[71]  Plaintiffs' Brief, Dkt. 212 at 41.
[72]  DEX 58 at 6 (Dkt. 183 at page 53).
[73]  DEX 58 at 6 (emphasis added).

### C.   Overwhelming evidence proves Mr. Reed should have worn a life jacket, and that his failure to do so was contributory negligence.

Plaintiffs' Brief at ¶ 85 is flat wrong to suggest it is an "unsupported theory" that Chris Reed's failure to wear a life jacket was a proximate cause of his death by drowning. Even Dr. Sanders agreed a life jacket can save your life, but only if you're wearing it.[74] Plaintiffs' lifesaving expert, Dr. Pia, agreed that adults on boat trips should wear a PFD, and that one of the easiest ways for fishermen in a recreational boat to prevent drowning is to wear a PFD.[75]  This is no mere theory.  It is a fact, supported by Dr. Pia, that Mr. Reed failed to prevent his own drowning by failing to wear his PFD.

The United States Coast Guard supports this fact, too.  *See* the discussion of Coast Guard recommendations for life jackets in Defendant's Post Trial Brief, Dkt. 213 at 29-30. Here, in the face of Plaintiffs' unsupported life jacket arguments, it bears repeating the USCG recommendation:  "Life jackets should be worn at all times when the vessel is underway.  A life jacket can save your life, but only if you wear it."[76]

Captain Danti, Maersk's small boat expert, supports this fact.  His opinion is that if Mr. Reed had been wearing his life jacket it would have aided in his survival.[77]  He confirmed "you are not going to sink" with a Type II PFD,[78] like the one Mr. Reed failed to wear.  Captain Danti's testimony proves that Mr. Reed's failure to wear his PFD was

---

[74] TR 2:134.
[75] TR 3:230.
[76] DEX 55 at 9.
[77] TR 6:24.
[78] TR 6:23.

negligent, a failure to exercise ordinary care for his own safety, and his contributory negligence was a proximate cause of his death by drowning.[79]

Maersk is not asking the Court to legislate a new life jacket rule, contrary to the assertion in Plaintiffs' Brief at ¶ 83.  Maersk simply points out that on the facts and in the circumstances of this case, Mr. Reed should have worn his PFD.  And if he had worn one it is more likely than not he would have prevented his drowning.  The USCG, Captain Danti, and Dr. Pia all agree with this.  Plaintiffs' Brief goes on in ¶ 84 to assert the childish argument that Chris Reed shouldn't have to wear a life jacket because Plaintiffs think few other recreational boaters wear life jackets.  Plaintiffs cite and offered no evidence about what other boaters do.  Regardless of what other boaters do, in the circumstances of this case it certainly was a failure to exercise ordinary care for his own safety, and for the sake of his wife and family, for Chris Reed to fail to wear his PFD.

## VII.   Additional sanctions are not warranted

This Court has already sanctioned Maersk for the extremely late production of Captain Maher's video.  Additional sanctions are not warranted because the untimely production was the result of an honest oversight and not bad faith, Plaintiffs were not prejudiced by the late production, and the video was not relevant to support Plaintiffs' claims or defences.

---

[79] See TR 6:17-24.

## A.       The legal standard for granting an adverse inference

Plaintiffs seek two adverse inferences:  (1) that he height of "the wake was 5-8 feet at the time the Reed's boat encountered it," and (2) "that the video recording of the Maersk *Idaho*'s wake is harmful to Maersk's case."[80]

A party moving for an adverse inference bears the burden of proof.[81]  The granting of an adverse inference sanction is "properly viewed as among the most severe sanctions a court can administer."[82]  Therefore, a party's burden in seeking an adverse inference "is heavy."[83]

"As a general rule, in the Fifth Circuit, the severe sanctions of granting… an adverse inference instruction may not be imposed unless there is evidence of 'bad faith.'"[84] Mere negligence is not enough to support the granting of an adverse inference, "for it does not sustain an inference of consciousness of a weak case."[85]

---

[80] *See* Plaintiffs' Post-Trial Brief, Dkt. No. 212 at p. 84.

[81] *See, e.g.. King v. Illinois Cent.* R.R., 337 F.3d 550, 556 (5th Cir.2003) ("[Movant] must show that [non-movant] acted in "bad faith" to establish that it was entitled to an adverse inference."]); *see also Hunt v. Marquette Transp. Co. Gulf-Inland, LLC,* CIV.A. 09-6055, 2011 WL 3924926, at *1 (E.D. La. Aug. 5, 2011), report and recommendation adopted, CIV.A. 09-6055, 2011 WL 3957254 (E.D. La. Sept. 6, 2011) ("The party seeking the sanction bears the burden of proof.").

[82] *See, e.g., Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F.Supp.2d 598, 619 (S.D. ex.2010); *see also LaFrentz v. Lockheed Martin Corp.*, 4:18-CV-4229, 2021 WL 1215847, at *5 (S.D. Tex. Mar. 31, 2021).

[83] *Kostic v. Texas A & M Univ. at Commerce,* 3:10-CV-2265-M, 2013 WL 3356263, at *4 (N.D. Tex. July 3, 2013).

[84] *See, e.g., Crompton Greaves, Ltd. v. Shippers Stevedoring Co.,* 776 F.Supp.2d 375, 403 (S.D. Tex.2011), *citing Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir.2005); *see also  King v. Ill. Cent. R.R.,* 337 F.3d 550, 556 (5th Cir.2003); *see also United States v. Wise*, 221 F.3d 140, 156 (5th Cir.2000).

