United States District Court
Southern District of Texas
**ENTERED**
January 05, 2023
Nathan Ochsner, Clerk

# In the United States District Court for the Southern District of Texas

## GALVESTON DIVISION

No. 3:19-cv-238

JANA REED, *ET AL.*, *PLAINTIFFS*,

v.

MAERSK LINE, LIMITED, *IN PERSONAM*, AND *M/V MAERSK IDAHO*, *IN REM*, *DEFENDANTS*.

## MEMORANDUM OPINION AND ORDER ENTERING FINDINGS OF FACT AND CONCLUSIONS OF LAW

JEFFREY VINCENT BROWN, *UNITED STATES DISTRICT JUDGE*:

This maritime action arises from a tragic accident. While crossing the Houston Ship Channel in Galveston Bay, Kemah police chief Christopher Reed's twenty-foot fishing boat encountered the wake of a large container ship, the *M/V Maersk Idaho*. While crossing the wake, Chief Reed fell off his boat and drowned.

Chief Reed's widow and children filed this lawsuit against Maersk Line, Limited, and the *Maersk Idaho* alleging four counts: (1) negligence;[1] (2) wrongful death under Texas law; (3) survival under Texas law; and (4) a bystander claim by Jana Reed. Dkt. 32 ¶¶ 20–44. The defendants, on the other hand, contend that Chief Reed's death was caused by his and his widow's negligence. *See* Dkts. 37 at 8; 203 at 46:15–22.

The court held a six-day bench trial. The parties presented fact and expert testimony and myriad exhibits about the Reeds, their boat, the *Maersk Idaho* and her crew, and the events of June 7, 2019. Based on the testimony and exhibits, the parties' oral and written legal arguments, and the relevant law, this court finds and concludes as follows:

- The Reeds failed to prove by a preponderance of the evidence that the *Maersk Idaho* maintained an unsafe speed, produced a dangerously sized wake, or failed to maintain a proper lookout in violation of 33 C.F.R. § 164.11 or Rules 5 or 6 of the Inland Navigation Rules, or that the defendants were otherwise negligent.

- The Reeds failed to prove by a preponderance of the evidence that the defendants' negligence was a legal cause of the occurrence that resulted in Chief Reed's death.

- The defendants have no liability to the Reeds for Chief Reed's death.

---

[1] The plaintiffs include as part of their negligence-count allegations that the defendants violated 33 C.F.R. § 164.11 and Rules 5 and 6 of the Inland Rules of Navigation. These violations, the plaintiffs charge, trigger the rule announced in *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136 (1873), as well as negligence per se. Dkt. 32 ¶¶ 24–27. But because the court finds that the defendants violated neither § 164.11 nor Rule 5 or 6, it has likewise determined that neither negligence per se nor *The Pennsylvania* Rule applies in this case.

The reasons for these rulings are set out below. Any findings of fact that are also, or only, conclusions of law are so deemed, and any conclusions of law that are also, or only, findings of fact are likewise so deemed.

## I. Background

### A. The Parties

The plaintiffs are Jana Reed, Chief Reed's widow, individually and on behalf of his estate, and their children, Alexis, Chase, and Logan Reed.

The defendants are Maersk Line, Limited, and the *M/V Maersk Idaho*. Maersk is a foreign corporation incorporated in the State of Delaware with corporate headquarters in Norfolk, Virginia. Maersk regularly engages in business in the State of Texas and in Texas waters. Maersk owns the *Maersk Idaho*, an American-flagged container ship. She is approximately 62,000 deadweight tons, 958 feet long, and about 106 feet on her beam.



*The Maersk Idaho*

**B.   Jurisdiction and Venue**

This court has jurisdiction over this dispute under 28 U.S.C. §§ 1331, 1333, and Rule 9(h) of the Federal Rules of Civil Procedure. Venue is proper in the Southern District of Texas as Maersk has availed itself of this district by directing its vessels, including the *Maersk Idaho*, into the waters of Galveston Bay, which is in this judicial district.

**C.   The Day in Question**

On June 7, 2019, Chief Reed and Jana embarked on an early afternoon fishing trip. They launched their twenty-foot center-console fishing boat and crossed Clear Lake into Galveston Bay. Neither wore a life preserver.



*The Reeds' Boat*

The Reeds cruised first to Moses Lake on the west side of the bay, near San Leon and just north of Dickinson Bayou. Chief Reed fished from a seat

on the bow while Jana read magazines. The fish weren't biting, so Chief Reed set out for "the jetties," a location he'd never visited. The boat's Raymarine Chart Plotter tracked the Reeds' exact positions as they proceeded through Galveston Bay.

Chief Reed was piloting the boat with Jana by his side. At about 3:40, they had just crossed the Houston Ship Channel traveling from east to west near buoys 31/32, just north of the Texas City Dike. At the same time, the *Maersk Idaho* was moving up the Ship Channel heading for the Bayport Container Terminal. She was also near buoys 31/32. With Captain Marcus Maher, a Houston pilot, at the conn, the *Maersk Idaho* was making about 15 knots.

Chief Reed next directed his boat across the Houston Ship Channel about a half-mile behind the *Maersk Idaho*. As he did, the Reeds' boat encountered the *Maersk Idaho*'s wake. After Chief Reed successfully navigated his boat through the *Maersk Idaho*'s starboard wake field, Jana testified that she told him she was scared, but Chief Reed reassured her they would be okay. Neither Chief Reed nor Jana put on a lifejacket during the calm break between the two wake fields.

At around 3:48–49 p.m., Chief Reed steered his boat into the *Maersk Idaho's* port-side wake field. During this encounter, Chief Reed fell

overboard. After he fell, Jana attempted to rescue Chief Reed by throwing him a dock line attached to the boat. No throwable personal-flotation device was immediately available. Unable to grab the moving line (he never raised his arms out of the water), Chief Reed exclaimed, "Jana Hurry! I can't hold on!" as he disappeared beneath the surface. Jana soon saw one of Chief Reed's shoes floating, but he never resurfaced. Jana immediately called 911 and requested emergency assistance. The Texas City Fire Department arrived first, followed by the Coast Guard. Chief Reed's body was recovered two days later.

## II.    Summary of the Trial Testimony and Credibility Findings

### A.    Captain Christopher McCloud

Captain Christopher McCloud appeared at trial by videotaped deposition testimony offered by both the plaintiffs and the defendants. McCloud was the captain of the *Maersk Idaho* on June 7, 2019. Dkt. 203 at 70. He is a 1990 graduate of the Massachusetts Maritime Academy, *id.* at 137, and has been the permanent master of the *Maersk Idaho* since 2017, *id.* at 144. The *Maersk Idaho* has been regularly calling on Houston since 2015; she now calls on Houston every 35 days. *Id.* at 150.

McLoud testified that on June 7, he met with Captain Marcus Maher, a Houston harbor pilot, and conducted a master/pilot exchange on board the

*Maersk Idaho* before she entered the Ship Channel. *Id.* at 109. McLoud and Maher discussed the pilot card, the state of the engines, the heading, the route, and the vessel's maneuvering capabilities. *Id.* McLoud did not remember whether he had discussed transit-speed restrictions or the potential for wake-wash damage with Maher, but McLoud did acknowledge he was obligated to discuss such topics by Maersk's Safety Management System (SMS). *Id.* at 110–12. The SMS sets forth the requirements he is to follow, including when a pilot is on board. *Id.* at 113.

McLoud testified that when the pilot is aboard, the pilot gives the orders for any change in the vessel's speed until she reaches the terminal. Dkt. 203 at 116. Both McLoud and Maher were responsible for monitoring the wake that the vessel created. *Id.* at 117. While the written plan for the *Maersk Idaho*'s inbound trip was for 14 knots, Captain McLoud confirmed the ship was making 16 knots near buoys 45/46 on the afternoon of the incident. *Id.* at 119. McLoud saw recreational boats in the Ship Channel but denied knowing that because of the shallow water and the wake effect in the area that people sometimes surfed the wake waves. *Id.* at 124–25.