[85] *Vick v. Texas Employment Comm'n,* 514 F.2d 734, 737 (5th Cir.1975).

In addition to showing bad faith, a moving party also has the burden to show it was prejudiced by not having use of the evidence in question.  "A severe sanction such as a default judgment or an adverse inference instruction requires bad faith and prejudice."[86] When a party has not been prejudiced, there is "an insufficient foundation for an adverse inference."[87] In order to satisfy the prejudice requirement, the party seeking sanctions must demonstrate that the missing or altered evidence would have been relevant to her case" and that the evidence would have supported the claims or defenses of the party that sought it.[88]

### B.     An adverse inference is not appropriate in this matter

As noted above, Plaintiffs are seeking two adverse inferences: (1) that he height of "the wake was 5-8 feet at the time the Reed's boat encountered it", and (2) "that the video recording of the *Maersk Idaho's* wake is harmful to Maersk's case."  Therefore, as the party seeking the severe sanction of an adverse inference, Plaintiffs have the burden of proof to show (1) Maersk acted in bad faith, (2) the video would have supported Plaintiffs claims or defenses, and (3) that Plaintiffs were prejudiced by the admittedly very late production of the video.

---

[86] *Rimkus Consulting Grp., Inc. v. Cammarata,* 688 F.Supp.2d 598, 642–43 (S.D. Tex.2010), *citing Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir.2005); *see also Whitt v. Stephens County*, 529 F.3d 278, 284 (5th Cir.2008) ("[A] jury may draw an adverse inference 'that party who intentionally destroys important evidence in bad faith did so because the contents of those documents were unfavorable to that party.'").

[87] *Premier Dealer Servs., Inc. v. Duhon*, CIV.A. 12-1498, 2013 WL 6150602, at *6 (E.D. La. Nov. 22, 2013).

[88] *Ashton v. Knight Transp., Inc.*, 772 F.Supp.2d 772, 801 (N.D. Tex.2011), *citing Rimkus,* 688 F.Supp.2d at 616.

Plaintiffs have not met their burden of establishing any of these three necessary prongs. Plaintiffs have offered no evidence to satisfy the first prong of showing bad faith on the part of Maersk because this was an honest mistake which involved no bad faith. Several other videos taken by Captain Maher were produced to Plaintiffs. It was not until Captain Maher testified at trial that he had taken the additional video that the undersigned was aware the video existed. Plaintiffs' assertion that "Captain Maher and Maersk's counsel discussed the presence of the video before trial" is not only unsupported by any evidence, it is completely untrue.[89] This honest oversight is further evidenced by the fact that the video was not given to or shown to any of Maersk's experts nor given or shown to any of the fact witnesses in this case.

Defense counsel clearly erred when the video taken by Captain Maher was inadvertently not produced. Defense counsel sincerely apologizes to the Court, and opposing counsel, for that error. However, Plaintiffs have not shown any bad faith because there was no bad faith.

Additionally, Plaintiffs have not shown any prejudice or that the video is relevant to supporting their claims or defences. In fact, it is telling that in Plaintiffs' eighty-four page Post-Trial Brief, Plaintiffs do not even once assert that not having the video prejudiced Plaintiffs, or assert that it is relevant to supporting their claims or defences. Nor have Plaintiffs sought to admit the video themselves or asked this Court to review the video to

---

[89] Plaintiffs Post-Trial Brief, Dkt. No. 212 at p.82.

determine its relevance to supporting their claims and defenses.  Plaintiffs have chosen not to provide this Court any evidence of what this video shows and, therefore, have not provided any evidence that the video is either relevant or prejudicial.

Plaintiffs have failed to meet their burden to establish even one of the elements required for the granting of an adverse inference.  Therefore, Plaintiffs' request for the adverse inferences should be denied.

### C.    The legal standard for use of the Court's inherent authority to sanction

Although it is not clear, it appears Plaintiffs may be asking that the three sanctions (i.e. the two adverse inferences and the striking of Captain Maher's testimony regarding the wake height of the *Maersk Idaho*) be issued pursuant to the Court's inherent power to issue sanctions.  It is undisputed that courts have the inherent power "to sanction a litigant for bad-faith conduct."[90]  However, as the Supreme Court has noted, "Because inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion."[91]  The Supreme Court noted another reason such inherent power must be exercised with restraint and discretion—because of "their very potency."[92]

Therefore, when invoking the use of the inherent power of a court, the moving party has "a heavy burden… to show by clear and convincing evidence that [the non-movant] had engaged in misrepresentation that prevented defendants from fully and fairly

---

[90] *Chambers v. NASCO, Inc*., 501 U.S. 32 (1991).
[91] *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980).
[92] *Chambers v. NASCO, Inc*., 501 U.S. 32, 44 (1991).

40

presenting their case."[93]   A court should "invoke its inherent sanctioning power only if clear and convincing evidence supports the court's finding of bad faith or willful abuse of the judicial process."[94]   The burden on the moving party is a "high threshold."[95] The "use of this [inherent] power should reflect our judicial system's strong presumption in favor of adjudications on the merits."[96]

### D.   Use of the Court's inherent power to sanction is not appropriate in this situation

One of the cases cited by Plaintiffs' in support of this Court using its inherent power to sanction was *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753 (5th Cir. 2018).  However, the *DePuy* case is actually illustrative of the type of case in which the inherent power can be exercised, which only highlights why the inherent power to sanction is not appropriate in this instance.