McLoud testified that the ship did not slow down for the recreational boats. *Id.* at 125. McLoud never saw the Reeds' boat and stated he knew of no crewmember aboard the *Maersk Idaho* that saw the Reeds' boat. *Id.*

McCloud stated that the dedicated lookout at this time was stationed at the bow. *Id.* at 168. He acknowledged that the ship could have traveled at less than 15 knots on the day of the incident, even as slow as 11 knots, but at that point he would need to think about the safety of the ship. *Id.* at 128. McLoud stated that his ship speed varies between buoys 31/32 depending on the traffic, per Rule 6 of the Inland Rules of Navigation. *Id.* at 135.

McLoud stated the ship was moving at a safe speed and he did not consider it necessary to slow down for the recreational boaters he observed. Dkt. 203 at 173. Because he is confident the *Maersk Idaho* did nothing negligent to cause Chief Reed's death, McLoud has not changed how he transits the Houston Ship Channel or the shoal areas near buoys 31/32 and 33/34. *Id.* at 135.

The court found Captain McLoud's testimony to be credible.

### B.  Captain Steven Cunningham

The plaintiffs then called maritime expert Captain Steven Cunningham. Cunningham is a lifelong sailor, graduating from the maritime school at South Tyneside College in New Castle, England, and having gone to sea for ten years before becoming a harbor-river pilot in the North Sea and on the River Tyne. Dkt. 203 at 178. He ultimately attained an unlimited

master-mariner license; he is currently on the third issue of that license, which is current and valid. *Id.*

Since 2013, Cunningham has worked in Houston as a maritime surveyor, consultant, and expert. *Id.* at 179. Since moving to Houston, he has furthered his education by obtaining a master's of science in marine-accident investigation, specializing in the forensic analysis of electronic navigation data and the tools and methods to use that data to reconstruct and analyze marine accidents. *Id.*

Cunningham opined that the wake the *Maersk Idaho* made on June 7 was more likely than not in the three- to five-foot range increasing to breaking waves around five to eight feet in the vicinity of the shallow spoil area. *Id.* at 208. Cunningham also testified that the Reeds' boat experienced elevation changes of generally between one and three meters, with a maximum of four meters, when interacting with the *Maersk Idaho*'s wake. *Id.* at 200–02, 206.

On cross-examination, Cunningham conceded that the Reeds' boat experienced multiple two-meter elevation changes when it was several miles from the *Maersk Idaho* and before it was close enough to encounter the ship's wake. *Id.* at 219. While experiencing the two-meter elevation changes, Cunningham testified that the data showed the Reeds' boat was traveling

between 38.7 and 41.7 mph. *Id.* at 218–21. When the Reeds' boat crossed the starboard side of the *Maersk Idaho*'s wake, the data showed a 2-meter elevation change within one second while traveling at 18 mph. *Id.* at 222. This occurred at 3:46 local time, before Chief Reed had fallen from the boat. *Id.*

The Reeds' boat next experienced a three-meter elevation change just seconds later, at 3:46:24, while traveling 14 mph. *Id.* at 222–23. Chief Reed again was still in the boat. *Id.* at 224. Between the starboard side of the wake and the port side, the Reeds' boat encountered two more two-meter elevation changes while traveling between 17.9 and 19.9 mph. *Id.* Chief Reed was likewise not thrown from the boat during these elevation changes. *Id.* at 225. Cunningham could not pinpoint the exact time or elevation at which Chief Reed fell out of the boat, but he testified it could have been on the next two-meter elevation change, or one of the later ones, around 3:49:52. *Id.* at 225, 230.

Cunningham further related that after Chief Reed fell out, Jana called 911. *Id.* at 231. The Coast Guard came out to the boat, boarded the vessel, and drove it to the Texas City Dike. *Id.* During the cruise back to the shore, the Reeds' boat experienced at least three two-meter elevation changes and one three-meter elevation change within one second without anyone falling

overboard. *Id.* at 232–33. Those elevation changes were independent from any wake from the *Maersk Idaho*. *Id.* Of the 18 two-meter or greater elevation changes the Reeds' boat experienced, the majority occurred independent of the *Maersk Idaho*'s wake and without incident. *Id.* at 234.

The court found Captain Cunningham's testimony to be generally credible, but his opinion testimony about the probable size of the *Maersk Idaho*'s wake on June 7 was not especially persuasive.

### C.   Wendy Sanders, Ph.D.

Dr. Wendy Sanders was called to testify about the handling of the Reeds' boat before, during, and after the point at which Chief Reed fell overboard. She holds three mechanical-engineering degrees, has studied fluid dynamics in the maritime field, and has personally operated small watercraft for many years. Dkt. 204 at 6–10. Sanders has performed marine-accident reconstructions since 2006, which includes reviewing boating-accident data and working with manufacturers on risk assessments, hazard analyses, warning labels, and development of collateral literature such as owners' guides. *Id.* at 8.

Sanders testified that certain safety equipment was required to be on board the Reeds' Sea Fox 200 Viper boat: a life jacket for everyone aboard, a throwable personal-flotation device immediately available, and three visual

distress signals. *Id.* at 11–12. The Reeds' boat had all of the required equipment. *Id.* at 14. Sanders opined that on June 7, Chief Reed was operating his boat consistent with safe-boating practices. *Id.* Sanders testified that this includes when he crossed the *Maersk Idaho*'s wake. *Id.*

Sanders testified that Chief Reed exercised prudence in decelerating as he approached the port-wake field. *Id.* at 28. She disagreed with the suggestion that Chief Reed was looking to jump the *Maersk Idaho*'s wake, as she did not see the type of accelerations that are associated with jumping wakes in the data traces. *Id.* at 33–34. Sanders estimated that Chief Reed fell overboard around 3:49:43. *Id.* at 36. She opined that the port-wake field was in the Houston Ship Channel's western spoils area, where the spoils from dredging is dumped. *Id.* at 39. This area is several feet shallower than that beneath the starboard-wake field. *Id.* at 39–40. The shallower water tends to create steeper and taller waves. *Id.* at 42. Sanders did not expect that a recreational boater like Chief Reed would be familiar with the effect on wake waves of a shoal or spoils area such as those in the Houston Ship Channel. *Id.* at 43.

Sanders identified gel-coat cracking and a fractured bracket on the Reeds' boat's trolling motor, evidence she found consistent with impact with

a large wave or wake. *Id.* at 44. The damage had not been noted in a survey performed on the boat several weeks before the incident. *Id.* at 47.

Sanders disagreed with the suggestion that Jana's throwing of a rope, as opposed to a throwable flotation device, was in error. *Id.* at 49. Because the throwable device could float away from the victim if not immediately retrieved, it is a one-and-done method; the rope, by contrast, allows for multiple rescue attempts or can be thrown past the victim to provide a tethering lifeline along the axis of the throw. *Id.* at 50.

Sanders noted the Coast Guard identified no infractions on the boat when they saw it. *Id.* at 51. Nor did she believe it would have made a difference if Jana had used the boat's VHF radio instead of calling 911. *Id.* at 51–52.

On cross-examination, Sanders confirmed that the Rules of Inland Navigation also apply to small vessels such as the Reeds' boat. *Id.* at 76. Additionally, while the Reeds' boat was not required to have a VHF radio, she acknowledged that boaters that do have a VHF radio are required to have it turned on and to stand watch. *Id.* at 135. One of Chief Reed's duties as captain, she conceded, was to teach his crew and passengers how to use the safety equipment on board, including throwable flotation devices, life jackets, and the VHF radio. *Id.* at 137. Sanders admitted that the top cause of

death in recreational motorboats—by a large margin—is falling overboard. *Id.* at 147–48. Contributing factors include but are not limited to alcohol and drug use, operator inattention, operator inexperience, careless and reckless operation, environmental sea conditions, excessive speed, improper personal-flotation-device usage, and no proper lookout. *Id.* at 148–50.