The *DePuy* matter involved what the Fifth Circuit described as the second bellwether case in a multidistrict litigation involving thousands of plaintiffs alleging injury due to defective hip implants.   In *DePuy*, a local plaintiff attorney designated a "non-retained" expert and repeatedly told the jury this allegedly non-retained expert "had neither pecuniary incentive nor motive in testifying."[97] The jury found in favor of plaintiffs and

---

[93] *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 790 (5th Cir.2018).
[94] *In re Moore*, 739 F.3d 724, 730 (5th Cir.2014):
[95] *Id.*
[96] *Shepherd v. Am. Broad. Companies, Inc.*, 62 F.3d 1469, 1475 (D.C. Cir.1995).
[97] *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 792 (5th Cir.2018).

awarded plaintiffs $502,000,000, including punitive damages (which was reduced pursuant to the Texas exemplary damages cap).

However, while preparing for the third bellwether case, the defendants discovered that before the previous trial, plaintiffs' counsel had made a $10,000 donation to a charity of the expert's choosing, the expert expected to be paid when testifying, and the expert received a $65,000 payment after the second trial.[98]  On appeal, the Fifth Circuit held, "This is the rare case in which counsel's deceptions were sufficiently obvious, egregious, and impactful to penetrate the layers of deference that would ordinarily shield against reversal."[99]

The *DePuy* case has no factual similarities whatsoever to the case before this Court. In their Post-Trial Brief, Plaintiffs state, "During cross-examination, it was revealed that Captain Maher is also a client of counsel for the *Maersk Idaho*."[100]  What Plaintiffs failed to mention is that Plaintiffs' counsel _knew_, to a certainty, and long before trial, that Captain Maher was represented by Maersk's counsel.  For example, in early 2020 Plaintiffs issued a subpoena *duces tecum*, requesting in part Captain Maher's correspondence with Maersk's counsel.[101]  The requests for communications between Captain Maher and Mr. Lightsey and Mr. Brown were objected to as attorney-client privileged.  The parties subsequently

---

[98] *Id.* at 765.
[99] *Id.* at 790.
[100] Plaintiffs' Post-Trial Brief, Dkt. No. 212 at p. 86.
[101] *See* Subpoena Duces Tecum, Dkt. No. 21, Exhibit A, requests nos. 1 and 3.

filed a Joint Letter over this discover dispute, in which **_Plaintiffs' counsel_** wrote, "Captain Maher is also represented by Maersk's counsel…"[102]

Plaintiffs' counsel also deposed Captain Maher in the summer of 2020, at which time Captain Maher told Plaintiffs' counsel that Maersk's counsel represented him for matters arising out of the same incident.  During the deposition, the following exchange occurred:[103]

> Q. When did you first contact a lawyer about this incident?
> A. I believe it was July the 26th of 2019.
> Q. Who did you contact?
> A. Mr. Jim Brown.
> Q. Was that for the purpose of seeking legal advice?
> A. Yes.

Furthermore, there has been no deception regarding Captain Maher's involvement in this case.  No payments have been made to Captain Maher, no donations have been made in his name, he has/had no expectation of being paid for his testimony.  Captain Maher's involvement in this case was fully explained to the Court during Maersk's opening statement:

> Captain Maher is not a party to this case. He does not have a personal or a financial interest in the case, but he does have an interest. The ship that he was on, that he was conning -- he was the one setting the speed and the course of the ship -- is accused of killing someone. And so he has a deeply personal interest in this case.[104]

---

[102] Joint Letter Regarding Plaintiffs' Motion to Quash and Motion for Protection.  Dkt. No. 57, p.2.
[103] June 11, 2020 deposition of Captain Maher, at p.139.
[104] TR 1:43.

At trial, Captain Maher was asked why he met with his/Maersk's attorney before testifying the next day. Captain Maher, whom the Court probably recognized as a very conscientious individual, was frank and honest, saying, "I wanted to be prepared. I'm here in front of a federal judge… I am just here to give the facts that I saw that day."[105]

On the afternoon of Wednesday, May 19, 2021, the day before Plaintiffs rested, Defense counsel approached Plaintiffs' counsel to discuss the fact that Defense counsel did not have any witnesses prepared to testify the following day.  Plaintiffs' counsel had no objections.   Maersk had intended to call its forensic pathologist, Dr. Grossberg, on Thursday.  However, after Dr. Grossberg attended trial on Wednesday and observed the testimony of Plaintiffs' experts, Drs. Bux and Pia, it was decided that her testimony would be cumulative and, therefore, unnecessary.[106]

Maersk had also intended to call Captain Fazioli on Thursday, but on Thursday Captain Fazioli was still in New Orleans in another trial.[107]   Defendant's naval architect, Dr. Yue, had been scheduled to testify on the following Monday.  However, as the course of the trial became clear, his travel arrangements were changed at the last minute so that he arrived in Galveston late Thursday evening so he could testify on Friday.  Finally, Defendant had two video depositions – Dr. Wimbish and Mr. Falkinson – that it decided not play for the Court, but rather merely submitted to the Court for the Court's viewing at its convenience.

---

[105] TR 5:120-121.
[106] Dr. Bux and Dr. Pia both testified in the afternoon, with Dr. Pia finishing later afternoon.
[107] TR 4:59.