Sanders acknowledged that right before Chief Reed fell out of the boat, its speed jumped from 9.4 mph to almost 20 mph; but she testified this was consistent with the boat riding a moving wave, which boosted the apparent speed captured by the boat's GPS. *Id.* at 78–80. Sanders testified that she thought Chief Reed would not necessarily have benefitted from a boaters' education course because his experience, which consisted of having gone out on his boat about 15 times, counted as education. *Id.* at 96. Sanders opined that Chief Reed's 15 trips out on the bay in his own boat without another qualified boater, in addition to his other boating experience throughout his life, made him an educated boater. *Id.* at 98.

Sanders was generally credible, and she was specifically credible in her evaluation of Jana's conduct on June 7. But Sanders was not credible in denying that Chief Reed would have benefitted from a boat-handling course. *Id.* at 95. Nor was she credible in saying she would not necessarily have recommended that Chief Reed wear a flotation device, despite being a novice

boater with medical conditions, including balance issues. *Id.* at 81. Nor was she credible in saying she did she not know whether wearing a life jacket would have drastically increased Chief Reed's chance of survival. *Id.* at 100. And Sanders was not credible in describing Chief Reed's handling of the boat as "expert." *Id.* at 94.

### D.   Carlene Neeley, Ph.D.

The plaintiffs next offered excerpts from the deposition of Dr. Carlene A. Neeley. Dkt. 174. Dr. Neeley's testimony concerned her personal knowledge of Chief Reed's mental state and lack of impairment on the morning of June 7, derived from personal interactions she had with him in the hours before the incident during a city meeting. *Id.* at 5–6. As executive assistant to Kemah's city administrator, Neeley provides administrative support to city-hall staff. *Id.* at 7. This included Chief Reed as chief of police. *Id.*

The city-hall staff met on June 7 to discuss IT upgrades that were required before the next fiscal year. *Id.* at 16. Chief Reed was an active participant in the meeting and asked coherent questions. *Id.* at 35. Neeley saw no sign of what she would recognize as impairment by use of marijuana in Chief Reed. *Id.* at 27. And she did not observe Chief Reed having any trouble with his balance that morning. *Id.* at 33. He did not slur his words

during the meeting or appear to be disoriented in any way. *Id.* at 34–35. The meeting ended about 4 hours before the incident. *Id.* at 28.

The court found Dr. Neeley's testimony credible.

### E.   Jana Reed

The plaintiffs next called Jana Reed. She testified that Chief Reed was not a reckless person. Dkt. 204 at 187. She did not believe her husband had any problem with his balance or his physical condition. *Id.* She had never seen Chief Reed impaired in any way while operating a vehicle or driving a boat. *Id.* at 187–88. She had no reason to believe Chief Reed was impaired on the day of the incident and no reason to be concerned about getting on the boat with him. *Id.* at 188. He was not acting unusually. *Id.* at 192.

Jana's job on the boat—as she described it—was to sit there and read. *Id.* at 194. She was not to bother Chief Reed or help, other than giving him snacks or water. *Id.* The water was not choppy on June 7, and the weather was hot and sunny. *Id.* at 194–95. Up until Chief Reed decided to head for the jetties, Jana had not felt the need to wear a life jacket because there were no large waves with the potential to knock someone overboard. *Id.* at 195–96.

Jana testified that when they first encountered the *Maersk Idaho*'s wake, it seemed that suddenly there was a wall of water in front of them. *Id.*

at 197–98. To Jana it appeared higher than the boat and taller than herself. *Id.* at 198. The Reeds then encountered flat water, but soon hit another series of waves. *Id.* at 199. These waves were not as high, but really choppy, and when the boat hit them, it sounded like it was striking concrete. *Id.* This second set of waves jarred the boat, turning it sideways and tipping it, and causing Chief Reed to fall off. *Id.* Jana went to the wheel and put the throttle into neutral but could not see where her husband had gone. *Id.* at 199–200. He eventually surfaced on the other side of the boat. *Id.* at 200.

At this point, Jana put the boat into reverse and went as slowly and calmly as she could backwards towards Chief Reed. *Id.* at 200. She got as close as she thought she could and then threw the deck rope toward Chief Reed. *Id.* Chief Reed was not able to lift his arms to grab the rope. *Id.* Another wave went over his head and he disappeared, and she never saw him again. *Id.* Jana first attempted to flag down another boat for help; when that failed, she called 911. *Id.* at 201. The Texas City Fire Department was the first to arrive at the scene and stayed with Jana until the Coast Guard arrived. *Id.*

On cross-examination, Jana testified that she considered Chief Reed a strong swimmer. *Id.* at 210–11. She did not know that Chief Reed had complained to his doctors that he had fallen three or four times in the last year. *Id.* at 212. She knew that Chief Reed thought he had chronic traumatic

encephalopathy ("CTE") but not that he had expressed any concern to his doctors about it. *Id.* at 212–13. Jana was also unaware that Chief Reed had complained to his doctors of getting lost while driving, of being confused, and of memory issues. *Id.*

Jana considered Chief Reed to be very safety-conscious, particularly when it came to her. *Id.* at 215. Nevertheless, as far as she knew, Chief Reed had never taken a boating class, nor did he discuss taking a class with her. *Id.* at 216. Nor did he have any behind-the-wheel, hands-on training in handling a small boat or a ship's wake. *Id.* at 217. Chief Reed did not mention to Jana whether he had read the boat's safety manual or any other material that came with the boat. *Id.* To Jana's knowledge, Chief Reed never wore a life jacket when he was out on the boat. *Id.* at 218. Neither did Jana, as she never felt the need. *Id.* Chief Reed did not educate Jana on how to use the safety equipment. *Id.* at 219.

Jana Reed was an extremely credible witness.

### F.   Captain Jay Rivera

Captain Jay Rivera was called to testify on the third day of trial. Dkt. 205 at 5. Rivera, a retired harbor pilot and liability expert, testified as to the likely height and relevant characteristics of the wake the Reeds' boat encountered. Before becoming a pilot, Rivera sailed as a master mariner on

American-flagged merchant vessels and made hundreds of transits through Galveston Bay. *Id.* at 8–9, 60. Rivera now works as a maritime consultant, which includes conducting feasibility studies on bringing ever-larger ships into American ports. *Id.* at 11–12. He has first-hand experience navigating a ship of the size, shape, and handling characteristics of the *Maersk Idaho*. *Id.* at 14.

Based on his personal experience sailing areas similar to the Houston Ship Channel—where shallow shoals abound—Rivera testified that the *Maersk Idaho* would have produced a very large wake on June 7— somewhere in the six-to-eight-foot range. *Id.* at 19, 57–58. Rivera testified that he has sat on pilot-review boards in Corpus Christi to hear cases about wake damage caused by inbound, deeply loaded ships creating large wakes which capsized other vessels. *Id.* at 58–59. It is common knowledge within the piloting community, Rivera noted, that large ships cause large waves. *Id.*

Rivera testified that though the *Maersk Idaho*'s wake may have been just one or two feet high adjacent to the ship, it would have increased in size as it moved from deep water into the shallower water above the shoals. *Id.* at 62–63.