Captain Maher was physically available to testify on Thursday.  Although Defense counsel discussed not calling any witnesses on Thursday, Defense counsel did not ask for leave of this Court to not call any witnesses on Thursday, nor was it explained to the Court as clearly as it should have been.  Obviously, clearing this plan of action with opposing counsel, while not clearing this with the Court beforehand was wrong and disrespectful to the Court.  Counsel sincerely apologizes to the Court for its handling of this matter.

As noted, Captain Maher was physically available to testify on Thursday.  Captain Maher works two week on and then has two weeks off.  Captain Maher had finished his two-week on-duty period on Wednesday, May 19, 2021.  As has been noted, "There is one basic rule in witness preparation--the witnesses must be *thoroughly* prepared for the total experience they are going to undergo in the courtroom… Witness preparation is one of the most important ethical obligations to the client."[108]  Or, as the late F. Lee Bailey wrote, "Any lawyer who fails to effectively prepare the defendant or his chief witness for cross-examination is derelict in his duty."[109]  Furthermore, "effective witness preparation, serves not only the interests of the attorney's client, but also enhances the efficiency of the judicial system."[110]

---

[108] Major Douglas E. Acklin, USAF, Witness Preparation: Beyond the Woodshed, 27 A.F.L. Rev. 21, 21 (1987)

[109] F. Bailey & H. Rothblatt, Successful Techniques for Criminal Trials, 403 (2d ed. 1985).

[110] Joseph D. Piorkowski, Jr., Professional Conduct and the Preparation of Witnesses for Trial: Defining the Acceptable Limitations of "Coaching", 1 Geo. J. Legal Ethics 389, 391–92 (1987).

### E. Defendants have been barred from using the video – additional sanctions are not warranted

This Court has ordered that Defendant is not allowed to use the video for any purpose.

Defendant believes this sanction is more than sufficient, especially considering the complete lack of bad faith, lack of prejudice to Plaintiffs, and lack of relevance in support of Plaintiffs' claims or defences.[111]

## VIII. Medical records tempest

### A. Plaintiffs' hyperbolic cries that Maersk attempted to "deceive and mislead the court" are unwarranted: the records are the records.

In their Port-Trial Brief, Plaintiffs try to minimize the importance of Chris Reed's prior self-reported medical conditions. Chris Reed's subjective and self-perceived medical conditions are relevant to this case. No matter what the doctors told him, he subjectively thought he was suffering from CTE and other cognitive conditions as he discussed with his family. Also, Chris Reed, not the doctors, personally completed page 3 of the Hauser Clinic records (DEX 145) in which he self-admitted to having "abused or used" marijuana in the past. These are Chris Reed's words, not Defendants' interpretation of them. Defendants and their expert Dr. Wimbish used this medical record (again Chris Reed's own

---

[111] Plaintiffs argue that "Rule 37 says that a failure to disclose evidence results in automatic exclusion of that evidence." *See* Plaintiffs' Post-Trial Brief, Dkt. No. 83. This is an incorrect statement of the law. Rather, such evidence is to be excluded "unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). The Fifth Circuit has confirmed that "[w]here the failure to disclose relevant evidence is harmless, exclusion is not required by the federal rules". *See, e.g., Caskey v. Man Roland, Inc*., 83 F.3d 418 (5th Cir.1996).

words) to show that Chris Reed was not naïve to the use of marijuana.  This record standing alone is not meant to show that he used marijuana on June 7, 2019, the autopsy report and the positive THC test (DEX 133, pp. 4-7) show that.  The fact that Chris Reed did not check off that he used marijuana in another medical record does not negate his admission on page 3 of DEX 145.[112]

Furthermore, Chris Reed's self-reported medical conditions regarding his cognitive and psychomotor skills problems are relevant to this case as they go to the unreasonableness of him not wearing a life vest while on a boat and negligence in leaving the dock in the first instance.  Because of Chris Reed's medical conditions it was negligent for him not to wear a life vest on June 7, 2019.  Months prior to the incident, Chris Reed self-reported having cognitive difficulties as follows:

**Presenting Problems:** Mr. Reed presented for reevaluation of neuropsychological functioning. He was last seen at our office 1.94 years ago on 2/2/17 at Dr. Rituparna Das's referral. At that time, he demonstrated essentially normal neuropsychological functioning. In contrast, he reported severe levels of depressive and anxiety symptoms. His test data did not suggest cerebral dysfunction impacting cognition.

Presently, Mr. Reed reported having persistent cognitive difficulties. He indicated that he has trouble remembering new information, people's names, intentions, and locations of items. He stated that his wife has told him that he often needs information repeated. He also reported particularly difficulty maintaining concentration. "I feel like I'm in a fog," he said. He indicated that he must expend extra effort to pay attention in order to avoid making mistakes. He stated feeling as though he is simply "going through the motions" when doing things. "I feel like a robot," he said. He indicated that this has led him to occasionally miss an exit when driving. He reported that these problems have progressively worsened over time.

*See* DEX 147, pp. 13-14.[113]

---

[112] DEX 145 was admitted without objection.  TR 6:66.
[113] DEX 147 was admitted without objection.  TR 6:66.

As presented at trial, Chris Reed self-reported falling 3-4 times in the year prior to the incident.  *See* DEX 147, p. 14.

> **Medical History:** He has hypertension, sleep apnea, restless leg syndrome, benign prostatic hyperplasia, occasional headaches, and hearing loss. He uses a CPAP machine nightly. He owns hearing aids but is not wearing them today. He reported that he has fallen 3-4 times within the last year. He denied experiencing loss of consciousness or any serious injury as a result of these falls. He previously participated in contact sports, including mixed martial arts and semiprofessional football, and sustained 1-2 concussions with brief loss of consciousness.