Rivera also testified that the Reeds were never at risk of impeding the passage of the *Maersk Idaho* and were not in a position to overtake her, as

contemplated by the Inland Rules of Navigation. *Id.* at 63. He acknowledged that Rule 9—the narrow channel rule—obligated the Reeds to not impede the *Maersk Idaho* while she was navigating the especially narrow Houston Ship Channel. *Id.* By going astern of the *Maersk Idaho*, Rivera testified, the Reeds were responsibly going around the ship instead of cutting across her bow. *Id.*

On cross-examination, Rivera admitted to never having performed a feasibility study concerning the Houston Ship Channel. *Id.* at 74. Likewise, though he has a small boat of his own, he is not a small-boat expert. *Id.* He testified he would never operate his boat under any type of impairment. *Id.* He also keeps his throwable personal-flotation device immediately accessible—underneath his seat in a console with a closed cover. *Id.* at 75. Rivera agreed that someone like Captain Maher, who had worked extensively on dredges[2] in the Houston Ship Channel, would be especially sensitive to the issue of possible wake-wash damage caused by his ship. *Id.* at 82. Rivera testified that he believed the *Maersk Idaho* was going too fast for the area, but he agreed that Captain Maher has vastly more experience than himself transiting the Houston Ship Channel. *Id.* at 85–86, 101.

Captain Rivera gave credible overall testimony, but his statements as to wave height and possible wake-wash damage, based on his experience on

---

[2] Dredges are particularly susceptible to wake-wash damage. Dkt. 205 at 82.

other very large ships and piloting ships in shallow shoal areas, were too attenuated from the actual incident to be of much help in determining how large a wake the *Maersk Idaho* cast on June 7.

### G.  David J. Jones, Ph.D.

The plaintiffs' next witness was Dr. David J. Jones, a toxicologist. Dr. Jones has a master's degree in pharmacology and toxicology and a Ph.D. in pharmacology. Dkt. 205 at 142. He has extensive experience as a consultant to two hospital systems, the Air Force drug-testing lab, and as a member of the National Institutes of Health and the Neurological Institute. *Id.* at 143.

Decomposition prevented the medical examiner from obtaining any usable blood from Chief Reed's system. *Id.* at 147. Samples were taken from his liver instead. *Id.* Jones explained that the amphetamine levels detected in Chief Reed's liver resulted from him taking his prescription Adderall in the prescribed fashion. *Id.* at 146. Dr. Jones also testified about the complications associated with using liver tissue for toxicology determinations. *Id.* at 148. Specifically, he opined that a single-measured level of THC from the liver cannot accurately determine the degree of impairment. *Id.* at 146. Liver-toxicity levels do not directly translate to blood-toxicity levels. *Id.* at 148–50. The difference in toxicity can be tenfold between blood and liver levels. *Id.* at 150.

Jones also testified that knowing someone's blood-alcohol level can help predict his level of impairment a lot better than knowing his THC-concentration level. *Id.* at 153. Accordingly, he cannot determine whether Chief Reed was suffering any THC-related impairment based just on the THC level in his liver. *Id.* at 155. Jones disagreed with Dr. Gary Wimbish that the THC finding meant that Chief Reed was impaired on June 7. *Id.* at 156.

On cross-examination, Jones agreed that Chief Reed had THC and its metabolites in his liver, but he could not tell whether he was feeling any effect or if he was a chronic or recent user. *Id.* at 171.

The court found Dr. Jones to be a credible witness.

## H. Robert Charles Bux, M.D.

The plaintiffs next called Dr. Bux to testify as a forensic-pathology expert. Dr. Bux is board certified in anatomical, clinical, and forensic pathology and has been a forensic pathologist since 1984. *Id.* at 181–82. He received his bachelor's degree from the University of Washington and his M.D. from Universidad Autónoma de Guadalajara Medical School in Guadalajara, Mexico. After an internship in Canada and a year of social service in Mexico, Bux served as an Army brigade surgeon at Fort Ord, California. *Id.* at 182–83. Bux next completed a four-year residency in anatomical and clinical pathology at Brooke Army Medical Center in San

Antonio. He later worked as a medical examiner and coroner in Texas and Colorado before retiring in 2019 and becoming a consultant. *Id.* at 184.

Bux testified that he believes Chief Reed struck something on his way out of the boat or when he hit the seabed. *Id.* at 189–90. Such a stunning or concussing injury may explain why Chief Reed had difficulty getting his hands up once he was in the water. *Id.* at 190. Bux stated that the toxicology shows only that Chief Reed had THC in his system; he could not say whether or to what extent the THC affected Chief Reed. *Id.* at 191. Bux agreed with the medical examiner's opinion that Chief Reed's manner of death was accidental, with drowning as the cause of death. *Id.* at 192–93.

The court found Dr. Bux's testimony to be credible.

## I.   Francesco Pia, Ph.D.

The plaintiffs next called Dr. Pia, a drowning expert, to testify by Zoom. Dr. Pia earned bachelor's and master's degrees from Long Island University, a master's and advanced clinical certificate from the City College of New York, and a Ph.D. in psychology, human factors, and public health. Dkt. 205 at 217. Pia is an expert in the field of drowning and the psychology of drowning. *Id.*

Pia testified as to the psychological experiences that Chief Reed endured in the minutes after he went overboard from the Reeds' boat and before losing consciousness. *Id.* at 221–28.

On cross-examination, Pia agreed that wearing a personal-flotation device can prevent a drowning. *Id.* at 230. Pia also agreed that adults should wear Coast Guard-approved, personal-floatation devices while boating. *Id.*

Dr. Pia's testimony was credible.

## J.   Alexis Reed

Alexis Reed, the Reeds' youngest child, testified about her relationship with her father. Chief Reed was Alexis's real-life superman, the first man she ever loved, and he helped to raise her and taught her to be strong. *Id.* at 249. Chief Reed supported her throughout her life, especially her athletic-training career in high school. *Id.* Her life will never be the same without him. *Id.* at 251.

On cross-examination, Alexis testified she had discussed with her father that he thought he had CTE. *Id.* at 252.

The court thanks Alexis Reed for her very credible testimony.

## K.   Marshall Motley

On day four, the plaintiffs offered the deposition testimony of Marshall Motley. Dkt. 206 at 9. Motley testified to his experience being in the Houston

Ship Channel's shoal area when the *Maersk Idaho* passed through on March 18, 2020. *Id.* at 11, 45. Motley was joined that day by one of the plaintiffs' attorneys, Paxton Crew, who recorded the *Maersk Idaho*'s wake using an aerial drone. *Id.* at 15. Motley estimated the wake to be in the four- to six-foot range. He based this estimate on his experience having worked offshore for several years, his extensive boating experience, and because his boat took on water over the bow as the wake passed. *Id.* at 47.

Motley's testimony was not especially useful. Motley's estimate of the size of the wake was that of a layman eyeballing a wave, and not the result of an expert's measurements. It says little about how large a wake the *Maersk Idaho* cast on June 7, 2019.

### L.   Chase Reed

The plaintiffs next offered the deposition testimony of Chase Reed, the Reeds' middle child. Dkt. 206 at 10. Chase testified about his relationship with his family and Chief Reed. Dkt. 175 at 14–16. He also described the events of June 7, the aftermath of Chief Reed's death, and how it has affected his family. *Id.* at 20–33. Chase had no knowledge of where the THC in Chief Reed's system may have come from. *Id.* at 42.

The court thanks Chase for his credible testimony.

### M.  Thomas H. Mayor, Ph.D.

The plaintiffs next called Dr. Thomas H. Mayor, a well-qualified and experienced economist. *Id.* Dkt. 206 at 11–14. Dr. Mayor calculated the Reeds' economic damages in accordance with the Fifth Circuit's guidelines in *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir. 1983). *Id.* at 14–15. He detailed his entire analysis and calculations for the court. *Id.* at 15–32. Mayor calculated the Reeds' economic losses as follows:

1.  Loss of earning capacity in the past and future: $1,175,695.
2.  Loss of pension income in the past and future: $1,900,947.
3.  Loss of household services in the past and future: $456,288.