Falling several times is not some subjective symptom existing solely in a patient's mind.  Moreover, Chris Reed self-reported the following cognitive difficulties on page 15 of DEX 138.

| True | False | Are you Experiencing any Cognitive Decline? |
|------|-------|---------------------------------------------|
| | | Check True or False for each question |
| ☑ | ☐ | From time to time, I forget what day of the week it is |
| ☑ | ☐ | Sometimes when I'm looking for something, I forget what it is that I'm looking for |
| ☑ | ☐ | My friends and family seem to think I'm more forgetful now than I used to be |
| ☑ | ☐ | Sometimes I forget the names of my friends |
| ☑ | ☐ | It's hard for me to add two-digit numbers without writing them down |
| ☑ | ☐ | I frequently miss appointments because I forget them |
| ☑ | ☐ | I rarely feel energetic |
| ☐ | ☑ | Small problems upset me more than they once did |
| ☑ | ☐ | It's hard for me to concentrate for even an hour |
| ☑ | ☐ | I often misplace my keys. When I find them, I often can't remember putting them there |
| ☐ | ☑ | I frequently repeat myself |
| ☐ | ☑ | Sometimes I get lost, even when I'm driving somewhere I've been before |
| ☑ | ☐ | I often forget the point I'm trying to make |
| ☐ | ☑ | To feel mentally sharp, I depend upon caffeine |
| ☑ | ☐ | It takes me longer to learn something than it used to |

On page 16, of DEX 138, Chris Reed self-reported the following conditions as Intense/Severe or frequent.

| | Symptom Assessment of Adrenal Function |
|---|---|
| | Enter the appropriate score for each statement below that applies to you |
| | Score: Leave blank =Never/Rarely; 1 =Occasionally/Slightly; 2 =Moderate intensity or frequency; 3 =Intense/Severe or frequent |
| 3 | I have experienced long periods of stress that have affected my well-being |
| 3 | I have had one or more severely stressful events that have affected my well-being |
| 3 | I have driven myself to exhaustion |
| | I overwork with little play or relaxation for extended periods |
| | I have had extended, severe or recurring respiratory infections |
| | I have taken long term or intense steroid therapy (corticosteroids) |
| 3 | I tend to gain weight, especially around the middle (spare tire) |
| | I have a history of alcoholism and/or drug abuse |
| | I have environmental sensitivities |
| | I have diabetes (type II, adult onset, NIDDM) |
| | I suffer from post-traumatic distress syndrome |
| | I suffer from anorexia |
| 3 | I have one or more other chronic illnesses or diseases |
| 3 | My ability to handle stress and pressure has decreased |
| 3 | I am less productive at work |
| 3 | I seem to have decreased in cognitive ability.  I do not think as clearly as I used to |
| 3 | My thinking is confused when hurried or under pressure |

Chris Reed's own words and subjective thoughts/feelings were the basis for Captain Danti to testify that "If I have someone that indicates that they have any type of problem with balance, … maybe trouble walking or things like that, …we'll talk to them, but we'll make them wear a PFD onboard the vessel. We'll require them to have a PFD onboard the boat and wear it."[114]

While Defendants included as exhibits the relevant medical records, it is telling that Plaintiffs did not include ANY of Chris Reed's medical records in their exhibits until after they closed their case.  Plaintiffs are trying now to use one page of a medical record to contradict or give less weight to another page in the same medical record.  Defendants used relevant parts of Chris Reed's medical records to show the Court that this plaintiff should have taken the proper precautions prior to going boating.  Chris Reed's self-reported medical conditions are relevant to this case and Defendants did not try to confuse or

---

[114] TR 6:64.

mislead the Court in any way.  The medical records are clear, Chris Reed in his own words and handwriting told his doctors that he used marijuana, was having cognitive and psychomotor difficulties prior to this incident.  Even having these subjective thoughts and beliefs regarding his medical conditions, in other words his medical reality, he still purposely chose not to take a boater safety training class, not properly train his only passenger on June 7, 2019 regarding the safety features of the boat in case of an emergency, and not wear a life vest while boating with active THC in his system.

Defendants presented the evidence and Chris Reed's medical conditions through his own eyes and handwriting and tied his medical reality to the facts of this case.  Plaintiffs are attempting to ignore Chris Reed's medical reality in the same way as they are trying to ignore his negligent acts which lead to his tragic death.

## IX.   No negative inference from not calling of experts

Throughout their Post-Trial Brief Plaintiffs imply that the Court should draw a negative inference from the fact that Maersk saw fit not to call its experts Dr. Grossberg and Captain Fazioli.  However, "[a]n adverse inference is not appropriate when the witness is equally available to both parties." *U.S. v. Heard*, 709 F.3d 413, 421 (5th Cir. 2013) (citing *U.S. v. Chapman*, 435 F.2d 1245, 1247 (5th Cir. 1970)).  If Plaintiffs believed that Dr. Grossberg's and Captain Fazioli's testimony would favor them, they were free to call them. In actuality, Maersk did not call these witnesses not because of something they might say but because of what Plaintiffs' experts actually said.  Maersk used Plaintiffs' experts effectively to prove that Plaintiffs' failed to meet their burden of proof and to establish that

Maersk is not liable for the death of Mr. Reed.  The fact is that these Maersk witnesses would only reassert the strong points Maersk was able to present through Plaintiffs' own experts.