*Id.* at 26–31. The sum of the economic losses is $3,532,930. *Id.* at 32.

Dr. Mayor's testimony was credible.

### N.  Logan Reed

The plaintiffs next called Logan Reed, the Reeds' eldest child. Dkt. 206 at 42. Logan testified about her relationship with her father, stating that he was a huge part of her childhood. *Id.* at 44. He took her to playgrounds and to everything he went to, including tailgates at Houston Texans' games. *Id.* Chief Reed coached Logan in all her sports except cheerleading. *Id.* He was very protective of Logan when they went to the beach; he would not allow her to go in the water by herself unless it was knee height or lower. *Id.* at 45.

Chief Reed helped Logan run for class vice president in high school, introduced her to local politicians so she could help on election campaigns, and helped her become a member of the Clear Lake Chamber of Commerce. *Id.* at 46. Chief Reed supported Logan financially through college, allowing her to focus on her grades and not have to work. *Id.* at 47. Logan said she and Chief Reed were like twins—that she could just feel him on a deeper level than anyone else. *Id.* at 48. Logan then described how Chief Reed's death has affected her family. *Id.* at 49–51.

On cross-examination, Logan testified that Chief Reed had been researching CTE because he had been a mixed-martial-arts fighter and played football, and he worried it might happen to him. *Id.* at 56. Logan stated Chief Reed never told her about his balance issues, nor that he had fallen three or four times before the incident. *Id.*

The court thanks Logan for her very credible testimony about the kind of man Chief Reed was.

### O.  Captain Marcus Maher

The defendants began their case-in-chief by calling Captain Marcus Maher. Dkt. 207 at 5. Captain Maher was the pilot on the *Maersk Idaho* during the incident. *Id.* at 32–33. Maher is an accomplished sailor with decades of personal and professional experience on the water. *Id.* at 8–14.

Much of that experience has been in and around Galveston Bay. *Id.* at 8. Maher graduated from the Texas A&M Maritime Academy in 1997. *Id.* at 14. His first job after graduation was working on tugs in Houston and Galveston. *Id.* at 10. He then worked for a dredging company, including in the Galveston Bay area. *Id.* at 10–11. He worked his way up to captain on one of the largest dredging ships in the United States. *Id.* at 10–12.

Maher has been a Houston pilot since 2005. *Id.* at 15. He testified that at the time of trial, he had made an estimated 3,300 transits of the Houston Ship Channel as a pilot. *Id.* at 26. Maher has piloted ships past the area where Chief Reed fell overboard about 3,100 times. *Id.* He has never noticed any unusual or dangerous wakes in spoils area on the west side of the Houston Ship Channel near buoys 33/34, where Chief Reed fell overboard. *Id.* at 26–27.

Maher testified that while the master has ultimate authority for the ship, as the pilot he oversees the movement of the vessel, and he works with the bridge team to navigate the vessel safely. *Id.* at 28–29. The master of the ship has the right and duty to take back the ship from the pilot if the captain feels the pilot is negligently doing his job. *Id.* at 29. Maher has never had a captain take the conn from him. *Id.*

When Maher boarded the ship on June 7, he was met by Captain McLoud for their pilot/master exchange. *Id.* at 32–33. One of the first things Maher did was order the posting of a lookout on the bow. *Id.* at 99–100. During the exchange Captain McLoud told Maher that a lot of pilots like to run the *Maersk Idaho*'s engines at 70 RPM, between half and full ahead, because there was less vibration. *Id.* at 32–33. Maher had no problem running at 70 RPM. *Id.* at 33. While Maher did not discuss the possibility of wake-wash damage with Captain McLoud, it was on his mind from the moment he boarded until he disembarked. *Id.* Maher testified that he had no complaints about Captain McLoud's performance as master of the ship. *Id.* He was on the bridge with Maher, cooperative and cool under pressure. *Id.* at 33–34. Maher observed Captain McLoud walking out on the bridge wing to survey the surroundings. *Id.* at 34.

Maher heard no radio traffic about anyone falling overboard near buoys 34 and 36. *Id.* On the ship's radio, Maher monitored channels 13 (vessel to vessel), 74 (port operations), and 12 (vessel-traffic service). *Id.* at 34–35. Maher does not monitor channel 16, but a pan-pan call would likely have been rebroadcast by the Coast Guard on channel 13 as well. *Id.* at 35.

Maher first learned of someone falling overboard and drowning in the Houston Ship Channel on his way home after disembarking the *Maersk*

*Idaho*. *Id.* Another Houston ship pilot called him to ask whether he had heard that someone had fallen overboard on their boat. *Id.* This call caused Maher to think about the trip he had just been on in detail as he knew his vessel was in or near that location. *Id.* at 38.

Maher testified that there are many inland tow boats—barges being pushed by a tug—with minimum freeboard distance from the water to their decks of only about three feet. *Id.* at 41. Because large wake waves could seriously damage these barges and tugs, and because so many of them ply the waters of Galveston Bay, pilots in the Houston Ship Channel aim to keep wakes under three feet. *Id.* at 41–42. When a ship does cast too large a wake, the tows are quick to let the pilot and everybody in the channel know. *Id.* at 42. During the June 7 transit, no tows contacted Maher. *Id.* In his entire career, Maher estimates he has been contacted five or six times by tows letting him know they did not like the size of his wakes. *Id.* at 42–43. The last time it happened was three to five years ago. *Id.* at 43.

Since learning of this lawsuit in 2019, Maher has piloted ships past buoys 33/34 at least 400 times. *Id.* at 50. He has made it a point to observe what size wake his ships have thrown there. *Id.* He has seen only one- to two-foot wakes through that area. *Id.*

Like Captain McLoud, Maher walked out on the bridge wing while piloting the *Maersk Idaho* on June 7 to verify her position in the center of the channel. *Id.* at 75. When he looked astern, he was also able to observe the ship's wake. *Id.* at 75–76. In the channel, the wake was roughly three feet; outside the channel, to both east and west, the wake was one to two feet. *Id.* at 77. The wake the *Maersk Idaho* cast on June 7 was in keeping with wakes Maher typically saw in his experience transiting the channel. *Id.*

Maher went into detail describing "Texas Chicken"—the maneuver ships use in the Houston Ship Channel to pass one another safely. *Id.* at 83. At 3:45, shortly before the incident, Maher was in the process of passing the *Nan Cenac*—a tugboat that was inbound in the barge lane—so that he could set up "Texas Chicken" with an outbound ship, the *NordBaltic. Id.* at 81. Compounding the complexity of the situation, the *Zip It*—an outbound tug pushing a barge—was in the opposite barge lane and in front of the *NordBaltic. Id.* at 80. Maher was passing the *Nan Cenac* to avoid a dangerous hydrodynamic situation should all three vessels come abreast simultaneously. *Id.* at 80–81. Maher testified that he must continuously "think about three moves ahead" when traversing the very busy and very narrow Houston Ship Channel. *Id.* at 81.

Maher testified that while it is possible to pilot the *Maersk Idaho* through the channel at less than 15 knots while still maintaining control of the vessel, it was prudent to make 15 knots on June 7 because of the traffic in the channel that day. *Id.* at 84–85.