For example, Dr. Grossberg was present in Court on the third day of trial and heard the testimony of Plaintiffs' experts Dr. Bux and Dr. Pia.  After analysis Dr. Bux and Dr. Pia's cross-examinations, Maersk determined that Dr. Grossberg would be cumulative regarding the lifesaving utility of life vests, pre-existing medical conditions, cause of death, and active THC in Chris Reed's system among others.

Captain Fazioli was in New Orleans on another trial during the first four days of this trial.  Again, after the cross examinations of Captain Cunningham, Captain Jay Rivera, and Dr. Sanders and the direct examination of Captain Maher, it was determined that Captain Fazioli's testimony would be repetitive to prove the negligence of Chris Reed and the prudent seamanship of the crew of the *Maersk Idaho* and its Pilot.  By the time that Captain Fazioli was available to testify in this case, Maersk had sufficient evidence in the record to show that Plaintiffs had failed to meet their burden of proof.  Calling Captain Fazioli would have been repetitive.[115]

---

[115] Plaintiffs point to the deposition testimony of Captain Fazioli where he testified that there was not an overtaking situation between the *Maersk Idaho* and the Reed boat and that the Reeds were not required to monitor their VHF radio.  Other witness including Plaintiffs experts agreed that there was an overtaking situation and that the VHF radio was required by law to be turned on by Chris Reed.  An expert's testimony cannot contradict the law.  Under the black letter law as set out by Rule 13 of the Inland Navigational Rules (DEX 28) because of the angle that Chris Reed approached the *Maersk Idaho* on its port side, there is no question that it was an overtaking situation.  Also, under the law Chris Reed was required to maintain a radio watch.  *See* TR 2:135; TR 3:76; and TR 6:28.  Plaintiffs conveniently omitted that Capt. Fazioli corrected his statement that the Reeds needed to maintain a radio watch in his errata sheet.  *See* DKt. No. 162-2, p. 2.

On the other hand, it was Plaintiffs who chose to de-designate their wave expert, whom they had touted as going to be producing the end all be all hydrodynamic analysis that would have proved Plaintiffs' case.  That expert and any hydrodynamic analysis was noticeably missing during Plaintiffs' case in chief.

**X.   Plaintiffs' Brief makes many assertions that are unsupported or contrary to the record.**

Plaintiffs' Brief ¶ 19 asserts it is "uncontroverted" that the incident occurred at "approximately" 3:49 and that is "approximately" when the Reed boat encountered the *Maersk Idaho* wake.  On the contrary, Maersk certainly controverted these alleged facts and demonstrated Plaintiffs' failed to meet their burden of proving exactly when and how Mr. Reed fell overboard.  See Defendant's Post Trial Brief generally, especially Section VII at pages 80-98.

Plaintiffs' Brief ¶ 33 wrongly alleges it is "stipulated" that the "Reed's boat experienced a 2 meter elevation change (6.5 feet) at the time of the accident."  That is not what was stipulated regarding accuracy of the Navionics and other GPS navigation data.  First, the exact time when Mr. Reed fell overboard is neither stipulated nor proven by Plaintiffs.  Second, Plaintiffs' own expert, Captain Cunningham, did not testify that a two-meter elevation change is 6.5 feet.  He said "remember the two-meter elevation is anything from 1.5 to 2.5 [meters]."[116]

---

[116] TR 1:237.

Plaintiffs' Brief, in paragraph 33, suggests "the wake that ejected Chris Reed from his boat" was created at "approximately 3:43 p.m." At that time the Reed boat was a few miles off the *Maersk Idaho* starboard side and headed south, not yet even in the *Maersk Idaho* starboard wake field. Here is a screenshot of DEX 1 at 3:43:00 (when Plaintiffs say the wake was created):



From the vessels' relative positions and headings at that time, there was absolutely no reason for *Maersk Idaho* to foresee that Mr. Reed would change course and speed to enter the starboard wake field, much less cross behind the ship's stern and change course again to chase the waves in *Maersk Idaho's* port wake field after the ship had passed. Since the port wake was created at 3:43, as Plaintiffs' Brief says, it was completely unforeseeable that Mr. Reed would encounter it more than six minutes later after the Reed boat travelled two or more miles and crossed to the opposite side of *Maersk Idaho*. At the time Plaintiffs'

Brief says the wake was created there was no foreseeable hazard to the Reed boat from the *Maersk Idaho* wake.

Plaintiffs' Brief ¶ 33 also talks about Captain Rivera's opinion that the wake was 6-8 feet when *Maersk Idaho* was travelling at 15 knots and Captain Cunningham's opinion the wake was 5-8 feet when the vessel was at a slower speed of 12.9 knots.  Even if their opinions were true (and Maersk has proven they cannot be true), this would just prove that reduction in speed made no significant difference in the wake height.

Plaintiffs' Brief ¶ 60 at page 31 wrongly says it is "uncontroverted" that Maersk did not identify "any other recreational boaters" that may have been unaware of the *Maersk Idaho* wake.  Firstly, Captain Maher testified he and the *Maersk Idaho's* lookout discussed a sailboat that safely passed through the ship's port wake at approximately 3:38 p.m.[117] Secondly, a few minutes later, at approximately 3:42 p.m., the *Maersk Idaho* captain and pilot saw a recreational boat jump the ship's starboard wake and continue on without incident.[118]  Thirdly, there is the small red boat Mrs. Reed testified was trailing the *Maersk Idaho* up the channel.