Maher has no recollection of ever seeing the Reeds' boat. Because it was a warm, sunny Friday afternoon in June, Maher was not surprised to see recreational boats in the bay. *Id.* at 91. But unless a recreational boat posed a danger to his ship, or his ship posed a danger to the boat, it would not stick out in his mind. *Id.* Maher does recall a sailboat crossing into his lane on June 7 while he had the *Maersk Idaho* in the middle of the channel. *Id.* at 91–92. Maher attempted to raise the sailboat by VHF but received no response. *Id.* at 92. Maher then instructed the crew to blow the danger signal—a series of five rapid blasts of the ship's whistle—alerting the sailboat to the dangerous situation; the boat consequently altered its course away from the *Maersk Idaho*. *Id.*

Maher agreed that at 3:47:15, the Reeds' boat was in an overtaking situation with the *Maersk Idaho* because Chief Reed was attempting to pass astern of her at an angle of 22 and a half degrees or less. *Id.* at 97. That made the *Maersk Idaho* the ship being overtaken. *Id.* When being overtaken, the

Inland Rules of Navigation compel the stand-on vessel to hold course and speed. *Id.*

The *Maersk Idaho*'s lookout never drew Maher's attention to the Reeds' boat on June 7, but Maher would not have changed anything he did that day even if he had been alerted to the boat's presence. *Id.* at 100. Maher believed the wake he cast that day was appropriate, even considering the number of pleasure boats in the bay. *Id.* He operated the ship at a speed that was consistent for meeting the other commercial vessels in the channel in a safe manner. *Id.*

Maher testified that Rule 6 of the Inland Rules, which requires vessels to maintain a safe speed, applies the entire time the vessel is under way. *Id.* at 107. To determine a safe speed, Maher considers a multitude of factors: visibility, traffic density, concentration of fishing vessels, the maneuverability of the vessel—especially her stopping distance and turning ability—the presence of background lights (applicable mostly at night), the wind, the sea, the current, the proximity of navigational hazards, and the draft in relation to the available water depth. *Id.* at 107–08. Maher testified that he took all these factors into account on June 7. *Id.* at 109. Maher believes that on June 7 he was traveling at a safe speed in accordance with

Rule 6. *Id.* Between markers 25 and 40 on June 7, Maher checked his wake multiple times. *Id.* at 110.

Under cross-examination, Maher admitted that he was a client of the defendants' lawyers under his professional-license insurance policy, which provides a defense for pilots involved in incidents. *Id.* at 112. Maher does not know how much his insurance company had paid the defendants' lawyers. *Id.* at 113. Maher agreed that a finding in this case that the *Maersk Idaho* was proceeding at an unsafe speed could perhaps result in a suspension or revocation of his professional license. *Id.* at 121. He testified that he was required to make 15 knots on June 7 to safely meet the ships above him while transiting the channel. *Id.* at 131.

The court found Captain Maher's testimony to be especially credible.

### P.   Dick Yue, Ph.D.

The defendants next called Dr. Dick Yue to testify as a naval-architecture expert. Dkt. 207 at 151. Dr. Yue is a professor of mechanical and ocean engineering at Massachusetts Institute of Technology (MIT) and an expert in wave hydrodynamics. *Id.* at 152. All of Yue's degrees—bachelor's, master's, and doctorate—are from MIT. *Id.* at 153. He has been working and teaching at MIT for almost 40 years. *Id.* at 155. He is the co-author of the widely-used, two-volume reference work *Theory and Application of Ocean*

*Surface Waves*. *Id.* at 156. Yue also serves on a committee that is editing and revising *Principles of Naval Architecture*, a multivolume reference tool found in every naval-architecture office. *Id.*

The defendants asked Yue to evaluate the hydrodynamics of the wake-wave properties generated by the *Maersk Idaho* on June 7. *Id.* at 153. Yue testified that according to his calculations, the height of the wake waves cast by the *Maersk Idaho* at the incident location on June 7 was no more than 2.2 feet. *Id.* at 161. He calculated the wake's maximum possible height by using what naval architects refer to as "McCowan's Criteria." *Id.* Yue then used another method of calculating the wave height to arrive at a predicted wave height of just 10 inches. *Id.* at 161–6. This method involved a numerical simulation of the forces at play using hull lines very similar to the *Maersk Idaho* and the bathymetry of the channel and shoal area. *Id.* at 162.

Yue also explained that while waves will rise in height when entering shallower water, that effect is short-lived. *Id.* at 176. As the water becomes shallower and shallower, the wave does not continue to become bigger and bigger. *Id.* The height will reach a limit and then the wave breaks. *Id.* This theoretical limit is the maximum wave height Yue calculated using McCowan's Criteria, resulting in a maximum height of 2.2 feet. *Id.* Yue also testified that a wave cannot grow bigger after that point, as once the wave

breaks, the energy is lost to turbulence and other factors. *Id.* at 183. There are no mechanisms to grow it further, unless a stiff wind were to blow it in that same direction, which Yue testified was not the case here. *Id.*

On cross-examination, Yue admitted he did not visit the Houston Ship Channel to conduct his calculations and had not been there since the early 1980s. *Id.* at 199–200. Yue also never saw the Reeds' boat, nor was he given any information about the damage to the boat. *Id.* at 200. Yue admitted he did not consider wind in his analysis, though he noted there was no significant wind on June 7. *Id.* at 204. Yue also did not consider the tidal current, mostly because it was too small to be worth considering. *Id.* Yue did not consider the trim or squat of the vessel in his analysis. *Id.*

Yue used the draft from the ship's status report instead of the draft indicated on the pilot card. *Id.* at 207. Similarly, he used a different ship displacement from what was reported on the pilot card. *Id.* at 208. Yue also used a baseline depth of 45 feet but was unable to say what the depth of the channel was at the precise time the *Maersk Idaho* generated the wave in question. *Id.* Yue also used a uniform depth of seven feet in the spoil areas despite the bathymetry in that area changing all the time, affecting water depth. *Id.* at 209–10.

On re-direct, Yue testified that adjusting his calculations to take into account discrepancies pointed out on cross-examination would make no significant difference in his opinion about the size of the *Maersk Idaho*'s wake on June 7. *Id.* at 221. To do so would not amount to good engineering practice because the magnitude of the factors at issue was small and the variance in his predicted wave heights would be mere inches. *Id.* Yue testified his opinion comports with first principles and good engineering practice. *Id.*

The court found Dr. Yue to be very credible and convincing. The court considers his testimony to be the most credible evidence offered regarding the size of the *Maersk Idaho*'s wake on June 7.

## Q.  Captain Thomas Edward Danti

On the sixth day of trial, the defendants called Captain Thomas Edward Danti to testify as a small-boat expert. Dkt. 208 at 6. Danti graduated from the Massachusetts Maritime Academy in 1983 with a third mate's unlimited tonnage license for any ocean and any vessel. *Id.* at 7. He then took a position at the Florida Institute of Technology as an instructor in navigation, including "the Rules of the Road," seamanship, safety, marine electronics, powerboat handling, and towing. *Id.* Following that teaching assignment, Danti served on board very large crude carriers as an able-bodied seaman and third mate before taking another teaching position at the Chapman

School of Seamanship. *Id.* at 7–8. Danti now serves as the dean and a professor-instructor at Chapman. *Id.* at 8–9. Danti has been a small boater for well over half his life and is a thoroughly experienced and qualified small-boating instructor. *Id.* at 9.

Danti testified that several boat clubs in the Houston/Galveston area offer courses or classes on small-boat handling. *Id.* at 14. In his experience, novice boaters tend to overemphasize wave heights. *Id.* Danti stated that wearable personal-flotation devices should be stored where they are readily available. *Id.* at 20. Conversely, Danti testified, a throwable must be *immediately* available. *Id.* at 21. A throwable device that is stored in a forward compartment or a closed hatch would be a violation of law and prudent seamanship. *Id.*

Danti opined that Chief Reed would have more likely survived and would have been more easily rescued by Jana had he been wearing a personal-flotation device. *Id.* at 24. Danti also testified about the use of alcohol or drugs by vessel operators, *id.* at 27, the law concerning VHF-radio use, *id.* at 29, and Chief Reed's obligation as captain to instruct Jana, his only crewmember, how to use everything on the boat.  *Id.* at 38. He also described the electronic chart that was available to Chief Reed on board his boat on June 7, *id.* at 25–26, and the warnings displayed on it for small craft,

including that they "should stay clear of large commercial vessels" and to use extreme caution when operating in the shoals alongside the channel. *Id.* at 41–42.