Plaintiffs' Brief ¶ 69 alleges "it would have been difficult" for the Reeds to recognize the height or "the dangerousness" of the *Maersk Idaho*'s wake.  If it was so difficult, then why was Jana Reed already scared to the extent she warned Chris Reed about the wakes?  Why did the couple both exclaim "Oh, Sh*t!" when they first encountered them?  Why did

---

[117] See Defendant's Post Trial Brief at 69, citing trial testimony.
[118] See Defendant's Post Trial Brief at 71-72, citing testimony.

Mrs. Reed tell the Court they passed through "walls" of water on the starboard side and overtaking the port side waves sounded like hitting concrete?  The answer is easy:  They both already recognized the height and the properties of the waves, as evidenced by the contemporaneous excited utterances of "Oh, sh*t!"  What is difficult to understand is why Mr. Reed left his position of safety and overtook the port waves despite his wife's warning.  Unless he was chasing the waves for sport!

Plaintiffs' Brief ¶ 70 tries to criticize Captain Danti for saying the Reeds should have avoided the shoal area.  Tellingly, so does the official NOAA navigation chart 11326, warnings that Mr. Reed failed to read or heed.[119]  Plaintiffs' Brief goes on to mischaracterize Dr. Yue's opinion about the 10-inch numerically predicted wave height, ignoring his opinion that the maximum possible height in the spoils area incident location was 2.2 feet, which is consistent with Captain Maher's testimony that the height outside the Ship Channel was one to two feet.[120]

Plaintiffs' Brief ¶ 86 wrongly asserts there is "no evidence" of where the throwable PFD was stowed on the boat at the time of the accident.  That is false because Mrs. Reed testified the Type IV throwable was in the right front compartment **with the hatch closed** when Mr. Reed fell overboard.[121]

Plaintiffs' Brief ¶ 87 omits an important admission from Dr. Pia when it argues use of the throwable PFD would not have made a difference to prevent the drowning.  Dr. Pia

---

[119] DEX 7.
[120] TR 5:77, 141.
[121] TR 2:220.

admitted that Chris Reed was a "swimmer in distress" when he was on the surface and able to speak to his wife.[122]   That means, according to Dr. Pia's theory about an instinctive drowning response for a "drowning person," the instinctive response was not yet a factor that would have prevented Mr. Reed while he was a "swimmer in distress," from being aided by a throwable PFD.  According to his theory of the five stages of drowning process, a "swimmer in distress" is not yet a "drowning person" and the "instinctive drowning response" does not occur until the third stage when the person's arms instinctively extend and try to push water down.[123] Before that third stage, when Mr. Reed was a swimmer in distress, the throwable PFD could have aided him and prevented him from progressing to the third stage of instinctive drowning response.

Plaintiffs' Brief ¶ 101 and ¶ 102 wrongly assert there is no corroborating evidence that Chris Reed was impaired from marijuana.  That ignores the abundant circumstantial evidence of his erratic course and speed changes, his poor decisions about not wearing a life jacket while purposely driving into and chasing the wake waves, ignoring his wife's pleas, his failure to use the engine cut-off switch, his risk-taking behavior, why he fell overboard but his wife didn't, all of which should be accepted as evidence corroborating the fact that he was under the influence of marijuana and it undermined normal use of his mental and physical faculties.

---

[122] TR 3:246-247.
[123] TR 3:222, 225-226.

Plaintiffs' Brief makes it apparent their case relies entirely on speed of the *Maersk Idaho*.  They repeatedly allege that if only the vessel had slowed down the wave would have been smaller and the incident would not have happened.  This is nothing but wishful argument, though, because the evidence from Dr. Yue proves the wave height could not possibly have exceeded 2.2 feet, regardless of the *Maersk Idaho* speed.  Even if Captain Rivera and Captain Cunningham's estimates of 5-8 feet wake at 12.9 knots (during the filming of the drone video) and 6-8 feet wake height at 15 knots (their speculation of what the waves might have been on June 7, 2019) were true, this merely proves a slower speed made no significant difference in wake height.  The bottom line is *Maersk Idaho's* speed did not cause this incident.  The cause of Plaintiffs' misfortune was only Mr. Reed's extraordinary negligence, including his decision to circle the ship and chase its wake.

## XI.  Damages

The cases and discussion in Plaintiffs' Brief pages 57 to 79 do not support the extremely high damages awards that Plaintiffs seek for this case on these facts.

### A.    Economic damages should be reduced.

Regarding the loss of pension income in the past and future, Plaintiffs have not proven support for this element of damages with sufficient evidence.  They seek $1,900,947 for loss of pension, but their economist, Dr. Thomas Mayor, admitted he has not seen the actual pension plan document.[124]  He only "assumed" the pension plan would

---

[124]  TR 4:38.

have kept paying benefits to the end of Chris Reed's life expectancy, so he could not say as a matter of certainty or probability that the pension actually would have kept paying to the end of Mr. Reed's life expectancy.[125]  His assumption is based only on what he heard in a telephone call with Mrs. Reed.  That is not sufficient evidence on which to base an award for $1.9 million on this element because the pension plan document itself would say what type and for how long benefits were selected under Mr. Reed's particular plan, but Dr. Mayor has not seen that document.