Danti testified that Chief Reed failed to adhere to the Inland Rules of Navigation as they pertain to one vessel overtaking another. *Id.* at 51–55. Danti has never seen a wave cause the kind of damage evident on the Reeds' boat after the accident and suspects it resulted instead from an impact with perhaps a dock or another boat. Id. at 60–61.

Danti testified that recreational boaters with balance issues should wear a personal-floatation device, *id.* at 64, and boaters with cognitive issues should not operate a boat at all. *Id.* at 66.

On cross-examination, Danti testified that he was not aware that after an adjustment to Chief Reed's medication his doctors found him to have no cognitive impairment. *Id.* at 77–78. Danti also admitted to having visited Galveston Bay just twice in his life and not at all in the past 30 years. *Id.* at 78. Danti has no opinion as to the size of the wake that the Reeds encountered. *Id.* at 80.

Danti testified that Chief Reed should have throttled back as he approached the back of the port wake field because he did not know the depth

of the wave trough. *Id.* at 84. Danti also faulted Chief Reed for being in the shoal area to begin with. *Id.* at 86.

Danti could not state whether the personal-floatation devices on board the Reeds' boat would have safely kept Chief Reed's head above water. *Id.* at 95. Danti faulted Jana for throwing a rope to Chief Reed instead of a throwable flotation device. *Id.* at 96. He could not say whether a VHF radio distress call would have made a difference in saving Chief Reed's life. *Id.* at 99.

On re-direct, Danti stated that it was more likely than not that had Chief Reed been wearing a life vest he would have survived. *Id.* at 106.

The court found Captain Danti's testimony to be credible, though the court was not persuaded that the Reeds' boat was overtaking the *Maersk Idaho* as contemplated by the Inland Rules of Navigation.

### R.   Gary Wimbish, Ph.D.

The defendants next offered the testimony of Dr. Gary Wimbish by deposition. Dkt. 208 at 109. Dr. Wimbish is a forensic toxicologist. Dkt. 200 at 6. Wimbish testified that within a reasonable degree of scientific probability, Chief Reed was impaired by THC on June 7. *Id.* at 7–8. Wimbish could not say whether the presence of THC in Chief Reed's liver samples indicated chronic or discrete use of marijuana. *Id.* at 25.

Dr. Wimbush's testimony did not persuade the court that Chief Reed was impaired on June 7.

### S.   Second Officer David Falkinson

The parties next offered the deposition excerpts of Second Officer David Falkinson. Dkt. 208 at 209. The second mate on the *Maersk Idaho* on June 7, Dkt. 171 at 20, Falkinson was responsible for preparing the vessel's passage plan. *Id.* at 22. The maximum speed in the passage plan in the incident area was 14 knots. *Id.* at 129.

### T.   Lee Ann Grossberg, M.D.

The parties next offered the deposition excerpts of Dr. Lee Ann Grossberg. Dkt. 208 at 110. Dr. Grossberg is a forensic pathologist. Dkt. 124 at 5. She testified that Chief Reed sustained a blunt-force traumatic injury to his head that may have resulted from an impact with either the boat or the seabed. *Id.* at 20. Grossberg also testified that she could not determine impairment based solely on the liver samples available in this case. *Id.* at 42.

The court found Dr. Grossberg's testimony to be credible.

### U.   Captain Marc Fazioli

The parties next offered the deposition testimony of Captain Fazioli, a maritime-liability expert. Dkt. 208 at 110. Fazioli testified that though Jana may have received a quicker response had she used the VHF radio rather

than called 911, it was impossible to know for sure. Dkt. 125 at 98. He also opined that the Reeds' boat was not in an overtaking situation with the *Maersk Idaho* because there was no risk of collision. Dkt. 125 at 182–83.

The court found Captain Fazioli's testimony to be credible.

## III.   Findings and Conclusions as to the Plaintiffs' Claims

### A.   Negligence

"To establish maritime negligence, a plaintiff must 'demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury.'" *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000) (quoting *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991)). The plaintiffs "have the burden of proving each element by a preponderance of the evidence." *Great Am. Ins. Co. v. Pride*, 847 F. Supp. 2d 191, 203 (D. Maine 2012).

"Under the general maritime law, a party's negligence is actionable only if it is a 'legal cause' of the plaintiff's injuries." *Donaghey v. Ocean Drilling & Expl. Co.*, 974 F.2d 646, 649 (5th Cir. 1992). Legal cause is a higher standard than "but for" causation—to be a legal cause, the defendant's negligence must proximately cause and be a "substantial factor" in the injury.

*See Rose Crewboat Servs., Inc. v. Wood Res., LLC*, 425 F. Supp. 3d 668, 676 (E.D. La. 2019); *Great Am. Ins. Co.*, 847 F. Supp. 2d at 204.

"Under maritime law, a plaintiff is owed a duty of ordinary care under the circumstances." *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 211 (5th Cir. 2010). The duty of care can be derived from "duly enacted laws, regulations, and rules; . . . custom . . . or . . . the dictates of reasonableness and prudence." *Galentine v. Est. of Stekervetz*, 273 F. Supp. 2d 538, 544 (D. Del. 2003) (citing *Pennsylvania R. Co. v. The Marie Leonhardt*, 202 F. Supp. 368, 375 (E.D. Pa. 1962); *see also Biscayne Aqua–Ctr., Inc. v. Hernandez*, 630 So.2d 620, 621–22 (Fla. App. 1993)).

The Inland Navigation Rules, codified in the Code of Federal Regulations, 33 C.F.R. § 83.01, *et seq.*, provide the "rules of the road" for vessels navigating on the inland waters of the United States, including the Houston Ship Channel. The broad purpose of these rules is to prevent incidents on the waterways.

Based on the evidence submitted at trial, the court finds that the defendants were not negligent and violated neither 33 C.F.R. § 164.11 nor Rule 5 or 6 of the Inland Navigation Rules. No negligent conduct by the defendants legally caused the occurrence that resulted in Chief Reed's death.

33 C.F.R. § 164.11 requires every vessel over 1600 gross tons to set her speed with consideration for the damage that her wake might cause. Captain Maher testified that he considers the potential damage his wake may cause "from the time I board until the time I get off the vessel." He testified that as a rule, he keeps his wakes less than three feet. Captain Maher further testified that on June 7 the *Maersk Idaho*'s wake was one to two feet in the area where Chief Reed fell overboard.

Captain Maher's testimony comports with the expert testimony of Dr. Yue, who calculated that the offending wake could not have been more than 2.2 feet. The court finds Dr. Yue's testimony very persuasive. No other witness offered credible testimony to refute either Dr. Yue's mathematical calculations or his expert opinion regarding the maximum size of the wake wave created by the *Maersk Idaho*.

The plaintiffs argue that regardless of the exact height, the wake was excessive, causing unusual, uncommon, and unanticipated wave heights. Yet Chief Reed had no trouble driving through the starboard wake field which, according to Jana's testimony, contained even higher wake waves. Further, Captain Maher testified other vessels were seen in the *Maersk Idaho*'s wake on the day in question, all passing through without incident. The court does

not find that the wake of the *Maersk Idaho* was excessive, unusual, or otherwise in violation of 33 C.F.R. § 164.11.

Rule 5—Lookout, 33 C.F.R. § 83.05—requires vessels to "at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." The evidence shows that the *Maersk Idaho* had a lookout posted on June 7. Captain Maher testified that he, Captain McLoud, and the lookout discussed a sailboat that came close to the *Maersk Idaho* at about 3:38 p.m., leading the *Maersk Idaho* to blow her danger signal as a warning. The *Maersk Idaho* was following Rule 5 on June 7.