The pension plan document and other correspondence about it, explaining whether and when and why it may have stopped paying benefits, would be documents within Plaintiffs' possession, custody, or control.  But Plaintiffs never produced the pension plan document or related correspondence.   Under Federal Rule of Civil Procedure 26(a)(1)(A)(iii), Plaintiffs were required to disclose and provide "the documents or other evidentiary material . . . on which each computation is based" for each category of damages claimed.  Under Rule 26(a)(1)(A)(ii), Plaintiffs were required to produce "all documents" they may use to support their claims.  They did not produce the pension plan document or any correspondence about why or whether or when the pension benefits stopped or whether the benefits would have continued to the end of Mr. Reed's life expectancy.

Without the pension plan document and related correspondence, without Dr. Mayor having seen those documents, Plaintiffs failed to prove this element of requested damages

---

[125]  TR 4:38-39.

with reasonable certainty, so they cannot recover for this loss of pension element of damages. "Damages must be proven to a reasonable certainty, but mathematical precision is not required." *United States of America for the Use of Marshall E. Wallace d/b/a Wallace Const. Co. v. Flintco Inc.*, 143 F.3d 955, 965 (5th Cir. 1998). Although the *Wallace* court said precision is not required, its ruling does indicate proper evidence is required:

> All that the law requires is that the best evidence of which a case is susceptible be produced, and if from such evidence the amount of damages caused by the defendant can be inferred or estimated by the jury with reasonable certainty, then the amount of such damages is for the jury.

*Wallace*, 143 F.3d at 965 (quoting *Bildon Farms, Inc. v. Ward County Water Improvement Dist. No. 2*, 415 S.W.2d 890, 897 (Tex. 1967)). Here, the best evidence would be the pension plan itself, Plaintiffs failed to produce it, and without it Dr. Mayor could only assume. That fails to prove this element of damages with reasonable certainty.

The amount Plaintiffs seek for loss of household services, $456,288, should be reduced by 12% ($54,754.56) because Dr. Mayor agreed this is an appropriate reduction to account for Mr. Reed's unused personal consumption of household services. This reduces the amount for loss of household services to $401,533.44.

**B.**     **Non-economic damages are far less than the amount Plaintiffs request.**

The jury verdicts attached as appendices to Plaintiffs' Brief are not evidence in this case. What juries did in other cases on other facts is not part of the record in this case, and these verdicts should not be used as evidence in this case to calculate or support any element of damages in this case.

59

The damages award cases that Plaintiffs' Brief cites include only two where the injury sustained was drowning.  In both those drowning cases, the plaintiffs ultimately recovered no damages.  In *Austin Bridge & Road, LP v. Suarez*, 556 S.W.3d 363 (Tex. App. —Houston [1st Dist.] 2018, pet. Denied), cited at Plaintiffs' Brief pages 61 and 77, the judgment in that drowning case was reversed on appeal because the defendant established a workers compensation exclusive remedy defense, so the plaintiffs recovered no damages from Austin Bridge.  *Id*. at 388.  The appellate court also reversed the jury's finding of gross negligence, so the plaintiffs recovered nothing from the exemplary damages the jury had awarded.  Id. at 393.  Ultimately, the trial court judgment was reversed, and the plaintiffs took nothing.  *Id.*

*Jones v. City of Houston*, 294 S.W.3d 917 (Tex. App.—Houston [1st Dist.] 2009, pet. denied), cited in Plaintiff's Brief at page 72, is the only other drowning case on which Plaintiffs rely.  In *Jones*, the plaintiffs recovered no damages for drowning of their brother because the court affirmed a summary judgment finding that the plaintiff siblings were not bystanders to the drowning incident.  *Id*. at 922.

The other cases on which Plaintiffs damages arguments rely are distinguishable for many reasons, especially for the types of injuries or deaths sustained and the duration of plaintiff suffering before death.  The cases include fires, explosions, railroad crossing collisions, drunk driver hitting a motorcyclist, gunshot, burns, infection at a nursing home, electrocution, and similar deaths or injuries that are not like this case.  These cases and jury

verdicts were decided on other evidence, other injuries, and by other fact-finders.  They should play no role in the calculation or award, if any, of damages in this case.

Maersk respectfully submits that the amount of damages in this case, if any are awarded, should not exceed the amounts discussed in Defendant's Post Trial Brief at pages 104-105, subject to reduction as appropriate for Mr. Reed's contributory negligence.

Maersk prays the Court will enter judgment in this case that Plaintiffs take nothing from Defendant, and grant such other relief to Defendant as justice may require.

Respectfully submitted,

HOLMAN FENWICK WILLAN USA LLP

/s/ Thomas N. Lightsey III
Thomas N. Lightsey III
Texas Bar No. 12344010
Federal ID No. 84829
tom.lightsey@hfw.com
5151 San Felipe, Suite 400
Houston, Texas 77056
Telephone: 713-917-0888
Facsimile: 713-953-9470
**ATTORNEY-IN-CHARGE FOR MAERSK LINE, LIMITED, *in personam* Defendant, and as the owner of the M/V MAERSK IDAHO, *in rem* Defendant**

**OF COUNSEL:**
**HOLMAN FENWICK WILLAN USA LLP**
James T. Brown
Texas Bar No. 03138150
Federal ID. No. 11656
jim.brown@hfw.com

61

Christopher R. Hart
Texas Bar No. 09136310
Federal ID No. 12517
chris.hart@hfw.com

Alejandro Mendez-Roman
Texas Bar No. 24102778
Federal ID No. 2295449
alex.mendez@hfw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served on this 1ST day of July 2021 to all counsel of record via this Court's Electronic Document Filing System:

*/s/ Thomas N. Lightsey III*
Thomas N. Lightsey III