Further, even though the lookout did not report the presence of the Reeds' boat to the *Maersk Idaho*'s bridge, Captain Maher testified that he would not have acted any differently had the Reeds' boat been drawn to his attention. Chief Reed did not fall overboard because of a violation of Rule 5.

Rule 6—Safe Speed, 33 C.F.R. § 83.06—provides as follows:

Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions. In determining a safe speed the following factors shall be among those taken into account:

(a)   By all vessels:

     i.    The state of visibility;

    ii.    The traffic density including concentration of fishing vessels or any other vessels;

   iii.    The maneuverability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;

   iv.    At night, the presence of background light such as from shore lights or from back scatter of her own lights;

    v.    The state of wind, sea, and current, and the proximity of navigational hazards;

   vi.    The draft in relation to the available depth of water.

(b)    Additionally, by vessels with operational radar:

    i.    The characteristics, efficiency and limitation of the radar equipment;

    ii.    Any constraints imposed by the radar range scale in use;

   iii.    The effect on radar detection of the sea state, weather, and other sources of interference;

   iv.    The possibility that small vessels, ice and other floating objects may not be detected by radar at an adequate range;

    v.    The number, location, and movement of vessels detected by radar;

   vi.    The more exact assessment of the visibility that may be possible when radar is used to determine the range of vessels or other objects in the vicinity.

The plaintiffs allege that because Chief Reed fell off his boat when passing through the *Maersk Idaho*'s wake, the wake was *ipso facto* excessive, and the cause of the excessive wake was excessive speed. But Captain Maher testified that he considered all the factors listed in Rule 6 when setting the speed of the *Maersk Idaho* on June 7, that he believed his speed was reasonable under the circumstances, and that the ship was not producing an especially large wake. The plaintiffs have failed to negate this testimony and neglected to offer any evidence of what a safe speed would have been for the *Maersk Idaho* on the day in question. While the plaintiffs presented evidence that the *Maersk Idaho* has transited the channel on multiple occasions slower than 15 knots, they did not show that proceeding up the channel at 15 knots, given the vessel traffic on June 7 and the pilot's need to space out vessels to avoid having three ships abreast, was unreasonable. The court is wary to say that the speed was excessive without more evidence. The court therefore finds the *Maersk Idaho* did not violate Rule 6.

Because the court has found the defendants committed no negligence on June 7, it is not necessary to determine whether either Chief Reed or Jana acted negligently. Nevertheless, the court notes that had it reached that question, it would have found neither that Chief Reed was impaired on June 7 nor that Jana's conduct had anything to do with his death.

### B.   Remaining Counts

The plaintiffs' remaining counts—wrongful death, survival, and bystander—fail as a matter of law because the evidence preponderates against finding that the defendants were negligent or that they violated 33 C.F.R. § 164.11 or Rule 5 or 6 of the Inland Navigation Rules.

## IV.   Sanctions

The plaintiffs have moved for sanctions against the defendants (1) for misrepresenting to the court of the availability of Captain Maher to testify on the fourth day of trial, and (2) for failing to timely produce during discovery a video Captain Maher took of the *Maersk Idaho*'s wake in the Houston Ship Channel. Dkts. 212 at 80–84; 216 at 41–46; 218 at 1–2.

The plaintiffs rested their case-in-chief on the morning of Thursday, May 20—the fourth day of trial. Dkt. 206 at 58: 17–18. The defendants informed the court that they had no witnesses available that afternoon, but they could commence the presentation of their defense the next morning. *Id.* at 58:25–59:2. In fact, it was later dramatically revealed during the cross examination of the defense's first witness, Captain Maher, that he was in Galveston and available to testify on the afternoon of May 20. Instead, he spent that afternoon at The Tremont House hotel—about four blocks from

the federal courthouse—being woodshedded by one of the defendants' lawyers. Dkt. 207 at 111–13. The court was not pleased.[3]

In addition to defense counsel misrepresenting the availability of its witnesses, Captain Maher revealed during cross examination that on a voyage subsequent to June 7, he had taken a video of the *Maersk Idaho*'s wake in the Houston Ship Channel. Dkt. 207 at 122–24. Counsel for the Reeds were unaware of this video before Captain Maher's testimony at trial. After the video was belatedly produced to the plaintiffs during trial, and after their counsel had an opportunity to review it, they asked that it be excluded from the evidence to be considered at trial. The court granted that request and prohibited the video's use in any way by the defense. *Id.* at 128.

Under Rule 37, the plaintiffs now ask: (1) that their contention be taken as true that the *Maersk Idaho*'s wake was 5–8 feet high at the time the Reeds' boat encountered it; (2) that the court disregard the testimony of Captain Maher regarding the wake height of the *Maersk Idaho* on June 7; and (3) that the court adversely infer that the video recording of the *Maersk Idaho*'s wake is harmful to the defendants' case.

---

[3] "I'm a pretty accommodating guy. It could be that, if you had said that, that I would have said that's fine. We could have talked. It could have been that plaintiffs' counsel would have agreed to it. Instead, I was left with the impression that there was nobody available and we were just stuck; and on an afternoon that I was planning on being in trial, we did nothing at all. You can understand that I'm a little upset about it?" Dkt. 207 at 125:22–126:5.

The court declines to grant the plaintiffs their requested relief. The court already excluded the video from evidence. Moreover, because the plaintiffs were afforded the opportunity to cross examine Captain Maher about the *Maersk Idaho*'s wake, neither a presumption that the plaintiffs' assertion of the wake's height is true nor an adverse inference is appropriate. *United States v. Heard*, 709 F.3d 413, 421 (5th Cir. 2013) ("An adverse inference is not appropriate when the witness is equally available to both parties."); *Premier Dealer Servs., Inc. v. Duhon*, No. CIV.A. 12-1498, 2013 WL 6150602, at *6 (E.D. La. Nov. 22, 2013) (finding there is "an insufficient foundation for an adverse inference" when a party has not been prejudiced).

Nevertheless, the court has determined that the delay caused by the defendants' misrepresentation of Captain Maher's availability to testify on the afternoon of May 20 warrants sanctions. Accordingly, although the defense has prevailed on the merits, the court will decline to award any taxable court costs to the defendants. *See Jensen v. Lawler*, 338 F. Supp. 2d 739, 744 (S.D. Tex. 2004) ("Pursuant to Rule 54(d)(1) of the Federal Rules of Civil Procedure, costs are to be awarded to the prevailing party as a matter of course, unless the court directs otherwise."). Moreover, the court understands that the parties have split the cost of the certified trial transcript. As a sanction for the defendant's conduct, the court will order the

defendants to reimburse the plaintiffs for their portion of the cost of the trial transcript. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991) (holding that the court's inherent power to sanction bad-faith conduct "extends to a full range of litigation abuses," including "delaying or disrupting the litigation") (quoting *Hutto v. Finley*, 437 U.S. 678, 689 n.14 (1978)). The total cost of the transcript was $5,294.16. Each side paid $2,647.08; the defendants are ordered to pay that amount to the plaintiffs.

\* \* \*

In sum, the court finds that the plaintiffs failed to prove by a preponderance of the evidence either that the defendants violated 33 C.F.R. § 164.11 or Rule 5 or 6 of the Inland Navigation Rules or were otherwise negligent, let alone that any negligent conduct by the defendants legally caused the occurrence that resulted in the drowning death of Chief Reed. Accordingly, the court concludes that the plaintiffs should take nothing by way of this action. The court further orders the defendants to pay the plaintiffs $2,647.08 in sanctions. Final judgment will be entered separately.

IT IS SO ORDERED.

Signed on Galveston Island this 5th day of January, 2023.

JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE